```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2    _____

 3    United States of America,    ) Criminal
                                   ) No. 1:21-cr-00158-KBJ
 4                    Plaintiff,   )
                                   )
 5    vs.                          ) Detention Hearing
                                   )
 6    Kyle Fitzsimons,             ) Washington, D.C.
                                   ) April 6, 2021
 7                    Defendant.   ) Time:  2:18 p.m.
      _____

 8
                 Transcript of Detention Hearing
 9                        Held Before
         The Honorable Magistrate Judge G. Michael Harvey
10                 United States Magistrate Judge

11    _____

                       A P P E A R A N C E S
12
      For the Plaintiff:        Brandon K. Regan
13                              DEPARTMENT OF JUSTICE
                                U.S. ATTORNEY'S OFFICE
14                              555 Fourth Street, Northwest
                                Washington, D.C. 20530
15
                                Puja Bhatia
16                              DEPARTMENT OF JUSTICE
                                U.S. ATTORNEY'S OFFICE
17                              555 Fourth Street, Northwest
                                Washington, D.C. 20530
18
      For the Defendant:        Gregory T. Hunter
19                              GREGORY T. HUNTER, ESQUIRE
                                2055 North 15th Street, Suite 302
20                              Arlington, Virginia 22201

21                              Joel W. Anders
                                1750 K Street, Northwest, Suite 700
22                              Washington, D.C. 20006

23    Also Present:            Da'Shanta' Valentine-Lewis, Pretrial
                               Services Agency.
24
      Proceedings reported by FTR Gold Electronic Recording Software.
25    _____
```

Transcribing Stenographic Court Reporter:
                        Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        United States Courthouse, Room 6509
                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
                        202-354-3118

1          P R O C E E D I N G S

2          THE COURT:  Good afternoon.  This is Judge Harvey.

3      Mr. Tran, please call the case.

4          THE COURTROOM DEPUTY:  Yes, Judge.  Give me one

5  moment.  The recording system is acting up.

6          Okay.  This is Case 21-cr-158, United States of

7  America v. Kyle Fitzsimons.  This is scheduled to be a

8  detention hearing held by video.

9          Would the parties please introduce themselves to the

10  Court, beginning with the government.

11          MR. REGAN:  Good afternoon, Your Honor.  This is

12  Brandon Regan on behalf of the United States.  Also on the line

13  are AUSA Puja Bhatia, AUSA Jodi Lazarus, for the United States

14  as well.

15          MR. HUNTER:  Good afternoon, Your Honor.  Greg Hunter

16  on behalf of Mr. Fitzsimons, who's present also by video and by

17  our consent.

18          THE COURT:  It's FITZ-SYM-ONS or FITZ-SIM-ONS?

19          THE DEFENDANT:  Your Honor, it's FITZ-SIM-ONS.

20          THE COURT:  FITZ-SIM-ONS.  Good enough.

21          MR. ANDERS:  And good afternoon, Your Honor.  I'm

22  Joel Anders joining as co-counsel with Mr. Hunter for the

23  defense.

24          THE PRETRIAL SERVICES OFFICER:  Good afternoon,

25  Your Honor.  Da'Shanta' Valentine-Lewis, Pretrial Services

1    Agency.

2            THE COURT:  All right.  This matter has been

3    scheduled for a detention hearing.

4        Mr. Hunter, did I just hear you consent on behalf of

5    your client to this proceeding occurring by video and not in

6    person pursuant to the CARES Act?

7            MR. HUNTER:  Yes, Your Honor.  We are grateful to all

8    of the staff with the marshals service and -- and the D.C. jail

9    and your court for making this possible.

10           THE COURT:  Okay.  As I hope the defense is aware, I

11   did issue an order earlier today, and the government has

12   responded to that order.  I had some question in my mind

13   between the defendant's charge in this case and a case that

14   I've scheduled for later this afternoon, which I thought looked

15   very similar -- the government's filing, very similar -- in

16   that both defendants are charged with violations of

17   18 U.S.C. 111.

18       What the government has clarified is that in this case,

19   Mr. Fitzsimons is charged with 111(a) and (b), and in the later

20   case -- that's the Lopatic case -- the government has only

21   charged that individual, Mr. Lopatic, with 111(a).  The

22   government's view is that because Mr. Fitzsimons is charged

23   with a violation of 111(b) that this -- his offense is a crime

24   of violence and, in their view, unquestionably so and that no

25   Court has ever held otherwise.

1          I'm going to ask the government a few questions about

2     that, but then I do want to present you with an opportunity to

3     respond.  And I'm happy to give you the possibility to respond

4     in writing, if you would so choose.  I don't mean to rush

5     things along, but I'll -- I'll ask that question of you,

6     Mr. Hunter, in a moment.

7          Let me just ask the government a question.  Government,

8     so he's been charged under (b) and he's been charged by

9     indictment -- is that correct -- Mr. Fitzsimons?

10              MR. REGAN:  That's correct, Your Honor.

11              THE COURT:  So what is the factual basis for the

12     charge under (b)?  My understanding under the statute is you've

13     got to use -- you know, has to be some proof of a weapon.  I --

14     I don't see that here.  I would assume the government is

15     pursuing the (b) charge because there was some physical injury

16     that was actually done by Mr. Fitzsimons in this case.  Is that

17     what the legal theory is?

18          I can't hear you.  You're muted, sir.

19              MR. REGAN:  That's correct, Your Honor.  For -- for

20     purposes of the detention hearing itself, that is the factual

21     basis.  There is no suggestion of use of a deadly or dangerous

22     weapon.  The government has alleged in the indictment use of

23     violent force that inflicted bodily injury on two separate

24     officers.

25              THE COURT:  Okay.  Well, I got it.  So that's the

1    point.  I just want to know what was the bodily injury.  I

2    don't believe there was a representation in the detention memo,

3    but I assume there's a factual basis for that assertion.

4    What -- what was the bodily injury that the government is

5    relying upon to prosecute Mr. Fitzsimons under U.S. --

6    18 U.S.C. 111(e)?

7              MR. REGAN:  Your Honor, in terms of the factual

8    basis, which, again, the government believes for the purposes

9    of a detention hearing, essentially there's two separate

10   officers that are assaulted by Mr. Fitzsimons in the lower west

11   barracks [sic], one of which he's grabbed and attempted to be

12   dragged into the crowd, and ultimately there's a large group of

13   people.  That officer falls on top of other officers' riot

14   shields and is injured.

15        Second officer, Mr. Fitzsimons actually reaches in

16   and lifts the gas mask up so it's not covering his face

17   anymore.  Individuals behind Mr. Fitzsimons are then spraying

18   what appears to be pepper spray or Mace that strikes the

19   officer in the face.

