IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

United States of America,       )  Criminal
                                 )  No. 1:21-cr-00158-KBJ
                 Plaintiff,      )
                                 )  **Detention Hearing,**
    vs.                          )  **continued**
                                 )
Kyle Fitzsimons,                 )  Washington, D.C.
                                 )  April 7, 2021
                 Defendant.      )  Time:  3:25 p.m.
_____

Transcript of **Detention Hearing, continued**
Held Before
The Honorable Magistrate Judge G. Michael Harvey
United States Magistrate Judge
_____

A P P E A R A N C E S

For the Plaintiff:         **Brandon K. Regan**
                           DEPARTMENT OF JUSTICE
                           U.S. ATTORNEY'S OFFICE
                           555 Fourth Street, Northwest
                           Washington, D.C. 20530

                           **Puja Bhatia**
                           DEPARTMENT OF JUSTICE
                           U.S. ATTORNEY'S OFFICE
                           555 Fourth Street, Northwest
                           Washington, D.C. 20530

For the Defendant:         **Gregory T. Hunter**
                           GREGORY T. HUNTER, ESQUIRE
                           2055 North 15th Street, Suite 302
                           Arlington, Virginia 22201

                           **Joel W. Anders**
                           1750 K Street, Northwest, Suite 700
                           Washington, D.C. 20006

Also Present:              **John Copes,** Pretrial Services Agency

Proceedings reported by FTR Gold Electronic Recording Software.
_____

Transcribing Stenographic Court Reporter:
                        Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        United States Courthouse, Room 6509
                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
                        202-354-3118

P R O C E E D I N G S

1          THE COURTROOM DEPUTY:  This is Case 21-cr-158,

2    United States of America v. Kyle Fitzsimons.  This is scheduled

3    to be a continued detention hearing held by video.

4          Will the parties please introduce themselves to the

5    Court, beginning with the government.

6          MS. BHATIA:  Good afternoon, Your Honor.  Puja Bhatia

7    for the United States, appearing via video Zoom.

8          MR. REGAN:  And Brandon Regan appearing via video

9    Zoom as well.

10         THE PRETRIAL SERVICES OFFICER:  Your Honor, John

11   Copes, pretrial services.

12         MR. HUNTER:  Good afternoon, Your Honor.  Greg Hunter

13   appearing on behalf of the defendant who is, again, present by

14   video and -- and at our express consent.

15         MR. ANDERS:  And good afternoon, Your Honor.  Joel

16   Anders, co-defense counsel, appearing by telephone.

17         THE COURT:  Mr. Fitzsimons, can you hear me?  I just

18   want to make sure your audio is working.

19         THE DEFENDANT:  Yes, Your Honor, it is.  Good

20   afternoon.

21         THE COURT:  Good afternoon.

22         So we're here for a continued detention hearing.  I did

23   request that the government provide both the Court and the

24   defense with the videos that they made reference to yesterday.

1   We -- we had seen screenshots up and to that point, and I have

2   been provided with what appears to me to be a -- a fixed

3   Capitol surveillance camera video and a second video which

4   appears to me to be the body-worn camera of one of the officers

5   who were in the police line that day.  I reviewed both of

6   those.

7          And I also received video -- it was about an hour and a

8   half long.  I watched about 15 minutes, when Mr. Fitzsimons was

9   talking.  It appears to be a video, as I understand it, of a

10  meeting of the Lebanon town meeting.  So I think it's the -- a

11  town that -- where he lives or is associated with, and they

12  were having a town meeting.  The video was marked January 7th.

13  I don't know the precise date.  But it's clear from

14  Mr. Fitzsimons' comments on the video it was soon after the

15  events at the Capitol.  So I've seen all those.

16         Mr. Hunter, I hope you have too.  I want to confirm that

17  you have and I want to hear if you want to make any argument

18  based on what you saw.  I want to give you the opportunity to

19  do that.

20         MR. HUNTER:  Your Honor, I -- I have received them,

21  and I -- I thank counsel for the government for making those --

22  those possible and for helping me with the -- with the IT

23  issues of -- of getting them to me.  They really are doing --

24  doing a heck of a job here making all of this possible.

25         Honestly, having seen the videos, Your Honor, it's --

1      it's -- it's clear from the -- both the fixed camera angle

2      video and the body cam video that Mr. Simons is present --

3      Mr. Fitzsimons is present and he's at the front of a crowd and

4      he finds himself between the police and -- and the front of the

5      crowd.

6             And as he's reaching his hands out to steady himself as

7      he's being pushed from behind, is he slipping on the -- the --

8      the same police shields that -- that are, you know, on the

9      ground and -- and that the police fell on?  Or is he reaching

10     at a police officer to -- to grab their -- their gas mask or

11     their shoulder?

12            You know, he -- he -- at one point he beat feets out of

13     there.  You know, he's been -- and we -- we know now that he's

14     been -- been clipped pretty good over the head and -- and blood

15     all over and that's why the -- the blood on the jacket, but as

16     far as showing any -- any intent, I -- I don't know if audio

17     would -- would be helpful.  I don't know if there are other

18     camera angles that show more, but that -- that's a -- that's an

19     awful lot of intent to -- to read into -- into what we've been

20     presented by the government.

