UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| | : | | |
| v. | : | Case No.: | 21-cr-158 |
| | : | | |
| KYLE FITZSIMONS, | : | Re Document No.: | 34 |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

DENYING DEFENDANT'S MOTION TO REVOKE DETENTION ORDER
AND FOR PRETRIAL RELEASE

## I.  INTRODUCTION

Defendant Kyle Fitzsimons was among the hundreds of people who stormed the Capitol to stop Congress from certifying the results of the 2020 presidential election. Video footage from that day shows him grabbing, pulling, and charging at a line of officers in the tunnel at the Lower West Terrace. He was arrested at his home in Maine on February 4, 2021 and charged with a 10-count indictment on February 26, 2021. Following a pretrial detention hearing before Magistrate Judge G. Michael Harvey of the District Court for the District of Columbia, Fitzsimons was ordered detained pending trial. Fitzsimons now asks the Court to revoke that detention order and release him. Def.'s Mot. to Revoke Detention Order ("Def. Mot."), ECF No. 34. For the reasons below, the Court will deny the motion.

## II.  BACKGROUND[1]

Fitzsimons has a long history of strongly held political beliefs leading up to January 6, 2021. In years prior, he made inflammatory remarks at a local public hearing in 2017 and

---

[1] This background is drawn from the government's charging instruments, the record before Magistrate Judge Harvey, the parties' briefing, and the exhibits tendered to the Court in

confronted a state representative in a grocery store parking lot in 2019. Gov't Ex. 14; Gov't Ex. 15. Over the course of 2020 he made multiple irate calls to his Congressional representative's office referencing civil war and election fraud, Gov't Opp'n Def. Mot. to Revoke Detention Order at 10 ("Gov't Opp'n"), ECF No. 35. Although he attempted to reach out to other individuals in his community, Fitzsimons traveled to Washington D.C. alone to attend the "Save America" march on January 6. *See* Gov't Ex. 12 (social media post offering to give rides or lead a caravan); Gov't Ex. 2, at 39:02–39:15 (audio of defendant recounting his efforts and travel).

After watching the speeches at the Ellipse, Fitzsimons returned to his car in a nearby parking garage and put on a white butcher coat. Gov't Ex. 2, at 40:21–41:03; *see also* Ex. 9 (photo of Fitzsimons in that outfit). As he approached the Capitol, a large crowd had already gathered, and Fitzsimons could observe individuals scaling the walls of the Capitol. *See* Gov't Ex. 2, at 41:47–42:02 (audio of the defendant recounting to a local board of supervisors that he could see people "climbing on top of the building" from "very far away"); Gov't Ex. 10 (photo of the crowd taken by Fitzsimons). He told local news that as he approached, an individual who had been shot was being evacuated in the other direction. Gov't Ex. 9, at 4. He nevertheless worked his way to the tunnel entrance on the Lower West Terrace, where a line of law enforcement officers in riot gear were trying to prevent rioters from entering the Capitol. *See generally* Gov't Exs. 7, 7A, 7B (video footage of Fitzsimons in the tunnel).

Once there, surveillance footage and body-worn camera footage show Fitzsimons engaging in a series of violent actions. After reaching the front of the tunnel, the recordings show Fitzsimons reaching out and attempting to grab at the officers, despite pepper spray being

---

support of each party's motion. It does not represent the Court's findings of fact on the merits of the case.

2

deployed nearby. Gov't Ex. 7A, at 00:10–00:14; Gov't Ex. 7B, at 07:48–07:54. Instead of retreating, the video shows Fitzsimons reaching down to grab an officer who had fallen. Gov't Ex. 7B, at 08:06–08:30; Gov't Ex. 7, at 00:36–01:01. The officer, later identified as Sergeant A.G., sustained a shoulder injury from the incident. Gov't Opp'n at 7. The government proffers that Fitzsimons attempted to drag Sergeant A.G. into the crowd and did not loosen his grip until after being struck several times with a police baton. *Id.* Even after having been seriously injured, Fitzsimons can again be seen charging into the tunnel and grabbing at the officers. Gov't Ex. 7B, at 09:07–09:14; Gov't Ex. 7, at 01:34–01:42. Finally, the video shows Fitzsimons visibly steeling himself and charging headlong into the tunnel, flailing his arms and striking officers before eventually exiting back into the crowd. Gov't Ex. 7B, at 09:14–09:23; Gov't Ex. 7A, at 01:39–01:49; Gov't Ex. 7, at 01:42–01:51. During that melee, Fitzsimons purportedly pulled the mask off of an officer, Detective P.N., causing Detective P.N. to be pepper sprayed by another rioter. Gov't Opp'n at 7.

