BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .   Case Number 21-cr-158
          Plaintiff,               .
                                   .
     vs.                           .
                                   .   Washington, D.C.
KYLE FITZSIMONS,                   .   September 16, 2021
                                   .   11:03 a.m.
          Defendant.               .
- - - - - - - - - - - - - - - - -


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RUDOLPH CONTRERAS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:        BRANDON REGAN, AUSA
                              United States Attorney's Office
                              555 Fourth Street Northwest
                              Washington, D.C. 20530


For the Defendant:            NATASHA TAYLOR-SMITH, AFPD
                              Federal Community Defender Office
                              Trial Unit
                              601 Walnut Street
                              Suite 545 West
                              Philadelphia, Pennsylvania 19106


Official Court Reporter:      SARA A. WICK, RPR, CRR
                              United States District Court
                                 for the District of Columbia
                              333 Constitution Avenue Northwest
                              Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2          (Call to order of the court.)

 3          COURTROOM DEPUTY:  This is Criminal Action 21-158,

 4   United States versus Kyle Fitzsimons.

 5          For the United States, I have Brandon Regan.  For Kyle

 6   Fitzsimons, I have Natasha Taylor-Smith.  Our court reporter

 7   today is Sara Wick.  All parties are present.

 8          THE COURT:  Good morning, everybody.  Thank you for

 9   pivoting to have this in person rather than by Zoom.  Things

10   have changed considerably at the jail because of the reopening

11   of Superior Court, and so we got bumped.  They've reduced the

12   number of rooms available for video hearings, and we got bumped.

13   So rather than postpone the hearing, I thought it best to have

14   it in person.  So thank you.  In particular, thank you for those

15   that had to travel to get here.

16          All right.  It's the defendant's motion, but the -- on the

17   motion to revoke the detention, but it's the government's

18   burden, and it's a de novo review, and I have not seen all of

19   the evidence that was presented to Judge Harvey.  So I think it

20   might make sense to have the government go first so that the

21   defendant can respond to the evidence when it comes in.

