UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 21-CR-158-RC |
| | : | |
| KYLE FITZSIMONS, | : | |
| Defendant. | : | |
| | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT KYLE FITZSIMONS' MOTION FOR TRANSFER

Nearly 45 years ago, the *en banc* D.C. Circuit rejected the argument made by defendant Kyle Fitzsimons here: that based upon "the District of Columbia's voting record in the past two presidential elections[,]" the defendants could not receive a fair trial in this District and a change of venue was required. *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc). In that case, the defendants were former high-ranking members of the Nixon administration, and they were charged with crimes arising from the Watergate scandal, which "received extraordinarily heavy coverage in both national and local news media." *Id.* at 51, 59. Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, the court declared that, "[n]ot without reason, the relevance of this information seems to have escaped the prosecution, the defendants, their counsel, and the trial court," and that there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43.

Significantly, although 93% of the Washington, D.C. population knew about the charges against the *Haldeman* defendants and 73% of those individuals had an opinion of the defendants'

guilt or innocence, *id.* at 144, the court of appeals nonetheless held both that the district court "was correct to follow this circuit's well-established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 64. And it found that an "extensive voir dire" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70.

The same holds true here. As with similar motions filed by other Capitol Attack defendants, Fitzsimons' pre-voir dire Motion for Transfer (ECF No. 47) should be denied as premature. As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that Fitzsimons receives a fair trial by an unbiased jury. "And if an impartial jury actually cannot be selected, that fact should become evident at the voir dire. [Fitzsimons] will then be entitled to any actions necessary to assure that he receives a fair trial." *Haldeman*, 559 F.2d at 63.

## BACKGROUND

Hundreds of individuals from all over the country traveled to Washington, D.C. for the events of January 6, 2021. On that date, as a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election, members of a large crowd that had gathered outside forced entry into the U.S. Capitol. Others in the crowd encouraged and assisted those acts. Scores of individuals entered the U.S. Capitol without authority to be there. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials. This event in its entirety is hereinafter referred to as the "Capitol Attack."

As relevant here, Defendant Kyle Fitzsimons was one of the individuals who physically attacked law enforcement officers defending an entrance to the U.S. Capitol on January 6, 2021. He traveled to the District of Columbia from his home in Maine, committed federal crimes in the District of Columbia, and subsequently was indicted by a federal grand jury in the District of Columbia. The grand jury charged Fitzsimons with: two counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Counts One and Two); (2) Obstruction of an Official Proceeding, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); (3) two counts of Inflicting Bodily Injury on Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Four and Five); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Six); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Seven); Engaging in Physical Violence in a Restricted Building or Ground, in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Nine); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Ten). *See* Indictment (ECF No. 5).

National and local news stations across the United States covered the events of January 6, 2021, and the Capitol Attack. Over 600 individuals have been charged in connection with the Capitol Attack, and the government expects that hundreds more will be charged.  Fitzsimons is only one person in a sea of hundreds from all over the country who have been charged in the District of Columbia based upon their involvement in the Capitol Attack. According to Fitzsimons, however, his trial should be transferred to the District of Maine because "[a] trial in Washington D.C. for Mr. Fitzsimons would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a 'white nationalist' attack by people with 'white

3

privilege,' who are continuously told they were victims of an 'insurrection,' who were placed under curfew and locked down as a result, and who have been placed under seemingly endless military hold because of danger posed by 'Domestic Violent Extremists.'" Memorandum in Support of Kyle Fitzsimons' Motion for Transfer (ECF No. 47) (hereinafter "Motion") at 12. As discussed below, Fitzsimons' Motion is both premature and meritless.

## ARGUMENT

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) ("Article III, § 2 of the Constitution requires that local crimes be prosecuted locally"). And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin,* 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (Collyer, J.). If "extraordinary local prejudice will prevent a fair trial," however, a defendant may request that the case be transferred to another district under Federal Rule of Criminal Procedure 21(a). *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) ("Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."). It is the defendant's burden to establish his entitlement to a transfer of venue. *See, e.g.*, *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("the courts have held that the criminal defendant has the burden of making the case for transfer" under Rule 21(b)); *United States v. Capo*, 595 F.2d 1086,

4

1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity.").

