**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-158 (RC)** |
| | : | |
| **KYLE FITZSIMONS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Defendant Kyle Fitzsimons' (the "Defendant") Motion to Dismiss Count Three of the Superseding Indictment, filed through counsel on January 6, 2022 (ECF No. 57, hereinafter "Def. Mot."). The referenced count alleges a violation of 18 U.S.C. §§ 1512(c)(2) and 2. In his motion, the Defendant raises three arguments which have already been rejected by other courts in this District. Specifically, Defendant argues that 18 U.S.C. § 1512(c)(2) only prohibits the corrupt obstruction of "tribunal-like proceedings" before Congress, and not the certification of the Electoral College vote. Second, Defendant argues that his criminal conduct cannot possibly qualify as conduct that "otherwise obstructs, influences, or impedes" an official proceeding as those terms are used in 18 U.S.C. § 1512(c)(2). Finally, Defendant argues that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague because "corruptly" is undefined.

As discussed below, the certification of the Electoral College vote is in fact a "proceeding before the Congress," and the Defendant did act corruptly to obstruct the proceeding. Section 1512 is not unconstitutionally vague, and the government can proceed to trial to prove that Defendant's actions were prohibited by the statute.

1

For the reasons set forth below, the Court should deny the Defendant's motion to dismiss Count Three of the superseding indictment.

## PROCEDURAL HISTORY

On February 26, 2021, a grand jury returned a ten-count indictment charging the Defendant with the following charges: 18 U.S.C. § 231(a)(3) (civil disorder) (Counts One and Two); 18 U.S.C. §§ 1512(c)(2), 2 (obstruction of an official proceeding) (Count Three); 18 U.S.C. § 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers and inflicting bodily injury) (Counts Four and Five); 18 U.S.C. §§ 1752(a)(1), (2) and (4) (entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds) (Counts Six, Seven and Eight); and 40 U.S.C. §§ 5104(e)(2)(D) and (F) (disorderly and disruptive conduct and act of physical violence in the capitol grounds of buildings).   *See* ECF No. 5.

On November 10, 2021, the grand jury returned a superseding indictment that updated the charging language of certain counts.   *See* ECF No. 50.   As relevant here, Count Three was modified to make clear that the "official proceeding" which Defendant obstructed was the Electoral College certification as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.   *Id.* at 2.

## FACTUAL BACKGROUND

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time ("EST"). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At around 1:00 p.m. EST, individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.   The crowd advanced to the exterior façade of the building.   The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.   At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S.

Capitol were locked or otherwise secured.   Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.   That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.   As individuals attempted to break into the House chamber by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

At approximately 2:30 p.m. EST, rioters broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.   Once inside, the rioters broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, and several were admitted to the hospital.   The rioters also confronted and terrorized members of Congress, Congressional staff, and the media.   The rioters carried weapons including tire irons, sledgehammers, bear spray, and Tasers.   They also took police equipment from overrun police including shields and police batons.   At least one of the rioters carried a handgun with an extended magazine.   The rioters' actions resulted in the disruption and ultimate delay of the vote Certification.

Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

At around 2:47 p.m. EST, rioters broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened the door to the Senate Chamber.

Between 3:25 and around 6:30 p.m. EST, law enforcement officers were able to clear the U.S. Capitol of all rioters.   Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm EST after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building*

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The

exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.   This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.[1]



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the USCP, assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

---

[1] The image above is from the website "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.   The archway is circled in red.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to

state the actions of these officers in thwarting the mob at the LWT entrance likely saved the lives of others, including potential harm to members of Congress.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

On January 6, 2021, from approximately 3:45 p.m. EST to 4:30 p.m. EST, Defendant was among the rioters violently attacking officers defending the LWT tunnel.   In the images below, Defendant can be seen reaching down and grabbing at officers as he entered the archway:



As he entered the archway, Defendant grabbed the gas mask from Officer P.N. and pulled it out of position, as another rioter sprayed P.N. in the face with a chemical agent.

Officer A.G., stationed in the archway, observed Defendant fighting with another officer, who fell down.   Defendant attempted to drag the officer into the crowd and Officer A.G. pulled the officer back to the police line.   Defendant then grabbed and held Officer A.G.'s shoulder pad and tried to grab and take away his shield.   Officer A.G. slipped on shields that were laying on the ground, and struck Defendant with his baton and kicked Defendant, attempting to break free,

but Defendant refused to let go. Officer A.G. was about to use his firearm on Defendant when Officer A.G. struck Defendant one last time on the arm/wrist area, causing Defendant to release his grip.

Defendant got up and moved towards the middle of the archway; he lowered his shoulder and charged at the line of officers.



After officers fought off Defendant, he retreated back into the crowd.



*The Defendant's Actions Before and After the Assault's on the Lower West Terrace*

During the course of the investigation law enforcement were directed to the "Lebanon Maine Truth Seekers" Facebook page in which a message posted on December 24, 2020 contained the following messages:

> "I'm also seeing flags that this election was stolen and we are being slow walked towards Chinese ownership by an establishment that is treasonous and all too willing to gaslight the public into believing the theft was somehow the will of the people."
>
> "Would there be an interest locally an organizing a caravan to Washington DC for the Electoral College cote count on Jan 6th, 2021? I am arranging the time off and will be a driver if anyone wishes to hitch a ride, or a lead for a caravan of vehicles. If a call went out for able bodies, would there be an answer?"

The Facebook message was signed with the Defendant's first and last name and included a Gmail address also containing his first and last name.

