UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-158 (RC) |
| | : | |
| KYLE FITZSIMONS, | : | |
| | : | |
| Defendant. | : | |

UNITED STATES' POST-TRIAL BRIEF ON
DEFENSE-OF-OTHERS, AS IT RELATES TO COUNT 3

In Count 3 of the second superseding indictment, Doc. 69, the defendant is charged with violating 18 U.S.C. § 111(a)(1) and (b) by using a dangerous weapon to forcibly assault, resist, oppose impede, or interfere with Metropolitan Police Department (MPD) Officer Sarah Beaver while she was assisting an officer of the United States performing his official duties. Specifically, undisputed evidence at trial proved that at approximately 4:09 p.m. on January 6, 2021, the defendant hurled his unstrung bow like a spear into a crowd of law enforcement officers guarding the "tunnel" on the West Front of the U.S. Capitol, striking Officer Beaver in the head. During the defendant's cross-examination of witnesses and closing argument, however, he suggested that he took this action in an attempt to defend a fellow rioter—an unidentified woman in red—who was in the middle of that group of officers and being struck repeatedly by one of them, who was standing next to Officer Beaver.

At the Court's direction, the United States of America submits this post-trial brief to address two interrelated questions: (1) whether the defendant has met the threshold requirements to raise the affirmative defense to Count 3 of defense-of-others; and (2) if so, whether the United States has disproven that affirmative defense beyond a reasonable doubt. Because there is no evidence in the record that the defendant was even <u>aware</u> of the woman in red, let alone that he

<u>actually believed</u> she was in danger and <u>actually believed</u> force was necessary to save her, the defense has failed to meet the threshold production requirement and the Court should not consider his defense-of-others claim. Nevertheless, if the Court did reach the merits of the defendant's claim, the Court should reject it; evidence presented at trial proved beyond a reasonable doubt that the defendant's hurling of a spear-like object at officers was not reasonable under the circumstances. Consequently, the Court should find the defendant guilty of Count 3.

## TRIAL EVIDENCE

### *The Government's Case-in-Chief*

Through the testimony of Officer Beaver, MPD Sergeant Phuson Nguyen, and United States Capitol Police (USCP) Sergeant Aquilino Gonell, as well as body worn camera (BWC) footage from other officers and U.S. Capitol surveillance camera video (CCTV), the United States proved at trial that throughout the afternoon on January 6, 2021, these and other officers defended the "tunnel," an entrance to the U.S. Capitol, *see* Govt. Ex. 607, from a violent mob of rioters trying to enter the building, *see* Govt. Ex. 204. The officers guarding the tunnel stood in a shoulder-to-shoulder phalanx inside of it, approximately five officers wide and seven officers deep, fighting what one officer described as an hours-long hand-to-hand "medieval battle" with rioters. *See* Govt. Exs. 204-211.

The defendant slowly pushed his way through the mob of rioters gathered on the U.S. Capitol's Lower West Terrace to join those fighting police at the mouth of the tunnel. *See* Govt. Ex. 622. A little after 4:07 p.m., the defendant arrived near the mouth of the tunnel, but at that time there were still at least two or three rows of rioters between the defendant and the front line. *Compare* Govt. Ex. 204 at 4:47:47 p.m. *and* Govt. Ex. 222 (using the position of the orange ladder to match-up videos).



At 4:09:08 p.m., the defendant—standing behind at least one other rioter and two scuffed six-foot long thick plastic shields—began raising the brown unstrung bow that he had carried throughout the afternoon into throwing position. *See* Govt. Exs. 204-206, 223.



Less than ten seconds later, at 4:09:17 p.m., the defendant hurled the unstrung bow, like a spear, into the phalanx of officers. *See id.*



At that time, Officer Beaver stood in the middle of the phalanx inside the tunnel, on the north side, approximately three officers back from the front line. *See* Govt. Ex. 205a-001. The spear hit Officer Beaver on the head, *see* Govt. Ex. 205a-003, but luckily did not injure her because it bounced off her helmet, which is designed to withstand a bullet, *see* Govt. Ex. 619. Had Officer Beaver not been wearing the helmet, however, the spear could have seriously injured her, such as by poking out one of her eyes. Other officers seized the bow and passed it back so that it could not be used again by the defendant or other rioters. *See* Govt. Ex. 207.

