1

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

3   United States of America,      ) Criminal Action
                                   ) No. 1:21-cr-00158-RC-1
4                     Plaintiff,   )
                                   )
5   vs.                            ) **<u>Verdict - Bench Trial</u>**
                                   )
6   Kyle Fitzsimons,               ) Washington, D.C.
                                   ) **September 27, 2022**
7                     Defendant.   ) Time:  10:00 a.m.
    _____

8

9

10

**Transcript of <u>Verdict - Bench Trial</u>**
**Held Before**
**The Honorable Rudolph Contreras**
**United States District Judge**

11

12

<u>A P P E A R A N C E S</u>

13   For the Government:      **Douglas B. Brasher**
                             UNITED STATES ATTORNEY'S OFFICE
14                            Northern District of Texas
                             1100 Commerce Street, Third Floor
15                            Dallas, Texas 75242

16                            **Michael M. Gordon** (via Zoom)
                             UNITED STATES ATTORNEY'S OFFICE
17                            400 North Tampa Street, Suite 3200
                             Tampa, Florida 33602

18   For the Defendant:      **Natasha Taylor-Smith**
                             FEDERAL COMMUNITY DEFENDER OFFICE
19                            601 Walnut Street, Suite 545 West
                             Philadelphia, Pennsylvania 19106
20   _____

21   Stenographic Official Court Reporter:
                             Nancy J. Meyer
22                            Registered Diplomate Reporter
                             Certified Realtime Reporter
23                            333 Constitution Avenue, Northwest
                             Washington, D.C. 20001
24                            202-354-3118

25

1                        **I N D E X**

2                                                          PAGE:

3      **Exhibits Admitted:**

4          Government Exhibit 218........................... 8
           Government Exhibit 219........................... 8
5          Government Exhibit 220........................... 6
           Government Exhibit 221........................... 6
6          Government Exhibit 222........................... 6
           Government Exhibit 223........................... 6
7          Government Exhibit 223A.......................... 6
           Government Exhibit 224........................... 6
8          Government Exhibit 225........................... 6
           Government Exhibit 226........................... 6
9          Government Exhibit 230-3......................... 8
           Government Exhibit 230-4......................... 8
10         Government Exhibit 230-5......................... 8
           Government Exhibit 230-6......................... 6
11         Government Exhibit 230-7......................... 6
           Government Exhibit 230-8......................... 6
12         Government Exhibit 230-9......................... 6
           Government Exhibit 230-10........................ 6
13         Government Exhibit 230-11........................ 6

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE COURTROOM DEPUTY:  This is Criminal Action

3     21-158, United States v. Kyle Fitzsimons.  For the

4     United States, I have Doug Brasher; and Michael Gordon by Zoom.

5     For defendant, I have Natasha Taylor-Smith.  Our court reporter

6     today is Nancy Meyer.

7          All parties are present.

8          THE COURT:  Good morning, everybody.

9          MS. TAYLOR-SMITH:  Good morning, Your Honor.

10          MR. GORDON:  Good morning, Your Honor.

11          MR. BRASHER:  Good morning, Your Honor.

12          MS. TAYLOR-SMITH:  Your Honor, I apologize for my

13     tardiness.

14          THE COURT:  No problem.  No problem.  You come a long

15     way, and it's a busy day in the courthouse today.

16          Mr. Gordon, are you the one from Tampa?

17          MR. GORDON:  I am, Your Honor.

18          THE COURT:  Are you evacuating?

19          MR. GORDON:  Yes, Your Honor.

20          THE COURT:  All right.  Be safe.

21          MR. GORDON:  Thank you.

22          THE COURT:  All right.  So we're here for the

23     verdict.  There are a number of counts.  So I'm going to go

24     through them one by one.  So it's going to take a bit of time.

25     So relax.

1          So I'll start off with the open-source videos,

2     evidentiary issues that I left open at the end of the trial,

3     so -- and whether the open-source videos were properly

4     authenticated.  The defendant's reply to the government's trial

5     brief on this issue emphasizes that an authentication is a

6     prerequisite to admissibility, and that is true.  But the case

7     cited, *United States v. Khatallah*, was actually more supportive

8     of the government's position.  In that case, the D.C. Circuit

9     affirmed admission of foreign phone records based on their

10    appearance, format, and connection to the defendant.

11         The D.C. Circuit rejected the defendant's arguments that

12    the phone records had not been authenticated to the jury,

13    holding that "in deciding the telephone records' admissibility,

14    the question is not whether the government conclusively proved

15    their authenticity.  It is only whether the government's

16    showing 'permit[ted] a reasonable juror to find that the

17    evidence is what its proponent claims.'"  And that's *United*

18    *States v. Khatallah*, 41 F.4th, 608, 623, D.C. Circuit (2022).

19    Any difference between that articulation and the government's

20    is semantic.

21         The question here is, therefore, whether the

22    government's showing regarding the open-source videos could

23    permit a reasonable fact-finder to find that they are, in fact,

24    what the government claims.  The government has attempted to do

25    that primarily through comparison through other admitted

1    evidence such as the CCTV video and the body-worn-camera

2    footage.

3         With respect to the government's video exhibits 220,

4    221, 222, 223, 223A, 224, 225, 226, I find that the

5    government's authentication is sufficient.  These exhibits

6    include the photos and videos of Mr. Fitzsimons outside the

7    tunnel and retreating from the tunnel.  Each of those videos

8    depicts events that can also be seen on the properly

9    authenticated CCTV or body-worn-camera footage, albeit from

10   different angles or further distance, such as the crowd member

11   who shouts, "Make a hole!" and another tells Mr. Fitzsimons

12   that he is an American hero.

13        But the defendant and other individuals who are

14   identifiable on both the CCTV and body-worn-camera videos by

15   their clothing and movements appear in the open-source videos

16   as well as other objects, such as crutches, the spraying of

17   pepper spray from the tunnel, and a moving ladder that further

18   align the open-source videos with the CCTV and body-worn-camera

19   footage.

20        In addition, the defendant's pictured in the same

21   distinctive clothing that was found during the FBI search of

22   his truck and house, and that has been admitted into evidence,

23   and the defendant described himself as wearing in his later

24   accounts of that day.  In some of the videos, even the pattern

25   of blood on his butcher jacket is consistent with the stains on

1    the actual butcher jacket that has been admitted into evidence.

2    I also note that many of those open-source videos are

3    consistent with each other, in that the same voices and

4    conversation are captured on each one, where the movement and

5    distance that Mr. Fitzsimons retreats before turning around is

6    the same.

7         I, therefore, hold that the government has sufficiently

8    authenticated those exhibits and admit them into evidence.

9              (Government Exhibit 220, 221, 222, 223, 223A, 224,

10   225, and 226 admitted into evidence.)

11             THE COURT:  Similarly, I will admit the photos in

12   Government Exhibit 230-6 through 230-11.

13             (Government Exhibit 230-6 through 230-11 admitted

14   into evidence.)

15             THE COURT:  Photos 7, 8, and 9 show the scene outside

16   the tunnel that can be seen from the other direction in the

17   CCTV footage in approximately the same time frame.  The pattern

18   of blood dripping down his face in those photos exactly matches

19   Photo 6, which I will admit as well.  Photos 10 and 11 appear

20   to show Mr. Fitzsimons still with approximately the same blood

21   marks as he leaves through the crowd and also show his

22   distinctive outfit, where the bloodstains in the photo match

23   with the bloodstains on the jacket entered into evidence.

24        The bloodstains and markings on his face are also

25   consistent with Photo 12 of that series, which was also

1    admitted as Defense Exhibit 407, and to which there was no

2    objection.  If anything, these photos are so similar that they

3    border on cumulative, and I have not given any single one of

4    them significant weight.

5        The videos of Mr. Fitzsimons at the Ellipse and

6    approaching the Capitol Building are a closer call, although

7    the video of Mr. Fitzsimons at the Ellipse is at least somewhat

8    consistent with the photos found on his cell phone.  There is

9    no body-worn-camera or CCTV footage that corroborates this

10   video, and the defendant was not yet wearing his distinctive

11   clothing.  I will, therefore, exclude Exhibit 216.

12       Another video of Mr. Fitzsimons approaching the Capitol

13   from a further distance away, Government Exhibit 217, also

14   lacks sufficient authenticated evidence to corroborate it and

15   only shows him momentarily from the back.  And I will exclude

16   it for the same reasons I will exclude the still photos at

17   Government Exhibit 230-1 and 230-2.  So that was 230-1 and

18   230-2.  In accordance with this ruling, I have not considered

19   the excluded exhibits in reaching my verdict in this case.

20       The videos in Exhibits 218 and 219 of Mr. Fitzsimons

21   going up the stairs, including footage of him helping pull

22   other rioters up with him and chanting freedom, clearly show

23   his distinctive outfit, and the government suggests that this

24   moment is visible in the CCTV footage in Government Exhibit

25   201.  I'm not convinced that the CCTV footage, which is from a

1    significant distance away, shows Mr. Fitzsimons or the

2    others -- or the other people and objects around him in that

3    location with sufficient clarity to permit meaningful

4    comparison.  While the scenes in the footage appear generally

5    consistent with the West Front of the Capitol that day, there's

6    not enough detail visible in the CCTV footage to be able to

7    meaningfully compare these specific videos to it.