20        Both of those are -- are physical touchings using force

21   as required in 111(b).  We believe --

22             THE COURT:  Well, I think physical -- I think

23   physical force is -- is -- is required for any of the felonies

24   under 111.  To get him into (b), you need bodily injury.  And

25   so you just said that the first officer slipped and fell and

1   bodily -- there is bodily injury.  What was his bodily injury?

2   MR. REGAN:  Your Honor, the officer that -- that

3   slipped and fell was taken down to the ground and landed on his

4   shoulder and indicated following the investigation that he --

5   that that was the injury that he sustained, went down on top of

6   the riot shields.  There was a whole slew of riot shields on

7   the ground with a subsequent scrum thereafter that injured his

8   shoulder.

9   And then the other officer, like I indicated earlier,

10   was sprayed in the face with pepper spray after the defendant

11   lifted up the -- the gas mask during the -- his attempt to

12   engage with the officer.

13   THE COURT:  Okay.  Mr. Hunter, you -- you've heard

14   all of that.  I'm happy to hear your response to the legal

15   issues raised in government's filing, to -- to those -- the

16   facts, if you wish, and no -- no obligation to respond to the

17   facts if you choose not to.

18   MR. HUNTER:  Well --

19   THE COURT:  And I'm happy to allow you to do it in

20   writing.  I gave the government that chance, and -- and -- and

21   I didn't mean to deny you of it, especially if you believe that

22   even as alleged under (b) this may not be a crime of violence,

23   which would -- under the Supreme Court's jurisprudence, which

24   you know is in some sense a little counterintuitive for anyone

25   who may be listening, but, anyways, Mr. Hunter, your response.

1          MR. HUNTER:  You know, Your Honor, it's -- it's

2    amazing to me the journey we've taken as -- as lawyers in the

3    last several years since the Supreme Court had their finding in

4    *Johnson* on the crime of violence and residual cause in the

5    Armed Career Criminal Act and how that's rippled through

6    everything else --

7          THE COURT:  Yeah.

8          MR. HUNTER:  -- that we do.  And now we're how many

9    layers past that into -- -to 111(a) versus (b) and -- and the

10   Bail Reform Act.

11        I -- I am concerned any time I see these issues briefed

12   that precedents and -- and quotations from -- from cases that

13   came before, because those -- those cases, the jurisprudence,

14   the opinions in those cases are based on old law.

15        We're -- we're pursuing a moving target here when we

16   talk about crime of violence, but I think, Your Honor, that

17   your -- your concern was spot on.  To -- to get this into

18   subsection (b), they've got to prove that the defendant caused

19   a physical injury.  And even by the government's own argument

20   here on the one officer, they're saying that -- that the -- the

21   touching that Mr. Fitzsimons is accused of then led to a harm

22   by -- by other people in -- in a scrum.  And -- and that just

23   fails under basic concepts of proximate causation.

24        And much like the -- the second officer with the -- the

25   gas mask, we -- we have, you know, some evidence of touchings,

1   assuming that that's Mr. Fitzsimons -- and I just don't want to

2   concede any of those issues right now; but even taking the

3   government in -- in the light most favorable to them with these

4   touchings, that counterargument that -- you know, maybe he's

5   pushed from behind.  What's the intent of -- of the touching on

6   Mr. Fitzsimons' part is -- is problematic for furthering

7   111(b).

8        And, likewise, the physical injury that the government

9   needs to -- to prove, in both cases they're saying that that

10   physical injury was actually caused later, by -- by some

11   other -- other person, some other factor, and not the -- the

12   touching that -- that Mr. Fitzsimons is alleged to have engaged

13   in.

14        THE COURT:  Well, Mr. Hunter, here's my -- my, you

15   know, additional level of complexity here is that the grand

16   jury has indicted -- has indicted him for, you know, that

17   charge.  They heard the evidence, probably much like Mr. Regan

18   articulated it, and they decided that there was probable cause

19   there for causing of a physical injury.  You know, he -- he

20   represents that the one officer fell and -- and hurt his

21   shoulder.  I -- I don't know if the grand jury received more

22   detail and perhaps the jury one day will and will need to, if

23   you try to push beyond probable cause.

24        I hear you on the causation.  I did -- I didn't hear

25   that -- that the first officer was injured as part of the

1    scrum.  I heard that -- the allegation is your client caused

2    him to fall to the ground and he hurt his shoulder.  I -- I get

3    your point with respect to causation in the mask.  Your client

4    moved the mask, and someone else squirted the Mace which caused

5    the injury.  Nevertheless, there is an indictment and he has

6    been indicted for that charge.

7         So, again, I don't want to rush this.  If you want to

8    think about it, if you want to submit something tomorrow and

9    that's -- I can have this hearing tomorrow, if that's what you

10   wish to do, but, you know, absent, you know, such a filing --

11   and I'll certainly consider it, you know, I -- I think they

12   have an indictment.  It's -- it's to that charge.

13        I don't think -- you know, I think consistent with the

14   case law that's been out there and even the Supreme Court case

15   law, which is -- as you say, has caused quite a -- quite a

16   ripple effect throughout the law, that I don't have the basis

17   hearing from you right now to find at least for purposes of

18   this detention hearing that the government can't trigger a

19   detention hearing under the crime of violence given the

20   indictment in front of me and cases that have been interpreted

21   that charge consistent with the Supreme Court's recent

22   jurisprudence in this area.

23        Again, I don't want to rob you of an opportunity to dig

24   a little deeper, if you wish.  It's your choice.

25             MR. HUNTER:  Your Honor, my -- my concern -- and I

1    say this with all the respect in the world for the -- the

2    secrecy that the marshals and the -- the United States

3    Attorney's Office work on to -- to preserve for the grand jury,

4    but I guarantee that there was no judge there explaining the

5    finer points of -- of 18 11 -- I'm sorry -- 111(a) versus (b)

6    and -- and the -- the -- the effect of, you know, what injury

7    is not a crime of violence depending on recent rapidly changing

8    legal precedents.

9         That said, Your Honor, I -- I think that the -- the

10   argument here for the government has to be whether this charge,

11   you know, qualifies as the kind of crime of violence that

12   triggers this hearing.  Because otherwise they've got to

13   prove that Mr. Fitzsimons poses a -- a danger to his

14   community; a risk of flight; a risk of tampering with a -- a

15   juror or a -- a witness in this case which is hard for them to

16   do when he lives in Maine and the case is going to be tried in

17   Washington.

18        THE COURT:  I hear you.  You've made your record.

19   I'm not hearing you requesting any additional time to further

20   research this issue.  I think you would be on better ground if

21   there was just a complaint in front of me.  I'm not going to

22   peek behind the indictment and try to figure out what was

23   presented to the grand jury and what wasn't.  I'm sure this

24   will be an issue at trial when and if you get there -- the --

25   the sufficiency of the government's evidence with respect to

1    111(b).