21            THE COURT:  Okay.  Government, any response?  Do you

22     want to make any response?

23            MS. BHATIA:  Yes, Your Honor.  And I think Your Honor

24     mentioned the body-worn camera video, the CCTV footage, the

25     town of Lebanon meeting.  And I also provided the voice mail

1    that was left on, I believe, Congressman Golden's voice mail on

2    December 20th, 2020.

3                    THE COURT:  I did receive it and I have heard it.

4            Mr. Hunter, have you heard that too?  I want to make

5    sure --

6                    MR. HUNTER:  I -- I had actually heard that some time

7    ago, Your Honor.  And if -- if you want to argue about it, I --

8    he certainly sounds angry, but he's asking his congressman to

9    do the same thing that, what, 170 members of the GOP conference

10   and 49 senators did and -- and, you know, vote to -- to try and

11   overturn the election.  He -- he's angry, but he's -- he's not

12   doing anything in that phone call that -- that, you know,

13   almost half of Congress did.

14                   MS. BHATIA:  So, Your Honor, just to clarify some of

15   the statements, some of the representations that Mr. Hunter

16   made about the video.

17           So Mr. Hunter said, you know, it's unclear whether

18   Mr. Fitzsimons is really steadying himself on the slippery riot

19   shields or whether he's actually reaching -- reaching for the

20   officer's gas mask.  I just want to make very clear for the

21   record -- and I also want to clarify for my own purposes

22   because I may have switched some of the timelines.  So I just

23   want to be very clear as to the sequence of events.

24           But on the -- on the body-worn camera that we see from

25   the officer, Mr. Fitzsimons actually starts with reaching for

1    an officer in the high visibility jackets, the -- the green

2    jackets.  That's Detective P.N.  And at that point is when, a

3    few seconds later, I believe, at 16:11:35, he's beaten down by

4    a baton.  And then you see Sergeant A.G., who's down on the

5    ground, with Mr. Fitzsimons' hand still on his arm.

6         So I just want to be extremely clear that Mr. Fitzsimons

7    is not trying to steady himself on these shields.  He is

8    purposefully reaching back into the tunnel, grabbing at the

9    officers, undeterred from any strikes that he receives, in an

10   attempt to continue to violently hurt the officers.  He then,

11   after all of that, steadies himself and then reappears in the

12   middle of the tunnel, which we see both on the CCTV footage as

13   well as on the body-worn camera.

14        He positions himself right in the middle of the tunnel

15   after all that activity happens on the left side of the tunnel

16   and then charges at the officers -- and I think the time stamp

17   on the body-worn camera is 16:12:40 -- and pushes against them

18   by lowering his head and pushing through -- through the line of

19   officers with his shoulder.

20        This is not an act of a person who is trying to steady

21   himself.  This is an act of a person who is relentless in

22   trying to break a police line and continue his violence and who

23   is undeterred by any of these -- these actions.

24        And, again, a lot of that is repeated through the CCTV

25   footage that we see from a slightly higher angle.  And, in

1    fact, what we see at the end of the CCTV footage -- I think

2    it's right around 1:46 -- is that when he charges with his head

3    and his body down, right before he's seen exiting out of the

4    tunnel, he's wildly throwing his arms up and down at the

5    officers all around before he finally exits the tunnel at

6    around 1:51 on that CCTV footage.  Therefore, even more

7    evidence.

8         Now, Mr. Fitzsimons was not simply trying to steady

9    himself or trying to get people off of him.  He was trying to

10   exert as much violence, as much aggression as he could before

11   he was finally, essentially, kicked out of the tunnel or chose

12   to give up at that point and exit the -- the tunnel.

13        And, again, I think the actions -- I think his words

14   speak very clearly.  Mr. Hunter thinks that this is sort of

15   dissatisfaction that Mr. Fitzsimons was exhibiting in the

16   comments that he made on the voice mail.  But I will say,

17   saying that, you know, I have the courage to object to my

18   entire life going forward if this is done to me is more than

19   just a constituent who's unhappy with election results.  It's

20   certainly the words of an individual who is really, really

21   willing to more than show his dissatisfaction, willing to come

22   down to D.C., and willing to basically do whatever is

23   necessary.  As he said before, this is going to be civil war.

24   And he's made his intention clear.

25        And then when he recounts the events at the town of

1    Lebanon meeting -- I don't want to obviously reiterate the

2    statements that I mentioned at yesterday's detention hearing,

3    but, again, you know, I -- even though he talks about this

4    being a peaceful revolution, he, again, talks about a lion

5    leading an army of lambs.  I mean, all of these words that were

6    used continuously throughout different medias, whether it's

7    public hearings, whether it's calling into the town of Lebanon

8    meeting, whether it's through the *Rochester Voice*, it's very

9    clear that Mr. Fitzsimons wanted to not just disrupt the

10   election certification but was going to do so at any means

11   necessary.

12          THE COURT:  Okay.  Thank you.  Anything further,

13   Mr. Hunter?

14          MR. HUNTER:  The -- Your Honor, there -- there were

15   two things yesterday that we talked about, the words of the

16   defendant's wife and -- and the -- the pretrial services report

17   from Maine that I wanted to address.  I didn't know if you

18   wanted to do that --

19          (Indiscernible simultaneous cross-talk.)