After leaving the Lower West Terrace, Fitzsimons sought and received medical treatment for his injuries before returning home to Lebanon, Maine. Gov't Ex. 9. Following his return, he was vocal about his participation in the events of January 6th, including calling into a local town hall meeting, *see* Gov't Ex. 2, and giving a statement to a newspaper, *see* Gov't Ex. 9. Fitzsimons was arrested on February 4th, 2021. *See* Arrest Warrant Returned Executed on 2/4/2021 in Lebanon, Maine, ECF No. 8. The Government charged Fitzsimons with: 2 counts of Obstruction of Law Enforcement During Civil Disorder (18 U.S.C. § 231(a)(3)), Obstruction of an Official Proceeding and Aiding and Abetting, (18 U.S.C. § 1512(c)(2), 2 Counts of Inflicting Bodily Injury on Certain Officers (18 U.S.C. § 111(a)(1), and (b)), Entering or Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)), Disorderly and Disruptive Conduct in

a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2), Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4)), Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)), Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)). *See* Indictment as to Kyle Fitzsimons, ECF No. 5.

Fitzsimons declined a pretrial detention hearing in Maine and was transported to the District of Columbia pending trial. Tr. of Proceedings before Magistrate Judge G. Michael Harvey held on 04/07/2021 ("4/7/21 Tr.") at 10:13–25, ECF No. 20; Def. Mot. at 1–2. He eventually appeared before Magistrate Judge Harvey on April 6 and 7, 2021 for a detention hearing. *See generally* Tr. of Proceedings before Magistrate Judge G. Michael Harvey held on 04/06/2021 ("4/6/21 Tr."), ECF No. 19; 4/7/21 Tr. In a thoughtful opinion, Magistrate Judge Harvey denied Fitzsimons's request for release and ordered him detained pending trial. 4/7/21 Tr. at 12:7–25:20; Order of Detention Pending Trial, ECF No. 36. After reviewing the evidence and the parties' briefing, the Court determines that Fitzsimons's release poses a threat to public safety and denies the motion to revoke that detention order.

### III. LEGAL STANDARD

When a magistrate judge detains a person pending trial, "the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The D.C. Circuit has "not squarely decided" what the standard of review should be for such proceedings. *See United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). But every circuit to address the issue has held that a district court's review of a magistrate's detention order is *de novo*. *See United States v. Chrestman*, --- F. Supp. 3d ----, 2021 WL 765662, at *5 & n.5 (D.D.C. 2021) (collecting cases). Neither party argues otherwise. Accordingly, the Court will review the detention order *de novo*.

## IV.  ANALYSIS

The Bail Reform Act permits the detention of a defendant awaiting trial only in "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  For a defendant to qualify for pretrial detention, his case must "involve[]" an offense that falls into one of five enumerated categories, 18 U.S.C. § 3142(f)(1), or pose a serious risk of flight or of trying to obstruct justice[2] or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The court "shall order the detention" of a qualifying defendant if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1).  In other words, the court must ask "whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

Fitzsimons is eligible for pretrial detention.  One kind of offense that qualifies a defendant for pretrial detention is a crime of violence.  18 U.S.C. § 3142(f)(1)(A).  A crime of violence includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 3156(a)(4)(A). Among other offenses, Fitzsimons is charged with assaulting, resisting, or impeding federal officers resulting in bodily injury in violation of 18 U.S.C. § 111(b).  *See* Indictment as to Kyle Fitzsimons at 3 (Counts 4 and 5).  Because that offense is "categorically a crime of violence," Fitzsimons is eligible for pretrial detention.  *See United States v. Quaglin*, 851 F. App'x 218