22          So go ahead.

23          MR. REGAN:  Understood, Your Honor.  Thank you.

24          Just for purposes of the record, I have a PowerPoint with

25   most of the exhibits up on the screen that I will scroll
```

1    through.  I've also provided courtesy copies to the Court and

2    the defense.  If at any point it stops playing, just let me

3    know, Your Honor, or technical issues.

4         THE COURT:  And you will introduce the exhibits that

5    were not on the disk that you provided to me; is that right?

6         MR. REGAN:  There are a handful of exhibits, Your

7    Honor, that were not on the disk.  Notably for audio/video,

8    there are a handful of jail call snippets, as well as one

9    additional body-worn camera, and then the rest are photos which

10   will be captured in the PowerPoint itself.

11        THE COURT:  Okay.

12        MR. REGAN:  So to start, Your Honor, as the Court

13   accurately pointed out, the standard of review for this is de

14   novo.  And understanding that the Court is going to review it de

15   novo, we do think an accurate starting point is where we started

16   at the beginning of this case with the detention hearing in

17   front of Judge Harvey, if for no other reason than just to

18   highlight some of the points that Judge Harvey made which the

19   government believes are salient in terms of the decision before

20   the Court here today.

21        THE COURT:  Let me stop you for just a moment.

22     Can you catch everything with the mask and from that

23   distance?

24        COURT REPORTER:  Yes.  Thank you, Your Honor.

25        THE COURT:  Okay.  Go ahead.

1          MR. REGAN:  So to start, Your Honor, pursuant to the

2     Bail Reform Act, the Court is essentially looking at four

3     factors, those being the nature and circumstances of the

4     offense, the weight of the evidence against the defendant, the

5     history and characteristics of the defendant, and the nature and

6     seriousness of the danger that the defendant presents to the

7     community should he be released.

8          And the government has gone through step by step, as has

9     the defense, with respect to those four factors to be considered

10    by the Court.  And I will just touch on them briefly, and then I

11    will go through Chrestman, which I think provides useful guide

12    posts that this court has set forth with respect to the Capitol

13    riot cases.

14         So with respect to the nature and circumstances of the

15    offense charged, as the government pointed out in its motion, I

16    think an appropriate place for the Court to start is how Judge

17    Moss has characterized January 6 just writ large.  There's been

18    some back and forth about the seriousness of January 6 vice the

19    seriousness of an independent defendant, and I think there's a

20    distinction to be made there.

21         But I think to start, it's worth noting that January 6 was

22    something that we've never seen before in this country.  To call

23    it an insurrection, I think, is to put it lightly.  And the way

24    Judge Moss characterized it, I think, is appropriate in that

25    this was a momentous occasion in United States jurisprudence and

something that shouldn't be taken lightly.

Judge Moss stated, "The defendant and hundreds of others," referencing a separate defendant, "took over the United States Capitol, caused the vice president of the United States, the Congress, and their staffs to flee the Senate and House chambers, engaged in violent attacks on law enforcement officers charged with protecting the Capitol, and delayed the solemn process of certifying a presidential election.  This was a singular and chilling event in U.S. history, raising legitimate concern about the security not only of the Capitol building but of our democracy itself."

And I would ask the Court to start there in terms of viewing the seriousness of January 6 itself and then move to the seriousness of the defendant's actions that day.

So as you can see in Government Exhibit 3, this is where we first see the defendant in the area of the lower west terrace. Notably, he's boxed in the red box.  He's wearing what appears to be a white butcher's coat with a blue jacket underneath.

The defendant has since stated that after attending the rally with then President Trump he went back to his vehicle, put on a white butcher coat, which is also monogrammed with his name on the front, "Kyle," and then proceeded to the U.S. Capitol.

Now, before we even discuss what it is that he actually does in Exhibits 3 through 6 and the subsequent videos, I think it's important to take a look at Exhibit 3 and see what's

1    happening in just this moment in time.

2        When the defendant arrives at the Capitol, chaos has

3    already ensued.  Officers are being assaulted.  Barriers are

4    being broken.  Tear gas and smoke grenades are being deployed by

5    law enforcement.  The defendant is undeterred.  He walks into a

6    situation where it is very clear, and you will see in the

7    videos, violence is occurring.  And despite his assertions that

8    he was there to peacefully demonstrate that day, he puts himself

9    in a violent situation that he himself then makes more violent.

10        So as you can see in the lower left-hand column of Exhibit

11    3 where the defendant is, in the foreground of this picture are

12    the officers that are protecting the Capitol that day.  Notably,

13    inside the U.S. Capitol lower west terrace tunnel, as we've

14    colloquially called it, you will see all of these helmets are

15    either MPD or U.S. Capitol police officers attempting to prevent

16    a breach of this entrance, because directly behind them is

17    direct access into the U.S. Capitol building.

18        In Exhibit 4, again moving just moments in time ahead, the

19    defendant is now reaching forward and grabbing at one of the

20    officers who is attempting to stop what is thousands of rioters

21    from breaching this entrance.  He is successful in grabbing an

22    officer.  He takes that officer to the ground.  That officer has

23    subsequently been identified as Sergeant A.G. from the U.S.

24    Capitol Police, and he is injured in this assault.  Notably, in

25    addition to the injury, Sergeant A.G.'s biggest concern at this

moment is that he is going to be pulled into the mob like other officers were and potentially killed.

Undeterred, the defendant is struck with a baton several times.  He doesn't break his grip, still trying to pull that officer into the crowd.  It takes several baton strikes and several other officers to engage with the defendant before they can get him to just even release his grip on this one particular officer.

Exhibit 5 shows moments later.  Once they are able to break the defendant's grip, he then steels himself, walks to the middle of the tunnel, and this is just moments later, and you can see in his face, he raises himself for what is about to be round 2 of this fight.  He then charges the line of officers, flailing his arms, attempting to strike as many officers as possible.

And then in Exhibit 6, just another view from the body-worn camera of one of the officers at the front of the line that day. He then engages with the officers.  You will get a better view of this in the body-worn camera.

So now in Exhibit 7, this is the surveillance video that we saw from the lower west terrace tunnel at the detention hearing. You can see it's caked in what appears to be pepper spray or bear spray, which was a common weapon that day.

And then in Exhibit 7A, which I will play for the Court here, body-worn camera that's about to capture the defendant

1    assaulting the officer for a second time.

2         (Video recording played.)

3         MR. REGAN:  And I played Exhibit 7A in its entirety.

4         Your Honor, with respect to Exhibit 7A, I think something

5    notable for the Court that differentiates this is there is a

6    momentary break in time from when the defendant first engages

7    that officer that he brings to the ground and attempts to drag

8    him to the crowd to when he then rushes head long into the line

9    of officers again.

10        At the detention hearing, prior counsel, there was some

11   suggestion that perhaps he was being forced into the tunnel by

12   the throng of rioters behind him.  When you watch that video and

13   the next video that we're about to watch, it becomes abundantly

14   clear, nobody is forcing him the second time to do anything.  In

15   fact, he steels himself, gets a look on his face as though he's

16   about to attack, and then that's exactly what he does.

17        The suggestion that he is doing anything other than

18   attempting to assault the officers in that tunnel should be

19   dismissed by this Court.  It just doesn't make sense based on

20   the review of the video.  And that's exactly what he does.

21        The government was actually able to obtain a second

22   body-worn camera video, which I have marked as Exhibit 7B.  In

23   the beginning of Exhibit 7A, you can see there's an MPD officer

24   who was sort of standing on the side wall who had a bird's eye

25   view of what's happening.  That's this officer, and I'm going to

1    start it at 7:42.

2         So before I hit play, Your Honor, I will just note for the

3    Court the defendant appears to be right against the left side of

4    the lower left tunnel wall, if you're looking from the

5    perspective of the police officers here, in that white butcher's

6    coat and the blue sweatshirt underneath, and I will play it from

7    here.

8         (Video recording played.)

9         MR. REGAN:  So there, Your Honor, you got another

10   perspective of what's happening that day.  The defendant

11   approaches from the left side of the lower west terrace tunnel

12   as the officers see him.  He engages not once but twice and

13   unsuccessfully attempts to drag an officer into the crowd.

14        Undeterred, he then moves behind the rioters to the center

15   of the stage and tries to break the line one more time, striking

16   as many officers as possible.

17        Now, the aftermath of that is this, Your Honor.  This is an

18   open source photo that was taken of the defendant as he was

19   walking away from -- he's facing the crowd at this point, as

20   he's walking away, and the injuries he sustained appear to have