### I.    Fitzsimons' Motion Should Be Denied Without Prejudice As Premature.

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudicial pretrial publicity is after voir dire. In the overwhelming majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all seated jurors can be fair and impartial and to provide a criminal defendant with the fair trial to which she is entitled. *See, e.g.*, *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) ("[A]ny high-profile case will receive significant media attention. It is no surprise that people in general, and especially the well-informed, will be aware of it. Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process."). As the D.C. Circuit has explained, "'[t]he ultimate question'" on a motion to transfer venue based upon prejudicial pretrial publicity "'is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.' It is then, and more usually only then, that a fully adequate appraisal of the claim can be made, and it is then that it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (quoting *Blumenfield v. United States*, 284 F.2d 46, 51 (8th Cir. 1960)). "If an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial." *Haldeman*, 559 F.2d at 63. Consistent with this approach, notwithstanding the "extraordinarily heavy coverage in both national and local news media" that the Watergate scandal received, the en banc court in *Haldeman* held that "the District

5

Court was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire. *United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled that a trial court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (quotation marks omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure."). As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

Fitzsimons concedes that "[t]he D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity," and that the Supreme Court has not "bar[red]

a court from deferring the decision on a change of venue motion until voir dire[.]" Motion at 23-24. He nonetheless asserts that this Court should grant a change of venue *now* because "the D.C. Circuit's usual practice of deferring a motion for transfer until after voir dire is insufficient to protect the defendant, and may instead result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication." Motion at 25. Although there may exist cases in which "'adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed,'" *id.* at 34 (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)), that is a question for the Court to decide *after* it conducts voir dire, *United States v. Edmonds*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("The results of the *voir dire* itself demonstrate that the community was not inflamed against the defendants."). Indeed, although Fitzsimons claims that is the "focus of significant media attention," Motion at 6, it is unlikely that any significant segment of the D.C. population knows Fitzsimons by name, much less which crimes he is accused of committing. *See Edmonds*, 52 F.3d at 1097 ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from the media, much less formed an opinion about their guilt."). Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity." *Id.* And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of the defendants and their crimes, and have formed an opinion of the defendants' guilt. 559 F.2d at 70, 144. In any event, because the question whether it is possible to select a fair and impartial jury is one that can only be answered after a thorough voir dire, this Court should follow the D.C. Circuit's "well-established procedure" and, as with similar motions

filed by other Capitol Attack defendants,[1] deny Fitzsimons' pretrial motion to transfer venue without prejudice to his ability to bring that motion again at the appropriate time.

## II.      Fitzsimons Has Not Established Circumstances So Extreme as to Warrant a Presumption of Prejudice.

The Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381. "[N]ews accounts of the crime" do not "alone presumptively deprive[ ] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). That is because "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Skilling*, 561 U.S. at 381. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."). And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history: Dzhokhar Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*,

---

[1] Motions by other Capitol Attack defendants to transfer venue for virtually the same reasons put forth by Fitzsimons have been rejected as premature. *See United States v. Caldwell, et al.*, 21-CR-28-APM, ECF No. 415, at 11 and *United States v. Reffitt*, 21-CR-32-DLF, October 15 Minute Order.

561 U.S. at 399; *In re Tsarnaev*, 780 F.3d at 15; *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *Yousef*, 327 F.3d at 155; *Haldeman*, 559 F.2d at 70.

In none of these cases did the courts apply a presumption of prejudice arising from extensive pretrial publicity of the defendants' crimes. Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption. And the Supreme Court has done so in only three, "extreme" cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *See Skilling*, 561 U.S. at 379 (describing *Rideau*). The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536). And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined

for more than five hours without counsel" that was "televised live" and "ended in a public brawl"—
did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S.
at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about
Sheppard and the murder,' did not alone deny due process"). Nor has either the Supreme Court or
the D.C. Circuit presumed prejudice in any case in the 55 years since *Shepard* was decided. To the
contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that
the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen
questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an
opinion into the jury box." 467 U.S. at 1029, 1032 (1984). In *Mu'Min v. Virginia*, the Court
declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to
the defendant. 500 U.S. 415, 429 (1991). And in *Skilling*, the Court refused to presume prejudice
notwithstanding "the magnitude and negative tone of media attention directed at Enron" because
of the "large, diverse pool of potential jurors" in the Houston Area; the fact that, "although news
stories about Skilling were not kind, they contained no confession or other blatantly prejudicial
information of the type readers or viewers could not reasonably be expected to shut from sight";
"over four years [had] elapsed between Enron's bankruptcy and Skilling's trial"; and "Skilling's
jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process
rights were violated by the District Court's refusal to grant . . . a change of venue prior to
attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and
accusatory in content," pretrial publicity. 559 F.2d at 61. The court explained that, "unlike the
situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the
court "no reason for concluding that the population of Washington, D.C. was so aroused against