The day after the riots, as described above, Defendant called into a Town of Lebanon meeting. The Defendant stated that he believes that Trump is a lion leading an "army of lambs through lawfare." After Trump's speech, Defendant stated he went to an unknown parking garage to put on a costume which consisted of butcher's jacket and an unstrung bow. Defendant stated that if it were the last day of the republic, he wanted to live it like he did every day. Defendant further stated he was near a group of individuals near a police line that was protecting a doorway and anyone "sucked in" to the crowd was pushed into the police line and were subjected to force.

Roughly four days later Defendant was interviewed by the Rochester Voice about his experience at the U.S. Capitol during the riot.   The article included pictures taken by Defendant at the riot, as well as photos from news coverage that day, which documented his travel up towards the Capitol building (pictured below).   Notably, the photos contained in this article depict the defendant wearing the same clothing he is pictured wearing in surveillance footage of the lower west terrace tunnel.



*Exhibit 9*



*Exhibit 10*

In the Rochester Voice article, Defendant is also quoted as saying:

"[t]he speeches from the morning were overtly preaching the election was not over, there was a path to victory through decertification, there was a plan to delay the certification by the House and Senate and then state legislatures would convene and (certify) the right result."   Moreover, Defendant provided that the crowd at the Ellipse was asked by President Trump to walk to the Capitol to "give our Republicans, the weak ones ... the kind of pride and boldness that they need to take back our country."

## **LEGAL STANDARD**

Before trial, a defendant in a criminal case may move to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v).   A valid indictment must set out "the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004).   The Government must state the essential elements of the crime and allegations "with sufficient specificity." *United*

*States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995), *see also United States v. Griffin*, 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. Jul. 2, 2021).

A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *Id.*   "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).   The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*   Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment.   The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

## <u>ARGUMENT</u>

### I.   COUNT THREE STATES AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1512

Defendant argues that Count Three of the superseding indictment fails to state an offense. In support of his arguments, Defendant claims that the Electoral Count on January 6 was not an "official proceeding" (Def. Mot. 2-28);[2] that the Indictment fails to allege an "actus reus" that falls within 18 U.S.C. §1512(c)(2) (Def. Mot. at 28-32), and that 18 U.S.C. §1512(c)(2) is

---

[2] Defendant's filing includes a proposed order as its first page.   Citations are to the page number of the Motion, which is one less than the page number in the pdf document.

unconstitutionally vague as applied to this case (Def. Mot. 32-38).    None of these arguments has merit.

Section 1512(c)(2) provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding" has committed a crime.   A person violates that statute when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding. *See* 18 U.S.C. § 1512(c)(2); § 1515(a)(1)(B).   As several judges in this district have recently concluded, Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding."   *See United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021).

Furthermore, Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence. Nor does the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015)—which construed a different term in a different statute—support imposing such an atextual limitation in Section 1512(c)(2).   But even if such a limitation existed, the statute encompasses the Defendant's alleged conduct.

### A.    The Certification of the Electoral College Vote is an Official Proceeding

Contrary to Defendant's claims, Congress's joint session on January 6, 2021, to review, count, and certify the Electoral College constitutes an "official proceeding" under the definition in Section 1515(a)(1).   Congress's meeting to certify the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress" under Section

1515(a)(1)(B), and therefore an "official proceeding" for purposes of Section 1512(c)(2).   That
conclusion flows principally from the statute's plain text.   *See Caldwell*, 2021 WL 6062718 at *
4 ("A straightforward reading of that definition easily reaches the Certification of the Electoral
College vote.").   Skipping past the text, Defendant argues that Congress's intent and other
language in the statute, as well as language in different statutes and other sources, import a
"tribunal-like" requirement into the term "official proceeding" (Def. Mot. at 6-28).   That
argument is incorrect, but even if somehow valid, would still not disqualify Congress's Joint
Session on January 6.

1. <u>Background, Congressional Intent, and Statutory Construction</u>

The Constitution and federal statutory law require that both Houses of Congress meet to
certify the results of the Electoral College vote.   Two separate provisions in the Constitution
mandate that the Vice President, while acting as the President of Senate "shall, in the Presence of
the Senate and House of Representatives, open all the Certificates, and the Votes shall then be
counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.   Under the Electoral Act of 1887,
a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock
in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C.
§ 15.   Section 15 details the steps to be followed: The President of the Senate opens the votes,
hands them to two tellers from each House, ensures the votes are properly counted, and then opens
the floor for written objections, which must be signed "by at least one Senator and one Member of
the House of Representatives." *Id*.   The President of the Senate is empowered to "preserve order"
during the Joint Session. 3 U.S.C. § 18.   Upon a properly made objection, the Senate and House
of Representatives withdraw to consider the objection; each Senator and Representative "may
speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17.   The Electoral

Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

Here, Defendant is charged with violating Section 1512(c)(2) by corruptly obstructing, influencing, or impeding any official proceeding.  An "official proceeding" for purposes of Section 1512(c)(2) is defined in Section 1515 as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1) (emphasis added).

Defendant suggests that legislative history shows that Congress intended the obstruction statute to be interpreted narrowly to protect witness tampering and destruction of evidence (Def. Mot. at 14-20).[3]  Putting aside that the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the statute's legislative history in fact underscores that Congress intended "official proceeding" to reach broadly.

---

[3] Defendant also cites the Victim and Witness Protection Act ("VWPA") of 1982 (Def. Mot. at 22-25).   But the Senate Judiciary Committee report that supported the VWPA justified the inclusion of a "broad residual clause" (in a provision that was not ultimately enacted) by noting that the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982).