***Evidence Concerning the Defendant's Claim of Defense-of-others***

During the relevant time span, two notable people stood near Officer Beaver in the tunnel: MPD Lieutenant Jason Bagshaw, wearing a white long-sleeved uniform shirt, was immediately to Officer Beaver's right, and a female rioter, dressed in a red long-sleeved top, stood in front of Lieutenant Bagshaw, sometimes directly in front and sometimes with another officer between her and him. *See* Govt. Exs. 204-205, Def. Exs. 100, 102, 104. Within this time frame, the woman in red was the only rioter who had penetrated into the middle of the law enforcement phalanx. *See*

4

*id*. None of the evidence presented at trial by either party showed or explained how she got there, how long she had been there, or what she had been doing beforehand, including any actions she had taken to resist, oppose, impede, or interfere with the officers' efforts to defend the U.S. Capitol (other than penetrating to the middle of the law enforcement defensive phalanx).

The tunnel CCTV footage shows that over an almost two-minute span running from approximately 4:07:00 to 4:08:54 p.m., Lieutenant Bagshaw repeatedly struck, or tried to strike, the woman in red with his baton. *See* Govt. Ex. 204.

At 4:07:26 p.m., an unidentified woman's voice can be heard saying "I didn't even touch you" on the BWC footage of an officer who was perched on a ledge on the north side of the tunnel, near Officer Beaver and Lieutenant Bagshaw. *See* Def. Ex. 102. But the defendant did not arrive at the mouth of the tunnel until at least twenty seconds later, and possibly as much as a minute and a half later. *See* Govt. Exs. 204, 222.

Crucially, for the 16-second span between 4:08:55 and 4:09:11 p.m., during which the defendant arrived at the mouth of the tunnel and began raising his unstrung bow into spear-throwing position, neither Lieutenant Bagshaw nor any other officer made visible movements toward the woman in red. *See* Govt. Ex. 204. Then, from 4:09:11 to 4:09:20 p.m., Lieutenant Bagshaw threw five left-handed jab punches in the direction of the woman in red's head or upper body. *See* Govt. Exs. 204-205, Def. Ex. 102. The photograph below shows Lieutenant Bagshaw, circled in yellow, with his left fist raised.



It is unclear from the camera angles in evidence whether any of Lieutenant Bagshaw's punches connected. *See id.* And because of the dense crowd, the available camera angles only show, at most, flashes of the woman in red's head and one hand; it cannot be determined whether she made physical contact with officers or did anything else to them below the level of her and their shoulders. *See id.*

At 4:09:12 p.m., a man's voice can be heard saying "Please don't beat her" on the BWC footage of the same officer perched on the nearby ledge. *See* Govt. Ex. 205, Def. Ex. 102. At that time, however, the defendant had already raised his bow into spear-throwing position, as displayed in Def. Ex. 102, which pulls together the tunnel CCTV camera, Officer Beaver's BWC footage, and the BWC footage of the officer perched on the ledge:



Moreover, at that time, the defendant's view of Lieutenant Bagshaw and the woman in red was obstructed by a stack of at least five people—the rioter standing in front of him and four law enforcement officers—as well as two large, scuffed plastic shields. Additionally, the woman in red was shorter than the officers standing in front of her, and thus the defendant's ability to see her was further obscured.



Finally, the defendant introduced evidence concerning the use-of-force policies of both the USCP and MPD. The defendant elicited testimony from law enforcement witnesses from both agencies that the head is considered a sensitive area, strikes to the head can cause death or serious injury, and strikes to the head are thus to be avoided unless necessary. The defendant did not elicit, however, any testimony that Lieutenant Bagshaw's strikes against the woman in red were unjustified or otherwise a violation of agency protocols.

On January 7, 2021, the defendant called in to his hometown's governing Select Board's weekly meeting and provided an approximately 12-minute-long monologue account of what he saw and did in Washington, D.C. on January 6. *See* Govt. Ex. 250. The next day, the defendant participated in an interview with *The Rochester Voice*, which was published as an article on January 11, 2021. *See* Govt. Ex. 616. In both forums, the defendant lauded himself as a patriot and peaceful protestor. *See* Govt. Exs. 250, 616. He said the mob had pushed him unwillingly to the mouth of the tunnel where, according to him, officers victimized him with unwarranted violence. *See id.* But he never once mentioned seeing the woman in red or anyone like her, let alone taking action to defend her or any other person. *See id.*

The defendant did not testify at trial.