8        Likewise, the still photos in Government Exhibits 230-3

9    through 5 show Mr. Fitzsimons' distinctive outfit, key parts of

10   which have been admitted into evidence.  Those photos and

11   videos in Government Exhibit 218 and 219 are also consistent

12   with each other and show some of the same other individuals

13   around Mr. Fitzsimons.  I will admit this group of photos but

14   note that their probative value is minimal and I have not

15   placed a significant weight on them.

16        (Government Exhibit 230-3 through 230-5, 218, 219

17   admitted into evidence.)

18        THE COURT:  Turning now to the heart of the matter,

19   the defendant, Kyle Fitzsimons, traveled from his home in Maine

20   to Washington, D.C., to take part in the "Stop the Steal" rally

21   on January 6th, 2021.  Following the speeches at the Ellipse,

22   he joined the mob that was violently attempting to enter the

23   Capitol Building and himself attempted to violently attack the

24   officers stationed in the tunnel of the lower west terrace.

25        As a result, he is charged with 11 separate offenses:

1  civil disorder; obstruction of an official proceeding;

2  assaulting MPD Officer Sara Beaver with a dangerous or deadly

3  weapon; inflicting bodily injury on Sergeants Phuson Nguyen and

4  Aquilino Gonell; assaulting, resisting, or impeding certain

5  officers; entering and remaining in a restricted building or

6  grounds; disorderly and disruptive conduct in a restricted

7  building or grounds; engaging in physical violence in a

8  restricted building or grounds; disorderly conduct in the

9  Capitol Grounds or Buildings; and act of violence in the

10  Capitol Grounds or Buildings.

11      I'll start with the counts in numeric order.  So the

12  first count is the civil disorder count.  Count 1 charges

13  Mr. Fitzsimons with a violation of 18 U.S.C. § 231(a)(3),

14  committing or attempting to commit an act to obstruct, impede,

15  or interfere with law enforcement officers lawfully carrying

16  out their official duties incident to a civil disorder, where

17  the civil disorder obstructed, delayed, and adversely affected

18  the conduct and performance of a federally protected function.

19      In order to find the defendant guilty of this offense, I

20  must find the following three elements beyond a reasonable

21  doubt:

22      First, the defendant knowingly committed an act or

23  attempted to commit an act with the intended purpose of

24  obstructing, impeding, or interfering with one or more law

25  enforcement officers.

1       Second, at the time of the defendant's actual or

2   attempted act, the law enforcement officer -- officers were

3   engaged in the lawful performance of their official duties

4   incident to and during a civil disorder.

5       Third, the civil disorder in any way or degree

6   obstructed, delayed, or adversely affected either commerce or

7   the movement of any article or commodity in commerce or the

8   conduct or performance of any federally protected function.

9       I find beyond a reasonable doubt that Mr. Fitzsimons

10  knowingly committed an act with the intended purpose of

11  obstructing, impeding, and interfering with one or more law

12  enforcement officers.  To give just two examples, he attempted

13  multiple times to grab at Sergeant Nguyen in what can only be

14  described as an attempt to obstruct and interfere with

15  Sergeant Nguyen's duties.

16      Mr. Fitzsimons' final charge into the tunnel in which he

17  flailed his arms and hit multiple officers can also be

18  described as an act of interference.  Both of these acts were

19  committed knowingly, meaning that Mr. Fitzsimons realized what

20  he was doing and was aware of the nature of his conduct.  In

21  both those instances, Mr. Fitzsimons could have retreated but

22  instead attempted to escalate the violence in the tunnel.

23      Nor is there any plausible argument for those two acts

24  that he was acting out of ignorance, mistake, or accident.  The

25  videos show him looking towards Sergeant Gonell and reaching in

1   his direction in a calculated manner.  The video also shows

2   Mr. Fitzsimons pause for a matter of seconds, look forward, and

3   brace himself before charging into the line of officers.  That

4   is not the body language of someone taking those actions

5   accidentally.  After those acts, he also encouraged others to

6   get in there, demonstrating his clear knowledge and

7   understanding of exactly what actions he had just taken.

8        The first element also requires a finding of the

9   defendant's specific intent to obstruct, impede, or interfere

10  with the law enforcement officers.  This, too, has been

11  satisfied beyond a reasonable doubt.  His intent in these two

12  respects is, again, apparent from his actions on the video.

13       When -- excuse me.  When reaching for Sergeant Nguyen,

14  he leaned in and calculated where he was reaching, and did so

15  multiple times over the course of that interaction.  And when

16  he ran into the tunnel, he was waving his arm in an apparent

17  attempt to increase the amount of physical contact he made with

18  them.  If his goal was simply to get into the building,

19  charging the line of officers would have been a highly

20  illogical choice.  After all, the tunnel was defended by seven

21  deep rows of officers.  All this leads to the conclusion that

22  Fitzsimons had the specific intent to interfere with and impede

23  the officers themselves.

24       As for the second element, the officers that

25  Mr. Fitzsimons interfered with were engaged in the lawful

1   performance of their official duties incident to and during a

2   civil disorder.  As all three law enforcement officers

3   testified, they had responded to the scene at the lower

4   west terrace as a result of the public disturbance, and the

5   parties' stipulation confirms that those officers were engaged

6   in their official duties.

7        The parties' Stipulation No. 3 also covers the

8   requirement that the evidence of January 6th, 2021, were a

9   civil disorder; which is defined as any public disturbance

10  involving acts of violence by groups of three or more persons

11  which causes an immediate danger or injury to another

12  individual, causes an immediate danger of damage to another

13  individual's property, results in injury to another individual,

14  or results in damage to another individual's property.  Even if

15  the parties had not so stipulated, the mountain of video and

16  photographic evidence showing the violent acts of hundreds of

17  rioters that day and in that specific location, including

18  scaling walls, throwing objects, breaking windows, and forcing

19  through doors, would leave no doubt in this particular element.

20       Turning to the final element, the defense moved under

21  Federal Rule of Criminal Procedure 29 for a judgment of

22  acquittal on Count 1, claiming that the government failed to

23  introduce evidence of any causal nexus between the defendant's

24  prohibited act and the purported impact on interstate commerce

25  and because 231(a)(3) exceeds Congress's power under the

1   Commerce Clause.

2        As to the first point, the government did enter evidence

3   that the Capitol riot impacted commerce by necessitating a

4   curfew in D.C. and the closure of Safeway stores throughout the

5   District.

6        And as to the second, the government correctly notes

7   that Rule 29 motions are not the proper vehicle for raising

8   legal arguments, such as the constitutionality of a statute.

9   See *United States v. Naegele*, 537 F. Supp. 2d 36, *40,

10  (D.D.C. 2008).

11       Fortunately, I need not wade into either argument

12  because there are two prongs to section 231(a)(3):  the

13  interstate commerce prong and the federally protected function

14  prong.  The full statutory text of 18 U.S.C. 231(a)(3) reads,

15  "Whoever commits or attempts to commit any act to obstruct,

16  impede, or interfere with any fireman or law enforcement

17  officer lawfully engaged in the lawful performance of his

18  official duties incident to and during the commission of a

19  civil disorder which in any way or degree obstructs, delays, or

20  adversely affects commerce or the movement of any article or

21  commodity in commerce *or* the conduct *or* performance of any

22  federally protected function shall be fined under this title or

23  imprisoned not more than five years, or both."

24       The plain text of the statute uses the -- the

25  disjunctive "or" throughout.  Other courts in this district

1    that have recently addressed challenges to section 231(a)(3)

2    have suggested that either prong is sufficient to sustain a

3    conviction.

4         Those examples are *United States v. Grider*, Criminal

5    No. 21-22 in front of Judge Kollar-Kotelly, which held that

6    section 231(a)(3) does not exceed Congress's authority under

7    the Commerce Clause and, therefore, did not address a separate

8    challenge to the federally protected function progress; *United

9    States v. Mostofsky*, Criminal No. 21-138, in front of

10   Judge Boasberg, which found that section 231(a) was permissible

11   under the Commerce Clause and suggested that the federally

12   protected function prong could be an alternate route to

13   conviction; and *United States v. Sargent*, 21-258, in front of

14   Judge Hogan, which stated that the government did not need to

15   specify whether the defendant obstructed, delayed, or adversely

16   affected a federally protected function or an article and

17   commodity in commerce.

18        What's more, the second superseding indictment does not

19   charge Mr. Fitzsimons under the commerce prong at all, only the

20   federally protected function prong.  As a result,

21   Mr. Fitzsimons' commerce-related challenges to Count 1 are

22   entirely beside the point, and his Rule 29 motion will be

23   denied by separate order.