2         But I -- I do find based on the indictment, based on the

3    case law, which has been provided to me by the -- the

4    government, that there is a crime of violence here.  And by

5    that I mean, the government has triggered its right to a --

6    a -- and your client's right to a full detention hearing and

7    I'm sure is -- and I can tell has -- based on the detention

8    memo I've already read, they're going to be arguing

9    dangerousness as -- as a result.

10        So with that, I'm going to go ahead and -- and

11   present -- allow the government to move forward.

12        Government, I have -- I did receive some exhibits.  I

13   must say, I did not look through them in detail.  I have no

14   video.  I don't know if you plan on showing me video.  I have

15   screenshots, and I have what looks to be slides from a

16   PowerPoint.  I assume you're about to show those to me.  I

17   encourage you to.  I have not, again, studied these -- these

18   slides.

19        I assume the defense has already received them as well.

20            MR. HUNTER:  Yes, Your Honor.

21            MS. BHATIA:  Yes, Your Honor.

22        So we don't plan on showing video at this time.  There

23   is one audio clip that's embedded in the PowerPoint that I hope

24   we'll have no issues in playing.

25            THE COURT:  I mean, I haven't heard it, so --

1          MS. BHATIA:  Okay.

2          THE COURT:  -- I hope you can play it for me, because

3     that was not -- if there was some way for me to play it in the

4     materials I received, I didn't figure it out.

5          MS. BHATIA:  No problem, Your Honor.  We'll -- we'll

6     try and play it right now.

7          So beginning, Your Honor, with obviously the standard

8     here, which under 3142(e) the Court must find that there are no

9     condition or combination of conditions which can effectively

10    assure the defendant's appearance or safety of the other

11    person -- of any other person or community, the Court will

12    obviously review the factors under 3142(g)(1) through (4).  So

13    in our presentation, we've actually outlined the factors (1)

14    through (4) and attached exhibits as to how the Court cannot

15    find there are -- that there is a condition or combination of

16    conditions that can assure either one of those factors under

17    3142(e).

18         So I'll actually begin with the nature and circumstances

19    of the offense charged, which obviously Your Honor is aware of,

20    but I will go ahead and share my screen, and hopefully this

21    will work.  Can you-all see the PowerPoint?  Okay.  Wonderful.

22         THE COURT:  Yeah, I can see it.

23         MS. BHATIA:  Okay.  So beginning with the nature and

24    circumstances of the offense charged and as Your Honor is

25    aware, the government is proceeding obviously on the crime of

1    violence theory, as well as the risk of flight; crime of

2    violence being under 3142(f)(1)(A) and risk of flight under

3    3142(f)(2)(A).

4         So under the nature and circumstances of the offense,

5    Your Honor, as Mr. Regan just talked about, we have two

6    offenses here with respect to two separate officers who were

7    injured.  In Exhibit 1, we have the pulling by Mr. Fitzsimons

8    of Detective P.N.'s mask.  Subsequent to this occurring,

9    Detective P.N. was sprayed in the face by another individual

10   behind Mr. Fitzsimons and, as a result, could not breathe, had

11   to actually be pulled back from this area of the lower west

12   terrace.

13        In addition, we have Mr. Fitzsimons -- and I believe

14   that this actually -- Exhibit 2 actually occurred just minutes

15   before Exhibit 1 with respect to Sergeant A.G.  This is where

16   Mr. Fitzsimons -- and if you can see in the red circle here,

17   there's actually a hand that's popping out.  That is actually

18   Mr. Fitzsimons' hand.  You can't actually see his face in

19   this -- in this still shot, but this was the time that

20   Sergeant A.G. was being pulled by the shoulder and being

21   dragged outside in an attempt by Mr. Fitzsimons to be pulled

22   out of the lower west terrace tunnel.

23        And subsequent to this is when Sergeant A.G. actually

24   slipped and fell on several of the shields and, as Mr. Regan

25   explained, was the time that he actually fell and hit his

1   shoulder.  As a result, Sergeant A.G. actually had to use his

2   baton several times on Mr. Fitzsimons to actually loosen his

3   grip on him and avoid actually being dragged out into the lower

4   west -- lower west terrace area outside of the tunnel.

5          In Exhibit 3, this shows actually a break in between the

6   acts of violence where Mr. Fitzsimons moves from, as you see in

7   Exhibit 1 and 2, the left portion the lower west terrace tunnel

8   to actually the middle portion of the tunnel where

9   Mr. Fitzsimons is seen with his butcher coat and the

10  inscription, and you can obviously see him displaying sort of a

11  determined face as though he is ready to charge at the officers

12  again.

13         And then in Exhibit 4, Mr. Fitzsimons actually does just

14  that, pulls towards the officers, lowers his shoulder, and

15  charges towards the officers in the middle portion of the lower

16  west terrace, again, undeterred from the prior baton strikes or

17  the attempts to try to prevent him from entering into the

18  tunnel.

19         And then, finally, we have in Exhibit 5, obviously the

20  bloodied face of Mr. Fitzsimons.  This was after he received

21  the baton strikes to his face but shows obviously this sort of

22  face of aggression and anger, even though officers were really

23  trying to stand their ground, hold their ground, to prevent

24  Mr. Fitzsimons from entering.  And obviously Mr. Fitzsimons

25  even in an injured state showed this sort of aggressive,

1     violent expression to -- to the camera.

2           So, Your Honor, then --

3           THE COURT:  Government, can I ask -- I -- I'm

4     confused by the timeline, and maybe it's because the pictures

5     were out of order.  What -- what is -- I understand this is

6     the -- I assume the last picture.  But are those first three

7     exhibits out of chronological order?

8           MS. BHATIA:  They are.  And I apologize, Your Honor.

9     So actually if -- and -- and -- and perhaps I should have

10    clarified.  Exhibit 1, as you can see on the time stamp happens

11    at around --

12          THE COURT:  Exhibit 2?

13          MS. BHATIA:  -- 4:11 p.m.  Sorry.  Exhibit 2.  I

14    apologize.  Actually happens at around 4:11 p.m.  And then

15    subsequently, I believe it's just a couple minutes later, is

16    when Mr. Fitzsimons assaults Detective P.N. in Exhibit 1.  So

17    it's actually Exhibit 2, then Exhibit 1.

18          And then after this happens on the left side of the

19    terrace, Mr. Fitzsimons then moves, as depicted in Exhibit 3,

20    towards the middle of the tunnel; where then, subsequent to him

21    appearing in the middle of the tunnel, he then lowers his

22    shoulder to battle with the officers again.

23          And then -- and then after that, after he's actually

24    pulled out of the tunnel, is where we see him outside in

25    Exhibit 5 with his bloodied face.  So, yes, I apologize that

1    they're slightly out of order, Your Honor.