20          THE COURT:  Under the rules, now is your time.  If

21   you want to make a record, do it.

22          MR. HUNTER:  I'm making the record.

23          The -- the government makes some allegations about

24   the -- the defendant not having a family support network and

25   uses evidence of that as a text message from the defendant's

1    wife.  And they misstate what it says, first of all.  And --

2    and I'm -- I'm -- I'm troubled -- I know it's their job to read

3    through all the messages, but it's -- it's snooping on a

4    marital conversation.  And then you -- you're using the

5    statement where the wife says:  If you don't make a change

6    after this trip, we're going to have problems and maybe you and

7    your daughter and -- and me are -- are going to be split up.

8         But that's -- you know, I -- I don't know anybody else's

9    marital status, but I -- I can't imagine having -- thinking it

10   would be fair in my life to have something from an argument

11   with my wife from three months ago being held up as -- as the

12   measure of our relationship status now.

13        As I said, Your Honor, we have other relatives happy to

14   act as -- as third-party custodians in multiple court districts

15   to hold them.  As to the main pretrial services report, it --

16   it says that he declined to be interviewed.  That's absolutely

17   true; and he declined to have his detention hearing at that

18   time.  And the reason being is for the exact thing that the

19   United States Attorney's Office says that they need this extra

20   time to -- to -- to prepare and -- and think about all these

21   cases for.

22        The advice to him from the -- the federal public

23   defender in Maine was have your one shot at detention in

24   Washington.  Let the marshals service transport you to

25   Washington and foot the bill for that.  But also every day that

1  goes by, the -- the decisions are going to be made more likely

2  from a position of -- of sober reflection and -- and not simply

3  from -- from the immediate aftermath anger.  And he didn't know

4  he'd be waiting 63 days to get the hearing, but that was a

5  decision he made.  And, quite frankly, Your Honor, that --

6  that's advice that I would give to any client in that same

7  situation.

8         So to -- to say that he -- he shouldn't get any support

9  from pretrial services because he -- he declined an interview

10  and -- and a detention hearing in Maine 63 days ago, I -- I

11  think, does a -- a disservice to him and -- and the -- the

12  actually smart legal advice that he got to -- to wait until he

13  was in this court and -- and give the government and -- and the

14  court a -- a chance to consider these cases from -- from sober

15  reflective positions, which, you know, the court in Maine

16  didn't have Chief Judge Howell's memorandum opinion in -- in

17  *Chrestman* at the time.

18         We -- we didn't have the benefit of -- of literally

19  hundreds of other cases being -- being brought forth to -- to

20  have an idea of -- of -- of what the most guilty -- most

21  culpable people are accused of doing and what the least

22  culpable people are accused of doing.

23         So I would -- would simply ask Your Honor that he -- he

24  be given the -- the chance as though he was just arrested the

25  other day and -- and, you know, without incident, without

1   evasion, not a member of a group like the Proud Boys, not

2   someone that there's any -- any evidence of or allegation that

3   he coordinated ahead of time or -- or assumed a position of

4   leadership or possessed a weapon.

5           And -- and with that, Your Honor, I think that he's --

6   he's a good candidate for pretrial release.

7           THE COURT:  Okay.  Well, thank you for all that.  And

8   thank you for the presentation from both sides in this case.  I

9   think it's been very good.

10          Mr. Fitzsimons, let me just start with the points that

11  your -- your -- your attorney made on your behalf, and he's

12  done an excellent job on your behalf to make all of his

13  points -- all of your points.  But I want to just say a few

14  things before I forget them.

15          You know, the -- the lack of responding to pretrial,

16  I -- that doesn't enter my calculus at all.  I do see that

17  time to time in cases based on advice of counsel that a

18  defendant makes that choice.  So I -- I don't take anything

19  from that.  You're not, in my book, required to say anything to

20  pretrial if you don't wish to.  And I'm not going to hold it

21  against you if you made that choice, especially on the advice

22  of counsel.

23          I actually think you received very good counsel by the

24  Maine federal public defender, if that's what they told you, to

25  wait 60 -- well, you probably didn't -- they didn't tell you to

1   wait 60 days; and that's unfortunate how long it took you to

2   get here.  And those are just issues outside of the Court's

3   control.  I -- the marshals service during the pandemic has

4   been struggling widely -- and even more so when we talk about

5   so many cases involved in this event, January 6th, at the

6   Capitol -- to get everyone here promptly.  And they -- they

7   have not.  They just cannot get the defendants here promptly,

8   and you know that better than anyone.

9        But, still, the advice was good.  The advice was good to

10  take some time, let the evidence develop, allow for civil

11  reflection, as Mr. Hunter's just indicated, allow for perhaps a

12  few more people to -- to proceed to these detention hearings

13  before you so the Court can start to draw some lines as to who

14  may be held, who's -- and who should not be held in this case.

15  And we -- we have done -- we've done that.

16       Chief Judge Howell has listed -- has issued her

17  *Chrestman* opinion.  Other district judges have as well.  We

18  also recently had guidance from the circuit in the *Munchel*

19  decision.  I'll talk about that, you know, decision here in a

20  moment.