---

[2] Fitzsimons's motion argues that he should not be considered eligible for detention based on 18 U.S.C. § 3142(f)(2)(B), relating to obstruction of justice, merely because he is charged with obstruction of an official proceeding.  Def.'s Mot. at 6.  Section 3142(f)(2)(B) was not relied on in Magistrate Judge Harvey's detention order, and the Government does not ask the Court to consider it now.  Order of Detention at 1.

5

(D.C. Cir. 2021); *see also United States v. Klein*, --- F. Supp. 3d ----, 2021 WL 1377128, at *5–7 (D.D.C. 2021).

The more difficult question is whether the Bail Reform Act demands Fitzsimons's detention due to his risk of flight or dangerousness. *See* 18 U.S.C. § 3142(e)(1) (requiring detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community"). The Government argues both that Fitzsimons is a flight risk and a danger to the community. Gov't Opp'n at 11, 17. A finding of flight risk must be supported by a preponderance of evidence, but a finding of dangerousness must be supported by clear and convincing evidence. *Simpkins*, 826 F.2d at 96. Although danger to the community alone can justify pretrial detention, a defendant should only be detained on this basis if his "history, characteristics, and alleged criminal conduct make clear that he . . . poses a concrete, prospective threat to public safety" and the court is satisfied that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Munchel*, 991 F.3d at 1280 (quoting 18 U.S.C. § 3142(f)).

Assessing whether the Government has made either showing requires consideration of four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1). The Court will address each in turn.

### A. Nature and Circumstances of Fitzsimons's Charged Offenses

While not all the rioters who stormed the Capitol on January 6 should be or have been detained pending trial, "those who actually assaulted police officers . . . are in a different

category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284. Fitzsimons, who is charged with attempting to violently break through police lines and causing actual injury to two federal officers, *see* Indictment at 2–3, is in the former category.

Chief Judge Howell's six considerations for assessing the relative severity of a Capitol rioter's conduct provide a helpful framework for the Court's analysis. *See Chrestman*, 2021 WL 765662, at *7–9. Those considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct," and (6) the nature of the "defendant's words and movements during the riot," including whether he "threatened or confronted federal officials or law enforcement." *Id.* at *7–8. Balancing those considerations, the Court concludes that the seriousness of Fitzsimons's offenses favors detention.

First, Fitzsimons is charged with multiple felonies. *See generally* Indictment. Felonies "are by definition more serious than misdemeanor[s]," so "the nature of a felony offense is . . . substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense." *Chrestman*, 2021 WL 765662, at *7. In particular, Counts 3, 4, and 5 each carry a maximum sentence of 20 years in prison. *See* Indictment at 2–3; 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 111(a)(1) and (b). And Counts 4 and 5—assaulting, resisting, or impeding federal officers resulting in bodily injury—are crimes of violence, which the Bail Reform Act specifically instructs courts to account for when evaluating the nature of an offense. *See* 18

U.S.C. § 3142(g)(1).  The gravity of Fitzsimons's charged felonies thus weighs in favor of pretrial detention.

The second *Chrestman* factor, prior planning, weighs in favor of Fitzsimons's release. *See Chrestman*, 2021 WL 765662, at *8.  Although Fitzsimons put out a call on social media for "able bodies" to attend the rally, he ultimately traveled alone and maintains that he planned only to engage in a peaceful demonstration, as is certainly his right.  Def. Mot. at 10–11; Gov't Ex. 9 (describing his peaceful intentions to the press).  The Government does not proffer that he brought any weapons or special tactical gear, and he carried only an unstrung bow that was purportedly symbolic in nature and does not appear to have been used as a weapon.  Gov't Ex. 2, at 40:32–41:32 (describing his "costume" consisting of an "unstrung bow" that he was using as a "staff").  These facts indicate that Fitzsimons may have been "caught up in the frenzy of the crowd" rather than having planned in advance to engage in violence.  *Chrestman*, 2021 WL 765662, at *8.  Closely related, Fitzsimons does not appear to have used a weapon in attempting to breach the line of officers at the capital as described under *Chrestman*'s third factor.  *Id.*  Even the unstrung bow that he purportedly carried to the Capitol is not evident in the video footage. *See, e.g.*, Gov't Ex. 7B, at 07:35–09:26.