21   been from his first interaction with law enforcement where he

22   was hit over the head several times in an effort to prevent that

23   officer from being dragged into the crowd.

24        Your Honor, it is not an exaggeration to say that the lower

25   west terrace was by far the most violent and dangerous place at

the U.S. Capitol on January 6, and that is because of defendants like Mr. Fitzsimons.  The officers stationed in there in what is roughly a 10-by-10 or 12-by-12 tunnel were essentially in a pill box attempting to keep out thousands of rioters from entering through that portion of the building for hours on end, throngs of rioters continuing to attack.

You will notice in the videos, in addition to having to deal with the actual physical people, they're being hit with ladders, pepper spray, bear spray, crutches.  Eventually, he is deterred, which is why he's not able to get in the building, but that's only because of the heroism of the officers that were stationed there that day, and that continued for hours on end.

Two of the officers that he did engage were, in fact, injured.  One of them, as I described earlier, was taken to the ground and suffered a shoulder injury.  The second one, again right next to Sergeant A.G., is an MPD detective.  The defendant was able to pull down his riot gear and his mask, and he was pepper sprayed in the face by the person behind the defendant.

So for the nature and circumstances of the offense, Your Honor, he is charged with grave offenses.  He is charged with civil disorder, and he is also charged with 111(b), which is assaulting officers and actually causing injuries on January 6, assaulting federal officers.

He forcibly entered and remained on Capitol grounds and made it very clear why he was there that day.  In the additional

1    exhibits, you will see that.  He was not hindered by batons

2    meant to prevent further violence on the defendant's part,

3    assaulted two officers, and then persisted in his violence and

4    was unhindered by the line formed at the tunnel meant to be the

5    last action of defense before the Capitol was breached by these

6    rioters.

7        The next factor the Court is supposed to consider is the

8    weight of the evidence against the person.  So here, as the

9    government has briefed in both the original detention hearing

10    and the hearing we are here for today, the defendant after

11    January 6 was not shy about the role he played.  In fact, he

12    provided an interview to a local news article, the Rochester

13    Voice, where he is identified by name, and he's also pictured

14    here on the left in a photo that shows the same injuries that we

15    just saw in Exhibit 5, that same white butcher's coat, and on

16    the right, a clear photo where you can see the actual monogram

17    on that butcher's coat that says "Kyle," the defendant's first

18    name, in what appears to be a selfie taken by Mr. Fitzsimons and

19    then sent to this news article.

20        In this news article, he explains why he is there.  He

21    doesn't deny being there.  But in fact, he describes what he

22    said was harmless or peaceful intentions of being in Washington,

23    D.C., not only for him but for the other rioters.  Now, what we

24    saw in that video is the exact antithesis to peacefulness.  It

25    is a man filled with aggression and anger.

1     He confirmed his presence to the Rochester Voice and

2     provided pictures, and the government was able to identify him

3     through several witnesses.

4     Exhibit 10 is another photograph provided by the defendant,

5     and the government only provides this to the Court to sort of

6     give context for what it is the defendant is seeing that day.

7     This is clearly not what the Capitol is supposed to look like

8     any day, let alone January 6 when they're trying to certify the

9     Electoral College vote.  Again, the defendant undeterred.

10    The next factor is the --

11              THE COURT:  Hold up.

12    (Pause.)

13              THE COURT:  Go ahead.

14              MR. REGAN:  Thank you, Your Honor.

15    Your Honor, with respect to the history and characteristics

16    of the person, the government doesn't disagree with the defense

17    in terms of the defendant's criminal history.  He does have some

18    criminal history, which gives the government some pause, but

19    more importantly, as the presentence report writer pointed out,

20    the defendant was unwilling to be interviewed or cooperate in

21    the process whatsoever.  So there was no explanation by Pretrial

22    about whether they could mitigate any of the risks that he

23    presents to the community, based on his unwillingness to

24    cooperate.

25    Additionally, the government presented several exhibits,

1   some of which I will play here now and some of which have been

2   provided to the Court, that talk about the defendant's past.  In

3   the original detention hearing, one of the facts that the

4   government brought forward was that the defendant is no longer

5   going to have the support of his wife and child if he were to

6   return to the community.  In his most recent motion, the

7   defendant has posited that he will then stay with his mom in

8   Florida.

9        I think the most important point the government can make

10  with respect to that fact is in the original hearing the

11  government presented evidence that the defendant was presented

12  with a choice from his wife.  The quote was, "It's either

13  politics or Holly and I," Holly being his daughter.  That did

14  not deter the defendant from going on January 6 and committing

15  what was one of the most egregious offenses of the Capitol riot

16  defendants that day.

17       So the government would suggest to the Court that if losing

18  his entire family, his daughter and his wife, was not enough to

19  stop him on January 6, it seems unlikely that having the

20  supervision of his mother is going to do anything different.

21       And added to that, Your Honor, is the fact that the

22  defendant, as Judge Harvey has pointed out, has shown no remorse

23  for what he did that day.  In fact --

24            THE COURT:  Hold on.

25            COURTROOM DEPUTY:  Can I start the call all over

1    again, Judge?  I just got a complaint.

2          THE COURT:  Hold on one second.  We're getting a

3    recording on the phone.

4        (Pause.)

5          THE COURT:  All right.  Go ahead.

6          MR. REGAN:  Thank you, Your Honor.

7        So Your Honor, I was just explaining to the Court that the

8    situation that the defendant found himself in just prior to

9    January 6 and undeterred took it even a step further from some

10   of his prior political affiliations and expressions of politics

11   that had gotten him into the situation he was in.

12       And as an example of that, Your Honor, Exhibit 11, as the

13   government explained in our brief, is a voicemail that the

14   defendant left for one of his local congresspersons, which I

15   would like to play for the Court.

16       (Audio recording played.)

17          MR. REGAN:  And Your Honor, I think Exhibit 11

18   perfectly captures the essence of what it is that the defendant

19   not only wanted to do on January 6 but has made his entire life

20   about at this point.  He says he's willing to risk his entire

21   life if the certification of the Electoral College vote goes

22   through.

23          THE COURT:  He said "object," not "risk."

24          MR. REGAN:  I apologize.  He said "object to my entire

25   life," not "risk my entire life."  I apologize, Your Honor.

1    And that's notable because at this point this ultimatum has

2    been put to him.  But regardless, this dovetails nicely not only

3    into the history and characteristics of the defendant but the

4    nature and seriousness he poses and danger to the community,

5    because this isn't the defendant's first foray into politics.

6    As we presented to Magistrate Judge Harvey, and this is an

7    exhibit from the prior detention hearing, the defendant has made

8    himself well-known in local political circles, which is

9    absolutely his right.  The defendant absolutely has a right to

10   express himself politically.  What's notable is that it has been

11   captured in several news articles with several quotes from

12   lawmakers that talk about being scared of the defendant, about

13   him having a vitriol for certain classes of people, but also

14   just for lawmakers in general who do not agree with him

15   politically.  And we see what is a rising tide up until

16   January 6.  Judge Harvey said, "To me, you're like a bomb

17   waiting to go off."  And that bomb went off on January 6.

18   The defendant has shown absolutely no remorse, and instead,

19   like I mentioned earlier, has double-downed on not only the

20   rhetoric of January 6, but what it is that he did that day.  And

21   I have various jail calls that I would like to play for the

22   Court, but I will do that later.

23   So in addition, the government would posit that all four of

24   the factors that the Court is supposed to look at here weigh

25   heavily in favor of detention of the defendant.  It is -- in

essence, nothing has really changed with respect to January 6 and the defendant here today.  His personal circumstances have not changed.  His opinion on January 6 or any remorse has not changed.

The only difference between now and then is that his mother is willing to take him in, into a community where he doesn't live, where the only person he presumably knows is his mother, and the Court would have to assume that he would now for some reason change his previous behavior, which was being willing to risk -- excuse me, to object to his entire life in order to stop the vote.

Now, the guideposts that I mentioned earlier, Your Honor, that come from Chrestman, there's six of them, and the government would posit that several, if not all, weigh in favor of detention.

First, whether the defendant has been charged with felony or misdemeanor offenses.  He has been charged with several felony offenses, to include obstruction of a federal proceeding, civil disorder, and multiple assaults against federal law enforcement officers.

The extent of the defendant's prior planning.  The defense suggests that this is a factor that weighs in favor of release based on what they consider a lack of planning.  I would point to Government Exhibit 12, which is up on the screen now, which was presented to the magistrate court judge as well, which is a