10

[the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated[.]" *Id.* at 61-62. The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals such as Rayful Edmund. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995) ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument is that no voir dire would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity. While Fitzsimons relies on news reports of his post-Capitol Attack statements to a town meeting recounting his involvement in the Capitol Attack, he fails to note that (1) he made the statements to a local town meeting in Lebanon, Maine, the very place he seeks to be tried; and (2) Fitzsimons' statements were hardly a confession, and merely stated his interpretation of the speeches made during the rally that preceded the Capitol Attack. *See* Motion, at 3. The news stories referring to Fitzsimons as a "racist conspiracy theorist," "racist and xenophobic," and "a freaking dangerous lunatic," are based on publicly available documents and news stories about Fitzsimons' conduct years before the Capitol Attacks. *See*

Motion, at 6 & n. 14-16.  These articles "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Indeed, given the sheer number of people number involved in the Capitol Attack, it is unlikely that more than a handful of D.C. residents could identify Fitzsimons by name, much less have gotten to know Fitzsimons as "a 'racist xenophobe' in that group of 'insurrectionists' who triggered the city siege." Motion at 47. The reporting on Fitzsimons' statements thus in no way resembles *Rideau*, where "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725. Whereas "Rideau's dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 561 U.S. at 382-83, Fitzsimons provides no reason to believe that, by the time his trial begins, D.C. jurors are likely to be able to remember and distinguish the reporting about him from that involving the many hundreds of other people charged as part of the Capitol Attack. And even if they could, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Id.* at 381.

The size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice. The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724. Indeed, the District is more populous than Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that

there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn[.]" 501 U.S. 1030, 1044 (1991).

Additionally, due to the backlog in trials for detained defendants caused by the COVID-19 pandemic, it appears unlikely that this case will be one "in which trial swiftly followed a widely reported crime[.]" *Skilling*, 561 U.S. at 383. And although there has been substantial publicity surrounding the Capitol Attack, that reporting has largely focused on either the Capitol Attack generally or on defendants other than Fitzsimons, and it has been nationwide, not merely "local." *Id.* at 378. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia"). Finally, this Court can take measures to prevent a "carnival atmosphere" from pervading Fitzsimons' trial and denying him "judicial serenity and calm" to which he is entitled. *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

Fitzsimons nonetheless argues that the court should transfer his case to the District of Maine *now*, without first conducting voir dire to evaluate whether it is possible to select an impartial jury, on the ground that "that detrimental pretrial publicity and community prejudice in Washington D.C. is so likely to have affected the jury pool that the venire must be presumed as tainted." Motion at 2. This is so, according to Fitzsimons, because "the jury who would hear the facts in Washington D.C. is the most politically prejudiced jury in the entire country." *Id.* at 3.

According to Fitzsimons, because he is a vocal supporter of former President Donald Trump, *id.*, and because "[a] trial in Washington D.C. for Mr. Fitzsimons would be by jurors who voted almost unanimously against Donald Trump," *id.* at 12, this Court should not even attempt to pick a fair and impartial jury in this case.

As previously discussed (at 1-2), the *en banc* D.C. Circuit rejected just such an argument in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. And the defendants were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," *id.*, that "led to the resignation of President Nixon," *id.* at 54 n.15. If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here. Ultimately, the question is whether the court can select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. The District's voting record hardly suffices to establish a presumption of prejudice so invidious that this Court should not even attempt to select such a jury.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals such as John Poindexter, Oliver North, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries. *See United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Stone*, Cr. No. 19-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020); *United States v. Libby*, 498 F. Supp.

2d 1 (D.D.C. 2007). Indeed, in *Stone*, Judge Jackson rejected an argument similar to the one

Fitzsimons makes here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you
> must not like Roger Stone, or if you are concerned about racism on the part of some
> of the President's supporters, then you must be applying that label to Roger Stone
> because he was a supporter, too. While there is no evidence that proves this
> hypothesis, there is evidence that contradicts it . . . . At bottom, the motion appears
> to be based on the defendant's assumption that the juror must have known who he
> was, what his relationship with Donald Trump has been over time, and what role
> he played in the campaign, and that since he was so central to the election, one
> could not possibly view him independently from the President. . . . But there is no
> basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31. Judge Jackson went on to explain that "[t]he case law in this Circuit

makes it clear that one cannot assume that people in the community — even those who follow the

news — have a deep understanding of the facts of a particular case. During the prosecutions that

arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly

expressed its confidence that jurors with open minds could be found within the District, even

though the investigations had received a great deal of public attention." *Id.* at *31. The same is

true here.