Additionally, as other judges of this Court have concluded, *see Montgomery* 2021 WL 6134591, at *15, the title of the legislation's section supports a broad interpretation of Section 1512(c). This provision was enacted in 2002 as part of the Sarbanes-Oxley Act, Pub. L. 107-204, specifically Section 1102 of the law, which is titled "Tampering with a Record or Otherwise Impeding an Official Proceeding." In other words, Congress evidenced its intent that "otherwise impeding an official proceeding" would indeed be a crime and would be a separate crime from "tampering with a record."

    2. Congress's Joint Session to Certify the Electoral College Vote is a "Proceeding <u>Before the Congress.</u>"

Section 1515(a)(1)(B) defines "official proceeding" as a "proceeding before the Congress." To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting Proceeding, Oxford English Dictionary, available at http://www.oed.com). Defendant does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—

under that broad definition.   *See* Def. Mot. at 5-6 (referring to the "election certification proceedings").

A narrower definition of the term "proceeding" would look to the "legal—rather than the lay—understanding" of the term.   *Ermoian*, 752 F.3d at 1170.   This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see also United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").   For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by Defendant—courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term "contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International

Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added). Thus, even under this narrower definition, Congress's Joint Session to certify the Electoral College vote—business conducted by an official body, in a formal session—would easily qualify.

Finally, the formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding, *see Perez*, 575 F.3d at 169, even under the narrower legal definition of the term "proceeding."   Few events are as solemn and formal as a Joint Session of the Congress.   That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Indeed, other judges of this Court have concluded that even if not all actions occurring before Congress constitute an "official proceeding," the certification of the Electoral College does. *Sandlin,* 2021 WL 5865006, at *3-4 (finding that the certification of the Electoral College is an official proceeding because the "Joint Session has the trappings of a formal hearing before an official body[,]… the certificates of electoral results are akin to records or documents produced during judicial proceedings, and any objection to these certificates can be analogized to evidentiary objections."); *Mostofsky*, 2021 WL 6049891, at *10 (concluding that the certification of the Electoral College is an official proceeding within the meaning of 18 U.S.C. §§ 1515, 1512(c)(2)); *Caldwell*, 2021 WL 6062718 at * 4 ("The Certification of the Electoral College vote thus meets the definition of an 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at *4 ("Although Defendants are correct that not every action taken within the walls of Congress constitutes an 'official proceeding' within the meaning of Section 1512(c), a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does"); *Nordean*, 2021 WL 6134595, at *5 ("For all these reasons, the certification is therefore a 'series

of actions' that requires 'some formal convocation,' making it a 'proceeding before the Congress,' 18 U.S.C. § 1515(a)(1)(B), and thus an 'official proceeding,' *id.* § 1512(c)(2).'").

Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress' meeting to certify the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body."   *See* Black's Law Dictionary, *supra*.   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15.   As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.*   And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").   The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until "the count of electoral votes" is "completed," and the "result declared." *Id.*   In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* Section 1515(a)(1)(B).

### 3.   Section 1515(a)(1)(B) Is Not Limited to "Tribunal-Like" Congressional <u>Proceedings</u>

Defendant incorrectly asks this Court to limit the interpretation of the "proceeding before the Congress" to encompass only tribunal-like proceedings before Congress which are adversarial in nature where witnesses are subpoenaed to appear and give testimony or to provide relevant evidence.   (Def. Mot. at 15).   But this narrow reading of the statute finds no textual support when

applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, as Defendant contends, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency.   Indeed, Section 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).   If Congress could limit the obstruction prohibition under § 1505 to congressional investigations, it could have done so in the text of § 1515(a)(1)(B).   But it did not.  *See Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.") Instead, Congress enacted broader language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505.   That broader definition includes the Electoral College vote certification. *See, e.g., Caldwell*, 2021 WL 6062718 at * 5 (rejecting the same argument and holding that "Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at *4 ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'"); *Montgomery*, 2021 WL 6134591, at *6 (rejecting argument that Congress intended to limit the definition of "official proceeding" and "quasi-judicial" proceedings, to proceedings at which witnesses appear and give testimony, or to

proceedings related "to the administration of justice"); *Nordean*, 2021 WL 6134595, at \*5-6 (rejecting argument that Congress intended to limit the definition of "official proceeding" to "quasi-adjudicative" or "quasi-judicial" proceedings and concluding that, "even if an 'official proceeding' had to be quasi-adjudicative or quasi-judicial in some way—a requirement missing from the plain text of the statute—because Congress's certification of the Electoral College vote has *some* of those features, it would pass the test.").

Defendant argues (Def. Mot. 9-11) that the adjective "official" and the preposition "before" limits the definitions in Section 1515(a)(1) to "quasi-judicial" proceedings.   As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of Congress.   Whatever the merits of the Defendant's argument for other provisions in Section 1515(a)(1), moreover, it finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."   Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting, it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency.   And to the extent that "before" refers to "some formal convocation of the agency in which parties are directed to appear," *see United States v. Young*, 916 F.3d 368, 384 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 140 S. Ct. 113 (2019), the certification of the Electoral College vote involves a "formal convocation" of Congress to assess the Electoral College vote and "declare[]" the "result" of the presidential election, 3 U.S.C. § 16.