## LEGAL STANDARD

Given that this briefing follows a bench trial, the procedural posture is akin to a charging conference in a jury trial, at which the parties and the trial judge discuss whether sufficient evidence exists in the record to merit a certain jury instruction.

Count 3 charges a violation of 18 U.S.C. § 111(a)(1) and (b). Doc. 69. Section 111 makes it a crime to "forcibly assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with" a federal officer in the performance of the officer's duties. 18 U.S.C. § 111(a)(1). A defendant

charged under Section 111 may assert, as an affirmative defense, a theory of self-defense or defense-of-others, "which justifies the use of a reasonable amount of force against an adversary when a person reasonably believes that he [or another] is in <u>immediate danger of unlawful bodily harm</u> from his adversary and that the use of such force <u>is necessary to avoid this danger</u>." *United States v. Middleton,* 690 F.2d 820, 826 (11th Cir. 1982) (emphasis added).

In *United States v. Slatten*, 395 F. Supp. 3d 45, 112-113 (D.D.C. 2018), a federal murder case, District Court Judge Royce C. Lamberth instructed the jury on defense-of-others as follows:

> Self-defense or defense-of-others is a complete defense to murder where Mr. Slatten actually believed that he or another person was in danger of serious bodily injury, and actually believed that the use of deadly force was necessary to defend against that danger and both of these beliefs were reasonable. Every person has the right to use a reasonable amount of self-defense or defense-of-others if: One, he <u>actually believes</u> he or another person is in imminent danger of bodily harm; and if, two, he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether Mr. Slatten, under the circumstances as they appeared to him at the time of incident, <u>actually believed</u> he or another person was in imminent danger of bodily harm, and could reasonably hold that belief. A person may use a reasonable amount of force in self-defense, including, in some circumstances, deadly force.

*Id.* (emphasis added). Judge Lamberth drew that instruction from the "Redbook." *See id.* (citing Barbra Bergman, *Criminal Jury Instructions for the District of Columbia* §§ 9.500, 9.501(B)-(C), 9.503 (5th ed. 2018)).

A defendant must satisfy five elements for a defense-of-others claim: (1) the defendant <u>actually believed</u> that another person was in danger of injury; (2) that belief was reasonable; (3) the defendant <u>actually believed</u> that the use of force was necessary to defend the person against the danger; (4) that belief was reasonable as well; and (5) the defendant used a reasonable amount of force in response. *See Slatten*, 395 F. Supp. 3d at 112-113 (emphasis added); *accord* Pattern Criminal Jury Instructions of the Seventh Circuit, 6.01 (2012 ed.) ("A person may use force when

he reasonably believes that force is necessary to defend [himself/another person] against the imminent use of unlawful force."); Wayne R. LaFave, *Substantive Criminal Law* § 10.5, Defense-of-others (Dec. 2021) ("[O]ne is justified in using reasonable force in defense-of-others person, even a stranger, when he reasonably believes that the other is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger.").

This defense, however, contains two important limitations. First, Congress enacted Section 111 "to protect both federal officers and federal functions." *United States v. Feola*, 420 U.S. 671, 679 (1975). As a result, "[a]n individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties." *United States v. Drapeau*, 644 F.3d 646, 653 (8th Cir. 2011); *see also United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) ("[Self-defense] principles must accommodate a citizen's duty to accede to lawful government power and the special protection due federal officials discharging official duties."). Second, even in circumstances where an individual might be justified in using some force to resist a federal officer, that resistance must be reasonable under those circumstances. *See Abrams v. United States*, 237 F.2d 42, 43 (D.C. Cir. 1956) (observing that "the use of 'reasonable force' only would have been open to defendants"); *see also United States v. Wallace,* 368 F.2d 537, 538 (4th Cir. 1966) (explaining that Section 111 permits "reasonable force employed in a justifiable belief that it is exerted in self-defense"); *United States v. Perkins*, 488 F.2d 652, 655 (1st Cir. 1973) (defendant may be convicted under Section 111 where "he used more force than was necessary to protect the person or property of himself or others").