24        I find beyond a reasonable doubt that the civil disorder

25   in which Mr. Fitzsimons took part impacted a federally

1    protected function, which means any function, operation, or

2    action carried out under the laws of the United States by any

3    department, agency, or instrumentality of the United States or

4    by an officer or employee thereof.

5         The term department includes executive departments, one

6    of which is the Secret Service.  As other courts in this

7    district have concluded, and I agree, the Secret Service's

8    statutorily prescribed responsibility to protect the

9    Vice President during the joint session of Congress on

10   January 6th, 2021, counts as a function carried out under the

11   laws of the United States.  See *United States v. Nordean*,

12   Criminal No. 21-175 in front of Judge Kelly.

13        The testimony of Special Agent Paul Wade of the

14   Secret Service makes clear that the civil disorder interfered

15   with the Secret Service's function of protecting Vice President

16   Pence on that day.  The Vice President was evacuated to a

17   secure location and was forced to remain there rather than

18   being able to evacuate the building because of the rioters,

19   including Mr. Fitzsimons, who had breached the perimeter and

20   the building.

21        Special Agent Wade credibly testified that the

22   Vice President's safety was jeopardized as soon as the

23   perimeter was breached and that they could not have moved him

24   until the grounds were clear.  Mr. Fitzsimons may have only

25   played a small part in the civil disorder that day, but he was

1       an active participant --

2                   THE COURT REPORTER:  Excuse me, Judge.  Can we go off

3       the record.

4                   (Off the record.)

5                   THE COURT:  So I will go over the last sentence I was

6       in the middle of.

7                   Mr. Fitzsimons may have only played a small part in the

8       civil disorder that day, but he was an active participant whose

9       presence and violent interference with law enforcement officers

10      escalated the circumstances and prolonged the interference with

11      the Secret Service's ability to protect the Vice President.

12                  Accordingly, I find Mr. Fitzsimons guilty beyond a

13      reasonable doubt as charged in Count 1, civil disorder.

14                  Count 2 is obstruction of an official proceeding and

15      aiding and abetting.

16                  Count 2 charges Mr. Fitzsimons with corruptly

17      obstructing or attempting to obstruct an official proceeding in

18      violation of 18 U.S.C. § 1512(c)(2), or aiding and abetting

19      others to commit that offense.

20                  In order to find the defendant guilty of corruptly

21      obstructing an official proceeding, I must find that the

22      government proved each of the following four elements beyond a

23      reasonable doubt:

24                  First, the defendant attempted to or did obstruct or

25      impede an official proceeding.

1    Second, the defendant intended to obstruct or impede the

2    official proceeding.

3    Third, the defendant acted knowingly, with awareness

4    that the natural and probable effect of his conduct would be to

5    obstruct or impede the official proceeding.

6    And fourth, the defendant acted corruptly.

7    The defense moved for a judgment of acquittal on Count 2

8    on the basis that the first element could not be satisfied

9    because the term official proceeding only extends to

10   tribunal-like proceedings related to the administration of

11   justice.  Relatedly, the defense argues in that motion that

12   there was no evidence of conduct that otherwise obstructs,

13   influences, or impedes an official proceeding because such

14   conduct must relate to some kind of evidence.

15   Not only are these both legal arguments, I have already

16   considered and rejected them both.  As I explained in my

17   opinion on Mr. Fitzsimons' pretrial motion challenging this

18   particular charge in the indictment, section 1512(c)(2) is

19   unambiguous and certainly not as limited as he contends.  The

20   certification of the Electoral College vote was a formal

21   convocation at which Congress convened to conduct its official

22   business and, therefore, an official proceeding.

23   And the use of the term otherwise at the beginning of

24   section 1512(c)(2) signals a prohibition of conduct that is

25   different in another way or manner from the conduct prohibited

1    in 1512(c)(1) rather than being limited by it.  A more

2    exhaustive discussion can be found in my prior opinion, and I

3    will deny the motion for judgment of acquittal on Count 2 by

4    separate order.

5         I will note that that -- those issues are before the

6    circuit in a government's appeal of Judge Nichols' rulings on

7    some of those issues.  So perhaps we will have an answer by the

8    time we get to sentencing.

9         I conclude beyond a reasonable doubt that Mr. Fitzsimons

10   attempted to and did obstruct an official proceeding before

11   Congress; the certification of the Electoral College vote.  As

12   Stipulation 2 establishes, the certification had commenced

13   earlier that afternoon and had to be suspended shortly after

14   2:00 p.m.  As that stipulation and the testimony of

15   Special Agent Wade established, Congress could not resume its

16   official business for several hours, until after 8:00 p.m. that

17   evening.  The certification of the electoral vote was,

18   therefore, obstructed and impeded in the most literal sense of

19   those terms.  It was prevented from going forward.

20        Mr. Fitzsimons was only one of many, but his actions

21   directly contributed to the inability of Congress to conduct

22   the official proceeding as scheduled on that day.  There's also

23   no doubt that Mr. Fitzsimons understood the certification to be

24   happening in Congress that day.  That was the entire point of

25   the trip to D.C., and he had announced in advance that he was

1    traveling to D.C. because he knew the certification would be

2    taking place on that day in both of the voice mails he left for

3    Representative Golden and the Facebook posts asking if anyone

4    wanted to form a caravan to D.C.

5         That evidence is also relevant to the second element;

6    whether Mr. Fitzsimons had the specific intent to obstruct or

7    impede the certification of the Electoral College vote.  I find

8    beyond a reasonable doubt that he did.  In his Facebook post,

9    Mr. Fitzsimons asked if anyone would be interested in

10   organizing a caravan to Washington, D.C., for the Electoral

11   College vote count on January 6th, 2021, and ended the posting

12   by asking, "If a call went out for able bodies, would there be

13   an answer?"  That's Government Exhibit 612.

14        In his first call to Representative Golden, he stated, I

15   will be in D.C. on the 6th.  I don't think that I'll see you

16   there, but maybe I will.  Maybe I will.  That's Government

17   Exhibit 611.

18        In the post and both voice mails, he also directly

19   linked his desire to be in D.C. on the 6th with not just the

20   certification, but the certification of what he believed was

21   the result of a fraudulent election.  The defense points out

22   the protests and what he believed to be a fraudulent election

23   is perfectly legal, and that is true.  But it's clearly from

24   those statements and others that he considered this more than

25   political expression.  He considered it something of an

1    existential crisis.

2         Even if Mr. Fitzsimons did not travel to D.C. with the

3    explicitly developed intent to engage in directly

4    obstructionary or violent conduct, those statements show that

5    he at least entertained the possibility that it might be, and

6    in his view, quote, necessary to do so.  His statements after

7    the fact further corroborate this.  When describing his goals

8    after the fact, he described it as the last day of the republic

9    to both the local newspaper and the town board.  Those are

10   Government Exhibits 616 and 250.

11        After the fact, Mr. Fitzsimons expressly linked the

12   events of that day when not just protesting the certification

13   but delaying it.  He told the local newspaper that the speeches

14   from the morning were overtly preaching that there was a plan

15   to delay the certification by the House and Senate and then

16   state legislators would convene and certify the right result.

17   Government's Exhibit 616.

18        He told the town board, as recorded in Government

19   Exhibit 250, that in those same speeches, we were given all the

20   lowdown of how they were going to fight through Lawfare, part

21   of which involved asking for a few more days to allow the

22   legislators from the swing states to decertify their electors

23   and send new ones.

24        These statements show that Mr. Fitzsimons understood

25   the official proceeding that was supposed to take place in

1    Congress and how obstructing or impeding that proceeding was

2    central to what he subjectively believed was the future of the

3    republic.

4         In the alternative, I find that the evidence is

5    sufficient in these respects that show that Mr. Fitzsimons

6    aided and abetted the obstruction of an official proceeding.

7    He was physically present in one of the most violent areas of

8    fighting.  And, in fact, we returned to the tunnel entrance a

9    second time after being pepper sprayed and starting to retreat.

10   He was aware of the unlawful tactics of the crowd, having had a

11   front row view of the crowd throwing things, spraying officers,

12   climbing the walls, and engaging in hand-to-hand combat.  He

13   took affirmative steps toward engaging in this behavior

14   himself, attacking the officers and preventing them from

15   pushing back the crowd.

16        Even after leaving the tunnel, Mr. Fitzsimons encouraged

17   others to get in there; and told them his full name, showing

18   that he knowingly associated himself with the commission of the

19   crime, participated in support of its commission, and

20   encouraged others to continue the crime thereafter.

21        It is clear beyond a reasonable doubt that

22   Mr. Fitzsimons personally acted knowingly, with awareness that

23   the natural and probable effect of his conduct would be to

24   obstruct or impede the official proceeding.  He was aware of

25   the violent scene and understood that the Capitol was closed to

1   the public.  In that context, natural and probable cause of

2   violently engaging with the officers was obvious to further

3   besiege the building and prevent the certification from going

4   forward.