2              THE COURT:  Okay.  Go right ahead.

3              MS. BHATIA:  Okay.  So the nature and the

4    circumstances of the offense as charged are obviously very

5    serious.  Mr. Fitzsimons, as I mentioned, undeterred by the

6    officers who were trying to stand their ground, makes

7    continuous attempts to try to get through the lower west

8    terrace.  He's not simply pulled into this area as he later

9    claims in interviews and statements that he makes.  It is a

10   clear attempt that by all means he's going to enter and breach

11   that police line to try to get past the officers.

12             In this case, Your Honor -- and under 3142(g)(2), the

13   weight of the evidence is also extremely strong against

14   Mr. Fitzsimons.  Not only do we have surveillance video and

15   body-worn camera capturing his actions, but we have

16   Mr. Fitzsimons' own words capturing what actually took place.

17             In Exhibit 6, we have an article that was written by the

18   *Rochester Voice* in which Mr. Fitzsimons himself is quoted as

19   saying if the republic was going to die that day, he wanted to

20   be there to witness it.  He himself states that a scrum of

21   people pushed him unwillingly forward into the police line,

22   but, again, as I mentioned, this is contradicted by the earlier

23   Exhibits 1 through 5 where Mr. Fitzsimons is -- is very clearly

24   willingly pushing himself onto the police officers.  And every

25   time he's sort of batted away by baton strikes, undeterred,

1    continues to make his attempted entrance into the lower west

2    terrace tunnel.

3          And the -- and Exhibit 6 also contains pictures that

4    Mr. Fitzsimons took of himself, including that picture that we

5    see in Exhibit 6 of Mr. Fitzsimons in the white butcher coat

6    with the inscription Kyle in purple on the left shoulder, he

7    willingly provided to the *Rochester Voice* documenting his

8    presence at the Capitol.

9          We then have in Exhibit 7, as part of the weight of the

10   evidence, a Lebanon Maine Truth Seekers post on Facebook that

11   was actually -- we don't know if it was posted by

12   Mr. Fitzsimons, but it is a note to individuals about

13   caravanning down from Maine to Washington, D.C.  And the end of

14   the note actually has Mr. Fitzsimons' name, as well as his

15   email address, listed as a point of contact in which he is

16   willing to be a driver if anyone wishes to hitch a ride or lead

17   a caravan of vehicles.

18         And he ends that note tellingly with, "If a call went

19   out for abled bodies, would there be an answer?"  Basically in

20   a plan to ask individuals if they're willing to join him in --

21   in his presence at the Capitol if there -- there was a call out

22   for individuals, would people be willing to collect at the

23   Capitol with him.

24         And then, finally, we have Exhibit 8, which is a picture

25   taken by Mr. Fitzsimons' phone that was obtained pursuant to a

1    lawfully obtained search warrant of Mr. Fitzsimons' phone where

2    he actually documents his bloodied butcher coat.  That also has

3    that same inscription of Kyle on the left-hand portion of -- of

4    his coat.

5         And this really shows that Mr. Fitzsimons -- and this

6    is -- this is not an exhibit that I attached, but in addition,

7    Mr. Fitzsimons called into a town -- town of Lebanon meeting

8    subsequent to being at the Capitol on January 6th.  And he

9    stated there that he was really there because if it were the

10   last day of the republic, he wanted to live it like he did

11   every day.  And he attributed President Trump's words to being

12   a lion leading an army of lambs through what -- throughout

13   there.

14        So rather than --

15             THE COURT:  When did he do that?

16             MS. BHATIA:  I'm -- I'm sorry?

17             THE COURT:  When -- when -- when did he make that

18   statement?

19             MS. BHATIA:  The town of Lebanon meeting, Your Honor,

20   I know was subsequent to him coming down to the Capitol.  I

21   can't remember if this was a day after or two days after, but

22   it was after the -- it was after his trip down to the -- down

23   to Washington, D.C.

24        And so rather than showing any sort of remorse or

25   showing any sense of understanding of the impact of his

1    actions, he, instead, touted what he did, you know, in multiple

2    forums, whether it was through written format by giving the

3    interview through the *Rochester Voice*, calling into the town of

4    Lebanon, or taking pictures to depict what he basically did.

5    This really weighs in favor of the government in terms of the

6    weight of the evidence being extremely strong here that he was,

7    in fact, the same person who committed those offenses on

8    January 6th.

9         And then the history and characteristics of the

10   defendant, as well as the nature and seriousness of the danger,

11   we're going to actually be combining factors (g)(3) and (g)(4)

12   into the next few slides here.  And here, Your Honor, before I

13   get into some of the exhibits, there was, in addition to

14   everything the government is going to present, a news story

15   that came out in Maine on January 23rd of a suspicious package

16   that was found in front of the Portland Museum of Art, and

17   Mr. Fitzsimons, by the police department, was actually

18   confirmed to be a person of interest.

19        Now, the government concedes that charges have not yet

20   been filed with respect to that case, but it does certainly

21   alert to the nature and seriousness of the danger to any person

22   or the community if Mr. Fitzsimons is released.  Basically what

23   was found in front of the Portland Museum of Art was a spray

24   painted message on the ground.  It spelled out -- bomb, but it

25   was actually spelled b-a-l-m.  And then it was a -- there

1    was -- there was some package that was placed that was made up

2    of tar and feathers surrounding a box.

3         And there was also an individual, an associate of

4    Mr. Fitzsimons, who actually told law enforcement that

5    Mr. Fitzsimons did talk about collecting tar and feathers and

6    having the intention to tar and feather members of the

7    Democratic party.  So even though Mr. Fitzsimons is not charged

8    in that offense, I certainly think it is relevant in terms of

9    the danger that he would pose to the community that he lives in

10   if he's released as shown by his subsequent actions on

11   January 23rd.

12        And then in Exhibit 9, Your Honor -- and let's hope that

13   this works.  This is the audio -- this is a voice mail that was

14   left by Mr. Fitzsimons to a congressional office on

15   December 20th, 2020, and I will just play that and we'll see

16   if -- if the volume works.

17             THE COURT:  I must say, I can't hear it.

18             MS. BHATIA:  You cannot hear it, Your Honor?

19             THE COURT:  No.  Can others hear that?

20             MR. HUNTER:  No, Your Honor.

21             MS. BHATIA:  I will try to see if I can increase the

22   volume, and maybe that will help.  Otherwise, I have a

23   transcription of what was said.  Hold on one second.

24        Is that any better, Your Honor?

25             THE COURT:  No.  It -- it's as if the audio is just

1   not connected.  It's --

2            MS. BHATIA:  I see.

3            THE COURT:  Mr. Hunter, can you hear that?

4            MR. HUNTER:  No, Your Honor, I cannot.

5            MS. BHATIA:  Okay.  I -- I apologize.  I have the

6   volume up, both on the message as well as on my computer, but

7   this -- I -- I listened to it a couple of times and transcribed

8   what was -- what was said on this.  But he's leaving a message

9   at a congressional office saying -- asking --

10           THE COURT:  I'm sorry, Counsel.  A congressional --

11  like a state congressional office?