21       But -- and -- and I also -- I've taken into

22  consideration all that Mr. Hunter has said, all the positive

23  attributes and the -- the distinguishing characteristics that

24  you have that does look different from some defendants who have

25  been held.  You know, you don't have -- you effectively have no

1    criminal record.  I think there's an unregistered vehicle issue

2    there, a DWI many number of years ago.

3         Effectively no criminal record that's going to impact on

4    my decision today, and it doesn't.  Nothing that I've seen in

5    your record impacts my detention decision here today.  So you

6    effectively have no criminal record.  You have no evidence of,

7    you know, failing to comply with conditions in the past.

8         With respect to January 6th, I think Mr. Hunter is

9    correct that you -- you know, you're not charged with using or

10   possessing a weapon.  I don't consider your unstrung bow to be

11   a weapon.  Symbolic in some way.  I don't understand the

12   symbolism, I must tell you.  In any event, I'm confident that

13   it was -- it was not being used or possessed as a weapon that

14   day.

15        You're not a member, to the Court's knowledge -- and the

16   government's presented no evidence -- of some -- one of these

17   more radical antigovernment militia groups, the Three

18   Percenters, the Oath Keepers, et cetera.

19        No real evidence that I can see of planning with respect

20   to violence that day.  Certainly planning to be there, planning

21   to protest, a few statements that you made that are open to

22   interpretation, but not like what we've seen in other cases

23   where the courts have emphasized that as being an issue.

24        People who've come with, you know, tactical equipment,

25   came to the Capitol with weapons, people for whom the

1    government does have clear evidence of, you know, calls to arms

2    and planning in anticipation of some sort of violence at the

3    Capitol.  I don't -- I don't see that here.  And so I -- I

4    think that is, you know -- is in your favor.  And as has been

5    pointed out to courts, those are some of the things that we,

6    you know, should be considering.

7          Also not listed is that you destroyed evidence, that you

8    tried to evade arrest.  I mean, I'll tell you right now, I

9    don't think you're a -- a risk of flight.  The government has

10   not really argued -- not strongly -- that you were, but I

11   certainly don't think there's any basis on what I've seen that

12   you're a risk of flight, and I -- I credit Mr. Hunter that

13   you've got family members who'd be willing to -- to take you

14   in, if -- perhaps your wife, and if not your wife, someone

15   else.  So, I mean, I considered all of that.

16         But there's another side to the coin as well.  And none

17   of the things that I have said and the cases that have said

18   that we should look at those factors have said that those are

19   the only factors that we should look at, or somehow that that's

20   a floor for detention; that -- that Chrestman and what he did

21   is -- is -- is the floor for detention.

22         Chief Judge Howell is very clear that these were just

23   factors that we should consider in any given case.  There might

24   be other factors to consider or some factors that we may

25   consider more than others.  It all just depends.  The *Munchel*

1    decision came out from the circuit recently and also gave

2    additional guidance.  *Munchel* and Chief Judge Howell and the

3    other judges that I can -- I'm aware that their decisions have

4    all had one class of case where it's been pretty consistent

5    with respect to detention decisions.

6        And unfortunately, sir, you fall within it, in my

7    judgment.  Those are individuals who were -- did engage in

8    forcible assault, you know, forcible entry into the Capitol and

9    physical assaults on law enforcement; a factor which

10   Judge Howell said is of grave concern and would -- would

11   mitigate strongly in favor of detention.  In the *Munchel* case

12   before the -- the circuit, again, all three judges -- there's

13   some dispute among the judges as to exactly how that -- the

14   method for resolving that case, but all three judges, I think,

15   also distinguished between what Mr. Munchel did and those who

16   were engaged in violence that day; Mr. Munchel and, I believe

17   it was, his mother.

18       You know, he did come with tactical equipment.  He had a

19   TASER, but he didn't use it.  For all of his bravado, he didn't

20   do anything.  He walked through the Capitol for 12 minutes and

21   left.  No one was assaulted.  There's no forcible entry.  No

22   property was destroyed.  And all of the judges in the *Munchel*

23   case indicated that that's a different class of case.  Those

24   individuals who's -- the *Munchel* court acknowledged who

25   would -- who would use violence to promote their beliefs are

1    of -- were a concern to those judges and concern to every other

2    judge on this court.

3         I have considered these other decisions, other district

4    court decisions.  I've looked at the one cited by Mr. Hunter.

5    I think I can fairly distinguish the Griffin case, the Couy

6    Griffin case, the Powell case.  Griffin case, there again,

7    there was no assault.  There was no forcible entry, no property

8    damage.  He certainly was inciting people, had some threatening

9    language, which was of concern, but, nevertheless, he was

10   released.

11        Ms. Powell, she did breach a window and used, like,

12   something that looked like a battering ram to do it, but she

13   didn't physically assault anyone.

14        I know of two cases where police officers were assaulted

15   and those defendants were granted release.  There might be

16   others.  It's hard to keep track of all of them.  I do have a

17   tracker trying to stay up to speed as to what other judges are

18   doing.  It's very important to me that individuals who are

19   engaged in similar conduct -- conduct are treated similarly,

20   especially with respect to a decision as important as this one,

21   detention, which is -- impacts the defendant's liberty.  I

22   think we have to.  The challenge for the judges on this court

23   is to be consistent.  So that's why I've looked at all of these

24   cases.