The fourth and fifth *Chrestman* factors address whether the defendant coordinated "with other participants before, during, or after the riot" and whether they "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct." *Chrestman*, 2021 WL 765662, at *8.  As discussed above, it does not appear that Fitzsimons engaged in any meaningful coordination in advance of the riot.  At oral argument, the Government urged the Court to consider Fitzsimons's actions in the tunnel both as coordination with other rioters and as evidence of a *de facto* leadership role, essentially arguing that Fitzsimons led by example.

There is some evidence of coordination in the video footage where Fitzsimons engages in the same actions as other rioters, such as grabbing and attempting to pull officers into the crowd and rushing into the line of officers while flailing his arms. Gov't Ex. 7B, at 07:35–09:26. He is also charged with pulling off Detective P.N.'s mask and allowing another rioter to pepper spray Detective P.N. Indictment at 3 (Count 5); Gov't Opp'n at 7. But such "ad hoc, spur-of-the-moment collaboration—while troubling—does not generate nearly the same kind of coordination concerns as other cases." *See Klein*, 2021 WL 1377128, at *8 (citing contrasting cases in which defendants "arrang[ed] concealed means of communicating by radio" or led "co-conspirators in deliberate efforts to prevent Capitol Police from closing . . . barriers" (citations omitted)).

The issue of whether his actions amounted to a *de facto* leadership role that "encourage[d] other rioters' misconduct" is close. *Chrestman*, 2021 WL 765662, at *8. On one hand, Fitzsimons was only engaged in the violent actions for a matter of minutes. *See Klein*, 2021 WL 1377128, at *8 (finding that the defendant had not assumed a leadership role despite being present in the tunnel for around thirty minutes). But Fitzsimons's actions during those few minutes were arguably more concerning than the actions at issue in *Klein*, in which the defendant did not demonstrate any intent to injure officers. *Id.* Here, Fitzsimons did in fact "attempt[] to battle or fight the officers with his bare hands," *see id.* (internal quotations removed). The video footage shows Fitzsimons, even after having been beaten with a police baton, pause and gather his force before charging at the officers. Gov't Ex. 7, at 01:40–01:50; Gov't Ex. 7B, at 09:14–09:23. This kind of intentional action could have set an example for his fellow rioters—but any such example was also likely a drop in the bucket in the context of that afternoon. The Court is ultimately unpersuaded that it rises to the level of *de facto* leadership.

Sixth and finally, Fitzsimons's "words and movements during the riot reflect the egregiousness of his conduct." *Chrestman*, 2021 WL 765662, at *8. The Government does not proffer any particular statement that Fitzsimons made during the riot, but his movements that are captured on video are deeply concerning. He was one of the rioters "who injured, attempted to injure, or threatened to injure others," not one who "merely wandered" the Capitol grounds. *See id.* at *8. He worked his way to the front lines of the conflict with law enforcement officers and used his body to forcefully attack and attempt to injure officers. *See Quaglin*, 851 F. App'x at 219 (finding it significant that the defendant was "on the front line of a group of individuals attempting to violently force their way inside the Capitol by physically overcoming a defensive line of police officers"); *United States v. Ballard*, 21-cr-00553 at *8, ECF. No. 15 (D.D.C. Aug. 20, 2021) (determining that a defendant's conduct was egregious "by virtue of having physically assaulted police officers in attempting to overwhelm a police line and gain entry to the Capitol building"). In fact, two officers did sustain injuries as a result of those actions, as reflected in the charges against Fitzsimons. *See* Indictment at 2–3 (Counts 4 and 5).