1    Facebook post signed Kyle Fitzsimons with his e-mail address

2    that is trying to organize a caravan of like-minded individuals

3    to the Capitol on January 6.  He says, "I'm also seeing flags

4    that this election was stolen, and we are being slow-walked

5    toward Chinese ownership by an establishment that is treasonous

6    and all too willing to gaslight the public into believing the

7    theft was the will of the people."

8         Now, Your Honor, admittedly, that is not the defendant

9    planning with other people to assault law enforcement officers

10   or to commit any further acts other than appearing.  But it's

11   notable when you take -- when you see in Exhibit 12 and what the

12   defendant does when he gets there, because the defendant, in

13   order to prior plan what he is doing, doesn't need to travel

14   with anybody.  He can plan all on his own to go, and then

15   notably, when he gets there, he becomes a part of the most

16   violent mob that we saw on January 6 outside of the U.S. Capitol

17   on the lower west terrace.  And he does so in conjunction with

18   throngs of rioters --

19            THE COURT:  Hold on one second.  So presumably, you've

20   gone through his phone and the like at this point in time.  Is

21   that right?

22            MR. REGAN:  For the most part, yes, Your Honor.

23            THE COURT:  Is there any indication that anyone

24   responded to this or that he did coordinate with other people?

25            MR. REGAN:  Not that we know of right now, Your Honor.

1          THE COURT:  Okay.

2          MR. REGAN:  And with respect to coordination,

3    something I would submit to the Court is coordination just

4    doesn't include things done prior or actually communicating with

5    people about intentions.  When he gets there that day, he's

6    coordinating with the people all around him.  He's pulling gas

7    masks down so that they can be pepper sprayed.  He's tearing

8    officers to the ground in an effort to allow other rioters to

9    potentially get into the building.

10         So I would ask the Court to consider that with respect to

11   that second factor for the extent of the defendant's prior

12   planning.

13         Now, for the third factor, whether the defendant used or

14   carried a dangerous weapon, the government isn't suggesting that

15   at any time the defendant used a weapon when he engaged with law

16   enforcement officers.  He didn't need to.  He was a part of a

17   large crowd where multiple people around him have weapons.  And

18   by engaging with the police, he made them vulnerable to every

19   single person around him.  Now, he's not using the weapon, and

20   the government is not suggesting he is.  The weapon that day

21   were his fists and his hands and his feet.  But nonetheless,

22   undeterred, he ran into that police line three times in an

23   effort to hurt as many police officers as he could.

24         The fourth, similar to the second, is evidence of

25   coordination with other protestors before, during, and after the

1    riot.  Now, here, the government's also shown you Government

2    Exhibit 12, and we've shown you the videos from the lower west

3    terrace.  The government would submit that there is clear

4    evidence of a coordinated effort by that entire group to get in

5    the building through the lower west tunnel entrance by any means

6    necessary.  And by any means necessary, that includes, as you've

7    seen in the video, the defendant attempting to drag officers

8    into the crowd of rioters, which happened that day to other

9    officers, the defendant pulling gas masks down, the defendant

10   fighting officers with his hands and feet while other officers

11   are trying to pull those officers back and simultaneously being

12   pummeled by the rest of the rioters with crutches and ladders

13   and pepper spray and batons.

14        THE COURT:  Let me ask you a question.  I have the

15   PowerPoint, but the underlying newspaper articles that are

16   referred to, are those in the record somewhere?

17        MR. REGAN:  They were presented at the detention

18   hearing earlier, Your Honor.

19        THE COURT:  I understand that, but I don't have them.

20   Do you have them to introduce today?

21        MR. REGAN:  I believe I do, Your Honor, and I have --

22   so Grand Jury Exhibit 9 is that article itself, which is a

23   screen shot of it, and I would be happy to provide the Court

24   with the full .pdf copy of that article.

25        THE COURT:  Why don't you make a point of looking back

1   at what was presented to Magistrate Judge Harvey and reintroduce

2   all the information.

3         MR. REGAN:  Understood, Your Honor.

4       And then finally, Your Honor, the last two are whether the

5   defendant played a leadership role in his words and movements

6   during the riot, with specific reference to whether the

7   defendant remained only on the grounds surrounding the Capitol

8   or stormed the Capitol interior or injured or attempted to

9   injure or threatened to injure others.

10      Now, there's no suggestion by the government that the

11  defendant played a leadership role in the sense of leading some

12  of the malitias that were there that day or the other

13  politically affiliated groups in a combined effort.  The

14  government would submit based on the video that he's playing a

15  leadership role in the lower west terrace when he storms in

16  there while other people are also trying to storm, setting an

17  example for how it is they can get through that police line that

18  day.

19      And the defendant very clearly injured or attempted to

20  injure or threatened to injure others, others being several

21  police officers in the line that day.

22      So Your Honor, at this point there are jail calls I would

23  like to play.  I would like to do so perhaps after the defense

24  presents argument.

25        THE COURT:  Present everything now so that she can

1    respond.

2              MR. REGAN:  So Your Honor, I briefly spoke earlier,

3    and I will move it along.  One of most important things for the

4    Court to consider in this case when trying to fashion a

5    combination of conditions that can reasonably assure the safety

6    of the community, the defendant's remorse and acknowledgment for

7    what happened on January 6 is important, because it suggests --

8    a lack of remorse suggests he doesn't think he did anything

9    wrong, and it also suggests that his past is going to be relived

10   again.

11       And I've clipped a couple of jail call videos where the

12   defendant talks about his feelings that day and why he was

13   there.

14             THE COURT:  Before you do that, let me take a

15   two-minute break, and we will resume.

16       (Recess taken from 11:37 a.m. to 11:40 a.m.)

17             THE COURT:  Okay.  Go ahead.

18       (Audio recording played.)

19             MR. REGAN:  And then, Your Honor, in a second jail

20   call -- and there, just for context, the defendant is talking

21   about why he was there that day and what his intentions were.

22             MS. TAYLOR-SMITH:  Your Honor, I'm going to object to

23   him proffering what the defendant meant in his words.  His words

24   are what they are.

25             THE COURT:  Remind me.  I don't know if you've said

1    this, but who is he talking to?  His mother?

2            MR. REGAN:  That is my understanding, Your Honor,

3    correct.

4            THE COURT:  All right.  And is there a transcript of

5    the call?

6            MR. REGAN:  There is not, Your Honor.  I do have the

7    entire call for the Court, if the Court would like to hear it as

8    well.

9            THE COURT:  I would like to hear it.  So when you

10   submit the other exhibits, submit that as well.

11           MR. REGAN:  Understood, Your Honor.

12      And Ms. Johnson, I'm going to try to plug in the audio

13   again to see if it will play through, because I noticed the

14   Court was having a hard time hearing it.  Playing from 3 minutes

15   and 7 seconds.

16      (Audio recording played.)

17           MR. REGAN:  And I played through 3:30, and starting

18   again at the 11-minute mark.

19      (Audio recording played.)

20           MR. REGAN:  And then finally from 13 minutes.

21      (Audio recording played.)

22           MR. REGAN:  And I've stopped it at 14:04.

23      Your Honor, with respect to that jail call, it is notable

24   for several reasons.  First, the defendant is talking about once

25   again engaging with elected officials, whether it be through

writing, which is his only method right now to do so, including he mentioned Susan Collins, the senior senator from Maine.  This is the same rhetoric and behavior that the defendant displayed before January 6, to include directly before January 6 when he tells Congressman Golden that I will be there on January 6 and he is willing to object to his whole life.

He also says that this is a "show me the man and I will show you the crime" case, suggesting that there's some sort of government conspiracy afoot to entrap him into something that he didn't do, which the evidence in this case strongly disputes.

But most concerning, he says that one of the other inmates at the jail is telling him that the best thing he can do is bail out and rally the troops, use the momentum of Trump and segue that into his own little power base.

Your Honor, the defendant is giving us a playbook for what it is he plans on doing when he leaves jail if he were released today by this Court.  That is the same rhetoric and behavior we saw beforehand that led to the individual that we saw on January 6 assaulting federal law enforcement officers.

And then finally in the last one, Your Honor, starting at 2 minutes and 42 seconds.

(Audio recording played.)

MR. REGAN:  And then again at 5:57.

(Audio recording played.)

MR. REGAN:  And then finally from 7:13.

1          (Audio recording played.)

2          MR. REGAN:  And I've paused it at 8:06.

3          And Your Honor, that concludes the jail calls.  Just to

4     close on that point from the jail calls, throughout you can hear

5     the defendant has absolutely no remorse, in fact doesn't even

6     think that he did anything wrong, is talking about how it is --