     In addition to being legally unsupported, Fitzsimons' assertions are also baseless in

numerous other respects. For example, Fitzsimons claims that, among the hundreds of people

involved in the Capitol Attack, he has been "the focus of significant media attention" Motion at 6.

As support for that proposition, Fitzsimons cites article by a *national* publications, such as

DailyKos, CNN and Esquire magazine. *Id.* at 6 n.15-17.  And Fitzsimons ignores the fact that the

first results that show up in a Google search for "Kyle Fitzsimons" are articles from WMTW 8,

the Portland Press Herald, and the Sun Journal, media outlets located in Maine—the precise place

where Fitzsimons seeks to be tried. *See* Motion at 24.

Fitzsimons' assertion that there has been a "military takeover of the city [of Washington, D.C.] by the National Guard," *id.* at 8, is likewise without any basis in fact. Whatever curfew, road closures, and other limited restrictions may have been imposed in the days immediately following the Capitol Attack, *see id.* at 8-9, there do not appear to be any such restrictions in place now.  The National Guard troops that were once deployed in the Capitol returned home in May 2021. *See* https://www.wusa9.com/article/news/national/military-news/national-guard-to-leave-dc-this-week-january-6-insurrection.  Moreover, the fact that National Guard were once temporarily deployed at the U.S. Capitol hardly establishes that "[t]he National Guard [has] kept the city under siege" or that it ever "occup[ied] D.C." Motion at 9. To state the obvious, the fact that there were National Guard troops protecting the U.S. Capitol building itself is a far different thing than a "military takeover of the city by the National Guard[.]" *Id.* at 8. Long on hyperbole and short on actual fact, these assertions are emblematic of Fitzsimons' Motion as a whole.

Ultimately, Fitzsimons purports to evaluate the so-called "*Skilling* factors" in an attempt to demonstrate that this Court should presume prejudice and transfer his case to Maine without even attempting to choose an impartial jury here. Motion at 11-23. But two of the four "[i]mportant differences" that the Supreme Court found to "separate Skilling's prosecution from those in which [it had] presumed juror prejudice" are unknown and, indeed, currently unknowable: the time elapsed between the crime and the trial, and whether the jury's verdict indicates impartiality. *Skilling*, 561 U.S. at 381-83. And, as previously discussed (at 10), the remaining two factors—the size of the District's jury pool and the type of information being reported about Fitzsimons—cut against presuming prejudice. Fitzsimons' arguments to the contrary improperly rely on his claims that "95% of the voters in D.C. voted against Donald Trump" and that "the Washington D.C. venire is almost entirely liberal," Motion at 13, 16; incorrectly assert that "government employment will

likely cause a bias" reducing the pool of potential jurors, *id.* at 11-12; and inaccurately equate the news coverage about Fitzsimons with "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," *Skilling*, 561 U.S. at 382. *See* Motion at 16. Whether the District's residents can distinguish Fitzsimons from the thousands of other people involved in the Capitol Attack is something that only a thorough voir dire can accurately evaluate. *See, e.g.*, *Yousef*, 327 F.3d at 155 ("the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool").

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes. This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling. 561 U.S. at 377. This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)." *United States v. Tsarnaev*, 968 F.3d 24, 42 (1st Cir. 2020); *see id.* at 56 ("[I]f pressed to decide the venue question now, two of us would likely find the judge abused no discretion in finding venue proper in Boston in 2015."). It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon." *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613. It was true in the World Trade Bombing case. *See Yousef*, 327 F.3d at 155. It was true in the post-Watergate prosecutions. *See Haldeman*, 559 F.2d at 70-71. And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for Fitzsimons' trial is one that the Court need not answer today. Rather, the only question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, Fitzsimons cannot possibly receive a fair trial in this jurisdiction. Because such a presumption has no legal or

factual support in this case, and runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting voir dire, the Court should deny Fitzsimons' Motion.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Defendant Kyle Fitzsimons' Motion for Transfer be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Robert Juman*
        ROBERT JUMAN
        Assistant United States Attorney
        Bar No. NJ 033201993
        United States Attorney's Office, Detailee
        555 Fourth Street, N.W.
        Washington, DC 20530
        Phone: (786) 514-9990
        E-mail: Robert.juman@usdoj.gov