Rather than engaging squarely with Section 1515's text, Defendant makes an unsupported logical leap that the conduct described in the statute "brings to mind" proceedings in which "parties are directed to appear, and in which someone will adjudicate or deliberate upon the parties'

presentations" (Def. Mot. 10). That approach fails in three respects.    First, it is methodologically flawed.    As discusses above, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).    In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, a proceeding before the Congress.    Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). The Defendant offers no rationale for breezing past the statute's plain text to consider what is "brought to mind" by the statute.[4]

Second, Defendant argues that because other statutes within Chapter 73 relate to witness tampering or investigatory proceedings, an "official proceeding before Congress" must be limited to the same type of "adversarial" court proceedings where there is a potential for witnesses to be influenced or documents destroyed.    *See* Def. Mot. 13-14.    However, the specific statutory provision under which the Defendant is charged, 18 U.S.C. § 1512(c)(2), explicitly reaches more broadly than tampering: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)). Defendant's narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—importing an extra-textual "administration of justice" requirement—would

---

[4]  Defendant's invocation of the Criminal Resource Manual ("Manual"), a predecessor to the Justice Manual, similarly has no bearing on the Court's analysis.    The Manual's generalized statements cannot alter the plain meaning of the statutory text.    Moreover, the Criminal Resource Manual predates the enactment of section 1512(c)—it was last published in 1997 and therefore sheds no light on the scope of the code provision at issue.    See *Caldwell*, 2021 WL 6062718, at *14-*15

undercut the broad statute that Congress enacted.   In Defendant's view, for example, an individual who threatened a Senator and a Representative with injury unless each agreed to object to the Electoral College certification—even though each Member knew that the objections were frivolous—would not amount to obstruction.   Nor would it appear to cover an individual who paid one of the tellers—who are appointed by the Senate and House of Representatives to handle the Electoral College votes—to falsify or destroy votes.   That crabbed approach fails to recognize that the certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426.   Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them.   *See also Montgomery*, 2021 WL 6134591, at *7 ("Section 1515(a)(1) reaches all three branches of government, and the definition of 'official proceeding' is properly understood in the unique context of each branch.").

Finally, the "adjudicatory" gloss Defendant purports to give to the "official proceeding" definition in Section 1515(a)(1) finds no support in the statute itself.   But even if such a gloss applied, the certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would qualify.   Far from a "ministerial act" (Def. Mot. at 2), the certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election.   Under the Constitution, the Electors create "lists" of the presidential and

vice-presidential candidates, which they "sign" and "certify" before sending to Congress. U.S. Const. amend. XII.   Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15; *see* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1659 (2002) (Under the Electoral Count Act, "the President-elect is not elected by 'We the People' on election day, or even by the electors on the day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted").   As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15.   And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16.1.   Nothing in the history Defendant describes suggests a different conclusion.

### B.      Section 1512(c)(2) is Not Unconstitutionally Vague or Overbroad.

Defendant argues that Section 1512(c)(2) is unconstitutionally vague and does not provide fair notice as to the conduct it punishes (Def. Mot. 32-38).   As several judges of this Court have recently concluded, this argument, too, lacks merit. *Sandlin,* 2021 WL 5865006; *Caldwell*, 2021 WL 6062718; *Mostofsky*, 2021 WL 6049891; *Montgomery*, 2021 WL 6134591; *Nordean*, 2021 WL 6134595.

#### 1.   Legal Standard

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.   An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people

fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it

fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

"As a general matter," however, a law is not constitutionally vague where it "call[s] for the

application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where

a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at

603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

### 2. Section 1512 is Specific Enough to Provide Notice

Defendant fails to overcome the strong presumption that Section 1512(c)(2) passes

constitutional muster.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963)

("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold

many times that statutes are not automatically invalidated as vague simply because difficulty is

found in determining whether certain marginal offenses fall within their language.").  Section

1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or

"indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S.

at 306, nor does it require application of a legal standard to an "idealized ordinary case of the

crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing],

influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy."

*Williams*, 553 U.S. at 306.  The statute requires that a defendant, acting with consciousness of

wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily

defined official proceeding.   While "it may be difficult in some cases to determine whether these

clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and

intent—the state of men's minds—having before them no more than evidence of their words and

conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.*

(quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Defendant's more targeted attack on "corruptly" (Def. Mot. at 33-36), relying on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), is equally unavailing.   The D.C. Circuit in *Poindexter* held that the term "corruptly" was "vague . . . in the absence of some narrowing gloss." 951 F.2d at 378.   *Poindexter* is inapposite for three reasons.[5]   First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385.   Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-30.   Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503).   Defendant's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted).   In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

---

[5] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

Third, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*.   For purposes of Section 1512(c)(2), "corruptly" includes two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness.   *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

That the term "corruptly" requires the government to prove that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing" ensures that Section 1512(c)(2) "reaches only" those who have committed felony obstruction.   *Andersen*, 544 U.S. at 706.   That limitation is particularly important where, as here, the Defendant is alleged to have obstructed a congressional proceeding.

To prove that an attempted or actual obstruction of a congressional proceeding amounts to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government must therefore adduce evidence establishing beyond a reasonable doubt that a defendant acted intentionally and with "consciousness of wrongdoing." *Andersen*, 544 U.S. at 706.   That standard could be met where, for example, evidence showed that a defendant, intent on storming the Capitol building and

preventing the Certification, shoved a barricade into a police line protecting the Capitol grounds and building.[6]  *See Montgomery*, 2021 WL 6134591, at *20 ("It is unsurprising, for example, that the words 'obstruct' and 'impede,' 18 U.S.C. § 1512(c)(2), mean to come in the way of, to block, or to hold up or that 'a proceeding before the Congress,' *id.* § 1515(a)(1)(B), includes the joint session of the Senate and House of Representatives held to certify the Electoral College vote.").

Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.  Defendant provides no support for his position.  Nor could he.  "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974).  Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to Defendant that *his conduct* was criminal.  *Mostofsky*, 2021 WL 604891 at *11 ("As a result, to the extent that Mostofsky argues that § 1512(c)(2) is vague on its face, such an argument cannot succeed. . . . The Court will also not dismiss the § 1512 charge as vague as applied to Mostofsky, given that mapping the statutory language on to his conduct") (emphasis in original); *See Sandlin*, 2021 WL 5865006 at *10-14 (rejecting defendant's challenge that "corruptly" was unconstitutionally vague as used in Section 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *19 ("the Supreme Court did not cast any doubt on the constitutional adequacy of a "corruptly"

---

[6] The "high maximum[] and no minimum[]" penalty provision that Congress enacted in Section 1512(c)(2), moreover, reflects that obstruction offenses "may run the gamut from major to minor," and empowers district court judges to "recognize differences between such cases" and to "try to make the punishment fit the crime." *Yates*, 574 U.S. at 569-70 (Kagan, J., dissenting); *see Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) (noting that "judges in this country have long exercised discretion" to impose sentences within a statutory sentencing range by "taking into consideration various factors relating both to offense and offender"). The same is true of the criminal contempt statute, 18 U.S.C. § 401, which has been applied to a wide range of conduct, *see United States v. McGainey*, 37 F.3d 682, 683 (D.C. Cir. 1994) (threatening gesture that led to "disruption" of a criminal trial constituted "'obstruction of the administration of justice'"); id. at 684-85 (citing other disruption case), and prescribes no maximum or minimum penalty, see 18 U.S.C. § 401 (permitting court the "power to punish by fine or imprisonment, or both, at its discretion").

standard … Neither ignorance about the existence of a statute nor reasonable debate about how best to interpret the statute render the law unconstitutionally vague…"); *Nordean*, 2021 WL 6134595, at *12 (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) and concluding, that while "no court has interpreted Section 1512(c)(2) to include the precise allegations made here. But that does not mean that this reading 'unexpectedly broadens' it").

Defendant alternatively argues the only definition of "corruptly" that passes constitutional muster is to act "'with the intent to obtain an unlawful advantage for [oneself] or an associate' in a tribunal-like forum concerned with the administration of justice." *See* Def. Mot. at 35.   But Defendant cites no authority for this radically limited, and extremely specific, definition of "corruptly," and imposing such a narrow meaning on the term would undercut the broad statute that Congress enacted to reach more broadly "otherwise obstructive behavior that might not constitute a more specific" obstruction offense.   *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)).   Moreover, as noted above, there is no basis to limit the statute to only "tribunal-like" proceedings.

The vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). "Close cases can be imagined under virtually any statute.   The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *See Williams*, 553 U.S. at 306.   The relevant question turns on whether the statute fairly informed Defendant that he would face criminal sanction for his conduct on January 6, 2021.   The answer is yes, for the reasons articulated above.   *Nordean*, 2021 WL 6134595, at *13 ("Section 1512(c)(2) is not 'narrow' at all. It sweeps broadly—punishing a host of 'corrupt' conduct. Thus, it hardly lulled Defendants into a false sense of security…").

30

Defendant further argues that Count Three fails to allege an act that falls within 18 U.S.C. § 1512(c)(2).   Def. Mot. 28.   But the government does not have to describe in the charging instrument how it will prove the statutory elements at trial. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the Defendant on notice as to every means by which the prosecution hopes to prove that the crime was committed.").   If the government fails to carry its burden on these elements at trial, the jury will say so.   But that future presentation has no bearing on the question here—whether Section 1512(c)'s text provided the Defendant with adequate notice.

### C.   The Supreme Court's Decision in *Yates v. United States* Does Not Counsel a Different Interpretation.

Defendant analyzes the Supreme Court's decision in *Yates v. United States* to argue that "obstruction of an official proceeding before Congress" must refer to "proceedings that are tribunal-like" (Def. Mot. at 11).   However, the Supreme Court's decision in *Yates v. United States*, which considered how to construe the statutory term "tangible object" in Section 1519, 574 U.S. at 532 (plurality opinion), does not undermine the interpretation of Section 1512(c)(2) articulated above.   *See Montgomery*, 2021 WL 6134591, at *14; ("… neither the plurality opinion in *Yates* nor Justice Alito's concurrence requires the Court to read Section 1512(c)(2) to only cover acts impairing the availability or integrity of evidence."); *Nordean*, 2021 WL 6134595, at *8 ("Reading Section 1512(c)(2) to include conduct unrelated to the impairment of evidence is most consistent with the text and structure of the statute…")

#### 1.   Section 1512 is Not Limited to Document-Focused Obstructive Conduct

In *Yates*, a plurality of the Court undertook a "contextual reading" to narrow the scope of "tangible object" in Section 1519 to "only objects one can use to record or preserve information,

not all objects in the physical world." *Id.* at 536 (plurality opinion).   The contextual features that animated that narrow interpretation in Section 1519 are, however, absent in Section 1512(c)(2).

The Court in *Yates* considered a prosecution brought under Section 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" a federal investigation. 18 U.S.C. § 1519.   Yates was a commercial fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities from determining whether he had harvested undersized fish. *Yates*, 574 U.S. at 531 (plurality opinion). The question presented was whether "tangible object" as used in Section 1519 included a fish. A fractured Supreme Court produced three opinions.