Moreover, the defendant has the initial burden of production to raise a defense-of-others claim. *See United States v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996) (concerning the analytically

identical self-defense justification). Only after the defendant meets his burden of production does the Government have the burden to disprove the defense beyond a reasonable doubt. *See id.* The Government is under no duty to affirmatively produce evidence to refute the defense-of-others claim. *See id.* For the defendant to satisfy the initial burden of production, "there must be evidence [in the trial record] sufficient for a reasonable jury to find in [the defendant's] favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988).[1]

## ARGUMENT

**I.     The defendant has failed to carry his initial burden because there is no evidence in the record that the defendant actually believed the woman in red was in danger, or that he actually believed force was necessary to save her.**

The defendant's defense-of-others claim is dead on arrival. There is no evidence in the trial record—none whatsoever—to show that he actually believed that the woman in red was in danger, or that he actually believed force was necessary to save her. *See Slatten*, 395 F. Supp. 3d at 112-113. Neither the defendant nor any other witness testified about what the defendant could see, let alone what he thought or believed, when he hurled his unstrung bow like a spear at the phalanx of officers and struck Officer Beaver. And the trial record is bereft of any such statements the defendant made to anyone else, including during his 12-minute-long monologue to the Lebanon Town Select Board the next day, *see* Govt. Ex. 250, or in his interview with Harrison Thorp of *The Rochester Voice* the day after that. There is no evidence in the record of the defendant's thinking or beliefs. Consequently, there is no evidence on which a reasonable factfinder could rely to find

---

[1] *See also United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006) (To establish a prima facie case of self-defense, the defendant must make an offer of proof of "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances.")

that defendant actually believed the woman in red was in danger and that he actually believed force—specifically the use of a spear—was necessary to save her.

There is thus no evidence in the record available to satisfy the first prong of the defense-of-others claim. *See Slatten*, 395 F. Supp. 3d at 112-113. As such, the defendant has failed his initial burden of production, which ends the inquiry. *See Mathews*, 485 U.S. at 63; *Branch*, 91 F.3d at 712. If this had been a jury trial, he would not be entitled to a jury instruction on this defense. Accordingly, here the Court should refuse to consider the claim any further.

If anything, the evidence in the trial record suggests that the defendant did <u>not</u> see the woman in red before hurling his bow like a spear. As described above, when the defendant pushed and maneuvered himself up to the mouth of the tunnel, Lieutenant Bagshaw was no longer striking the woman in red. *Compare* Govt. Ex. 204 *and* Govt. Ex. 222. There were also at least five people and two scuffed, translucent (but not transparent), six-foot long riot shields between the defendant and the shorter woman in red, who is barely visible to a CCTV camera that had a higher, more direct vantage point. *See* Govt. Ex. 204. When the defendant began raising his bow into throwing position, he was not even looking in the direction of Lieutenant Bagshaw or the woman in red. *See id*. And the defendant had cocked and raised the bow in his hand one second *before* the unknown man stated, "Please don't beat her," indicating the defendant was not reacting to that statement. *See* Govt. Exs. 204-205. There is also no evidence in the record that, during the chaotic events at the mouth of the tunnel, the defendant could hear this remark or any other statement made about the woman in red, most of which occurred before the defendant arrived in the relevant area. *See* Govt. Exs. 204, 222.

The defendant also failed to mention the woman in red during his call in to the Select Board or his interview with *The Rochester Voice*—two uncritical, open platforms where the defendant

described his activities in Washington, D.C. on January 6 to sympathetic audiences. In both forums, he portrayed himself as a peaceful protestor who had been unwillingly pushed into conflict with police and undeservedly struck and bloodied. And yet the defendant made no mention in either forum of seeing other "patriots," particularly women, being unjustly beaten or his own noble, heroic, dramatic action to attempt to save anyone. Moreover, in both forums, the defendant described retrieving his unstrung bow from his car after the rally and carrying it with him onto the grounds of the U.S. Capitol. And yet, conspicuously, in neither forum did the defendant describe what he did with it or how he lost it.

These statements—given in the days immediately following January 6—fail to fit the defendant's present narrative that he used the bow to defend the woman in red from what he believed to be a police officer's use of unlawful force. They instead suggest that the defendant developed this defense-of-others claim *post hoc* in preparation for trial, only after scouring the BWC and CCTV footage and discovering Lieutenant Bagshaw's actions toward the woman in red.