5          To take just his final charge at the officers as an

6   example, Mr. Fitzsimons could have retreated prior to that act

7   when he was already well aware of the situation in the tunnel,

8   Government Exhibit 204 at 4:12:36.  He, instead, paused and

9   then doubled down.  The video is unambiguous.  Mr. Fitzsimons

10  did not charge at the officers ignorantly or by mistake.  He

11  did it knowingly and, as described above, with the knowledge

12  that his acts would obstruct or impede the certification and,

13  in fact, the specific intent to do so.

14         Finally, I find beyond a reasonable doubt that

15  Mr. Fitzsimons acted corruptly.  Corruptly means that the

16  defendant used an unlawful means or had a wrongful or unlawful

17  purpose or both.  Physically attacking law enforcement officers

18  engaged in their official duties in an attempt to gain entrance

19  to an area that is off-limits to the public is certainly

20  unlawful.  And "[u]nusual or illegal conduct is a useful, if

21  not necessary, indicator of improper purpose," *United States v.*

22  *Andries*, Criminal No. 21-93.

23         Mr. Fitzsimons also acted with consciousness of

24  wrongdoing, meaning that he understood his actions to be

25  unlawful.  Mr. Fitzsimons knew the dividing line between

1    peaceful protest and unlawful violence.  His statements after

2    the fact, in which he emphasized his peaceful intent and cast

3    himself as an unwitting victim, are sharply at odds with the

4    video evidence of his actions that day and provide further

5    circumstantial evidence that he knew he had crossed that line.

6         It makes no difference whether Mr. Fitzsimons believed

7    his unlawful actions were justified, as long as he understood

8    that they were unlawful, which I find that he did.

9    Mr. Fitzsimons' fervent belief in the lies he was being told

10   about the election is truly saddening, and to be sure, much of

11   the blame for the events of that day rest with the people in

12   positions of power who spread those lies.  Nevertheless, that

13   does not absolve Mr. Fitzsimons of knowingly and intentionally

14   breaking the law to act on his convictions.

15        I, accordingly, find Mr. Fitzsimons guilty as charged in

16   Count 2.

17        Counts 3 through 6 involve assault, resisting, or

18   impeding certain officers.  Counts 3 through 6 charge the

19   defendant with forcibly assaulting, resisting, opposing,

20   impeding, intimidating, or interfering with the federal officer

21   while the officer is engaged in the performance of his or her

22   official duties in violation of 18 U.S.C. § 111(a)(1) and (b).

23        Count 3 relates to Officer Sarah Beaver of the

24   Metropolitan Police Department.

25        Count 4 relates to Sergeant Phuson Nguyen of the

1     Metropolitan Police Department.

2          Count 5 relates to Sergeant Aquilino Gonell of the

3     United States Capitol Police.

4          And Count 6 relates generally to officers from the

5     United States Capitol Police and Metropolitan Police

6     Department.

7          The elements of the offense are:

8          First, the defendant assaulted, resisted, opposed,

9     impeded, intimidated, or interfered with the officer or

10    officers described in the indictment.

11         Second, the defendant did such act forcibly.

12         Third, the defendant did such act intentionally.

13         Fourth, the person assaulted, resisted, opposed,

14    impeded, intimidated, or interfered with, was an officer or an

15    employee of the United States who was then engaged in the

16    performance of his official duties or any person assisting such

17    an officer or employee in the performance of that officer's

18    duties.

19         Fifth, the defendant made physical contact with the

20    federal officer or acted with the intent to commit another

21    felony.

22         As established by their testimony, Officer Beaver,

23    Sergeant Nguyen, and Sergeant Gonell were law enforcement

24    officers with the MPD or Capitol Police who responded to the

25    lower west terrace as part of their duties that day, as were

1    the other officers present in the tunnel.  As established by

2    their testimony and Stipulation No. 6 of the parties, MPD

3    officers were assisting the Capitol Police officers with their

4    official duties as officers or employees of the United States

5    on January 6th, 2021.  It was a part of the official duty of

6    those officers to protect the U.S. Capitol complex on

7    January 6th, 2021, and to detain individuals who lacked

8    authorization to enter the restricted area around the complex.

9         Accordingly, the fourth element of the violation is

10   satisfied beyond a reasonable doubt for Counts 3 through 6.

11   And I will focus on the remaining elements with respect to each

12   count in turn.

13        Count 3 is the one that covers Officer Sarah Beaver, who

14   is a member of the MPD, who responded to the Capitol on

15   January 6th, 2021.  As her credible testimony established, she

16   responded to the west terrace and was present alongside other

17   officers of the MPD and Capitol in the tunnel when

18   Mr. Fitzsimons first reached that area.

19        As can be seen in Government Exhibits 204, 206, and

20   206B, which is the slow-motion version, at about 4:09:16 p.m.,

21   a long wooden object is thrown into the tunnel and bounces off

22   something before hitting her helmet.  In Government

23   Exhibit 240, the CCTV footage, you can clearly see

24   Mr. Fitzsimons' distinctive white sleeve with a black jacket

25   underneath throwing the bow and see his face momentarily as he

1    throws it as well.

2         The same moment of the bow making impact is visible from

3    different angles in Government Exhibits 205 and 206 as well.

4    The long wooden object, which is captured on body-worn camera

5    as it passed -- as it is passed back through the video, is

6    consistent with Fitzsimons' own description of it as an

7    unstrung bow; Government Exhibit 207 and 207A.  I, therefore,

8    find beyond a reasonable doubt that the wooden object was the

9    unstrung bow that Fitzsimons described bringing to the Capitol

10   and that Mr. Fitzsimons was the one who threw it.

11        But Mr. Fitzsimons does not actually contest that he

12   threw the bow.  Instead, he presented a defense of another

13   defense for that action.  The other person in question was

14   referred to during trial as the woman in red, a female rioter

15   who had advanced several rows of officers into the tunnel.  The

16   video footage shows, and Officer Beaver acknowledged during her

17   testimony, that another officer to her right, identified as

18   Lieutenant Bagshaw, struck or attempted to strike the woman

19   with his baton and later his fists.

20        Also in the body-worn camera you can hear a woman say,

21   quote, I don't -- I didn't even touch you at 4:07:23, and a man

22   shout, quote, please help, end quote, at 4:07:55, Defense

23   Exhibit 102.

24        Mr. Fitzsimons does not reach the mouth of the tunnel

25   until -- until somewhere between 1 or 2 minutes later, at

1   4:00:02, Government Exhibit 204.  At 4:09:07, Officer Bagshaw

2   lifts his hand and begins to strike the woman in red with a

3   closed fist, and another man can be heard shouting, quote,

4   please don't beat her, end quote, as was compiled on

5   Defendant's Exhibit 102.  As can also be seen on that

6   compilation video, Fitzsimons raises the bow just after

7   Lieutenant Bagshaw begins striking the woman but before or

8   perhaps simultaneously with the pleading of the unidentified

9   male voice in the video.

10         Every person has the right to use a reasonable amount of

11   force in defense of another person if, one, he actually

12   believes that the other person is in imminent danger of bodily

13   harm and if, two, he has reasonable grounds for that belief.

14   Both sides agree on that standard but disagree on whether the

15   evidence shows that Mr. Fitzsimons was acting in defense of the

16   woman in red.

17         The government argues that this defense fails at the

18   outset because there is no evidence to suggest that

19   Mr. Fitzsimons actually believed the women in red to be in

20   imminent danger or, indeed, that he was even aware of her.

21         There's evidence on both sides.  The government points

22   out that Fitzsimons did not witness the first part of

23   Lieutenant Bagshaw's actions when he hit the woman in red with

24   a baton because he had not yet arrived at the mouth of the

25   tunnel and it would have been impossible to see up the steps

1    and over the officers to what was happening before then.

2    Fitzsimons might well have heard the man's cry of, quote,

3    please help, close quote, although it is highly doubtful that

4    Mr. Fitzsimons would have been able to glean any meaningful

5    context from that.

6        As the government also points out, even after reaching

7    the mouth of the tunnel, Mr. Fitzsimons' view was obscured by

8    multiple police shields which appeared dirty and scuffed, as

9    well as several lines of officers between him and the woman in

10   red.  He is also only there for a few seconds before almost

11   immediately raising his bow to take aim.  I seriously doubt

12   that he could see enough to draw a conclusion about whether the

13   woman in red was in imminent danger in that time.

14       At most, the circumstantial evidence might suggest that

15   Fitzsimons leaped to a conclusion that someone was in danger

16   based on the shouts, but even assuming that -- that only gets

17   Fitzsimons so far.  The standard also requires that the

18   defendant have reasonable grounds for that belief.  There was

19   simply not enough time or visibility between Mr. Fitzsimons'

20   arrival and when he began to throw the bow for him to have had

21   reasonable grounds to believe that the specific woman in red

22   was in imminent danger of bodily harm.