12           MS. BHATIA:  No, a federal congressional office.

13           THE COURT:  Okay.

14           MS. BHATIA:  And asking if the member has the courage

15  to dispute what we all know is a garbage election.  He then

16  goes on to say, "Because I certainly have the courage to

17  object to my entire life going forward if this is done to me."

18  He then says, "I'll be in D.C. on the 6th," clearly stating

19  his intention to come down to the Capitol to contest the

20  election.

21           And, Your Honor, this is obviously quite disturbing in

22  terms of the words that were used by Mr. Fitzsimons, but it

23  actually follows a pattern of calls that were made and -- we

24  don't know if it's the same congressional office, but other

25  congressional offices got messages as well talking about

1   starting a war with China -- this was back in March of 2019 --

2   about his position against impeachment and giving it -- giving

3   it to her, meaning the -- the congressional woman, hard and

4   coming for her with respect to President Trump's impeachment.

5          And then another voice mail that was documented on --

6          THE COURT:  What was the date of that?

7          MS. BHATIA:  I'm sorry.  So that was on December 17th

8   regarding his position on impeachment and giving it to the

9   congressional person hard and coming for her.

10         THE COURT:  A federal congressperson?

11         MS. BHATIA:  A federal -- from what we understand, a

12  federal congressional member.

13         And then subsequently another federal -- federal

14  congressional member that he also called into on December 18th

15  saying that the Electoral College was corrupt and that this was

16  going to be civil war.

17         I actually think Mr. Regan might be able to play the

18  audio for us from Exhibit 9 because he can play it directly

19  from his desktop.  So I'll let him go ahead and do that.  Let

20  me see if I can stop sharing.

21         MR. REGAN:  Just a moment, Your Honor.

22         MS. BHATIA:  It seems like we can't quite get the

23  audio to quite work.  I'll go ahead and continue to share my

24  screen.

25         Your Honor, this -- this definitely shows a pattern of

1    behavior in which Mr. Fitzsimons on continuous occasions is

2    willing to display not just his dissatisfaction towards

3    congressional members and their decisions in their official

4    acts of duty but is threatening potentially violence in talking

5    about civil war and objecting to his entire life going forward

6    if this is done to him.  And, again, as I said, this is a

7    pattern of behavior.

8              In Exhibit 10 we have here a CNN article in which

9    Mr. Fitzsimons was documenting --

10             THE COURT:  When is it dated?

11             MS. BHATIA:  I'm sorry?

12             THE COURT:  When is it dated?

13             MS. BHATIA:  It is dated, Your Honor -- the article

14   is February 7th, 2021.  The hearing that Mr. Fitzsimons

15   actually appeared at was from May 10th, 2017.

16             And I believe that that was a -- a state legislative

17   meeting in which a bill was being considered to expand teaching

18   of English to immigrants.  And at that time Mr. Fitzsimons

19   stood at this public hearing and referred to the immigrants

20   that the bill was intended to help as being replacements.  He

21   talked about the places that he grew up in becoming

22   multicultural hellholes.  He talked about bringing in a third

23   new world and bringing in replacements and, again, talked

24   about --

25             Again, this -- this sort of racist xenophobic language

1    continued when he talked about seeing a man standing in front

2    of a poster that had some image of navigating the juvenile

3    criminal justice system.  Mr. Fitzsimons at this hearing said,

4    "What's wrong with your culture that you need to know that much

5    about how to teach your kids to stay out of jail?"

6         In addition, he referred to the state flag -- and I

7    don't know if this is the Maine official state flag -- but that

8    it had two white laborers on it, and -- and he basically told

9    the legislators who were in this hearing not to put those

10   laborers at the end of the line.  So, again, very troubling

11   language that displays how Mr. Fitzsimons would continue to act

12   and continue to pose a danger to the community if he were

13   released because, again, this is a pattern and behavior that he

14   has displayed.

15        And in this CNN article there is actually a reference to

16   a time in which Mr. Fitzsimons confronted a state legislator,

17   and this goes on to Exhibit 11 where -- where this -- this

18   article -- where this incident is discussed in further detail

19   where state Representative Michele Meyer was accosted by

20   Mr. Fitzsimons in, I believe, the spring of 2019.  We don't

21   have an exact date, but the article -- the article from the

22   *Bangor Daily News*, Exhibit 11, is dated February 11th, 2011.

23        But Representative Meyer recounts Mr. Fitzsimons

24   following her into the parking lot with his car and almost

25   cornering her with his car so that she couldn't actually leave

1    the parking lot and that Mr. Fitzsimons spoke of the Second

2    Amendment.  Again, sort of backed that language of a civil war.

3    He speculated that America was headed to a civil war over gun

4    rights.  And I think most telling is that Representative Meyer

5    just stayed calm and didn't confront Mr. Fitzsimons because she

6    just hoped he wouldn't shoot her in the face.

7        And I think if there is any quote that best encapsulates

8    the potential danger that Mr. Fitzsimons poses to the

9    community, I think it's just that; that a state representative

10   would be scared that a constituent would accost her and to the

11   point of potentially actually exhibiting violence and shooting

12   her in the face; is the exact reason why the Court should hold

13   Mr. Fitzsimons under the 3142(g) factors.

14       So, again, we have multiple acts of violence, not only

15   in the District of Columbia on January 6th, the threats of

16   violence to congressional offices, and also several incidents

17   in Maine itself that show that Mr. Fitzsimons if released would

18   be a danger to the community that he lives in, Your Honor.

19       And it's for those reasons that the government argues

20   that there's just simply in this case no condition or

21   combinations that could assure either his appearance or, most

22   importantly, the safety of the community in which

23   Mr. Fitzsimons would be reentering upon his release.

24           THE COURT:  Okay.  Thank you.

25       Mr. Hunter.

1          MR. HUNTER:  Thank you, Your Honor.

2          It's -- it's concerning to me as -- as a -- as a

3     litigator here defending these -- these charges, even in terms

4     of a detention hearing where we're talking about the way these

5     charges and their nature impacts a decision under the -- the

6     Bail Reform Act.  The government chose to represent their --

7     their evidence with still photos, and -- and that was a choice

8     they made because they -- they said that they have the video,

9     but then they represent that -- that the videos would -- would

10    clearly show you something, which is exactly the element that

11    they need to show you to make their case on -- on intent as

12    opposed to Mr. Fitzsimons possibly being pushed from behind by

13    the pulse of the crowd and -- and other -- other cues that they

14    say clearly show his intent to -- to break these specific laws.

15          THE COURT:  Mr. Hunter, I do want to make sure.  Have

16    you been -- have they produced the videos to you?

17          MR. HUNTER:  They have not, Your Honor.

18          THE COURT:  They have not.  All you have are the

19    still photos?