25        The two cases that I know of where the individuals

1   assaulted police officers, as you've been charged with doing,

2   and were released, I think, are different too from this case.

3   There was a Mr. Leffingwell.  He was one of the first people

4   who came in front of me.  He apparently did punch a police

5   officer, was inside the Capitol, was not trying to forcibly

6   enter into one of the entrances of the Capitol.  And as soon as

7   he punched the police officer, he turned and apologized.  He

8   was also a veteran who had some brain injury as a result of his

9   service.  There was suggestion of some sort of diminished

10  capacity.

11       There was also Emanuel Johnson or Jackson.  I always

12  forget his last name.  I actually held him.  What he did sounds

13  a lot like what the government alleges you did.  That he twice

14  attacked -- might have been the -- the lower west Terrence --

15  lower west terrace entrance too.  I don't know.  One of those

16  entrances -- entrances with the archway.  He attacked once with

17  his fist and, like, I don't know, an hour or few hours later he

18  came back and attacked again, this time with a baseball bat.

19  That concerned me greatly.  I -- I -- I held the man, the --

20       Judge Howell reversed me and released him, but because

21  he had mental health issues and an intellectual disability,

22  which she found he had diminished capacity, I guess, would be

23  the best way to characterize it that day.

24       And it's -- I've not seen any evidence of that with

25  respect to you.  We'll talk about your passionate beliefs in a

1    few minutes, but I'm not seeing evidence of diminished

2    capacity, not in a way that I think would be recognized by the

3    law.

4         So I do think you fall into a class of cases which

5    the -- this court has detained individuals, individuals

6    involved at the Capitol, who were engaged in violent assaults

7    on law enforcement.  That's not the only basis of which

8    I -- I -- I rest my decision.  I am going to -- to hold you in

9    this case, but it is certainly a very significant one and one

10   that I think puts you in -- as acknowledged by the circuit and,

11   I think, by Chief Judge Howell -- puts you in -- in a different

12   class, and a class which indicates to me, at the very least,

13   you do represent a danger to the community were you to be

14   released.

15        I did review the video, and I heard first -- I must tell

16   you, I heard first the statement that you made to the Lebanon

17   town meeting.  So I heard your description first.  I wanted to

18   do that.  I wanted to hear, you know, your view of it, and then

19   I watched.

20        Sir, I did not see what you described.  I understand

21   that I'm not the jury in this case.  I'm not even going to be

22   the judge who's going to handle this case after today.  So

23   ultimately this is just how I view the evidence.  You have the

24   presumption of innocence, and you will have Mr. Hunter by your

25   side, if you choose to go to trial, to attempt to show frame by

1    frame what -- what happened there that day; but I did view it,

2    and I viewed the videos a few times.

3         I did not see someone who was being pushed by the crowd

4    into the police, which is, you know, my interpretation at the

5    very least of what you were suggesting to the Lebanon town

6    meeting.  You indicated that you were sort of sucked into the

7    crowd, you cycled through to the front, you received a beating,

8    and you left.

9         One of those things is true.  You did receive a beating.

10   I did see that, but what was interest -- significant to me is

11   that you -- before that, what appeared to me is that you, you

12   know, lunged for the officer, you grabbed him, you pulled him,

13   and then when he did hit you with your [sic] baton any number

14   of times, you went to the ground, you got up, and you went

15   right back.  You lunged in again.

16        I saw -- you know, I -- I saw hits.  I saw, you know,

17   pulls.  I saw you -- you lunging your shoulder into the -- into

18   the -- the police line.  I saw aggressive, violent assaults

19   which, you know, unless my eyes are not to believe what it's

20   seeing, were voluntary movements made by you that day -- or

21   over about a minute and a half where there was a continual

22   series of -- of violent actions taken by you against that

23   police line.

24        And you face serious felonies now as a result; a

25   ten-count indictment, two counts of inflicting bodily injury on

1  police officers.  That's a 20-year offense.  A number of

2  counts, I believe, of civil disorder.  That's an 8-year

3  offense, and also corruptly impeding an official proceeding,

4  another 20-year offense.

5       So I -- I believe that those are significant felonies

6  that you face and also weigh in favor of your detention, both

7  because of how serious they are but also, again, because of the

8  danger represented by individuals who stand charged with having

9  committed those offenses.

10      So the first category, which is what we've been talking

11 about, the first factor the Court is supposed to consider in

12 making its detention determination is the nature and

13 circumstances of the offense.  I do find that that factor

14 weighs in favor, and, you know, I've done that after

15 considering the full circumstances of what I saw you do that

16 day, as well as other decisions made by the circuit by other

17 judges in this court as I attempt to evaluate my detention

18 decisions based on the full range of conduct that has been

19 charged that day.

20      With respect to the strength of the government's

21 evidence, which is the second factor I'm supposed to consider,

22 I think the government's got a very strong case.  Again, you

23 have the presumption of innocence.  Case law has indicated that

24 it's probably the least important factor for the Court to

25 consider, but, nevertheless, it's a factor that we're supposed

1    to consider.

2         I've seen both the stills but now the video, which I

3    think is pretty clear to me, about what you did that day and

4    what happened and also what didn't happen.  As I said, I saw

5    violent, assaultive conduct on your behalf against the various

6    law enforcement officers in that police line.