In sum, Fitzsimons's behavior during the riot "reflect[s] a contempt for the rule of law and law enforcement, a disturbing disregard for the safety of others, and a willingness to engage in violence." *See United States v. Gieswein*, 21-cr-24, 2021 WL 3168148, at *11 (D.D.C. July 27, 2021); *see also Klein*, 2021 WL 1377128, at *9. The seriousness of his conduct weighs in favor of detaining him pending trial.

### B. The Weight of the Evidence Against Fitzsimons

The weight of the evidence against Fitzsimons also strongly favors detention. Multiple videos and photographs from security cameras, body-worn cameras, and news footage, corroborate the Government's account of events that day. *See, e.g.*, Gov't Ex. 7, at 01:35–01:51

10

(security camera footage showing Fitzsimons charging at officers in the tunnel of the Lower West Terrace); Gov't Ex. 7A, at 01:35–01:44 (body-worn camera video depicting the same); Gov't Ex. 7B, at 07:35–9:26 (same).

There is little disputing that Fitzsimons is the person depicted in the videos and photos. He self-reported to have been wearing the distinctive white butcher's coat that can be seen on the video footage, which was even embroidered with his name. Gov't Ex. 5; Gov't Ex. 9; *cf. Gieswein*, 2021 WL 3168148, at *12 (noting that a rioter's "distinctive outfit" helped to identify him in video and photographic evidence). And in the days following the Capitol riot, Fitzsimons himself publicly shared his account of that day, which despite characterizing events differently than the Government, still places him both at the Capitol and at the front lines of the attack. *See* Gov't Ex. 2, at 44:51–45:14 (describing how he twice "cycled through" being "pushed to the front" to "receive a beating"); Gov't Ex. 9 at 4 (quoting Fitzsimons in a local paper as saying "I was pressed into the front two times"). He was identified by three separate tips from concerned citizens who had interacted with him on multiple occasions. Crim. Compl. at 7–9, ECF No. 1.

The evidence against Fitzsimons is overwhelming and thus weighs in favor of detention. Nevertheless, it "is the least important" detention factor. *See Klein*, 2021 WL 1377128, at *10 (quoting *United States v. Gebro*, 948 F.2d 1118, 1121–22 (9th Cir. 1991)).

C. **Fitzsimons's Personal History and Characteristics**

When evaluating a defendant's personal history and characteristics, a court should take into account the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). Some of these factors clearly weigh in favor of

11

release. Fitzsimons has no purported history of substance abuse and has only a minor criminal record involving "one misdemeanor conviction for driving under the influence," Def. Mot. at 13, and a conviction for "operating an unregistered motor vehicle," Gov't Opp'n at 15. Those relatively minor offenses from several years ago have little relationship or relevance to the conduct here. *See Munchel*, 991 F.3d at 1275, 1282 (noting that two misdemeanor marijuana possession convictions were "limited criminal history" that favored release).

The Government's contention that Fitzsimons presents a flight risk is premised primarily[3] on this factor, specifically, his limited familial support network and lack of employment. Gov't Opp'n at 15. Prior to his detention, Fitzsimons lived in Maine with his wife of three years and young daughter but appears to have lost the support of that nuclear family in no small part due to his political radicalization. *Id.*; *see also* 4/7/21 Tr., at 24: 11–14 (noting that Fitzsimons's potential "lack of community ties" with his wife "is yet another example of where your beliefs have led and the damage they have done"). While he does have the strong support of his mother, who has agreed to take him into her home in Florida, Def. Mot. at 12, he does not appear to have any support system in Florida other than his mother. Although his mother has offered to help Fitzsimons find employment, Def. Mot. at 12, he does not have any guaranteed employment in Florida and appears to have had at least unsteady employment prior to his arrest, Gov't Opp'n at 15 (proffering the mention of his "unemployment" in the Pretrial Services report).