7     what he can do when he gets out to have a ground swell of

8     support, things like he's going to ride the Trump wave again.

9          All of that suggests, as Magistrate Judge Harvey pointed

10    out in the detention hearing, somebody who not only lacks

11    remorse, but doesn't even believe they did anything wrong.  The

12    government has a hard time believing he's then going to follow

13    conditions of release set by this Court and follow the rules

14    when he's on the outside.

15         The actions of the defendant that day are so incredibly

16    dangerous, not only then but now, because he just goes -- if

17    he's released here today, the government has -- excuse me, the

18    defendant has those same opinions he had on January 6 today, and

19    nothing has changed since the defendant was held the first time

20    other than now he may move to a different state with the only

21    connection being his mother, who is also the woman on these

22    calls and, to be fair, does posit some good ideas for the

23    defendant in terms of staying out of trouble, but also appears

24    to enable some of those ideas as well when talking about elected

25    officials.  There's nothing to suggest that the defendant is not

1    going to continue the same path that got him detained once he's

2    released -- if he were to be released by this Court.

3        So for those reasons, Your Honor, the government would ask

4    that the Court again hold the defendant until trial based on

5    3142(f) for a crime of violence.

6        Thank you, Your Honor.

7            THE COURT:  Thank you.

8        All right.  Ms. Taylor-Smith, are you ready to go forward?

9            MS. TAYLOR-SMITH:  I am, Your Honor.  I'm going to

10   move the microphone as close to me as I can get it to assure

11   that the Court can hear me.  Is that good?

12           THE COURT:  Yes, I can hear you very well.

13           MS. TAYLOR-SMITH:  Thank you.

14       Your Honor, I'm going to break up my argument into three,

15   maybe four sections.  The first section is prior to the

16   incident, prior to January 6.

17       The government proffers that my client somehow was

18   coordinating his visit to Washington, D.C., on January 6.  In

19   support of that, they provide a letter purportedly written by

20   Mr. Fitzsimons.  However, as the Court was not advised,

21   Mr. Fitzsimons doesn't have any social media presence.  He did

22   not himself post anything anywhere.  He couldn't, because he

23   doesn't have a Facebook page.

24       And telling individuals -- even if the letter is from him,

25   telling individuals that he intends to go to Washington, D.C.,

to do something that many local, state, and federal officials
has told him he has a right to do is not the same as
coordinating an attack on the country.

The government started off by asking the Court to begin its
analysis with the fact that what happened on January 6 is
something unlike we've ever seen in our lifetime.  But I would
ask the Court to start its evaluation of whether or not
Mr. Fitzsimons should be released on a bedrock of our system of
criminal justice, and that is that every individual defendant
who appears before this Court is in fact an individual and
should be judged on his actions and not necessarily on the
actions of individuals who may have been around him.

There's some sort of suggestion that Mr. Fitzsimons went
from one end of the Capitol to the other end of the Capitol to
another end of the Capitol until he found the most violent area
and then decided to engage.  There's just no evidence of that,
Your Honor.

The fact of the matter is, he went to Washington, D.C.,
alone.  He stayed in a hotel.  He visited the Washington
Monument, the Lincoln Memorial, and Catholic churches.  And
although the government did provide the Court with some of the
photographs that were downloaded from my client's phone, they
didn't provide them with client's sightseeing photographs
because it doesn't fit their motive that his only reason for
being in Washington, D.C., was to be violent and to be

1    aggressive.

2          THE COURT:  I'm sorry.  I didn't understand.  The what

3    photograph?  The one they didn't provide was the what

4    photograph?

5          MS. TAYLOR-SMITH:  The only photograph they provided,

6    Your Honor, was the photograph that my client took while he was

7    standing on the parapet and you could see the crowd.  That was

8    the only photograph that the government took from my client's

9    phone that they provided for the Court.  But it was not the only

10   photograph that was taken while he was in Washington, D.C.

11   There were other photographs taken of him doing what individuals

12   do when they come to Washington, D.C., which is sightseeing.

13   And they didn't provide those to the Court because it doesn't

14   fit their narrative that his sole purpose in coming to

15   Washington, D.C., on January 6 was so that he could be violent.

16   There just is no evidence of that.

17        Your Honor, I want to move on to what he did while he was

18   in D.C.  The Court at this point has had an opportunity to view

19   the video, Exhibit 7A and 7B.  I'm going to ask the Court to

20   take a look at the video again but this time from my computer

21   where I slow it down.

22          THE COURT:  Okay.

23        (Video recording played.)

24          MS. TAYLOR-SMITH:  Your Honor, this is the exact same

25   view that the government showed of what happened, and it just

1    starts a few moments before the government's video.  As you can

2    see, there is an officer who is perched higher up who has just

3    maced the entire crowd, and Mr. Fitzsimons at this point is not

4    seen on the video.

5         The government has proffered that Mr. Fitzsimons was

6    somehow a leader here.  But as you can see, he's not even

7    present 15 seconds at this point in the video.

8         I'm going to pause it.

9         At this point is the first time that you can see

10   Mr. Fitzsimons in the video.  His head is down.  There's one

11   individual -- two individuals in front of him, and he is on the

12   right side near the archway.  His head is down just after we see

13   the Capitol officers mace the entire crowd.

14        (Video recording played.)

15            MS. TAYLOR-SMITH:  You can see there's an individual

16   in front of Mr. Fitzsimons who is engaging in physical

17   altercation, but Mr. Fitzsimons is just standing behind him.

18        I'm going to pause it here.

19        At this point in time, Your Honor, you can see that there

20   is an officer who is down on the ground, an individual who has

21   his hand on that officer wearing a black tactical helmet and a

22   black jacket, and Mr. Fitzsimons with one part of his body, the

23   right side of his body outside of the view and the left side of

24   his body touching the individual, not the officer.

25        (Video recording played.)

1          MS. TAYLOR-SMITH:  You can see that person pulling on

2     the officer, and then the officer stands up.  Mr. Fitzsimons at

3     this point has not touched anyone.  The Court can see that

4     Mr. Fitzsimons's hand reaches out, but he does not make physical

5     contact with anyone before he is maced again.  Mr. Fitzsimons is

6     bending over, and it is at this point in time that an officer,

7     not the sergeant who allegedly struck Mr. Fitzsimons, but

8     another officer about three officers back begins to raise his

9     baton and lower his baton.  You can see from that vantage point

10     that there are at least three or four people with their heads

11     bent down.

12          I'm going to just rewind for one second, because I missed

13     the portion that I wanted the Court to notice.  I'm sorry.

14     Court's indulgence.  Your Honor, I've rewinded it back to

15     16:11:21.

16          (Video recording played.)

17          MS. TAYLOR-SMITH:  There are a number of individuals,

18     Your Honor -- this is what I wanted the Court to see.  There are

19     a number of individuals who are underneath Mr. Fitzsimons at

20     this point, both protestors and, I assume, although I cannot

21     see, an officer.  But there are at least three or four people

22     under Mr. Fitzsimons at this point.

23          (Video recording played.)

24          MS. TAYLOR-SMITH:  He's hit once.  You will see the

25     baton go back and come down and strike again.

1       Your Honor, at this point in time, you can see that Kyle

2   Fitzsimons's left arm is raised up.  It's not touching anybody.

3   And the rest of his other arm is somewhere under his body.

4           THE COURT:  Can you point on the screen?

5           MS. TAYLOR-SMITH:  Yes.  Your Honor, this is his left

6   arm.  You will see the white coat --

7           THE COURT:  Okay.  I see it.

8           MS. TAYLOR-SMITH:  -- with the sweatshirt.  And the

9   rest of his body is underneath him somewhere not visible, but

10  certainly not dragging a sergeant down -- or out of the archway.

11      (Video recording played.)

12          MS. TAYLOR-SMITH:  This is the portion of the video

13  that the government showed where now you can no longer see

14  Mr. Fitzsimons.  This is before the second interaction occurs.

15      Your Honor, I only show that to say that the video speaks

16  for itself, and the fact that Mr. Fitzsimons has at this point

17  maintained his innocence, he is charged in a 10-count

18  indictment, 10 counts, and the fact that he at this point is

19  maintaining his innocence on one or some or all of those counts

20  does not mean that he does not -- has not acknowledged

21  wrongdoing in some way, shape, or form.  We haven't gotten to

22  that point yet, Your Honor.  We have not gotten to the point

23  where Mr. Fitzsimons would be able to acknowledge any

24  wrongdoing.  He has an absolute constitutional right to a trial

25  and enjoys the same presumption of innocence as every other

1    member of our community.

2          He went to the rally alone.  He left the rally alone.  He

3    walked to his car alone.  He walked to the Capitol alone.  And

4    but for the fact that there are other individuals who are also

5    engaging in conduct, he's not a leader, he's not an organizer,

6    and Your Honor, he is not working in concert with anyone else.

7          After -- shortly after the second incident that the Court

8    saw, Mr. Fitzsimons is taken to the hospital where he received