A four-Justice plurality concluded that Section 1519's "context" supported a "narrower reading." *Yates*, 574 U.S. at 539.   A holding that "tangible object" included "any and all objects," the plurality concluded, would "cut § 1519 loose from its financial-fraud mooring" in the Sarbanes-Oxley Act. *Id.* at 532. The plurality grounded its analysis in several "[f]amiliar interpretive guides." *Id.* at 539.   First, neither Section 1519's caption, "Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," nor the title within the Sarbanes-Oxley Act within which Section 1519 was placed, "Criminal penalties for altering documents," suggested that Congress aimed to "sweep" in "physical objects of every kind." *Id.* at 539-40.

Second, the plurality relied on Section 1519's placement within Title 18's Chapter 73. *Yates*, 574 U.S. at 540.   Specifically, its placement at the end of the chapter following several provisions "prohibiting obstructive acts in specific contexts," suggested that Congress did not intend Section 1519 as an "across-the-board" spoliation ban. *Id.*   In contrast, the plurality noted, Congress directed codification of the Sarbanes-Oxley Act's "other additions . . . within or

32

alongside retained provisions that address obstructive acts relating broadly to official proceedings and criminal trials." *Id.*   To illustrate one such "broad[]" provision, the plurality specifically referred to the provision at issue in this case, Section 1512(c), which, as noted above, was titled "Tampering with a record or otherwise impeding an official proceeding," and which Congress placed (as Section 1512(c)) within the "broad proscription[]" found in the "pre-existing" Section 1512.  *Id.* at 541.

Third, the plurality compared Section 1519 with the "contemporaneous passage" in the Sarbanes-Oxley Act of Section 1512(c)(1).  *See* 574 U.S. at 541.   Because Section 1512(c)(1)'s reference to "'other object'" encompassed "any and every physical object," the plurality "resist[ed] a reading of § 1519" that would make Section 1512(c)(1) superfluous. *Id.* at 542-43.   Moreover, the plurality reasoned, the fact that Congress's formulation in Section 1519 did not track the language in Section 1512(c)(1) indicated that Congress intended Section 1519 to be construed differently from Section 1512. *Id.* at 545 n.7.   More specifically, the plurality concluded that, by adopting those different formulations, Congress intended the phrase "tangible object" in Section 1519 to "have a narrower scope" than the phrase "'other object'" in Section 1512(c)(1).  *Id.* at 544-45.

Fourth, the plurality found support for its narrowing construction in the *noscitur a sociis* and *ejusdem generis* interpretive canons.  574 U.S. at 543-46.   Because "tangible object" in Section1519 was the "last in a list of terms that begins 'any record [or] document,'" the *noscitur a sociis*canon counseled interpreting that term "to refer . . . specifically to the subject of tangible objects involving records and documents." *Id.* at 544.   That reading, moreover, "accord[ed] with" Section1519's verbs, which include "'falsif[ying]'" and "'mak[ing] a false entry in'"—terms that commonly "take as grammatical objects records, documents, or things used to record or preserve

information." *Id.* (emphasis omitted). Similarly, application of the *ejusdem generis* canon—that "general words" following "specific words" when listed in a statute are "construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *id.* at 545 (internal quotation marks omitted)—indicated that Congress "would have had no reason to refer specifically to 'record' or 'document'" if it intended Section 1519 to "capture physical objects as dissimilar as documents and fish." *Id.* at 546.[7]

Finally, the plurality stated that, to the extent its "recourse to traditional tools of statutory construction" left "any doubt" about how to interpret "'tangible object'" in Section 1519, the rule of lenity favored a narrow interpretation of that phrase. 574 U.S. at 547-48. Because a broad reading of Section 1519 would criminalize "tampering with *any* physical object that *might* have evidentiary value in *any* federal investigation into *any* offense, no matter whether the investigation is pending or merely contemplated, or whether the offense subject to investigation is criminal or civil," the plurality reasoned that before it opted for the "harsher alternative," Congress must speak "in language that is clear and definite." *Id.* at 548 (internal quotation marks omitted).

Justice Alito concurred in the judgment on narrower grounds.[8] Observing that the statutory "question is close," Justice Alito reasoned that the combined effect of "the statute's list of nouns, its list of verbs, and its title" favored the plurality's conclusion. *Yates*, 574 U.S. at 549 (Alito, J., concurring). Section 1519's nouns suggested that "'tangible object'" in that provision

---

[7] By way of example, the Supreme Court cited its decision in *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015), where the Court interpreted the residual clause in the Armed Career Criminal Act (ACCA), which covered "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The ACCA's enumeration of specific crimes suggested that the "otherwise involves" provisions applied only to "*similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Begay*, 553 U.S. at 142.

[8] Under the rule announced in *Marks v. United States*, 430 U.S. 188 (1977), Justice Alito's concurrence represents the binding holding as the narrowest opinion among those concurring in the judgment. *See id.* at 193.

"should refer to something similar to records or documents." *Id.* at 550.    Similarly, Section 1519's list of verbs are "closely associated with filekeeping," and at least one verb phrase— "'makes a false entry in'"—"makes no sense outside of filekeeping." *Id.* at 551.    Finally, Section 1519's title—"Destruction, alteration, or falsification of records in Federal investigations and bankruptcy," § 1519—suggested that "no matter how other statutes might be read," Section 1519 "does not cover every noun in the universe with tangible form." *Id.* at 552.

The decision in *Yates* does not unsettle the straightforward interpretation of Section 1512(c)(2) articulated above because the "familiar interpretive guides" on which the plurality (and to some extent Justice Alito) relied to narrow the scope of Section 1519 do not apply to Section 1512(c)(2).