## II.   Even if the defendant saw Lieutenant Bagshaw striking the woman in red, there is no evidence in the record that Lieutenant Bagshaw acted outside the scope of his official duties.

If the Court considers the claim further, the Court should find that it fails the second analytical step as well because the evidence shows beyond a reasonable doubt that the defendant did not act reasonably in defense-of-others.

While it is undisputed that Lieutenant Bagshaw repeatedly struck, or attempted to strike, the woman in red in the head or upper body, *see* Govt. Ex. 204; that the head is a sensitive area, *see* Def. Exs. 404, 408; and that both MPD and USCP use-of-force policies direct officers to avoid striking the head unless necessary, *see id.*, these facts are insufficient to show that Lieutenant Bagshaw acted unlawfully or outside the scope of his official duties. *See Drapeau*, 644 F.3d at

653; *Branch*, 91 F.3d at 714. Indeed, in the context of a self-defense (or defense-of-others) claim lodged against a federal officer, a defendant cannot succeed unless he shows a reasonable fear of "the imminent use of sadistic and malicious force . . . for the very purpose of causing [] harm." *United States v. Waldman*, 835 F.3d 751, 755 (7th Cir. 2016).[2]  The defendant cannot meet that burden.

Lieutenant Bagshaw's official duties on January 6, 2021, included defending the U.S. Capitol, protecting members of Congress and staff members inside, and preventing rioters from entering the building. As multiple officers testified, the mere presence of the mob of rioters at the tunnel interfered with their ability to defend the U.S. Capitol, both at that location and others. Worse, by 4:00 p.m., officers defending the tunnel, like Lieutenant Bagshaw, had been subject to chemical sprays, thrown objects, punches, kicks, and other forms of physical violence from rioters for hours. *See* Test. of Sgt. Aquilino Gonell, Tr. at 47:20-48:3, 48:9-49:2. Combined with a constant barrage of violent threats, these officers reasonably believed that their lives were in danger. *See id.* at 41:13-17; 50:11-22; 53:9-54:15; 57:12-21. They did not know the U.S. Capitol building had been breached elsewhere. *See id.* 59:17-25, 61:18-21. They reasonably believed that they stood as the last barrier between the rioters and the interior of the U.S. Capitol. *See id.* They reasonably believed that the lives of Senators, Representatives, their staffs, and the Vice-President were in danger and that their lives depended on the officers holding the door and preventing the rioters from accessing the building. *See id.* 45:4-46:11. Finally, the officers reasonably believed

---

[2] The Seventh Circuit in *Waldman* adopted that standard in the context of a prison official, but the underlying rationale—namely, enabling prison guard to carry out their protective roles without having to "second-guess every use of force to ascertain whether the force used exceeded, even by a bit, what was necessary," which would "threaten the efficient and safe function of the prison system," *see United States v. Gore*, 592 F.3d 489, 495 (4th Cir. 1995) (citation omitted)—applies with full force here.  *See Waldman*, 835 F.3d at 755 (citing *Gore*).

that our democracy itself was at risk if the rioters managed to enter the building and overtake Congress by force.

That context must inform the Court's understanding of Lieutenant Bagshaw's reaction to the woman in red's penetration halfway into the seven-person deep defensive officer phalanx. While many observers might instinctively cringe at the sight of a male police officer using a baton to strike, or attempt to strike, the head, neck, and shoulder area of a smaller woman, there are many possible lawful justifications for Lieutenant Bagshaw's use of force. The woman in red's location alone was criminal, making her subject to arrest, and it presented a threat to the officers and the U.S. Capitol. Here, there is no evidence in the trial record explaining how the woman penetrated the phalanx of officers, whether she was armed at the time, or if she had threatened or undertaken violent action against an officer. Depending on these circumstances, an officer may have been justified in using violent force against her. It is possible that Lieutenant Bagshaw struck her for no justifiable reason. But it is also possible he struck her to disarm her, or to subdue her after she attacked an officer. The record is silent on these questions, and thus the defendant cannot point to any evidence that Lieutenant Bagshaw used unlawful force, or otherwise acted outside the scope of his official duties, *see Drapeau*, 644 F.3d at 653; *Branch*, 91 F.3d at 714, let alone "used sadistic and malicious force . . . for the very purpose of causing [] harm," *see Waldman*, 835 F.3d at 755. As a result, the defendant cannot establish his right to act on the woman's defense.