23       Even the defense's formulation requires, quote,

24   reasonable fear that a real and specific threat existed at the

25   time, close quote.  There is not any evidence, whether from the

1  video or any other after-the-fact statements, that there was

2  anything reasonable about Mr. Fitzsimons' fear, assuming

3  without deciding that he had one at all.  As other courts have

4  pointed out, "[a] third party is usually in an even worse

5  position than the arrestee to make an adequate assessment of

6  the initial legality of an arrest."  That's *Glover v. State*,

7  88 Md. App. 393, *408 (1991).  And that certainly was the case

8  here.  I, therefore, reject Mr. Fitzsimons' affirmative

9  defense.

10      The throwing of the bow, as Officer Beaver credibly

11  testified, impeded her ability to defend the Capitol.  Throwing

12  a bow also opposed and interfered with Officer Beaver within

13  the ordinary meaning of those words.  I also find that the

14  throwing of the bow was an assault because it was an attempt or

15  threat to inflict injury, coupled with the present ability to

16  do so.  There's no real doubt that Mr. Fitzsimons as he threw

17  the bow had the present ability to inflict injury, although the

18  defense claims that it was only meant to counter

19  Lieutenant Bagshaw's force, it at minimum threatened to inflict

20  injury.

21      There's also no reasonable doubt that the act of

22  throwing the bow was an act that used force against

23  Officer Beaver and, thus, that Mr. Fitzsimons acted forcibly.

24  I also have no difficulty concluding that Mr. Fitzsimons' bow

25  made physical contact with the victim, Officer Beaver, as

1    described by her testimony and visible in the videos.

2         Next, I determined that Mr. Fitzsimons threw the bow

3    intentionally, as the video shows he threw the bow with full

4    control and, in fact, took several seconds to aim it.  It is

5    not clear that he intended to assault, oppose, or interfere

6    with Officer Beaver specifically, since, in fact, the bow

7    appears to have bounced off something or someone else before

8    hitting her.  It is, nonetheless, clear that he intended to

9    assault someone in the line of officers, since it was virtually

10   a certain result that by throwing the bow as a spear into the

11   line of officers he would hit one of them.

12        Thus, Mr. Fitzsimons had the clear intent to assault,

13   oppose, impede, and interfere with the federal officers in her

14   vicinity, since he aimed and threw the bow into directly where

15   the officers were defending the tunnel.

16        Finally, I must consider for Count 3 whether the bow was

17   a dangerous or deadly weapon.  I find that it was.  A deadly or

18   dangerous weapon means any object which as used or attempted to

19   be used may endanger the life of or inflict great bodily harm

20   on a person.  The unstrung bow which was, in essence, a long

21   piece of curved wood with slightly more pointed ends and a grip

22   in the middle was capable of inflicting great bodily harm.

23        When thrown as a spear, it has the obvious potential to

24   harm someone.  Further, both the video of the bow being thrown

25   and then being passed back show that it was fairly large, and

1   the earlier photos and videos of Mr. Fitzsimons with the bow

2   show that it was almost as tall as he was.  It was heavy enough

3   that Officer Beaver could feel the impact and involuntarily

4   moved her head to the side as a result of the impact even

5   though her heavy bulletproof helmet was on.

6       I tried on the helmet myself and found it highly

7   protective, such that a minor impact or a light object would

8   not have had that result.  I, therefore, conclude that the bow

9   was a dangerous or deadly weapon.

10      Accordingly, I find Mr. Fitzsimons guilty beyond a

11  reasonable doubt of assaulting Officer Beaver with a dangerous

12  or deadly weapon as charged in Count 3.

13      Count 4 is the charge involving Sergeant Nguyen.  After

14  committing that assault on Officer Beaver with the bow, the

15  video shows that an officer sprays pepper spray into the crowd

16  where Mr. Fitzsimons is standing; Government Exhibit 205 at

17  16:09:30; Government Exhibit 223; Government Exhibit 220 at

18  about 9:15.

19      Fitzsimons then retreats from the tunnel, walking

20  several steps down and grimacing, as shown in Government's

21  Exhibit 224 and 220.  He, nevertheless, turns around and walks

22  back about a minute later.  This time, Fitzsimons approaches

23  the other side of the tunnel and can be seen again in the

24  tunnel CCTV footage in Government Exhibit 204 at approximately

25  4:10:50.  At about 4:10:57, the footage shows his face and

1   outfit clearly.

2       It is at that point that the acts relevant to Count 4

3   begin, which charges Mr. Fitzsimons with the same violation of

4   18 U.S.C. § 111, with respect to Sergeant Phuson Nguyen.

5   Sergeant Nguyen is a member of the MPD who responded to the

6   west terrace on January 6th, 2021.  As he testified, he was

7   part of the line of officers defending the tunnel at the

8   relevant time.  At that point in the day, he was wearing a gas

9   mask which secures around the back of the head with adjustable

10  straps and has a filter that protrudes several inches from the

11  face downwards and to the left.

12      Sergeant Nguyen testified that he was at the front of

13  the line.  A man in a light jacket grabbed his mask and pulled

14  it while the other protester sprayed a substance like pepper

15  spray or bear spray and then let go, allowing the mask to snap

16  back into place and trap the gas there in an incredibly painful

17  experience.  Sergeant Nguyen testified that at that point he

18  fell down and momentarily thought he would die.  That's Nguyen

19  transcript at 16 -- pages 16 and 17.

20      Government Exhibit 205B shows in slow motion that

21  Fitzsimons is reaching towards Sergeant Nguyen and grabbing at

22  him.  Fitzsimons reaches out to grab Sergeant Nguyen.  Defense

23  Exhibit 214 shows this in a frame-by-frame slow motion.  At one

24  point, Fitzsimons appears to make contact with

25  Sergeant Nguyen's hand; Defense Exhibit 212, at 16:11:07, and

1    Defense Exhibit 214.  Sergeant Nguyen also testified that he
2    could tell Mr. Fitzsimons made contact with his hand; Nguyen
3    transcript at 47, line 4.
4         Within a few seconds, another rioter can be seen behind
5    Mr. Fitzsimons spraying what is pepper spray, bear spray, or
6    something similar, at the officers right over Mr. Fitzsimons'
7    head.  The spray appears to affect Mr. Fitzsimons as well, and
8    he leans against the wall at the opening of the tunnel and
9    lowers his head.  None of the videos clearly show contact being
10   made with the gas mask.
11        Sergeant Nguyen agreed that the footage and the still
12   photos did not show any contact being made, Defense
13   Exhibit 207, 208, 209, 210, and 211A.  Indeed, the moment this
14   could have occurred is incredibly brief because Mr. Fitzsimons
15   takes cover almost immediately after the spray stops and is no
16   longer grabbing.
17        On cross-examination, the defense suggested a different
18   narrative.  When Sergeant Nguyen first spoke to the FBI, he
19   stated that a man in a light gray jacket was responsible for
20   pulling his gas mask.  Although the document in question,
21   Defense Exhibit 8, was not formally admitted or adopted as
22   Sergeant Nguyen's statement, later in his testimony,
23   Sergeant Nguyen did adopt that particular statement, agreeing
24   that he had said the rioter in question was wearing a gray
25   jacket.  That's in Nguyen transcript at 50.

1    Slightly before in the video footage, a man in a bluish

2    gray jacket with a camo hat also reaches toward Sergeant Nguyen

3    and appears to make contact with his gas mask, after which

4    Sergeant Nguyen reaches toward his gas mask to possibly adjust

5    it; Defense Exhibit 206 at 16:10:30 through 41.

6    Based on all of this, I will now turn to the elements of

7    the offense.

8    I find that Mr. Fitzsimons assaulted, opposed, impeded,

9    intimidated, or interfered with Sergeant Nguyen.  His actions

10   show a purposeful intent to swipe at and intimidate

11   Sergeant Nguyen and were calculated to try and make contact.

12   Given the context and the calculated aim with which

13   Mr. Fitzsimons was reaching, I conclude that he acted with the

14   intent to cause bodily injury and, indeed, the specific intent

15   to oppose, assault, intimidate, and impede Sergeant Nguyen.

16   Again, there's no doubt that reaching out to strike at

17   someone is a forcible act, and I find that, at minimum,

18   Fitzsimons made physical contact with Sergeant Nguyen's hand

19   during that altercation as the video suggests and Sergeant

20   Nguyen credibly testified.

21   That is not enough to find -- that is -- I'm sorry.

22   That is enough to find Fitzsimons guilty of a violation of

23   section 111(a) but does -- that does not entirely end my

24   inquiry because the government seeks the enhancement of having

25   caused bodily injury.  There's no doubt that Sergeant Nguyen

1    suffered a terrible injury.  He credibly testified that the gas

2    trapped in his mask was so suffocating that he believed he was

3    about to die in that moment and that the pain and burning

4    lasted for days and weeks thereafter.

5            However, I cannot find beyond a reasonable doubt that

6    Mr. Fitzsimons was the -- was the one responsible for that

7    injury.  The other protester who does appear to make contact

8    and cause Sergeant Nguyen to adjust his gas mask may have been

9    the culprit as well or perhaps been responsible for moving his

10   mask out of place so that it was not properly sealed when the

11   other rioter sprayed him.  It is unclear Fitzsimons ever made

12   contact with the gas mask, and there are some inconsistencies

13   about the color of the jacket and whether the mask was pushed

14   or pulled and snapped back.