20          MR. HUNTER:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. HUNTER:  I mean, I -- I take them at their word

23    that this is what's going to be shown, but we're here in court,

24    I guess in a way, by Zoom and this is what they've chosen to

25    bring.

1      I'm -- I'm -- as a defense lawyer, Your Honor, I've

2 always known I -- I don't get that -- that -- the benefit of

3 the doubt from the Court.  It's not what I've got for evidence.

4 It's what I've got and I bring with me to the Court.  They --

5 they showed us one picture to say that he's got this determined

6 look that would prove something.  Determined looks are not a

7 crime.

8      They introduced this newspaper article where

9 Mr. Fitzsimons gives his account without video, that they --

10 they've not produced here or -- or to me, his accounts of --

11 of -- a pretty reasonable account of what happened where he

12 says he was there and he was -- was -- was at the front of the

13 crowd and pushed -- pushed back and forth and that he wanted to

14 be there as a witness to what might be the last day of the

15 republic, not a participant, not someone who was looking to --

16 to crush the government or -- or -- or rebel against the

17 government, but that he wanted to be there to see it.

18      They -- they bring up this -- this internet posting from

19 the Lebanon Maine Truth Seekers -- Lebanon, Maine, is a pretty

20 small place, Your Honor.  It is rural Maine -- and someone

21 who -- who may or may not be Mr. Fitzsimons, asking if others

22 would join, but there's no call in there of violence or

23 lawlessness.  There's no proof that anyone read it until the

24 FBI was looking for it.  And -- and -- and there's nothing as

25 to the nature of the Lebanon Maine Truth Seekers as opposed to,

1    say, the Proud Boys or -- or one of the other known

2    insurrectionist groups that's -- that's engaged in violence.

3          You know, if he's proud of what he did and what he was

4    there for that day, what if he was -- really was pushed?

5    What if he really was sandwiched between the front of the crowd

6    and the police officers trying to -- to -- to defend

7    themselves?

8          This account of a suspicious package on the street in

9    Portland, Maine, with the -- the -- the balm, b-a-l-m, and the

10   feathers, that he's possibly a person of interest, he hasn't

11   been charged in that crime, Your Honor.  We have no idea what

12   the government's interest in -- in Portland, Maine, is.  In

13   talking to him, he might be a witness.  He might know somebody

14   else involved with it.

15         The -- they couldn't play the call.  I will give the

16   benefit of the doubt on that, Your Honor.  These IT issues

17   are -- are difficult, but it is a call that I have heard.  And

18   at no point in that call does he say anything about committing

19   any violence or threatening the member of Congress or

20   threatening a member of Congress' staff.  He -- he's angry

21   about the election, but that's an opinion -- opinion he's

22   allowed to have.  He's allowed to contest the election.  He's

23   allowed to be against impeachment.  More than a hundred members

24   of Congress contested the election, Your Honor.

25         A -- a majority of the Senate failed to -- well, I guess

1    not a majority of the Senate.  But the -- the Senate was unable

2    to -- to impeach, and it was a -- the impeachment vote that

3    the -- one of these phone calls is talking about is -- is the

4    2020 -- early 2020 impeachment, the pre-COVID impeachment of --

5    of President Trump.

6         And -- and, once again there, Your Honor, there were

7    over 200 members of Congress and -- and, what, 49 members of

8    the Senate who -- who thought that that was just fine; which

9    none of us have to agree with, but we -- we do have to

10   understand as officers of the court, that's a political opinion

11   that people are willing to have.

12        As for his -- his dangerousness to -- to his -- his

13   community in Maine, statutorily we're talking about his --

14   his -- his dangerousness to -- as someone who might do

15   something dangerous but also someone who might tamper with or

16   be -- be dangerous to a witness or a potential juror.  There

17   are no witnesses or potential jurors in this case in Lebanon,

18   Maine.  That -- that's just not an issue.

19        And -- and as for him being this menace to his -- to his

20   community, it's well known, his entire criminal record,

21   Your Honor, is a 2008 conviction for driving under the

22   influence of alcohol and -- and a -- a 2016 charge for having

23   an invalid registration on his motor vehicle.  There's no

24   indication that he ever failed to show up for court for that.

25   There's no indication that he ever failed to comply with the --

1     the orders of the courts in those cases.  There are no other

2     charges known to be against him at any time.

3          He's -- he's said some things in -- in town meetings

4     that people find to be offensive.  He's -- he's got very strong

5     opinions about political matters that would not -- would not be

6     in any way mainstream here in Washington, D.C., where we live,

7     but in -- in Lebanon, Maine, he -- he's -- he's allowed to have

8     those -- those opinions.  And even if we think they're --

9     they're offensive or other people think they're offensive,

10    that's not dangerous as a matter of law.

11         We're in a court where -- where Chief Judge Howell has

12    issued the -- the *Chrestman* opinion.  It's an enormously

13    helpful opinion to all of us, I think, about how we examine

14    these issues under the Bail Reform Act and pretrial release in

15    regards to those January 6th defendants.  And there's no proof

16    here that -- unlike in Mr. Chrestman's case -- that

17    Mr. Fitzsimons ever held a weapon; participated in

18    coordination, planning, or communication with others before the

19    riot; communication or planning or -- or incitement,

20    encouragement of others during the riot; anything for escape

21    and evasion after the riot.  He -- he didn't destroy the

22    evidence.  He -- he didn't tamper with anything.  He -- he

23    never possessed a weapon.  He never assumed a -- a leadership

24    position.

25         His entire record, Your Honor, is a DUI.  If -- if we

1    were here on -- on sentencing, the -- the one mechanism we have

2    in the federal courts for assessing one defendant's prior

3    contact with the criminal justice system versus another is in

4    the federal sentencing guidelines.  And as I wrote in my -- my

5    paper, he's a Criminal History I.  He's among the -- the least

6    dangerous, least criminally culpable defendants that we ever

7    examined in our system.

8         Your Honor, we've -- I think we've presented a -- a

9    compelling case for why Mr. Fitzsimons is -- is not a danger to

10   his own community.  There's no -- no evidence shown that

11   he's -- that he's ever failed to appear for court or -- or that

12   he's a risk of flight in any way.

13        We are prepared to present two separate plans for a

14   third-party custodianship; one with family in New Jersey where

15   his grandmother lives.  He'd be living with his aunt and close

16   to a United States probation office, but also many hours closer

17   here to Washington, D.C., for -- for future court appearances,

18   and -- and caring for his elderly grandmother and otherwise

19   involved in the family in that way, perhaps with GPS

20   monitoring.

21        Lebanon, Maine, is more difficult.  It's a rural area.

22   It's -- it's a fair distance from Portland, Maine, and the --

23   the nearest United States probation office, but if -- if

24   Mr. Fitzsimons was ever a danger of -- of nonappearance,

25   noncompliance, dangerousness to his community, there's --

 1     there's certainly no record of that ever happening.