7         So it does appear to me that the government has a strong

8    case, a case not only that you committed this offense but also

9    strong in the sense that it, again, shows why you represent a

10   danger.  It's strong evidence of your own violence.  So I think

11   that factor points to your detention in this case.

12        With respect to the history and characteristics, I --

13   I've indicated there are a number of them which are in your

14   favor.  The most important of which is you don't have any prior

15   criminal record or any record of violating conditions of

16   release a court might set for you.  But I've also considered

17   this factor with what the government has shown with respect to

18   other activities you've been involved with, the calls to

19   Congress people in December, the interaction with that Maine

20   legislator in 2017.  So I have considered that in -- I mean,

21   you don't stand charged with threats.  I think the -- the

22   government here and in Maine have probably made the right

23   decision.

24        But your conduct, especially viewed through the lens of

25   what happened on January 6th, did strike me as -- as menacing,

1   intimidating.  The fact that it was directed against

2   legislators in -- presumably based on what you've said, you

3   know, in the service of your political beliefs, concerns me

4   because of what we saw on January 6th.  You're allowed to have

5   strongly held beliefs.  You're allowed to reach out to your

6   Congress people.  You're not allowed to threaten them, but

7   you're also not allowed to take violent action.

8        And what I see looking at the totality of the

9   circumstances here is someone who is -- has very passionately

10  held beliefs, perhaps abnormally so.  And what I mean by that

11  is it appears they can get the best of you.  If you lose

12  control, you can be violent.  You're to me like a bomb waiting

13  to go off.

14       It's always difficult for a magistrate judge making that

15  sort of prediction, someone who might engage in violence if I

16  were to release him.  It's made somewhat easier for me here

17  because the bomb did go off on December 6th -- on January 6th.

18  Excuse me.  That's what that video shows; someone who's willing

19  to engage in violence to promote his political beliefs.  The

20  First Amendment doesn't protect that, sir.

21       You've gone beyond any constitutional right that you

22  think you may have.  Let me tell you, it does not permit that.

23  And if the government can prove its case at trial, those

24  beliefs may have caused you to violate very serious federal

25  laws.

1      So I also consider all the other government's evidence

2   with respect to your political beliefs, the menacing conduct

3   that you've engaged in in the past directed towards political

4   leaders, of which January 6th was the most extreme example for

5   you.  So I think all of those facts also weigh in favor when I

6   consider your case as a whole of your detention.

7      I mean, the -- the wife, I -- I don't know what's going

8   on with your wife.  I -- I hope that whatever the issue is is

9   resolved, but for me, you know, I'm not -- I don't hold against

10  you that you somehow lack community ties.  I think you plainly

11  do and perhaps with her, but for me, it is yet another example

12  of where your beliefs have led and the damage they have done

13  and your -- frankly, your inability, apparently, to control

14  your beliefs and to moderate your behavior.

15     I note as well that I've not seen any record of remorse,

16  any record of taking a responsibility or acknowledgment that

17  you did anything wrong.  You don't ever have to do that, not at

18  this point, but other courts in this jurisdiction have looked

19  at that just in terms of while we are still in this political

20  moment -- and in my view we are.  Some suggestion in the

21  *Munchel* opinion by one of the judges that we are somehow beyond

22  the moment.  I don't agree with that.

23     But while we are in this moment, where the individuals

24  who were moved to violence on January 6th, have they shown

25  remorse for that or should the Court be concerned that in the

1    next protest you might do the same thing?  I would have that

2    concern.  I would not want to go to a protest where you were at

3    because of fear that violence might break out.  So I think it's

4    important the -- the no remorse, no backtracking.  I didn't

5    hear any of that in that audio from that Lebanon town meeting.

6    I heard someone who was just as passionate, if not even more

7    so, on January 7th as they were on the 6th.

8         So for all these same reasons, I do find that your

9    release would present a danger to the community and I would not

10   feel confident that I could structure conditions of release

11   that would fairly, reasonably assure the safety of the

12   community.  Again, sir, I don't think you're a flight risk.  I

13   deny the government's request to hold you for that reason, but

14   I will hold you because I believe there's clear and convincing

15   evidence as I look at the totality of this case, what you're

16   alleged to have done, the strength of the government's

17   evidence, and other cases from this jurisdiction involving

18   events on January 6th; that this is an appropriate case for

19   detention because of the danger your release would represent to

20   the community.

21        That's my decision.  I will be issuing a detention memo

22   shortly, which will put in writing the things I've said here

23   today.

24        Do we have a next date in this case?  Government?

25             MS. BHATIA:  Your Honor, I believe that the clerk had

1  mentioned a status hearing was set for April 22nd in front of

2  Judge Jackson.

3          THE COURTROOM DEPUTY:  Yes.  April 22nd at 11:00 a.m.

4  before Judge Ketanji Brown Jackson.

5          THE COURT:  April 22nd at 11:00 a.m. before

6  Judge Jackson.

7      Mr. Fitzsimons, I'll tell you, you -- you have the right

8  to, you know, appeal my decision.  I'm not the last word on

9  your detention.  So you'll be in front of Judge Jackson here in

10  a few weeks, and Mr. Hunter can advise you on whether or not

11  that's something you should do and how that's done.  So you do

12  have a right to appeal your -- your detention decision that

13  I've just made.  And that would be directed towards

14  Judge Jackson.

15      The next date in this case will be before her on -- I'm

16  sorry -- April the --

17          MS. BHATIA:  22nd.

18          THE COURT:  April the 22nd.  This will be your last

19  stop before a magistrate judge, Mr. Fitzsimons.  It will be

20  Judge Jackson who will handle the case going forward and who

21  will be the judge for your trial, if you go to trial.