---

[3] The government also proffers the Pretrial Services report from February recommending against release in part because Fitzsimons had refused to be interviewed by Pretrial Services. Gov't Opp'n at 15. As the transcript from Magistrate Judge Harvey's decision demonstrates, Fitzsimons refused to be interviewed in part on the advice of counsel to allow some time to pass and to seek his detention hearing here in D.C. 4/7/21 Tr. at 10:22–11:22; *see also* Def. Mot. at 1–2. The Court agrees with Magistrate Judge Harvey's view that the refusal to speak with Pretrial Services, especially on the advice of counsel, is not probative of flight risk. *Id.* 12:19–22.

However, there is also no indication whatsoever that Fitzsimons tried to evade arrest or destroy relevant evidence. *See United States v. Sabol*, --- F. Supp. 3d ----, 2021 WL 1405945, at *53–54 (D.D.C. 2021) (finding an "unquestionabl[e]" risk of flight where the defendant attempted to destroy electronics and took concrete steps to try and flee the country). Quite to the contrary, Fitzsimons's public sharing of his story and photos from that day made him comparatively easy to find. *See generally*, Crim. Compl. And he did not attempt to flee or even relocate following January 6th, rather, he was arrested at his home in Maine. *See* Arrest Warrant Returned Executed on 2/4/2021 in Lebanon, Maine. In total, this Court disagrees with the Government that Fitzsimons presents a flight risk or would be unlikely to appear in court.

But danger to the community is an additional justification for pretrial detention, and other considerations under this third factor are pertinent to that inquiry as well. The Court finds particularly concerning some of Fitzsimons's past conduct. It is undisputed that Fitzsimons has strongly held political beliefs and has been civically active over several years, which is of course protected First Amendment activity. But when viewed together and in light of Fitzsimons's eventual actions described above, his past conduct demonstrates a severe lack of judgment as to identifying the line between political expression and threats.

For example, the first incident that the government proffers, in which Fitzsimons made xenophobic comments at a public hearing in May 2017, was indeed offensive and inflammatory—but did not escalate to threats or violence. *See* Gov't Ex. 14 (news article describing that hearing and noting that the law enforcement officer stationed in the hearing felt "exposed" and "not terribly safe"). But in 2019, Fitzsimons reportedly followed a state representative into a parking lot, parked his truck behind her car, and positioned himself by the door of her car. *Id.* He angrily confronted her over a gun safety bill that she was co-sponsoring

at the time and "speculated America was headed to civil war over gun rights." *Id.* Again, the incident did not escalate into violence but was described by the representative as "unsettling and intimidating." Gov't Ex. 15. Over the course of 2020, Fitzsimons made multiple calls to his Congressional representative's office, saying among other things: "This is Kyle Fitzsimons, the man who wants to start a war," "we're coming for [the Congressperson]," and "Biden is a corrupt skeleton and [] this is going to be Civil War." Gov't Opp'n at 10. His references in those calls to the 2020 election show a clear connection between his threats of violence and his actions on January 6th. Taken together, they demonstrate an escalating pattern of conduct that culminated in Fitzsimons's participation in the Capitol riot.

Also relevant here is Fitzsimons's lack of remorse or even acknowledgment of wrongdoing. "[A]lthough contrition is not a defense, it has some bearing on the character of the defendant." *United States v. Cua*, No. CR 21-107, 2021 WL 918255, at *4 (D.D.C. Mar. 10, 2021). After returning to Maine, Fitzsimons's statements at the local government meeting and to news sources attempt to cast his role as having been a victim, a characterization drastically at odds with the video footage from that day and overtly conspiratorial in tone. *See, e.g.*, Gov't Ex. 2, at 44:43–45:12 ("If you got close enough… you would get sucked in. . . and you would get pushed to the front . . . . I cycled through that wave of humanity twice before I was bloodied enough to get off the steps . . . ."); *id.*, at 46:03–46:14 ("I can tell you right now, as an American, and as a thinking man, that it was a set up."); Gov't Ex. 9 at 2 ("Fitzsimons . . . almost died when a police officer clubbed him over the head with a baton after a scrum of young men behind him pushed him unwillingly forward into a police line."); *id.* at 5 ("I'm not the one who is rebelling, it's the leadership of this country."). And jail calls proffered by the government similarly suggest that Fitzsimons's conviction has not dampened since then. *See* Jail Call #1, at 06:14–

14

06:20 ("I know this sounds pretty crazy, but it's exactly what was asked of me."). Such statements suggest a troubling lack of remorse—or even awareness—about the severity of his actions.