9    eight staples.  The photograph that the government provided of

10   the white coat with the blood on it was taken at the hospital.

11   And then he returned to Maine.  He did not go to Maine and rally

12   the troops.  He did not go to Maine and start discussing next

13   steps.  He went back home.  That was it.

14         And by the way, he went back home to the same house that he

15   shared with his wife.  There was no discussion at that point of

16   him moving out.  There was no discussion at that point of them

17   ending their marriage.  He went back home where he was

18   surveilled by the FBI agents and ultimately arrested.  So the

19   whole indication that his wife gave him an ultimatum prior to

20   January 6, it's either politics or your daughter, it's just a

21   salacious rumor, Your Honor.  The fact of the matter is, after

22   January 6, he went back home and continued his marriage with his

23   wife living with his daughter.

24         Subsequent, and I think that this was captured on the phone

25   calls, his wife has experienced some harassment as a result of

1    his arrest, and the parties have agreed that it would probably

2    not be best for him to return to that home, which is why his

3    mother has offered to open up her home.

4        The government points to my client's prior advocacy as a

5    reason why in his nature and history and circumstances that he

6    poses some sort of dangerousness to the community.  They point

7    to these newspaper articles, all of which, by the way, were

8    published subsequent to January the 6th, in which everybody has

9    on their Monday morning quarterback headsets and want to talk

10   about how he was irritable, agitated, and violent.

11       But the truth of the matter is, not during one of those

12   interactions with any lawmaker was law enforcement ever called,

13   was he ever removed from a setting, were any steps taken by any

14   individual, whether or not it be the selectmen in his township,

15   his state representatives, or his federal representatives, to

16   either change their security protocols as a result of him, to

17   change any policy or procedures as a result of him.

18       His opinions may not have been popular, and yes, they may

19   have been, you know, littered with xenophobia and racism and

20   sexism, but we don't punish people in this nation because of

21   their thoughts and their opinions.  I ask the Court to take that

22   into consideration as well.

23       In the government's response to my motion, they cited the

24   case of Sabol as a guide to what this Court could look toward

25   when deciding whether or not to grant or deny release of my

1    client.  I don't want there to be any misconceptions.  Mr. Sabol

2    is accused of taking an officer, dragging him down a flight of

3    steps, and beating him and then standing over another officer

4    and beating that officer and then going back home and attempting

5    to commit suicide.

6        Those are not the facts that we have in this case, Your

7    Honor.  They're not analogous.  Mr. Mr. Fitzsimons's case is

8    more analogous with the case of Brian Bingham, 21-mj-430.

9        THE COURT:  Is that one cited in your brief?

10       MS. TAYLOR-SMITH:  It is not, Your Honor.

11       THE COURT:  Okay.  Let me get that information.  Brian

12   Bingham?

13       MS. TAYLOR-SMITH:  Bingham, B-i-n-g-h-a-m, which is at

14   21-mj-430, who was accused of punching and kicking officers.

15   The only exception is he was actually inside the Capitol

16   building when he was doing it.

17       Or the case of Steven Cappuccio, C-a-p-u-c-c-i-o, which is

18   at 21-cr-40, who can be seen visibly removing the gas mask of an

19   officer who is being pressed against a door inside the Capitol

20   and screaming while that officer was being maced.

21       Or Bruno Cua, C-u-a, which is cited in my case and also in

22   the government's case, where he was inside the Capitol building

23   pushing officers.

24       THE COURT:  Hold on one second.  Where is that?

25       MS. TAYLOR-SMITH:  It's the government's motion, page

1    12, 21-cr-107.

2           THE COURT:  Okay.  Got it.

3           MS. TAYLOR-SMITH:  Or the case of David Judd,

4    21-cr-40.

5           THE COURT:  No, 40 was Cappuccio, unless they're

6    co-defendants in the same case.

7           MS. TAYLOR-SMITH:  Yes, they're co-defendants, where

8    Mr. Judd is accused of trying to ram the line and throwing a lit

9    item at law enforcement while in the lower west terrace, some 30

10   minutes after Mr. Fitzsimons had already left the lower west

11   terrace.

12          Your Honor, all of these individuals have been released

13   with some conditions, and those cases are a lot more analogous

14   to Mr. Fitzsimons's case than the case that the government cites

15   as kind of seminal, which is the Sabol case.

16          I would ask that the Court take into consideration -- you

17   can stop sharing my screen.

18          Your Honor, in the *Munchel* case, there are two factors that

19   I would like to draw the Court's attention to, factor 3 and

20   factor 6, and the statements that were made by the Court in that

21   case.

22          In 3, the case is overturned because it is determined that

23   the district court did not demonstrate that it adequately

24   considered, in light of all the record evidence, whether the

25   defendants who were a part of a mob or assault on the Capitol

1    illegally entered the Capitol, carried weapons onto the grounds,

2    and showed no remorse for their actions but had limited criminal

3    history, whether or not that group, the group I just described,

4    whether or not they actually presented an identifiable, an

5    articulable risk to some individuals in the community.

6            THE COURT:  All right.  Can you repeat to me, what

7    case is that you're quoting?

8            MS. TAYLOR-SMITH:  It's the *Munchel* case.

9            THE COURT:  The circuit case, yeah.

10           MS. TAYLOR-SMITH:  And also, Your Honor, whether or

11   not the defendant posed such a threat outside the specific

12   context of where the government wanted you to start its inquiry,

13   January 6.

14       Your Honor, taking those things into consideration, taking

15   into consideration the fact that he has a limited criminal

16   history, there was no planning involved -- he's not one of those

17   individuals who arrived in Washington, D.C., with firearms,

18   knives, mace, zip ties, tactical gear.  Whether or not he was a

19   leader, he acted alone, Your Honor.

20       This is -- the government has infinite discretion in

21   charging individuals and literally could have charged each and

22   every single one of those individuals in the lower west terrace

23   with some sort of conspiratorial or aiding and abetting.  He's

24   not charged with that.

25           Whether or not there are conditions that the Court can put

1    into place that will ensure both his appearance in court -- and

2    just so the record is unblemished, there has been no suggestion

3    that Mr. Fitzsimons is a flight risk.

4           THE COURT:  Is a?

5           MS. TAYLOR-SMITH:  Flight risk.

6           THE COURT:  I agree with that.

7           MS. TAYLOR-SMITH:  And so that is why I focus most of

8    my argument on the dangerousness.  And the idea that the Court

9    should first and foremost look at the context of January 6

10    diminishes the fact that there are other factors for the Court

11    to consider.  And I would argue that after weighing those

12    factors, they weigh in favor of my client's release.

13      There are two letters that I would like to provide to the

14    Court at this time.  I've already provided a copy to counsel.

15    One letter is a letter I received yesterday from

16    Mr. Fitzsimons's mother, who has agreed not only to let her son

17    come live with her, she has gone through the expense of having a

18    landline placed in her home so that he might be able to do so on

19    electronic monitoring.

20      And also, his neighbor who knew him prior to January the

21    6th and engaged in discussions with him -- and the Court will be

22    able to read them.  I will let his words speak for him, not my

23    words interpreting his words as to Mr. Fitzsimons's character or

24    level of dangerousness in the community which he came from prior

25    to January 6.

1        May I approach?

2            THE COURT:  You may.  Give me a moment to look at

3    them.

4        (Pause.)

5            THE COURT:  Okay.  I've read them both.  Go ahead.

6            MS. TAYLOR-SMITH:  Your Honor, the last two things

7    that I would like to address are the issues with Pretrial

8    Services.

9        As the government is aware, because prior counsel proffered

10   this to the Court, Mr. Fitzsimons did not participate in the

11   interview with Pretrial Services in Maine on the advice of

12   counsel in Maine.  There was no subsequent refusal to do so, no

13   subsequent refusal to cooperate in any way, shape, or form.  He

14   has had zero, zero infractions while he is in custody at this

15   point.

16       And really, if the government is really concerned about him

17   coordinating with others, then maybe moving him out of the CTF

18   where he's being held with, you know, two dozen other

19   individuals charged with similar offenses with their own ideas,

20   maybe that's a good start, removing him from CTF.

21       And finally, Your Honor, as it relates to the jail calls,

22   imagine being punished for motherly advice about how to stay out

23   of custody.  Imagine, Your Honor, being punished for expressing

24   viewpoints.  I would argue that that's what we heard on those

25   calls.  There was no idea that he was going to be released from

1   custody and join the Proud Boys or the Three Percenters or any

2   other extremist groups whereby he would have access to

3   additional methods to wreak havoc on our country.

4        I ask that the Court consider releasing him so that he

5   might reside with his mother in Titusville, Florida, that the

6   Court, in order to ensure the safety of the community and

7   others, may place him on electronic monitoring or location

8   monitoring, that the Court give him an opportunity to show the

9   Court that he can adhere to the rules and regulations of