Consider first, as the plurality did, Section 1512's statutory title. *See Yates*, 574 U.S. at 539-40 (plurality opinion); *see also id.* at 552 (Alito, J., concurring) (considering Section 1519's title).    Even leaving aside the "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text," *Brotherhood of R.R. Trainmen*, 331 U.S. at 528-29, Section 1512's title, "Tampering with a witness, victim, or an informant," provides no reason to narrow the interpretation of Section 1512(c)(2). *See supra*, at 15-17.    For one thing, Congress named that title 20 years before it enacted 1512(c) in the Sarbanes-Oxley Act, and then simply opted not to rename Section 1512 to reflect either of the two new obstruction prohibitions added in Section 1512(c).    Section 1512's overarching title therefore does not have the same interpretive force as Section 1519's title, which was enacted by the same Congress that enacted the rest of Section 1519. *See Yates*, 574 U.S. 541 n.4 (plurality opinion).    Additionally, whereas Section 1519's title within the Sarbanes-Oxley Act, "Criminal penalties for altering documents," suggested a narrow focus on document destruction, *see id.* at 539-40, Section 1512(c)'s title within

the Sarbanes-Oxley Act reflected both the document-destruction prohibition in Section 1512(c)(1) *and* the broader catch-all obstruction provision in Section 1512(c)(2): "Tampering with a record *or otherwise impeding an official proceeding*." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).

Similarly inapposite here is Section 1512(c)(2)'s placement within Chapter 73. *See Yates*, 574 U.S. at 540-41 (plurality opinion).   Whereas Congress enacted Section 1519 as a standalone prohibition and placed it at the end of the chapter "together with specialized provisions expressly aimed at corporate fraud and financial audits," it instead inserted Section 1512(c) within the "pre-existing" Section 1512. *Id.* at 541 (plurality opinion).   So situated, Section 1512(c)(2)'s function as a catch-all obstruction prohibition is consistent with Section 1512's role as a "broad proscription" on obstructive acts.   *See id.* (plurality opinion).

That reading, moreover, is consistent with how the *Yates* plurality opinion describes Section 1512(c). *See* 574 U.S. at 541-43, 545.   Contrasting the term "other object" in the document-destruction provision in Section 1512(c)(1) with "tangible object" in Section 1519, the plurality concluded that Section 1512(c)(1)'s later enactment suggested Congress intended it to reach more broadly than Section 1519. *Id.* at 542-43; *id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it.").   And if Congress intended Section 1512(c)(1) to cover more ground than Section 1519, Section 1512(c)'s text and structure make plain that it further intended Section 1512(c)(2) to cover more ground than Section 1512(c)(1).

The plurality, 574 U.S. at 544-45, and Justice Alito, *id.* at 550, also drew support for their narrowing construction of Section 1519 from interpretive canons, but those canons do not help Defendant here.  "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145

F.3d 1369, 1370-71 (D.C. Cir. 1998). Section 1519's structure—a list of specific terms ("record" and "document) followed by a more general term ("tangible object")—in a singular provision is susceptible to that analysis. *Yates*, 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring).   But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separate numbered provision containing the separate catch-all obstruction prohibition.   "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).   Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin*, 573 U.S. at 359 (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprised "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses on an equal footing and indicating that they have separate meanings").

The *noscitur a sociis* canon is similarly inapplicable here.   That canon is used only to construe terms that are "of obscure or doubtful meaning," not to change the meaning of unambiguous terms that are simply broad. *Russell Motor Car Co.,* 261 U.S. at 520.     Moreover, the canon may be invoked only "when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." *S. D. Warren Co. v. Maine Bd. of Env't*

*Prot.,* 547 U.S. 370, 378 (2006) (internal quotation marks omitted); *see Beecham v. United States,* 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). As noted above, the first and second clauses of Section 1512(c) are not items in a list of related terms; rather, they are distinct offenses phrased in the disjunctive. 18 U.S.C. § 1512(c). That structure therefore does not lend itself to application of *noscitur a sociis.* *See De Bruhl-Daniels*, 491 F. Supp. 3d at 251 (declining to apply the *noscitur a sociis* canon to Section 1512(c)).

Finally, contrary to Defendant's argument (Def. Mot. 38-39), the *Yates* plurality's reliance on the rule of lenity has no application here.[9] The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). As discussed at length above, there is no "grievous ambiguity" here. Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *Petruk*, 781 F.3d at 447 (internal quotation marks omitted).

The plurality also found the rule of lenity "relevant" in part given the absence of limiting principles under a broad construction of Section 1519. *See Yates*, 574 U.S. at 548. But neither of the features that constrain Section 1512(c)(2)'s reach—the government's requirement to

---

[9] Justice Alito did not rely on several features that guide the plurality opinion, including the rule of lenity. *See* 574 U.S. at 549 (noting that the case "should be resolved on narrow grounds," namely, "the statute's list of nouns, its list of verbs, and its title," but not discussing the Sarbanes-Oxley Act, Section 1519's placement within Chapter 73, the Supreme Court's decision in *Begay*, or the rule of lenity). It follows that that his controlling opinion, *see supra* note 8, makes even more clear that Section 1512(c)(2) should not be interpreted differently than its text and structure would suggest.