Moreover, the defendant could not have known the answer to these questions. He did not arrive at the mouth of the tunnel, within visual or aural range of the woman in red, until almost two minutes after Lieutenant Bagshaw first struck the woman in red. *See* Govt. Ex. 204. Thus, assuming the defendant even saw the woman in red, *see* Section I *supra*, he certainly did not see how she got so deep into the tunnel in the first place, whether she was armed, or what, if anything,

she had done to officers prior to Lieutenant Bagshaw's efforts to subdue her. While "an individual may be justified in using force to resist excessive force used by a law enforcement officer," *Drapeau*, 644 F.3d 646, 653-654, here the evidence demonstrates that the defendant had no knowledge of the relevant circumstances and thus could not have formed a <u>reasonable</u> belief that Lieutenant Bagshaw was using excessive force. As such, the defendant cannot claim he was justified in hurling his bow like a spear.

At best, one might speculate that the defendant *assumed* Lieutenant Bagshaw was acting outside the scope of his official duties. But such a claim would fail for two reasons.  First, as noted above, there is no evidence in the record establishing what the defendant perceived or thought when he hurled his bow like a spear. *See* Section I *supra*. Second, a self-defense (or defense-of-others) claim is "reserved for 'extraordinary circumstances' which 'require nothing less than immediate emergency.'" *United States v. Sahakian*, 453 F.3d 905, 910 (7th Cir. 2006) (quoting *United States v. Bell*, 214 F.3d 1299, 1301 (11th Cir. 2000)). Such a claim cannot be predicated on an individual's assumptions about what is happening or might happen—such as a "vague unsubstantiated threat" or, as here, a perception of unlawful or disproportionate force used by a law enforcement officer—because expanding the defense in this fashion "would only serve to exacerbate" violence.  *Id.*

III.   **Even if the defendant was justified in using some force against Lieutenant Bagshaw, the force he used—throwing a projectile dangerous weapon—was unreasonable.**

Even if the defendant saw the woman in red and had some right to act on her behalf, the video evidence, *see* Govt. Ex. 204, shows that the defendant impermissibly escalated the violence. *See Waters v. Lockett* 896 F.3d 559, 570 (D.C. Cir. 2018) (self-defense not applicable "if [the defendant] and his co-conspirators used excessive force to repel Hargrove's attack.").

16

A defendant claiming self-defense or defense-of-others is limited to using reasonable force in opposition. *See Slatten*, 395 F. Supp. 3d at 112-113. Reasonable force is understood as equal, or proportionate, to the type and degree of force being used by the target. Here, the video evidence shows that Lieutenant Bagshaw ceased using his baton against the woman in red at approximately 4:08:55 p.m., over 20 seconds before the defendant hurled his bow like a spear at 4:09:17 p.m. *See* Govt. Ex. 204. Close inspection of the video reveals that the defendant actually began preparing to throw the bow/spear a second *before* Lieutenant Bagshaw raised his fist. The defendant's use of a weapon thus constituted an unreasonable escalation, fatally undermining his defense-of-others claim.

Moreover, the defendant's own subsequent actions—specifically his assaults on Sergeant Nguyen and Sergeant Gonell, and his final fists-flailing bull charge into the crowd of officers—undermines any claim that he reasonably acted in the defense-of-others. Likewise, the defendant's statement urging others to join the hand-to-hand combat against officers ("Get in there!") belies any claim that he reasonably believed his conduct was *necessary* to protect others against unlawful force. *See* Govt. Ex. 221. The Court should reject his assertion that he acted in defense-of-others when he hurled his bow like a spear, striking Officer Beaver.

## CONCLUSION

For the reasons set forth and based on the evidence presented at trial, the United States respectfully requests that this Court reject the defendant's claimed affirmative defense-of-others claim and find him guilty on Count 3.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:    */s/ Michael M. Gordon*
MICHAEL M. GORDON
Assistant United States Attorney
Florida State Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33602
michael.gordon3@usdoj.gov
Telephone:  813-274-6370


*/s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
douglas.brasher@usdoj.gov
Telephone:  214-659-8604