15           I tried the gas mask on as well and confirmed that the

16   seal breaks relatively easily when pulled outwards, but that it

17   is very difficult to do so when swiping at it from the

18   direction that Mr. Fitzsimons was swiping.

19           This is not to say that Sergeant Nguyen was incredible.

20   Much to the contrary, I find him to be forthright and willing

21   to admit uncertainty.  But the events in the tunnel were

22   chaotic, to say the least, and it is possible that he may have

23   confused the order or timing of events.  I sincerely regret

24   what Sergeant Nguyen went through that day, and I credit him

25   for his brave service.

1        However, I do have a reasonable doubt as to whether

2   Mr. Fitzsimons' assault caused him bodily injury, and I will,

3   therefore, find Mr. Fitzsimons guilty only of assaulting

4   Sergeant Nguyen and making physical contact, but not causing

5   bodily injury.

6        Count 5 is the one involving Sergeant Gonell.  Count 5

7   charges Mr. Fitzsimons with another violation of section 111,

8   this time with respect to Sergeant Aquilino Gonell.

9   Sergeant Gonell is a member of the U.S. Capitol Police who

10  responded to the tunnel as part of his official duties that

11  day.  He is easily identifiable in the videos by his round

12  shield, since he was the only officer in the tunnel at that

13  time using that type of shield.  Sergeant Nguyen was positioned

14  on the left-hand -- on the left-hand side of the tunnel facing

15  outward, quite near Sergeant Nguyen.

16       The actions at issue in this count occur shortly after

17  the other rioters spray toward Sergeant Nguyen, and

18  Mr. Fitzsimons is taking cover by leaning against the wall.

19  After the spraying stops, you can see in Government

20  Exhibit 204, the CCTV footage, that Mr. Fitzsimons stands

21  upright at 4:11:25 and that Sergeant Gonell's shield is

22  directly in front of him.

23       Also in that footage, you can see Sergeant Gonell fall

24  2 seconds later, at 4:11:27, while Mr. Fitzsimons is standing

25  but supporting himself on the wall.  At that point,

1    Mr. Fitzsimons looks over his shoulder out into the crowd and

2    then back towards Sergeant Gonell on the ground.  At 4:11:28,

3    Mr. Fitzsimons pushes off the wall and leans over to grab

4    Sergeant Gonell.  Mr. Fitzsimons is bent over but standing for

5    several seconds and appears to be pulling outwards before other

6    rioters and officers pile on top of them, and Mr. Fitzsimons

7    goes under the pile of people at 4:11:35.

8         In the slow-motion footage at Government Exhibit 211B,

9    Mr. Fitzsimons' hand, identifiable by the black sleeve

10   underneath the white jacket, is visible holding on to

11   Sergeant Gonell's shoulder strap even from under the pile of

12   people.  It's Government Exhibit 211B at 16:11:42 through 50.

13   That footage also shows Sergeant Gonell turning to call for

14   help from his fellow officers, consistent with his testimony.

15        Sergeant Gonell testified that he was helping another

16   officer who had fallen when Mr. Fitzsimons leaned in to grab

17   him.  He testified that Fitzsimons grabbed both his shield and

18   shoulder strap and pulled outward toward the crowd.

19   Sergeant Gonell was aware that being pulled into the crowd

20   would be a life-threatening situation.  He testified that his

21   arm was being pulled along with his shield and that he felt an

22   intense pain in his shoulder.

23        Sergeant Gonell attempted to use his collapsible baton

24   and considered firing his service weapon in self-defense but

25   ultimately did not do so because he was afraid that it would

1    further agitate the crowd and result in more violence.

2    Eventually, with the assistance of another officer,

3    Sergeant Gonell was able to break free, and Sergeant Gonell

4    went to the back of the tunnel.

5         With that background, I will turn to the elements of the

6    crime.  I find beyond a reasonable doubt that Mr. Fitzsimons

7    assaulted, opposed, impeded, intimidated, and interfered with

8    Sergeant Gonell through his actions.  Sergeant Gonell testified

9    that Mr. Fitzsimons' actions and the other rioters interfered

10   with and opposed his ability to do his job that day.

11   Sergeant Gonell also powerfully testified to the fear and

12   intimidation he felt as Mr. Fitzsimons pulled him toward the

13   crowd, so much so that he feared for his life and considered

14   firing his service weapon.

15        Mr. Fitzsimons' alternate theory is that he was

16   disoriented from the spray and slipped, grabbing on to whatever

17   he could.  But that is not what the video footage captured from

18   two different angles shows.  The video footage shows Fitzsimons

19   standing upright after the spray had stopped, looking over his

20   shoulder, and then back down at Sergeant Gonell, and leaning in

21   and down in a calculated attempt to grab him.  There was no

22   accident or confusion apparent in the video.  To the contrary,

23   Mr. Fitzsimons pauses momentarily, sees his opportunity, and

24   takes it.

25        The video also suggests, consistent with

1    Sergeant Gonell's testimony, that Mr. Fitzsimons was not merely

2    pulling down but out and into the crowd.  That's Government

3    Exhibit 204 at 4:11:30.  Grabbing Sergeant Gonell's shoulder

4    strap for several seconds, as is clearly captured on the video,

5    is a forcible act.

6         Mr. Fitzsimons also continued to intentionally hold on,

7    even after being pushed under the crowd.  It was clear from

8    Sergeant Gonell's shouting and struggling that he was in pain,

9    but even at that point, Mr. Fitzsimons continued to hold on.

10   All of this is enough to infer beyond a reasonable doubt that

11   Mr. Fitzsimons intended his actions to cause bodily injury.

12   In other words, he intended to inflict injury on

13   Sergeant Gonell.

14        Making contact with the shoulder strap counts as

15   physical contact, and there's simply no doubt that

16   Mr. Fitzsimons grabbed Sergeant Gonell's shoulder strap for

17   several seconds.

18        Finally, I also find that Mr. Fitzsimons' actions caused

19   Sergeant Gonell bodily injury.  Although more individuals

20   appear to have been pushing downwards on the shield once the

21   pile-on started, it was Fitzsimons who initially pulled him

22   down and out causing a shooting pain in his shoulder and

23   continued to hold on prolonging that pain.  Although the

24   defense entered footage showing that Sergeant Gonell was

25   standing, walking, and moving his shield a few minutes after

1    the incident, I do not believe that undercuts the credibility

2    of his testimony, particularly where Sergeant Gonell testified

3    that he felt obligated to fight through the pain and return to

4    the tunnel for the rest of the afternoon.

5         Sergeant Gonell needed surgery on his shoulder and

6    testified that he continues to have a limited range of

7    mobility.  This is more than sufficient to show that he

8    suffered serious bodily injury.

9         Accordingly, I find Mr. Fitzsimons guilty of assaulting

10   Sergeant Gonell and causing bodily injury beyond a reasonable

11   doubt.

12        Count 6 is the one I've referred to as the final charge.

13   Next, Count 6 does not relate to a specific officer.  Rather,

14   it involves Mr. Fitzsimons' final charge into the line of

15   officers after the previous assaults had already occurred.

16   This event is clearly captured on video in Government

17   Exhibits 204, the CCTV footage, and 205, the body-worn camera

18   from the officer on the ledge.

19        After standing up from the altercation with

20   Sergeant Gonell, Mr. Fitzsimons rushes toward the officers on

21   the left side of the tunnel, reaching out and grabbing them.

22   That's at 16:12:25.  This moment is captured on the body-worn

23   camera in Government Exhibit 208 and even more clearly in the

24   still photographs from that footage at 208A, 2 through 14.

25   After he is initially pushed back, Fitzsimons stumbles to the

1    center of the tunnel; Government Exhibit 204; 208; 208A, 14

2    through 15.

3         At that point, the videos and still photographs leave no

4    ambiguity whatsoever.  Mr. Fitzsimons stands in the center of

5    the mouth of the tunnel, pauses to steel himself, and then runs

6    forward into the line of officers with his arms flailing;

7    Government Exhibit 208A-16; 204; and 205.  He is pushed back by

8    the officers and stumbles out of the tunnel a few seconds

9    later; Government Exhibit 204 at 4:12:37 to 4:12:44.

10        It is clear that this conduct at a minimum falls within

11   the actions listed in section 111(a)(1).  Mr. Fitzsimons

12   opposed, impeded, intimidated, and interfered with those

13   officers within the ordinary meaning of those words by charging

14   at them, which both impeded and interfered with the officers'

15   activities, and was both oppositional and intimidatory.

16        The term assault is more technical and means any

17   intentional attempt or threat to inflict injury upon someone

18   else when coupled with an apparent present ability to do so.