 2               THE COURT:  Okay.  Thank you.

 3          Pretrial, what -- what is your recommendation in this

 4     case?

 5          Ms. Valentine-Lewis, if you're speaking, I can't hear

 6     you.  You're muted.

 7               THE PRETRIAL SERVICES OFFICER:  I'm sorry,

 8     Your Honor.

 9          No combination of conditions can reasonably assure the

10     defendant's appearance or the safety to the community.

11               THE COURT:  Government, do you want to have --

12     respond to any of the arguments made by Mr. Hunter?

13               MS. BHATIA:  Yes, Your Honor, I would.

14          Your Honor, I think the -- the *Chrestman* case, though

15     obviously not -- is -- is going to be factually slightly

16     different -- I think is -- is very analogous in terms of why

17     the Court there found that the defendant was a danger.  And I

18     think that's exhibited by the actions that were taken and the

19     coordination with other individuals and the intention shown by

20     the defendant to potentially cause further harm.

21          I think that the situation is extremely appropriate here

22     where Mr. Fitzsimons was planning to go down there and to take

23     on any individuals who'd be willing to come with him.  And

24     rather than sort of downplaying the actions subsequently, his

25     real intention is shown, I think, by -- by everything he says

1    and talks about, which is his intention was to go down there

2    and was to really exhibit as much violence as possible and --

3    and to stop this lawful process from taking place.

4        And I think the Court has to consider both his actions

5    before but also his actions after that show that that really

6    was his intention.  And the -- the violence that was exhibited

7    in the short period of time in the lower west tunnel really

8    encapsulates the dangerousness that Mr. Fitzsimons exhibited

9    that day.  And just -- just briefly to address some of

10   Mr. Hunter's points, which is that Mr. Fitzsimons only has two

11   convictions.  As pretrial services made clear, their position

12   is that there are no condition or combination of conditions of

13   release that would assure the safety of the community.

14       I will note in a pretrial services report in Maine -- in

15   Maine -- sorry -- dated February 10th, the pretrial services

16   report also stated that he had a risk of dangerousness, and

17   because of his unwillingness at that time to be interviewed,

18   detention was also recommended.

19       I will note that Mr. Fitzsimons, while he might have

20   alternative individuals to stay with, as the government

21   outlined in its detention memo, has text messages where the

22   individuals who would be closest to him are not necessarily

23   sources of support for him; where -- where his wife made clear

24   to him that if he decides to do what he's going to do, that's

25   sort of the -- the end of the line in terms of her support and

1    their daughter's support of Mr. Fitzsimons.

2         I will also note that Mr. Fitzsimons is no longer

3    employed as a butcher.  So in terms of the steadiness of income

4    and ties to the community, that's something that obviously

5    weighs against him when the Court determines release.

6         THE COURT:  So let me ask a few questions.  Are you

7    going to -- you're not playing the video; is that correct?

8         MS. BHATIA:  Your Honor, we can go ahead and play the

9    video.  I'm sorry that we hadn't embedded it before, and I --

10   I'm willing to go ahead and play the --

11        THE COURT:  Sure.  Has Mr. Hunter not seen the video?

12        MS. BHATIA:  Mr. Hunter has not seen the video.

13   We -- we obviously wanted to provide the video as soon as the

14   protective order was in place in this case, to -- to provide it

15   to him.

16        THE COURT:  Is there not a protective order in this

17   case yet?

18        MS. BHATIA:  There was one that was filed, but I

19   don't believe that a protective order was signed as of yet.

20        THE COURT:  Well, I have a few additional questions

21   for the government.  I -- I am not willing to have the

22   government just play a video that defense counsel hasn't even

23   seen yet.

24        There is -- this is -- for me it's a -- it's -- you

25   know, it's -- both sides have made good arguments, and I'm

1    going to want to think about this.  I have -- I want to study

2    these various exhibits, which I did not have an opportunity to

3    do prior to the hearing today.  So I'm going to, I'll tell you

4    right now, schedule this case for a continued detention

5    hearing.  I'll render my decision tomorrow afternoon.

6          Understanding that, you know, Government, you should

7    produce the video to Mr. Hunter, and I'll permit you to play it

8    tomorrow, but I want him to see it first.

9          Is this protective order, is it pending before this

10   Court, before the district court?

11         MS. BHATIA:  Your Honor, I believe it's in front of

12   the district court judge.

13         THE COURT:  Okay.  Well, I will instruct my law clerk

14   to reach out to -- who is it?  Who's the judge?

15         MR. HUNTER:  Jackson.

16         MS. BHATIA:  Yes.

17         THE COURT:  Amy Berman Jackson?

18         MR. HUNTER:  No.  Ketanji Brown Jackson, Judge.

19         THE COURT:  All right.  Well, reach out to

20   Judge Jackson's chambers to ask that they sign the protective

21   order, which I assume is a consent protective order,

22   Mr. Hunter?

23         MR. HUNTER:  Your Honor, I have a -- a form objection

24   to a very small part of it.  I -- I -- as an officer of this

25   court, I -- I applaud the government and the -- the court and

1    the -- the public defender system service for coming up with

2    this.

3         But I -- I -- I don't think that I can consent to the

4    time being excluded for my client for the government's

5    convenience when it was their choice to -- to prosecute 400

6    defendants at the same time.  I -- I -- I know I'm tilting at a

7    windmill here, Your Honor, but I -- I just have that one

8    objection as -- as -- as a form objection.

9         THE COURT:  Well, that's an objection to tolling of

10   time, not to the actual protective order itself.

11        MR. HUNTER:  Oh, no.  I have no issue with the

12   protective order, Your Honor.  I -- I'm incredibly grateful for

13   the government's willingness to -- to provide and -- and

14   produce evidence in this way.

15        THE COURT:  Okay.  Well then, I want to have my

16   chambers reach out to Judge Jackson's chambers, and they will

17   do what they can to get that signed, you know, this evening.

18        Government, I want you to produce then that video to my

19   chambers and to Mr. Hunter so that we can both review it.  You

20   can play it on the public record tomorrow at the hearing, and

21   then I'll render my decision.  But I want to see it just as

22   soon as possible.

23        Mr. Hunter, I'll give you an opportunity to, you know,

24   make whatever argument you want to make based on the video at

25   the beginning of the hearing tomorrow.

1          MR. HUNTER:  Thank you, Judge.

2          THE COURT:  I have some additional questions, though.

3  Government, are you -- you're not saying that Mr. Fitzsimons is

4  a member of, you know, any of these -- the Three Percenters,

5  the Proud Boys, any other, you know, radical anti-establishment

6  organizations; is that correct, Government?

7          MS. BHATIA:  We -- we don't have evidence at this

8  time, Your Honor, that he's part of any of those groups.