22      Any further requests from the government?

23          MS. BHATIA:  Yes, Your Honor.  So I believe looking

24  at the -- the docket entries, Judge Faruqui ruled under the

25  Speedy Trial Act to exclude the time up until the last hearing,

1    which I believe was March 29th.  We are asking that any time --

2    I'm sorry.  Up until the detention hearing yesterday set on

3    April 6th.  So we're asking for a similar exclusion of time

4    from April 6th through April 22nd under the Speedy Trial Act.

5              THE COURT:  For what purpose?

6              MS. BHATIA:  Yes, Your Honor.  So obviously the

7    Chief Judge's standing order, but also that the interests of

8    justice outweigh the interests of the defendant, obviously this

9    being part of a set of complex cases in which there is

10   voluminous discovery, which we are going to attempt to start

11   providing to Mr. Hunter immediately.  But for those reasons,

12   Your Honor, we ask for the exclusion of time.

13             THE COURT:  Mr. Hunter?

14             MR. HUNTER:  Your Honor, I -- I'm -- I'm -- I'm aware

15   of the challenges facing the government here, and as an officer

16   of this court, I know it's incumbent on me to -- to do what I

17   can do to -- to help all of us to -- to get through this

18   unprecedented number of cases being tried all at the same time.

19   As -- as counsel for Mr. Fitzsimons, I'm -- I'm deeply troubled

20   by stretching the -- the precedent about what -- and the rules

21   about what is a complex case and what are the -- the --

22   demanded by the ends of justice for -- for delays.  His case --

23   they said nothing that makes this case complex.  He -- he

24   doesn't have co-defendants here that he's being -- being tried

25   with for judicial economy.

1    It's just inconvenient for the government because

2    they've chosen to prosecute 400 defendants from -- from one day

3    all at the same time, and -- and I know that they're unable

4    to -- to -- to do that.  There just aren't enough hours in the

5    day or enough AUSAs in the building.

6    But why is that the defendant's problem?  Why -- why

7    does the Speedy Trial Act not apply?  Why do the --

8    THE COURT:  Especially when he's held.

9    MR. HUNTER:  Exactly, Your Honor.  He's -- he's -- it

10   frustrates me and I -- I --

11   THE COURT:  Well, Mr. Hunter, let me --

12   (Indiscernible simultaneous cross-talk.)

13   MR. HUNTER:  -- a window.

14   THE COURT:  Well, let me just -- I mean, maybe this

15   will make it somewhat easier for you.  The -- there's motions,

16   the complex case, we want -- 60-, 90-day extension motions are

17   out there.  I don't know if it's been filed in this case.  I

18   don't hear the government is making that request right now.

19   They're requesting a -- a tolling just between now and the next

20   date.  Perhaps at that date they will be making -- asking for a

21   longer period of time.

22   I think such request is best directed -- I would not

23   rule on it.  It's Judge Jackson's case at this point.  So we're

24   just talking between now and -- and April the 22nd.  And I'm

25   certainly not -- would not make right now a complex case

1     finding justifying that limited tolling.  Again, you can still

2     say no.  It's up to you.

3              MR. HUNTER:  Your Honor, I -- and I -- I appreciate

4     your -- your making that finding.  I would also point out the

5     difference when we set this hearing, we set it for March

6     the 31st.  The government then was unable to make March

7     the 31st, and -- and it was on their motion that the case

8     was -- was -- was delayed another week to get in front of -- of

9     your court.  And I'm happy to be here, but that delay is

10    entirely at their -- their convenience.  And I don't think that

11    time should be excluded and -- and counted against the

12    defendant, especially while he's held.

13         And I -- and I know I'm probably just making that --

14    that objection for the record, but this -- this is my windmill

15    to tilt that.

16              THE COURT:  So I don't -- just let me make clear.

17    What's your position?  Are you willing to toll time between now

18    and the 22nd or not, and -- or is it just the period of time

19    between March 31st and today that you don't want to toll?

20              MR. HUNTER:  I don't want to toll any of it, Judge.

21    I -- I realize that's the reality that -- that we live with.

22    And -- and I know this has just never happened in American

23    jurisprudence and certainly -- certainly not in our district

24    that we have our regular 2021 criminal docket, our regular 2021

25    civil docket, maybe more so because we're -- we're climbing out

1    of the COVID thing and then we add, what, 400 cases to the

2    docket all at once?  There's going to be problems.  I -- I -- I

3    fully embrace that as an officer to this court.  As

4    Mr. Fitzsimons' counsel, I have to complain about it.

5              THE COURT:  Okay.  Well, again, I think that for

6    longer extensions of time, I will leave it to Chief [sic] Judge

7    Jackson.

8         I will grant the government's request over the defense's

9    objection to just toll time between now and April the 22nd for

10   the -- the reasons stated by the government given, just at the

11   very least the volume of discovery that will need to be

12   presented.