Fitzsimons's personal history and characteristics suggest that while he is not a flight risk. However, this factor weighs in favor of a finding that he is a danger to the community, and therefore in favor of detention.

D. **The Nature and Seriousness of the Danger Fitzsimons's Release Poses**

The final factor in assessing dangerousness also supports detention. Assessing the "'nature and seriousness of the danger . . . posed by the defendant's release' . . . 'encompasses much of the analysis set forth above, but it is broader in scope,' requiring an 'open-ended assessment of the seriousness of the risk to public safety.'" *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (first quoting 18 U.S.C. § 3142(g)(4); and then quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,' it bears heavily on the Court's analysis." *Id.* (quoting 18 U.S.C. § 3142(e)). The conduct involved in Fitzsimons's offense and his personal history demonstrate that his release would threaten the community.

Fitzsimons's actions at the Capitol show that he is willing to use violence—even against law enforcement—to achieve his political aims. He sought out conflict with law enforcement by making his way to the front lines. *Quaglin*, 851 F. App'x at 219; *United States v. Caldwell*, No. 21-cr-181, 2021 WL 2036667, at *10 (D.D.C. May 21, 2021). And the Government has provided robust evidence that his actions were intended to injure law enforcement officers and did in fact injure two law enforcement officers that day. Such egregious conduct "reflect[s] the

depth of [his] disregard for the safety of others, for our democratic institutions, and for the rule of law." *See Chrestman*, 2021 WL 765662, at *15.

And Fitzsimons's prior conduct suggests that his actions that day were not an anomaly. While his history of civic engagement is in some respects laudable, his actions leading up to and at the Capitol riot suggest that his strong beliefs can and do get the better of him. *Cf. Sabol*, 2021 WL 1405945, at *17 (noting that the rioter "did not simply hold . . . misguided beliefs" about "a tyrannical government that 'stole' a presidential election"; "he acted on them"). The previous instances of threatening behavior toward government officials follow a clear pattern increasing in severity over several years. Given his lack of remorse—and even pride—in his actions that day, the Court lacks confidence that Fitzsimons has somehow broken this pattern, and fears that the escalation of his behavior will continue and result in a graver act of violence given that the trigger for his violent acts—the election of President Biden—will be present for, at least, three more years. *See* Gov't Ex. 11, at 00:34–00:43 (asking his Congressional representative to object to the election results and saying "I certainly have the courage to object to my entire life going forward if this is done to me").

As Magistrate Judge Harvey aptly explained when reaching the initial detention decision in this case:

> [W]hat I see looking at the totality of the circumstances here is someone who is -- has very passionately held beliefs, perhaps abnormally so. And what I mean by that is it appears they can get the best of you. If you lose control, you can be violent. You're to me like a bomb waiting to go off. It's always difficult for a magistrate judge making that sort of prediction, someone who might engage in violence if I were to release him. It's made somewhat easier for me here because the bomb did go off . . . on January 6th . . . . That's what that video shows; someone who's willing to engage in violence to promote his political beliefs. The First Amendment doesn't protect that, sir.

4/7/21Tr. at 23:8–20. Even on *de novo* review, this Court agrees. When considering both Fitzsimons's history of confrontational and threatening conduct in furtherance of his political

16

views and his actions on January 6th, he has demonstrated a disregard for the safety of others and the rule of law. Accordingly, no combination of pretrial release conditions could reasonably guarantee the safety of the community.

## V.  CONCLUSION

For the foregoing reasons, the Defendant's Motion to Revoke the Detention Order (ECF No. 34) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 24, 2021                                    RUDOLPH CONTRERAS
                                                             United States District Judge