10  pretrial supervision in a similar manner as he's done while

11  incarcerated up to this point.

12       Mr. Fitzsimons has been in custody now since, I think,

13  April.  His trial is likely to take place in 2022.  And I ask

14  that the Court take all of those things into consideration when

15  deciding this motion.

16       Thank you.

17            THE COURT:  Thank you.

18            MR. REGAN:  May I, Your Honor?

19            THE COURT:  You may.

20            MR. REGAN:  And I will keep it brief and use the same

21  format:  Before, during, and after.

22       So just to address some of the points about the defendant

23  before January 6 and, I guess, on January 6, the suggestion that

24  the defendant came to the Capitol on January 6 for anything

25  other than to attend the rally and then ultimately participate

1    in the events of that day is, in the government's opinion,

2    ludicrous.  The suggestion that he came here as a sightseer is

3    completely disproved by all the evidence in this case, to

4    include the defendant's own words on his jail calls where he

5    states, "I did exactly what was asked of me," because he is

6    somebody that ardently supports then President Trump.  The

7    defendant was not here as a sighseer that day.  The defendant

8    was here to express his political beliefs, which we

9    wholeheartedly agree with the defense he has a right to do.  As

10   Judge Harvey pointed out, your First Amendment rights are

11   completely curtailed when your First Amendment rights involve

12   violently assaulting federal law enforcement officers, which it

13   is very clear that he did on that day.

14       With respect to during, Your Honor, the government isn't

15   asking the Court to judge the actions of others around him.  The

16   government is asking the Court to use that as context, because

17   this is not the defendant walking into a situation where he

18   didn't know what was happening.  When the defendant walked up to

19   that lower west terrace, the defendant had a choice.  He's

20   actually at the lower west terrace for approximately 45 seconds

21   before he engages in any violence.  Instead of leaving, the

22   defendant then finds somewhere closer where he can actually

23   engage in violence and assaults federal law enforcement

24   officers.

25       The defendant wasn't looking to express his political

beliefs at that point.  The defendant was looking to either get in the building or hurt as many law enforcement officers as he could, because the crowd that day considered federal law enforcement traitors because they wouldn't let them inside the building, and that's exactly what the defendant did that day, not once, but twice.

The suggestion by the defense, when you slow that video down, that the defendant is not doing anything wrong again the government considers preposterous.  Because what is the defendant trying to do there?  What is he reaching for?  And when you watch that video, Your Honor, curiously, the moment that the defendant reaches for that officer is when the officer is on the ground and he is most vulnerable, and that is exactly what the defendant is trying to do.

Now, ultimately, by the heroism of the officers, he is unsuccessful in dragging that officer into the crowd, but that doesn't stop the fact that that's exactly what he was doing, and they had to beat him with a baton to break his grip.  Beaten with a baton, undeterred, he then moves to the center of the crowd, steels himself, stares directly at the officers, and goes head long into a group of officers, those same officers that he just assaulted and then hit him with a baton to stop him.

The defendant didn't stop, because he wasn't there to express his First Amendment rights that day or his support for President Trump.  At this point in time, the defendant is there

1   to assault officers.

2        Now, it's worth noting, Your Honor, in the *Munchel* opinion,

3   there's some conversation about the moment and whether or not

4   that political moment still exists and whether or not that's

5   even relevant.  Judge Harvey posited in the detention hearing in

6   this case that there's some suggestion that that political

7   moment is over.  However, he disagrees with that, and the

8   government does as well, because that political moment is still

9   currently here.  As the Court well knows, the rhetoric that

10  brought the defendant to the Capitol on January 6 is alive and

11  well.  It is all over the news.  It's all over the defendant

12  when he's talking about his jail calls.  It is still the number

13  1 news story in the United States.

14       That is the world that the defendant is asking to be

15  released into, the same world that got him here that led him

16  from town hall meetings to harassing calls to congressmen to

17  more harassing calls to congressmen, to include the suggestion

18  that he is willing to object to his whole life and I will be

19  there on January 6, to ultimately what we saw on those videos.

20       To release the defendant, who has shown no remorse and has

21  made very clear his political opinions about that day, would

22  create a serious danger to the community, a community to which

23  he has no ties other than his mother.

24       And then finally after, Your Honor, and perhaps this might

25  be the most salient point.  The defense likes to characterize

what the defendant did that day, he went to the hospital and got
stitches and then he went home, and that's true.  And that's
true.  The defendant absolutely did go home.  And he went home
to his wife, who at the time, including the defendant, had no
idea the enormity of the trouble that the defendant was about to
be in.

But regardless, what does the defendant do when he gets
home?  The very first thing, the defendant calls Lebanon Town
Hall, which is Exhibit 2, and gives a 15-minute monologue of the
things that he saw and the things that he did.  He says things
like, "Trump is leading an army of lions through lawfare.  If
the republic was going to die that day, I was going to be there
to see it."  Those are the things he's saying after January 6.

He then provides the interview to the Rochester Voice.  And
the reason the government included the photo that is seen in
Exhibit -- just a moment, Your Honor -- 10, is, one, it provides
context.  That's what the Capitol looked like that day.  That's
what the defendant saw when he decided that he was going to
assault police officers.  And most importantly, that was
provided by the defendant to the Rochester Voice, because in the
days after January 6 the defendant still didn't think he had
done anything wrong.

In fact, he wanted to tell the world about it.  He is still
trying to tell the world about it.  In those jail calls, the
government has somewhat -- some reservations about the way his

mother handles, but if you want to characterize it as motherly advice, that's fine.  The government is more troubled by what it is that the defendant said.  A groundswell of support.  He's now famous because he's all over the news.  Again, quotes like, "I'm going to write letters.  I've got Susan Collins's ear.  Show me the man, I'll show you the crime.  I need to get bailed out and rally the troops, use momentum, segue into my own little power base."  Those are direct quotes.  That is the defendant not only after January 6, after he has been arrested and charged.

If the defendant in this moment does not know the enormity of the consequences he is facing, then when will he?  And despite that, he is still saying things to suggest that he is politically motivated to continue the movement.  To the government, that strikes as somebody who will not be willing to comply with conditions of release and is just going to continue the way he was acting beforehand after.

Now just a couple of points of clarification, Your Honor. The government cites the Sabol opinion not for the proposition that the facts are analogous, although the beginning facts are, but for some of the quotes within, to include Judge Moss's exposition on January 6 writ large.

In *Munchel*, which again the defense referenced, there's a quote in the *Munchel* opinion that says those who actually assaulted police officers are in a different category of dangerousness than those who cheered on the violence or entered

1    the Capitol after others cleared the way.

2         To be absolutely clear, the defendant is in the category of

3    people who actually assaulted police officers, multiple police

4    officers.  He is not somebody casually there.  He is not

5    somebody just cheering on the violence.  And he is not somebody,

6    as the defense suggested, who is sort of happening upon the

7    lower west terrace.  There are throngs of people behind the

8    defendant, thousands of people.  The defendant had to make his

9    way all the way up there and witness the incredible violence

10   that was happening.  That did not stop him.

11        And that's because, Your Honor -- the government doesn't

12   believe there is a condition or combination of conditions that

13   can stop the defendant, because the defendant is in the same

14   place he was on January 6th.

15        And then finally, I don't know the facts of all of the

16   cases that the defense cited.  I am somewhat familiar with Cua,

17   and I would distinguish Cua quite a bit.  Cua, although inside

18   the building, it is my understanding that he is charged with

19   shoving an officer as he attempted to enter the Senate gallery

20   door.  Albeit still an assault, a much less violent assault in a

21   much less violent portion of the Capitol on January 6, because

22   again, Your Honor, context matters.  The defendant goes to the

23   most violent place of the Capitol and decides that he is going

24   to participate.  And you can see in that video, he is a rallying

25   cry for others around him.  There are crutches, pepper spray,

1  bear spray, at certain points ladders, riot shields.  The

2  defendant is at the very front of that line.

3      The defendant doesn't need to say things like follow me or

4  be an organizer.  He is leading by his actions.  Others are

5  watching him and then joining in, and that's what made it so

6  dangerous.  When other people are at the front of the line

7  assaulting officers, everybody behind them then jumps in, and

8  that is why that was so tremendously dangerous that day.  Those

9  officers were literally fighting for their lives because of