establishthat the defendant acted "corruptly" and a nexus to a contemplated official proceeding, *see supra*, 17-22—is present in Section 1519.   Section 1519 requires that the defendant act "knowingly" and"with the intent to impede, obstruct, or influence," 18 U.S.C. § 1519, but does not impose the more stringent "corruptly" *mens rea*.   And courts of appeals have uniformly concluded that Section 1519does not include a "nexus" requirement. *See United States v. Scott*, 979 F.3d 986, 992 (2d Cir. 2020) (Supreme Court's decisions in *Marinello*, *Arthur Andersen*, and *Aguilar* do not "overrule[]"existing circuit precedent that Section 1519 "does not have a nexus requirement"); *United States v. Moyer*, 674 F.3d 192, 209 (3d Cir. 2012) (declining to extend nexus requirement from Section 1503 and 1512(b)(2) to Section 1519); *United States v. Kernell*, 667 F.3d 746, 753-55 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 712-14 (8th Cir. 2011); *see also* S. Rep. No. 107-146, at 14-15 ("[Section 1519] is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conductto a pending or imminent proceeding or matter.").

To be sure, no court appears to have applied Section 1512(c)(2) to conduct precisely akin to Defendant's alleged actions, namely, confronting and assaulting law enforcement officers asthe defendants attempted to force their way into the Capitol to halt or delay a congressional proceeding.   Even if Section 1512(c)(2)'s application to this case was "not expressly anticipated by Congress," that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation marks and brackets omitted).   That is so even if the statute's application in a particular case "reaches 'beyond the principal evil' legislators may have intended or expected to address." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)). And any policy-based suggestion "that the current scheme should be altered," *Intel Corp. Inv. Policy*

*Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020), ought to be addressed to Congress, not this Court, *see, e.g.*, *United States v. Rodgers*,466 U.S. 475, 484 (1984) ("Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.").

> 2. Even if Section 1512(c)(2) Required that the Obstructive Act Relate to Documentary or Tangible Evidence, Defendant's Alleged Conduct Would be <u>Covered</u>

At a bare minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. If, for example,the Defendant had corruptly blocked the vehicle carrying the election returns to the Capitol for congressional examination at the certification proceeding, that conduct would clearly fit within Section 1512(c)(2). Section 1512(c)(2) would likewise cover blocking a bus carrying the Members of Congress to the Capitol to examine the election returns at the certification proceeding. And it just as readily covers displacing the Members of Congress from the House and Senate Chambers, where they would examine and discuss those returns and other records.

No court following *Yates* has adopted an interpretation of Section 1512(c)(2) that limits it to document-focused obstructive conduct. *See, e.g.*, *Petruk*, 781 F.3d at 447-48; *De Bruhl-Daniels*, 491 F. Supp. 3d at 251; *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021). But even were this Court to adopt the limitation that Section 1512(c)(2) "requires some nexus to tangible evidence," *United States v. Singleton*, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006), or a "tangible object," *United States v. Hutcherson*, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006), Defendant's alleged conduct would still fall within the scope of Section 1512(c)(2) because Defendant "otherwise obstruct[ed], influence[d], or impede[d]" Congress's ability to review documents that it was constitutionally and statutorily required to

receive and act upon, thereby obstructing the certification of the Electoral College vote.

The certification of the Electoral College vote is rooted in federal constitutional and statutory law that requires the creation and consideration of various documents.  Under the Twelfth Amendment, the state Electors must "vote by ballot," marking one set of ballots for the individual voted for as President and "distinct ballots" for the vice-presidential selection.  U.S. Const. amend. XII.  The Electors must then create "lists" of the presidential and vice-presidential candidates who received votes, "which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States." *Id.*   These certified lists, or "certificates," are then opened by the President of the Senate "in the presence of the Senate and House of Representatives." *Id*.    After opening them, the President of the Senate hands the certificates to two appointed "tellers," who in turn create a new "list" that comprises "the votes as they shall appear from the said certificates." 3 U.S.C. § 15.  During the reading of the certificates, the President of the Senate must open the floor to objections; any objection "shall be made in writing . . . and shall be signed by at least one Senator and one Member of the House of Representatives." *Id.* Congress's certification of the Electoral College vote, therefore, operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.

Had Defendant sought to alter or destroy any of those documents, he also would have violated Section 1512(c)(1).   Instead, Defendant allegedly sought to stop the Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election.    Because Defendant's alleged conduct thus precluded a full and fair examination of physical or documentary evidence at an official proceeding, the indictment's allegations would satisfy any extratextual "requirement" in

Section 1512(c)(2) "for some nexus to a document or other tangible evidence." *Singleton*, 2006 WL 1984467, at *5.

Finally, while Section 1512(c) may have been enacted due to concerns over document destruction and corporate malfeasance, "[s]tatues often reach beyond the principle evil that animated them." *Sandlin,* 2021 WL 5865006, at *9 (finding that Section 1512(c)(2) may apply to defendants who attempted to stop the certification of the Electoral College on January 6, 2021); *see also Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that Section 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'—which cannot be read so narrowly.  The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means <u>other than</u> document destruction.'") (emphasis in original); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'").

Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding." Section 1512(c)(2) is not unconstitutionally vague or overbroad, and nothing in its text, structure, or history limits it to obstruction tied to documentary or tangible evidence.  But even if such a limitation existed, the statute encompasses Defendant's alleged conduct. Therefore, Defendant's motion to dismiss Count Three should be denied.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this

motion, the government respectfully requests that the Defendant's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:     */s/ Robert Juman*
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

*/s/ Brandon K. Regan*
Brandon K. Regan
Assistant United States Attorney
Bar No. MD 1312190043
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (202) 252-7759
E-mail: brandon.regan@usdoj.gov