19   At that point, Mr. Fitzsimons was not armed and using no other

20   weapon besides his body, but other rioters and Mr. Fitzsimons

21   himself had already inflicted harm without their weapons, and

22   the video shows him putting his full force into the forward

23   charge.

24        The definition of assault also requires not just an

25   attempt to use force, but an attempt to inflict injury.

1    Therefore, if Mr. Fitzsimons had been trying to push past the

2    officers to get through the police line but with no intention

3    of harming them, that would not necessarily be an assault.

4    Nevertheless, I believe that the evidence shows beyond a

5    reasonable doubt that Mr. Fitzsimons' intent was to inflict

6    injury.  He did not run in a way that attempted to maneuver

7    through or past the officers.  Instead, he was waving his arms

8    in an apparent attempt to increase the amount of physical

9    contact he made with the officers.

10        If his goal was simply to get into the building,

11    charging the line of officers would have been a highly

12    illogical choice; after all, rows of defending officers were

13    seven deep.  He had also just committed the previous assaults.

14    There's also no real room for debate that Mr. Fitzsimons' final

15    charge was a forcible act.  Running into someone while flailing

16    one's arms is a forceful act.

17        Again, I find beyond a reasonable doubt that

18    Mr. Fitzsimons' final charge at the officers was intentional.

19    He was not pushed and did not slip or fall.  Much to the

20    contrary, the video shows him pause for a moment, look straight

21    ahead, and prepare to run towards the officers.

22        Collectively, each of these four assaults provides

23    circumstantial evidence that Mr. Fitzsimons' acted

24    intentionally with respect to the others.  He repeatedly,

25    despite opportunities to retreat, took every opportunity he had

1    to continue inflicting harm on the officers, and afterwards he

2    encouraged other rioters to follow his example and get in

3    there.

4          Finally, Mr. Fitzsimons made physical contact with

5    multiple officers during his final charge, as can be seen and

6    heard on the video.

7          Accordingly, I find beyond a reasonable doubt that

8    Mr. Fitzsimons is guilty as charged in Count 6.

9          Count 7 is the entering or remaining in a restricted

10   building or grounds.  Count 7 charges Mr. Fitzsimons with

11   entering or remaining in a restricted building or grounds in

12   violation of 18 U.S.C. § 752 [sic] (a)(1).  In order to find

13   the defendant guilty of this offense, I must find that the

14   government proved each of the following elements beyond a

15   reasonable doubt:

16         First, that the defendant entered or remained in a

17   restricted building or grounds without lawful authority to do

18   so.

19         Second, that the defendant did so knowingly.

20         The first element of this offense is covered by the

21   parties' Stipulation No. 1 in which the parties agree that on

22   January 6th, 2021, the restricted area outlined in red in

23   Government Exhibit 601 was a posted, cordoned off, or otherwise

24   restricted area where the Vice President and members of his

25   immediate family were and would be temporarily visiting and,

1    therefore, constituted a restricted building or grounds, as

2    that term is used in Title 18, United States Code § 1752(c).

3    It was Stipulation 1, Exhibit 3 of the pretrial statement.

4         I also find persuasive the government's

5    evidence presented through the testimony of Captain Summers

6    which established the security measures in and around the

7    Capitol that day.  It also effectively -- it is also

8    effectively undisputed and confirmed through ample video

9    footage that Mr. Fitzsimons entered and for some time remained

10   in that restricted area.

11        The only area for debate is, therefore, the second

12   element, whether he did so knowingly.  As with Count 1, a

13   person acts knowingly if he realizes what he is doing and is

14   aware of the nature of his conduct and does not act through

15   ignorance, mistake, or accident.

16        Although it is possible that the barriers had already

17   been removed by the crowd when Mr. Fitzsimons approached the

18   Capitol at close to 4:00 p.m., I still find beyond a reasonable

19   doubt that he acted knowingly.  Particularly, when approaching

20   the mouth of the tunnel, there were alarms sounding, a line of

21   officers in riot gear attempting to push back rioters, and tear

22   gas being deployed on the crowd; all ample warnings to stay

23   away.

24        Mr. Fitzsimons' own statements after the event are also

25   strongly suggestive that he knew he and the other members of

1    the crowd were in a restricted area.  In the interview he gave

2    to *The Rochester Voice*, Mr. Fitzsimons noted that he had

3    himself seen the Capitol defended a day earlier and that he

4    found it strange that he could see people climbing on top of

5    the building from some distance away.  In that article and his

6    statements to the Lebanon town select board, he also recounted

7    noticing the smell of tear gas and pepper spray as he

8    approached, seeing someone with a sledgehammer, and hearing

9    that someone had been shot.

10           Finally, the video also shows that after his first

11   approach to the mouth of the tunnel, he was pepper sprayed and

12   began to walk away down the stairs unimpeded by the crowd, but

13   then turned around and went back a second time.  Having himself

14   been pepper sprayed, in addition to all the other evidence,

15   makes it abundantly clear that Mr. Fitzsimons acted knowingly

16   in entering and remaining in the restricted area.  There was

17   nothing ignorant, mistaken, or accidental about his presence

18   there.

19           Accordingly, I find the government has proven both

20   elements beyond a reasonable doubt and find Mr. Fitzsimons

21   guilty as charged with respect to Count 7.

22           Count 8, disorderly conduct in a restricted building or

23   grounds.  Count 8 of the indictment charges Mr. Fitzsimons with

24   disorderly or disruptive conduct in a restricted building or

25   grounds in violation of 18 U.S.C. § 1752(a)(2).  In order to

1    find Mr. Fitzsimons guilty of this offense, I must find that

2    the government proved each of the following elements beyond a

3    reasonable doubt.

4         First, that the defendant engaged in disorderly or

5    disruptive conduct in, or in proximity to, any restricted

6    building or grounds.

7         Second, that the defendant did so knowingly and with the

8    intent to impede or disrupt the orderly conduct of government

9    business or official functions.

10        Third, that the defendant's conduct occurred when or so

11   that his conduct, in fact, impeded or disrupted the orderly

12   conduct of government business or official functions.

13        The same stipulation that the tunnel on the lower

14   west terrace was within the restricted grounds applies here,

15   and I find that Mr. Fitzsimons engaged in disorderly and

16   disruptive conduct in that area.

17        Disorderly conduct occurs when a person is unreasonably

18   loud and disruptive under the circumstances or interferes with

19   another person by jostling against or unnecessarily crowding

20   that person.  And disruptive conduct is a disturbance that

21   interrupts an event, activity, or the normal course of a

22   process.  Even presence in a violent mob like the one on

23   January 6th, 2021, is, to some extent, disorderly and

24   disruptive because it contributes to disturbing the peace and

25   disrupting the normal and orderly business of the Capitol and

1    its occupants.  See *Rivera,* 21-cr-60 at 11.

2          And Mr. Fitzsimons' actions, throwing a bow at the

3    officers, grabbing and swiping at them and charging headlong

4    into the police line with his arms flailing doubtlessly come

5    within that definition.  The conduct was committed knowingly.

6    Mr. Fitzsimons was not pushed into the line of police officers.

7    He gathered himself and ran into it.  He threw his bow and

8    grabbed at the officers with full awareness of the situation,

9    as I have already explained.

10          I also find that Mr. Fitzsimons engaged in misconduct

11    with the specific intent of impeding or disrupting the orderly

12    conduct of government business, principally, the certification

13    of the Electoral College vote.  The law permits a fact-finder

14    to infer that a person intends the natural and probable

15    consequences of their actions, and the natural and probable

16    consequences of Mr. Fitzsimons' actions was to disrupt the

17    orderly business of Congress.  See *Rivera*, same case I cited

18    earlier.

19          Moreover, Mr. Fitzsimons knew the certification was

20    taking place in Congress that day and had traveled to D.C. for

21    that specific reason.  He may have started the day merely

22    hoping to peacefully support the senators and representatives

23    who were objecting, but at that point when he was physically

24    engaging officers in the tunnel, any such interpretation is

25    nonsensical.

1    I find beyond a reasonable doubt that his goal was to

2    delay the Congress's orderly official business, including

3    engaging in disorderly and disruptive conduct.  I also find

4    that his conduct, in fact, impeded the orderly conduct of

5    government business that day.

6    The House and the Senate were adjourned and evacuated,

7    and the Vice President had to shelter in a secure location as a

8    result of the mob's attack on the Capitol, as is established in

9    Stipulation 2 and the testimony of Paul Wade.  As Special Agent

10   Wade testified, the Vice President could not return from his

11   secure location to preside over the Senate until the entire

12   grounds had been cleared, including outside of the building.

13   The officers testified that absent the conduct of

14   Mr. Fitzsimons and others like him in the tunnel, they would

15   have been free to assist in other areas of the Capitol that had

16   been breached and restore order.  And, in fact, Congress could

17   not resume its business for several hours, until after

18   8:00 p.m. that evening.  Although Mr. Fitzsimons was only one

19   member of the mob at one part of the day, his actions were,

20   therefore, nonetheless, an impediment to the governmental

21   functions.