9          THE COURT:  Okay.  What about his arrest?  Was

10 there -- did he evade arrest?  What were the circumstances of

11 his arrest?

12         MS. BHATIA:  Your Honor, from what I understand, law

13 enforcement up in Maine were able to contact Mr. Fitzsimons

14 while he was at his residence and he was -- they were able to

15 successfully arrest him without any efforts to try and avoid

16 detention by -- by the officers.  So I don't think --

17         THE COURT:  And do you have any evidence of

18 destruction of evidence in this case?

19         MS. BHATIA:  No, we do not, Your Honor.

20         THE COURT:  And you're not alleging that he possessed

21 weapons on that day; is that correct?

22         MS. BHATIA:  That is correct.  I will say,

23 Your Honor, in the pictures he does have an unstrung bow that

24 he carries with him that are part of the pictures that -- that

25 are then captured later by the *Rochester Voice*, but the

1   government is not alleging that he used that unstrung bow on

2   that day.

3          THE COURT:  I mean, the whole chronology as presented

4   here has been very confusing to me.  You know, I -- I was

5   unaware that he -- if what you're saying now, he had an

6   unstrung bow on January 6th.  I thought he had it in some later

7   discussion with one of the other news organizations.  You're

8   saying that he had an unstrung bow?

9          MS. BHATIA:  Yes.  That's correct, Your Honor.

10          THE COURT:  Okay.  That wasn't clear to me before.

11   In any event, I mean, it is an unstrung bow.  I don't know what

12   you can do with an unstrung bow.  Are you saying that that was

13   a weapon?

14          MS. BHATIA:  We -- we aren't alleging that,

15   Your Honor, and we certainly didn't charge that subsequent to

16   111(b).  That was not our theory that we proceeded on.

17          THE COURT:  Do you have any evidence that he attacked

18   anyone with the bow?

19          MS. BHATIA:  No, Your Honor.

20          THE COURT:  Mr. Hunter also said that there's no

21   evidence here that he incited anyone during the riot.  Would

22   you agree with that?

23          MS. BHATIA:  Your Honor, at this point we don't have

24   any evidence of words that were used by Mr. Fitzsimons, but I

25   will say his actions certainly did so, especially with respect

1    to Detective P.N., when he pulled Detective P.N.'s gas mask,

2    allowing another individual to spray the officer.  I think

3    that's sort of an -- an exhibition of inciting violence towards

4    the officer.

5              THE COURT:  Okay.  Mr. Hunter, quick question for

6    you.  Is Mr. Fitzsimons -- is he employed or not?

7              MR. HUNTER:  Your Honor, I hit the mute the wrong

8    way.

9         Mr. Fitzsimons is -- is self-employed.  He has a

10   business as a -- a butcher tending to a lot of the farms in the

11   area, helping people to butcher the -- the pigs and -- and

12   cattle and -- and geese and ducks that they -- that they raise

13   there on their farms in the countryside.

14        He has been employed with -- with a -- a local grocery

15   chain.  My understanding, speaking with -- with family and --

16   and others in Lebanon, Maine, is that that company likes him.

17   He -- he certainly, you know, is welcome to -- to come back

18   and -- and to cut meat for them, but we also have another

19   alternative plan where he would be employed in -- in -- in

20   New Jersey.

21             THE COURT:  Would he have a job in New Jersey too?

22             MR. HUNTER:  Yes, Your Honor.

23             THE COURT:  I'm sorry.  Doing what?

24             MR. HUNTER:  In addition to full-time elder care for

25   a 90-plus-year-old woman, the --

1          THE COURT:  A relative?

2          MR. HUNTER:  Yes, it's his grandmother.  And -- and

3    they -- they are paying other elder care now and would replace

4    that with Mr. Fitzsimons, which in -- in many ways is -- is a

5    blessing, but it's also maybe not a temporary situation given

6    the -- the length of time we may be waiting for these cases

7    to -- to -- to filter out.

8          But also there are -- there's work that he could do

9    for -- for grocery stores there.  I -- I will tell you my -- I

10   know this because my -- my sister is a manager with the Harris

11   Teeter chain.  If you can cut meat, there's always a job for

12   you.

13         THE COURT:  Okay.  All right then.  So let's go ahead

14   and -- and schedule a continual -- a continued detention

15   hearing for tomorrow.  It will be remote, of course.

16         Mr. Tran, the -- the hearing that I have, the detention

17   hearing at 3 o'clock tomorrow, is that a Capitol case?  I don't

18   think so.  No, it is not.  I recall now.

19         So let's schedule this for a continued detention hearing

20   at 3:30 tomorrow afternoon.

21         MS. BHATIA:  Your Honor, I actually have another

22   matter set for 3:45 in another Capitol riot case.

23         THE COURT:  What kind of case is that?  What kind

24   of -- is it a status hearing?  Is it a detention hearing?

25         MS. BHATIA:  It is a status hearing, Your Honor.

1          THE COURT:  Okay.  Well, we can schedule this at 4:30

2     then.

3          MS. BHATIA:  That would be fine.

4          THE COURTROOM DEPUTY:  Judge, if I may, I believe all

5     of your 1:00 p.m.s for the day should be continued.  Might I

6     recommend 2 o'clock.

7          THE COURT:  Oh.  Well, I have got six.  Do you think

8     they're all going to be continued?

9          THE COURTROOM DEPUTY:  Yes, the overwhelming

10    majority.  You might have one or two, but it looks like

11    everything else is going to be continued.

12         THE COURT:  All right.  Well, 2:30 then.

13         MR. HUNTER:  2:30 is fine with us.

14         MS. BHATIA:  That's fine, Your Honor.

15         THE COURT:  All right then.  Let's schedule this for

16    2:30 tomorrow.  Let's get that video to us this evening.

17         MS. BHATIA:  Yes, Your Honor.

18         THE COURT:  All right.  Mr. Fitzsimons, we'll see you

19    back here -- 2:30 tomorrow -- for a continued detention

20    hearing.

21         The parties are excused.

22              (The proceedings concluded at 3:26 p.m.)

23

24

25

1       <u>CERTIFICATE</u>

2              I do hereby certify that the foregoing is a true,

3       correct, and complete transcript of the audio-recorded

4       proceedings in this matter, audio recorded on April 6, 2021,

5       and transcribed from the audio recording to the best of my

6       ability, and that said transcript has been compared with the

7       audio recording.

8              Dated this 16th day of April, 2021.

9

10                               /s/ Nancy J. Meyer
                                 Nancy J. Meyer, Official Court Reporter
11                               Registered Diplomate Reporter
                                 Certified Realtime Reporter
12                               United States Courthouse, Room 6509
                                 333 Constitution Avenue Northwest
13                               Washington, DC 20001
                                 202-354-3118
14                               nancy_meyer@dcd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25