13        Where is the government with respect to its plea policy?

14   Is it making plea offers, and has it made one to

15   Mr. Fitzsimons?

16             MS. BHATIA:  Your Honor, not at this time.  I think

17   that that should be forthcoming shortly.  Now that the

18   protective order is in place, we've told Mr. Hunter that we're

19   going to be working diligently to informally provide him

20   discovery, and then our office is already undertaking the

21   efforts to do fast-track discovery where a large amount of

22   discovery will be provided in batches to defense counsel.

23        So I imagine we'll be able to provide Mr. Hunter with

24   some discovery at least by the end of this week, and we're

25   going to be undertaking that process to get this case

1    fast-tracked, obviously, because Mr. Fitzsimons is detained.

2    So it's a priority to provide that as soon as possible.  And I

3    think the turnaround time for that is about a week to two

4    weeks.  Don't hold me to it, but I think we're --

5            THE COURT:  Well, I'm not, but Mr. Hunter will.  But

6    you'll see Judge Jackson.  So I'm sure he will quote you.

7            MS. BHATIA:  I'm sure he will.  I'm sure he will.

8            THE COURT:  It's just a question.  I want to know

9    where his plea offer is.

10           MS. BHATIA:  I -- I understand --

11           (Indiscernible simultaneous cross-talk.)

12           MS. BHATIA:  So there is no plea offer at this time.

13   We have not been authorized, at least from what I understand,

14   to make plea offers.  I know -- I know this is probably the

15   line from a lot of the AUSAs, but I have been told that they

16   will be forthcoming at some point.  I hope soon after being

17   able to provide discovery, we can be in a position to engage in

18   plea negotiations.  And just to clarify --

19           THE COURT:  I've got to tell you, I mean, you -- you

20   might have an argument in some other cases.  I don't see why

21   Mr. Fitzsimons' -- Fitzsimons' case should be held up, his plea

22   should be held up.  You know, you've heard my ruling, but he

23   stilled seemed to be out there acting alone.  You know, sort of

24   a different category of case, a little bit of a lone wolf,

25   which can be problematic, and I think is problematic.  But it's

1    not as if it appears to me that the government needs, you know

2    more -- more investigation in this case.

3         The case is what it is and it's pretty strong.  And as

4    far as the co-conspirators and the like, I -- I just don't see

5    it.  I don't see what the concern is and why his case can't

6    move forward and his plea offer be made.

7         MS. BHATIA:  Understood, Your Honor.  I -- we -- we

8    will certainly try to move it along as quickly as possible.

9         I also just want to clarify for the record, because

10   Mr. Hunter did point out that the original detention hearing

11   was set for, I believe, March 31st.  I just want to clarify for

12   the record, I think I requested the time be tolled from

13   April 6th to April 22nd.  I think Judge Faruqui's exclusion

14   only took us through March 31st.  So I'd be asking from -- for

15   March 31st through April 22nd to make sure we have that -- the

16   entire time covered.

17        THE COURT:  Well, I will -- look, I think it's

18   covered as well because the detention decision was being

19   briefed and pending.  So there are --

20        MS. BHATIA:  Yes.

21        THE COURT:  -- any number of reasons, but I will also

22   exclude it because, you know, I -- we needed the time,

23   certainly the Court did, to -- as Mr. Hunter suggested, sober

24   reflection of the issues raised by this detention hearing.

25        So in any event, I am tolling all time between the 31st

1    and April 22nd.  You know, I suspect that Mr. Hunter's

2    objection will grow stronger every week as to, you know, why

3    this case shouldn't move forward, especially now that his

4    client is being held.  At the very least, that he receive a

5    plea offer.  That's just surprising to me.  It is April

6    the 7th.  We are three months in.  No plea?

7                MS. BHATIA:  I understand, Your Honor.  We --

8                THE COURT:  All right.  That's all I can do,

9    Mr. Hunter.

10               MR. HUNTER:  Listen, Judge, I -- I really appreciate

11   it.  You made that -- that point beautifully.  Usually --

12   usually defense lawyers are -- are happy to have a judge try

13   the case for -- for as long as they're not going to lose it,

14   but I thought you did better than I would have.  So I

15   appreciate that.

16               THE COURT:  All right.  Well, good enough.

17        Mr. Fitzsimons, I do -- I wish you the best of luck in

18   your case going forward, and you do have the presumption of

19   innocence.  The jury would never be told the decision I made

20   here today; all right?  It's a clean slate.

21        All right.  Parties are excused.

22               (The proceedings concluded at 4:15 p.m.)

23

24

25

1

<u>CERTIFICATE</u>

2
        I do hereby certify that the foregoing is a true,

3
correct, and complete transcript of the audio-recorded

4
proceedings in this matter, audio recorded on April 7, 2021,

5
and transcribed from the audio recording to the best of my

6
ability, and that said transcript has been compared with the

7
audio recording.

8
        Dated this 16th day of April, 2021.

9

10
                        /s/ Nancy J. Meyer
                        Nancy J. Meyer, Official Court Reporter
11
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
12
                        United States Courthouse, Room 6509
                        333 Constitution Avenue Northwest
13
                        Washington, DC 20001
                        202-354-3118
14
                        nancy_meyer@dcd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25