10  defendants like Mr. Fitzsimons.

11      Your Honor, it's for those reasons that the government asks

12  that the defendant continue to be held until trial.  Thank you.

13          THE COURT:  Thank you.

14      Ms. Taylor-Smith, because it was your motion, I will give

15  you the last word.

16          MS. TAYLOR-SMITH:  Thank you, Your Honor.  Your Honor,

17  I just have four very quick points.

18          THE COURT:  Sure.

19          MS. TAYLOR-SMITH:  My first point is that my assertion

20  in saying what Mr. Fitzsimons did when he arrived in D.C. was

21  not that he was only here as a sighseer.  I wasn't asserting

22  that.

23          THE COURT:  I understand.

24          MS. TAYLOR-SMITH:  Okay.  So I will move on from that.

25      Secondly, Your Honor, the idea that my client might still

1    be politically motivated, the Court could order him as a

2    condition of release to refrain from using -- well, he doesn't

3    use social media, but from, you know, calling legislators,

4    local, federal, state, and writing letters to them in reference

5    to both his case and, you know, the incident that occurred on

6    January the 6th, because that's really what he's talking about

7    on these phone calls.  Right?  He's talking about how he can

8    find a way to help himself, the groundswell of support, you

9    know, the people like the Congress people who show up at the CTF

10   and attempt to get inside.

11       But that's the echo chamber that the government has placed

12   him in.  He's only getting that side of the news.  And so I ask

13   that the Court remove him from that echo chamber so that he can

14   see what's going on with the rest of the world.

15            THE COURT:  Sure.  I'm not concerned with letter

16   writing or telephone calls or anything of that nature unless

17   they're intimidating.  I'm more concerned with him cornering

18   someone in a parking lot, as the article -- granted, it is a

19   statement post-January 6, but it is a concerning statement.

20   That's what I'm more concerned about.

21       There's lots of people under threat, you know, vote

22   counters and election officials in various states, and there's

23   lots of demonstrations.  The threat is not over.  The fences are

24   literally going up around the Capitol as we sit here today.  So

25   the threat is not over.  That's what I'm more concerned about.

1      The government overplays a lot of the jail calls and the

2   like.  I don't care if he fund-raises.  That's his prerogative.

3   I'm more concerned that he repeat what he did on January 6.

4      And I understand your point that January 6 is a very unique

5   context.  Let's hope that it is.  It's still -- given that the

6   fences are going up as we speak, it's still unclear how unique

7   it is.  Hopefully, it is unique, but it's still unclear whether

8   that's in fact the case.

9      So that will be the focus of my entire thinking.

10      MS. TAYLOR-SMITH:  Just so the Court is clear, like I

11   said, even the Monday morning quarterbacking with the state

12   legislator, it's not as if this woman was shopping at a

13   supermarket and Mr. Fitzsimons cornered her there.  His local

14   elected officials have monthly town halls, and he was attending

15   one of her monthly town halls.  And now, after she's hearing

16   that he's at January 6, she has decided that that was a very

17   aggressive and assertive way to get his point across.  But she

18   didn't call law enforcement at the time.  She didn't call

19   anybody.  She didn't tell anybody about it.  She didn't put his

20   picture up at the office.  She didn't prevent him from attending

21   any future town halls.  She said odd bird, go away, I heard you,

22   and then she continued about her responsibilities and her

23   duties.

24      And that just goes to show that although he is charged with

25   what he's charged with for January the 6th, he has not

1    demonstrated himself to be this kind of, you know, individual

2    who came to Washington with weapons and zip ties and duct tape

3    and flak jackets and, you know, other items to show that he was

4    here to commit violence.  And that's what I would ask the Court

5    to take into consideration.

6           THE COURT:  Okay.  Thank you.

7        All right.  I will take the motion under advisement.  I

8    want to review all of the evidence, only part of which has been

9    presented to me, and I want to look very closely at the

10   comparators.

11       I've only had to have made this decision once before.  All

12   my other defendants are on release.  But that was a more clear-

13   cut case in which the defendant had sprayed an officer with bear

14   spray, and every case I looked at of a defendant in that

15   situation the defendant had been detained, which is what I did.

16       This is a closer case, you know.  Part of the problem we

17   have is that we have a multitude of prosecutors making

18   decisions.  We have a multitude of magistrate judges making

19   decisions.  So there is a gradation of decisions across the

20   board, and it's hard to draw any firm rules other than the bear

21   spray.

22       So I will have to study some of these cases and comparators

23   and kind of figure out how best to proceed, and I will do that,

24   obviously, as quickly as practical.

25       All right.  Putting that motion aside, what's the next step

1     for the substance of the case?

2              MR. REGAN:  So Your Honor, I think at the last hearing

3     we had discussed potentially setting a trial date.  However, we

4     were waiting until this happened.  I don't know if the defense

5     is ready to set a trial date.  I think that may be influenced by

6     the Court's decision on the motion here today.

7          So I would suggest to the Court that until the Court makes

8     a decision we just set a status hearing out, and then based on

9     that decision, we can set a trial date.

10             THE COURT:  Okay.

11             MS. TAYLOR-SMITH:  Your Honor, I'm fine with that

12    suggestion.

13             THE COURT:  Okay.  So my schedule is still wide open

14    essentially for December and possibly January as well.  So I

15    think putting off the decision now as to a trial date will not

16    negatively impact scheduling it.  Now, there's -- we are still

17    under COVID protocols as far as space and only three trials

18    going forward at any one time.  So we may face that problem,

19    aside from my personal availability.

20         But let's come back in 30 days, and then hopefully we can

21    set a trial date then.

22             COURTROOM DEPUTY:  By Zoom or in person?

23             THE COURT:  By Zoom.

24             MS. TAYLOR-SMITH:  Your Honor, is that going to be an

25    in-person hearing or virtual?

1        THE COURT:  My preference is Zoom, if that's the

2   preference of the parties.  My practice has been if folks demand

3   in person I consent to that.  So it's kind of up to the

4   defendant.

5        MS. TAYLOR-SMITH:  He would like it to be via video,

6   if at all possible.  I guess there's some consequences as a

7   result of him having left the prison today.

8        THE COURT:  No, that's understandable.  He's not alone

9   in that position.  So if we can do it by Zoom, that is my

10  preference as well.

11       MS. TAYLOR-SMITH:  Thank you.

12       COURTROOM DEPUTY:  Is everyone available on the 20th

13  of October at 12:30?

14       MS. TAYLOR-SMITH:  Yes.

15       COURTROOM DEPUTY:  It looks to be available right now,

16  but I can't tell because I don't have access to all of the

17  calendars.  So 12:30 looks to be available on October 20th.

18       MS. TAYLOR-SMITH:  Ms. Johnson, just so that you are

19  aware, the only bad day for me that week is the 18th.

20  Otherwise, I will make myself available.

21       COURTROOM DEPUTY:  Okay.

22       THE COURT:  All right.  So that's October 20th at

23  12:30.

24     And the motion is still pending.  So the time under the Act

25  is still tolled.  But I hope to rule before October 20th.  So

1    what do the parties want to do with respect to the speedy trial

2    from whatever point in time I rule to October 20th?

3              MS. TAYLOR-SMITH:  Your Honor, I will agree to waive

4    the time between your ruling and the 20th of October.

5              THE COURT:  All right.  So in the interest of justice

6    and with the consent of the parties, I will toll the Act between

7    any gap in the period between which I rule on the pending

8    motion, which is currently tolling the time, and the next status

9    hearing that is now set for October 20th at 12:30.

10             Anything else we need to resolve today?

11             MR. REGAN:  Your Honor, does the Court request any

12   additional briefing based upon the cases cited by the defense

13   today?

14             THE COURT:  No, I don't think so.  I just want to look

15   at the evidence.  I think the easiest thing to do would be to

16   put all the exhibits on a single disk and then hand-deliver that

17   to the Court.  What you recently hand-delivered had like four of

18   the exhibits on it, and I think, just for completeness, it makes

19   sense to have them all in one place.

20             MR. REGAN:  Understood, Your Honor.

21             MS. TAYLOR-SMITH:  Would the Court also like me to

22   provide you with the slowed-down version?  I assume the Court

23   has the ability to slow it down, but I never assume anything.

24             THE COURT:  I assume I have that ability, but I have

25   never done it myself, and the body-worn camera is a unique

1    program that --

2            MS. TAYLOR-SMITH:  I'm happy to provide it to the

3    Court.  You have a young law clerk who might be able to assist.

4            THE COURT:  If it's not too much effort on your part,

5    go ahead and submit it.  That might save me a little bit of time

6    and frustration.

7        All right.  Anything else we need to resolve today?

8            MR. REGAN:  No, thank you, Your Honor.

9            MS. TAYLOR-SMITH:  Nothing for the defense.

10           THE COURT:  Thank you.  You're excused.

11       (Proceedings adjourned at 12:47 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

          I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.

Sara A. Wick                              October 23, 2021
SIGNATURE OF COURT REPORTER               DATE