22   Accordingly, I find that the government has proved each

23   of these elements beyond a reasonable doubt and find

24   Mr. Fitzsimons guilty as charged in Count 8.

25   Count 9 is engaging in physical violence in a restricted

1  building or grounds.  Count 9 of the indictment charges

2  Mr. Fitzsimons with engaging in an act of physical violence in

3  a restricted building or grounds which is a violation of

4  18 U.S.C. 1752(a)(4).  The elements that I must find beyond a

5  reasonable doubt for this offense are:

6       First, that the defendant engaged in any act of physical

7  violence against any person in any restricted building or

8  grounds.

9       Second, that the defendant did so knowingly.

10      Much of the previously discussed reasoning applies here.

11 First, the lower west terrace of the Capitol was a restricted

12 area on January 6th, 2021.

13      Next, an act of physical violence means any act

14 involving an assault or other infliction or threat of

15 infliction of death or bodily harm on an individual, or damage

16 to or destruction of real or personal property.  Mr. Fitzsimons

17 engaged in multiple acts of physical violence.  Namely,

18 throwing a bow at officers, charging at officers, and grabbing

19 at officers.  These acts are captured on multiple videos and

20 were testified to by the officers.  These acts both threatened

21 and caused bodily harm to those officers.

22      Mr. Fitzsimons committed these acts knowingly for the

23 same reasons previously described.  He did not mistakenly

24 arrive to the police line.  He approached two separate times

25 and before leaving, paused and gathered his strength before

1    charging headlong into the police line.  Indeed, for the final

2    act of violence when he charged into the officers,

3    Mr. Fitzsimons does not even offer an alternative theory for

4    what happened.

5         I, accordingly, find that the government has proven

6    beyond a reasonable doubt that Mr. Fitzsimons is guilty as

7    charged in Count 9.

8         Count 10 is disorderly conduct in a Capitol Building.

9    Count 10 of the indictment charges Mr. Fitzsimons with

10   disorderly conduct in a Capitol Building or Grounds in

11   violation of 40 U.S.C. § 5104(e)(2)(D).

12        The elements of this offense, which the government must

13   prove beyond a reasonable doubt are:

14        First, that the defendant engaged in disorderly or

15   disruptive conduct in any of the United States Capitol

16   Buildings or Grounds.

17        Second, that the defendant did so with the intent to

18   impede, disrupt, or disturb the orderly conduct of a session of

19   Congress or either House of Congress.

20        Third, that the defendant acted willfully and knowingly.

21        My previous finding that the defendant engaged in

22   disorderly and disruptive conduct applies with equal force to

23   this count.  The parties have further stipulated that the lower

24   west terrace is part of the Capitol Building or Grounds for the

25   purposes of this count, which includes all squares,

1    reservations, streets, roadways, walks, and other areas as

2    defined on a map entitled, quote, Map Showing Areas Comprising

3    United States Capitol Grounds, end quote, dated June 25, 1946,

4    approved by the Architect of the Capitol and recorded in the

5    Office of the Surveyor of the District of Columbia in Book 127,

6    page 8.5.

7         As in Count 8, I find that Mr. Fitzsimons engaged in

8    this disorderly and disruptive conduct with the specific intent

9    of impeding and disrupting the orderly conduct of a session of

10   Congress; specifically, the certification of the Electoral

11   College vote in a Joint Session of Congress.  Mr. Fitzsimons

12   knew the certification was taking place in Congress that day

13   and had traveled to D.C. for that specific reason.  He believes

14   subjectively, if not correctly, that the election was

15   illegitimate and that it would represent the last day of the

16   republic and his actions were intended to delay and disrupt

17   that process.

18        For the third element, I have already explained how

19   Mr. Fitzsimons' disorderly conduct was knowingly committed.  I

20   also find beyond a reasonable doubt that he acted willfully.  A

21   person acts willfully if he acts with the intent to do

22   something that the law forbids; that is, to disobey or

23   disregard the law.  Mr. Fitzsimons acted with specific intent

24   to obstruct and assault police officers engaged in their lawful

25   duties, which is unlawful.

1    The definition of willfully does not require proof that

2    the defendant be aware of the specific law or rule that his

3    conduct may be violating, although it is certainly common

4    knowledge that assaulting a law enforcement officer is

5    unlawful.  Mr. Fitzsimons' recasting of a narrative afterwards

6    also provides further circumstantial evidence that he was, in

7    fact, aware that he had broken the law.

8    All three elements have been established beyond a

9    reasonable doubt, and I, therefore, find Mr. Fitzsimons guilty

10   as charged in Count 10.

11   Count 11, act of physical violence in the Capitol

12   Grounds or Building.  Finally, Count 11 of the indictment

13   charges Mr. Fitzsimons with engaging in an act of physical

14   violence in the Capitol Building or Grounds in violation of

15   40 U.S.C. § 5104(e)(2)(F).

16   The elements for this offense that I must find beyond a

17   reasonable doubt are:

18   First, that the defendant engaged in any act of physical

19   violence in any of the United States Capitol Buildings or

20   Grounds.

21   Second, that the defendant acted willfully and

22   knowingly.

23   Each of these elements has already been addressed.  I

24   find that Mr. Fitzsimons engaged in an act of physical violence

25   for the same reasons described in Count 9 and that he did so

1    within the Capitol Building and Grounds as described in Count

2    10.

3          I also find that he knowingly engaged in that act of

4    physical violence as described in Count 9, and he did so

5    willfully in disobedience and disregard for the law.

6          Accordingly, I find beyond a reasonable doubt that the

7    government has proved each element of Count 11, and

8    Mr. Fitzsimons is guilty as charged therein.

9          In summary, I have found Mr. Fitzsimons guilty of all

10   11 counts, although I do not find him guilty beyond a

11   reasonable doubt of having caused bodily injury to

12   Sergeant Nguyen.

13         So I guess it's time to set a sentencing date.  And

14   according -- the probation office is very backed up given all

15   of these January 6th cases.  So based on the time they need to

16   prepare the presentence report and my schedule, it looks like

17   the earliest week feasible is the week of February 13th.

18         What do the parties' schedules look like then?

19              MS. TAYLOR-SMITH:  Court's indulgence.

20              THE COURT:  Sure.

21              MS. TAYLOR-SMITH:  Your Honor, I have nothing on my

22   schedule for that.

23              MR. BRASHER:  I have no conflicts.

24              MR. GORDON:  Your Honor, I currently have a trial set

25   on -- with Judge Boasberg for that week.  I could be available

1    the week before or week after.

2              THE COURT:  Do you know if he sits Friday?  I don't

3    think he sits Fridays.

4              MR. GORDON:  I don't know, Your Honor, but I can also

5    say I do not expect that trial to last through Friday.  So

6    Friday, the 17th, would be fine.

7              THE COURT:  Okay.  Tanya, are you available Friday,

8    the 17th?

9              THE COURTROOM DEPUTY:  Yes, Judge.

10             MR. BRASHER:  That works for me as well, Your Honor.

11             THE COURT:  Okay.  What -- do I have anything on my

12   schedule that day?

13             THE COURTROOM DEPUTY:  10:00, another pretrial.

14   10:00 you have a pretrial conference.

15             THE COURT:  Which case?

16             THE COURTROOM DEPUTY:  Another January 6th case.

17             THE COURT:  2:00 p.m. Friday, the 17th, is -- was

18   that the date, the 17th?

19          Does that work for everybody?

20             MR. BRASHER:  Yes, Your Honor.

21             MS. TAYLOR-SMITH:  Yes.

22             MR. GORDON:  Yes.

23             THE COURT:  Okay.  Anything else we need to cover

24   today?

25             MR. BRASHER:  Not for the government.

1       MS. TAYLOR-SMITH:  Not from the defense.

2       THE COURT:  I didn't hear the government.

3       MR. BRASHER:  No, Your Honor.

4       THE COURT:  Okay.  All right.

5       THE COURTROOM DEPUTY:  This will be in person?

6       THE COURT:  In person, yes.

7       All right.  I'll note more at the time of sentencing how

8  good a job I thought the defense did in this case.  I can't

9  help -- as I watched the disturbances in Russia and Iran, I

10 can't imagine that those folks are going to get counsel paid

11 for by the government they're attacking and obtain the level

12 of -- and competence of the defense the defendant got in this

13 case.  That's -- this country has a lot of problems, but that's

14 a remarkable part of this system.

15 So thank you.

16      MS. TAYLOR-SMITH:  No.  Thank you, Your Honor.

17      THE COURT:  All right.

18 Thank you, Mr. Fitzsimons.

19 You're excused.

20      (Proceedings were concluded at 11:41 a.m.)

21

22

23

24

25

1       <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                        Dated this 23rd day of October, 2022.

10

11                       /s/ Nancy J. Meyer_____
                         Nancy J. Meyer
12                       Official Court Reporter
                         Registered Diplomate Reporter
13                       Certified Realtime Reporter
                         333 Constitution Avenue Northwest
14                       Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25