**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-158 (RC)** |
| **KYLE FITZSIMONS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in connection with the above-captioned matter. Kyle Fitzsimons, one of the most violent and aggressive participants in the January 6, 2021 attack on the United States Capitol, assaulted at least five different police officers and caused a career-ending and life-altering injury to United States Capitol Police ("USCP") Sergeant Aquilino Gonell. For the reasons set forth herein, the government requests that this Court sentence Fitzsimons to 188 months of incarceration followed by three years of supervised release, a fine of $26,892, at least $2,000 in restitution, and the mandatory special assessment of $770. This sentence of imprisonment is at the low-end of Fitzsimons' Sentencing Guidelines range after a two-level upward departure under U.S.S.G. §3A1.4 n.4, and/or U.S.S.G. §§5K2.2 (Physical Injury), and/or 5K2.7 (Disruption of Governmental Function) and takes account of his repeated violence against police officers on January 6th, the permanent, career-ending and life-altering injury he inflicted on Sgt. Gonell, Fitzsimons' utter lack of remorse, his efforts to profit from his crime, and the urgent need to deter others from engaging in political violence.

1

## I.      INTRODUCTION

The defendant, Kyle Fitzsimons, a 39 year-old butcher and Maine resident, participated repeatedly and violently in the January 6, 2021 attack on the United States Capitol—an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, resulted in more than 2.8 million dollars in losses, and almost threw the United States into a Constitutional crisis.[1]

Leading up to January 6, 2021, Fitzsimons knew that Congress planned to convene on January 6 to review and certify the Electoral College ballots, officially making Joe Biden the President-Elect, which Fitzsimons claimed would doom the country to a communist takeover. He wanted to stop Congress's certification, was prepared to use force if necessary to do so, and tried to recruit others to join him. On January 5, 2021, Fitzsimons traveled to Washington, D.C. from his home in Lebanon, Maine. The next day, during the riot at the Capitol, Fitzsimons committed five separate violent assaults against police officers during the brawl at the mouth of the "tunnel" on the Lower West Terrace ("LWT"). In chronological order, he hurled a wooden staff like a spear at the group of officers, striking Metropolitan Police Department ("MPD") Officer Sarah Beaver in the head. He swiped repeatedly at MPD Detective Phuson Nguyen's face, trying to strike him and dislodge his gas mask. He wrenched USCP Sergeant Aquilino Gonell's shoulder so hard and for so long that he permanently damaged it, ending Sgt. Gonell's law enforcement career and

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

forever inhibiting his ability to use it. And Fitzsimons twice charged into the group of officers, wildly swinging his fists, indiscriminately trying to punch any officer he could reach. Finally, after walking away from the "medieval battle" at the tunnel, Fitzsimons proudly celebrated his actions and urged other rioters to "get in there" and fight the police like he had.

After a four-day bench trial, the Court convicted Fitzsimons of eleven crimes, including seven felonies. Those seven felonies included two assaults on police officers in violation of 18 U.S.C. §§ 111(a)(1) and (b) and another two assaults in violation of 18 U.S.C. §§ 111(a)(1). Even now—over two years after the Capitol riot and almost a year since being found guilty—Fitzsimons has demonstrated zero remorse for his conduct. Indeed, he has given interviews from the D.C. jail insinuating that he is an innocent victim of a biased prosecution, and he has fundraised off his crimes.

The government's recommended sentence of 188 months of incarceration—which is at the low end of the advisory Sentencing Guidelines' range after incorporating a two-level upward departure pursuant to U.S.S.G. §3A1.4 n. 4 and/or U.S.S.G. §5K2.2—reflects the gravity of Fitzsimons' conduct on January 6, 2021, the impact of his violence on his victims, and the need to deter him and others from using violence to achieve their political goals.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

Having presided over the trials in this case and *United States v. Rhine*, 21-cr-687 (RC), this Court is well-aware of the details of the attack on the United States Capitol building and grounds by a mob of thousands of rioters on January 6, 2021. The Court has heard testimony regarding the joint session of Congress that was in progress on that date to certify the vote of the Electoral

College, as well as the breach of the Capitol by the mob, the consequences of that breach, and the attempts by the mob to further breach the Capitol via the "Tunnel" in the middle of the LWT. For additional background, the United States hereby incorporates by reference the trial testimony of USCP Captain Tia Summers, U.S. Secret Service Special Agent Paul Wade, MPD Det. Nguyen, MPD Officer Beaver, and USCP Sgt. Gonell. *See* Testimony of Summers, Trial Tr. 8/16/22 ("Summers Tr.") at 4-40; Testimony of Wade, Trial Tr. 8/16/22 ("Wade Tr.") at 1-36; Testimony of Nguyen, Trial Tr. 8/16/22 ("Nguyen Tr.") at 3-56; Testimony of Beaver, Trial Tr. 8/17/22 ("Beaver Tr.") at 2-76; Testimony of Gonell, Trial Tr. 8/17/22 ("Gonell Tr. I") at 3-142 and 8/18/22 ("Gonell Tr. II") at 158-246.

### B.      Assaults on Police at the "Tunnel"

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.[2]

As described by Sgt. Gonell, Det. Nguyen, and Officer Beaver during their testimony, one of the most violent confrontations on January 6 occurred the entrance to the Capitol building in the LWT. As explained *infra*, Fitzsimons worked his way through thousands of people to place himself at the front of the mob and in the thick of that violence, where he personally, forcefully, and repeatedly contributed to it.

---

[2] *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long (the "Tunnel"). The Tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol building. The exterior of the Tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. *See* "Inauguration at the U.S. Capitol," Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the USCP, assisted by officers from the MPD, were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defensive line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who did not relent. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically fighting the police with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and physically engaged

them with batons and OC spray. At a later hearing on the events of January 6, Representative Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the Tunnel doors between the police and rioters:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.[3]

The violent battle for control over the Tunnel and the entrance to the Capitol just beyond it involved intense, sustained hand-to-hand combat between police and rioters. It continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. It featured some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone, the previously mentioned assault of Officer Daniel Hodges, and Fitzsimons' attack on Sgt. Gonell.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a

---

[3] *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Sgt. Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. Officer Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, including Sgt. Gonell, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the Tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the Tunnel area. The actions of these officers

in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### C.    Fitzsimons' Preparations for the January 6, 2021 Attack on the Capitol

Sometime in December 2020, Fitzsimons decided to travel to Washington, D.C. to try to stop the certification of the Electoral College vote. Hoping to recruit others to join him, Fitzsimons drafted a Facebook post in which he called the 2020 presidential election a "fraud" and a "theft," described the "establishment" as "treasonous" and "gaslight[ing] the public," and volunteered to drive anyone who wanted to go to D.C. with him or lead a caravan. Government Trial Exhibit ("GEX") 612. Fitzsimons ended the post by asking, "If a call went out for able bodies, would there be an answer?" *Id.* Fitzsimons' use of the term "able bodies" indicated he was contemplating and anticipating a violent revolt—a civil war—if the political process did not lead to his desired result: former President Trump remaining in office.

Rather than post this message to his own Facebook account, where it would only be seen by his limited number of Facebook "Friends," Fitzsimons pestered fellow Lebanon, Maine resident Deborah Wilson to post his message on her "Lebanon Truth Seekers" account, which reached thousands of people. *See* Testimony of Deborah Wilson, Trial Tr. at 32:25-33:22, 35:11-19. Fitzsimons e-mailed the text of his message to Wilson, but she initially refused to post it, *id.* at 41:24-43:19, because she was wary of Fitzsimons and feared for the safety of the people in town whom she thought might go along with him, *id.* at 46:13-47:19. Refusing to take no for an answer, Fitzsimons showed up uninvited at Wilson's home late on Christmas Eve and angrily badgered Wilson to post it for him. *Id.* at 43:20-46:10. She gave in and posted it to her "Lebanon Truth Seekers" account later that same night. *Id.* at 47:20-25; GEX 612.



*Image 1: Fitzsimons' recruitment attempt, posted on Wilson's "Lebanon Truth Seekers" page. GEX 612.*

Two days later, on December 26, 2020, Fitzsimons placed two phone calls to the Washington, D.C. office of Maine Congressman Jared Golden. Both calls went to voicemail. In the first call, Fitzsimons declared there had been "election fraud" and that Congressman Golden likely did not win his race legitimately. GEX 611. Fitzsimons menacingly stated, "I will be in D.C. on the 6th. I don't think I'll see you there. But maybe I will. *Maybe I will*." *Id.* The first time Fitzsimons said "maybe I will" his tone sounded speculative. The second time, his tone sounded more ominous. A few minutes later, Fitzsimons left the second voicemail. In it, Fitzsimons complained about the "garbage election," asked whether Congressman Golden would have the "courage to object on the 6th," and said that he (Fitzsimons) would "have the courage to object to my entire life going forward if this is done to" him, GEX 610, implying that he would be willing to die to stop the certification. Fitzsimons ended the second call by again declaring that he would

9

be in D.C. on the 6th. *Id.* Congressman Golden's Chief of Staff found both messages intimidating and implicitly threatening. Testimony of Aisha Woodward, Trial Tr. at 13:2-18:4. One of the congressman's staff members reported the second message to the USCP for investigation. *Id.* at 12:2-16.

On January 5, 2021, Fitzsimons drove alone from Lebanon, Maine to the Washington, D.C. area. At some point in the afternoon, he walked near the U.S. Capitol building and observed substantial security measures in place on the Capitol grounds. *See* GEX 250, 616 ("I'd been outside the Capitol on Tuesday, and it was heavily guarded."). That night he stayed at an Airbnb in Virginia.

### D.     Fitzsimons' Actions During the January 6, 2021 Attack on the Capitol

On January 6, 2021, Fitzsimons drove into Washington, D.C. and attended former President Trump's rally. GEX 250. When the speeches ended, Fitzsimons returned to his parked car and changed clothes. *Id.* As he put it in a later public statement, "If it was going to be the last day of the republic, I wanted to live it like I lived every day." *Id.* Fitzsimons, then a professional butcher and recreational trapper, put on black rubber boots, a black apron, and a distinctive white butcher's coat embroidered with his first name, "Kyle," in blue. *See* GEX 217, 230-003, 230-005, 619. He wore a fur pelt around his neck. *Id.* And he carried an approximately six-foot-long unstrung wooden archery bow. *Id.*; *see also* GEX 250 ("I looked my part. And if I had a weapon, it was standing as a staff. And it was an unstrung bow.").



*Image 2: Fitzsimons in his "costume" on the Capitol's exterior ramparts, carrying his unstrung bow. GEX 230-003.*

Fitzsimons then walked to the U.S. Capitol building to join the riot in progress. As he entered the Capitol grounds and approached the Capitol building, Fitzsimons—as he later described in an interview with *The Rochester Voice*—marveled at how rioters had so quickly breached the Capitol's security, which he had noticed the day before. *See* GEX 616. Fitzsimons was not content with merely joining the mob and occupying the Capitol grounds; he was intent on getting to the front line. In pursuit of that goal, Fitzsimons wormed and pushed his way through hundreds, if not thousands, of people to get to the LWT. *See, e.g.*, GEX 619, 230-005, 622.



*Image 3: Fitzsimons (circled) pushing through the mob to reach the mouth of the Tunnel.*
*GEX 622.*

At approximately 4:13 p.m., Fitzsimons reached the mouth of the Tunnel, which was then guarded by a phalanx of approximately 50 MPD and USCP officers—standing 5 or 6 across and 8 to 10 rows deep, most of them wearing riot gear. *See* GEX 204-207, 211, 212. Officer Beaver, Det. Nguyen, and Sgt. Gonell were among those guarding the tunnel. They and their colleagues had already been engaged for more than an hour in brutal hand-to-hand combat with wave after wave of rioters. They did not know the Capitol building had been breached elsewhere; they believed that if they allowed the rioters access to the Tunnel and its doors, the Capitol building—and perhaps the government itself—would fall. *See, e.g.*, Beaver Tr. at 13:3-13. Indeed, Sgt. Gonell testified that if rioters had breached the Tunnel, "it would have been a bloodbath for the members of Congress and senators . . . [who] were being evacuated" along a route the rioters would have intercepted. Gonell Tr. I at 44:24-46:11.

Immediately after reaching the Tunnel, Fitzsimons joined the violence against police officers. First, Fitzsimons raised his unstrung bow and hurled it like a spear into the group of police officers. It struck Officer Beaver in the head, forcing her head to the side due to its weight. GEX 205, 205a-003, Beaver Tr. at 15:2-19:6.



*Image 4 (left): Fitzsimons (outlined) hurling his unstrung bow like a spear into the Tunnel. GEX 223.*
*Image 5 (right): Fitzsimons' projectile striking Officer Beaver in the head. GEX 205a-003.*

Luckily, Officer Beaver was wearing a riot helmet engineered to withstand a gunshot, as well as a face shield, *see* GEX 619, so the spear/bow's impact did not injure her, but had she not been wearing the helmet, it easily could have poked out her eye or caused another serious injury.

Meanwhile, rioters were spraying the police with chemical sprays and the police were using their own chemical sprays to try to disperse the rioters. GEX 205.

13



*Image 6: Officer spraying chemical (circled in red) toward rioters, including Fitzsimons (circled in yellow), at the mouth of the Tunnel. GEX 205.*

Some of that spray affected Fitzsimons, so after throwing the bow like a spear, he briefly retreated a couple of rows back in the mob to recover. GEX 220.



*Image 7: Fitzsimons (circled) briefly retreating from the Tunnel after being sprayed. GEX 220.*

Fitzsimons was not deterred, however. Approximately two minutes later, Fitzsimons rejoined the fight, again working his way through the mob to reach the front line of the battle between the rioters and police. *Id.* There, Fitzsimons committed his second assault.

When Fitzsimons reached the mouth of the Tunnel for the second time, MPD Det. Nguyen was on the front line, wearing a gas mask. GEX 205. Fitzsimons repeatedly swung his arm at Det. Nguyen's face, trying to strike him and remove the gas mask. *Id.*



*Image 8: Fitzsimons (white coat) swinging his arm at Det. Nguyen (yellow jacket).*
*GEX 205a-006.*

Although Fitzsimons intended to grab Det. Nguyen's gas mask, he contacted Nguyen's hand instead. *Id.* At approximately the same time, Det. Nguyen's gas mask seal was dislodged, which broke its seal. Nguyen Tr. at 15:24-17:1. Within seconds, another rioter sprayed Det. Nguyen in the face with a chemical spray. *Id.* at 16:15-17; GEX 205.



*Image 9: Rioter spraying police as Fitzsimons (white coat) grasps at Det. Nguyen. GEX 205b.*

As Det. Nguyen's mask snapped back in place, it trapped the gas inside, temporarily choking and suffocating him, and causing serious pain, including a burning sensation on his skin and eyes; he thought he was going to die. Nguyen Tr. at 17:7-17:21. Luckily, Det. Nguyen was able to regain his wits, break the seal, access fresh air, and make his way to the back to recover. *Id.* at 17:22-18:1.

Moments later, Fitzsimons committed his third assault. Just after Det. Nguyen left the front line, Sgt. Gonell—who was also on the front line—noticed a fellow officer had fallen to the ground. Gonell Tr. at 47:18-49:22, 50:23-51:16. Sgt. Gonell leaned down and tried to pull that officer up and back into the pack of officers. *Id.* at 51:18-25. As he did so, Fitzsimons saw an opportunity and took it. He grabbed and pulled on Sgt. Gonell's shoulder pad strap, yanking Sgt. Gonell to the ground, away from his fellow officers, and toward the mob. *Id.* at 52:1-54:3; GEX 211; 211a.



*Image 10: Fitzsimons (hand circled in yellow) pulling on the left shoulder strap of Sgt. Gonell (outlined in red). GEX 211a-009.*

As the Court recognized in announcing its verdict, during this attack on Sgt. Gonell, Fitzsimons was not acting out of "accident or confusion" due to being "disoriented" from the effects of chemical spray used by another rioter, as his counsel suggested at trial. Verdict Tr. at 38:15-22. Instead,

> The video footage shows Fitzsimons standing upright after the spray had stopped, looking over his shoulder, and then back down at Sgt. Gonell, and leaning in and down in a calculated attempt to grab him. There was no accident or confusion apparent in the video. To the contrary, Mr. Fitzsimons pauses momentarily, sees his opportunity, and takes it.

*Id.* at 38:15-24.

Sgt. Gonell felt Fitzsimons wrenching his shoulder and trying to pull him out of the tunnel and into the mob, which Sgt. Gonell knew would be life-threatening. Gonell Tr. at 54:6-15 ("You may not survive [being pulled into a crowd]. [T]hey could take your weapon, use it against you.

17

They could kill you. They could beat you up. You're going to be in a lot of hurt."). Sgt. Gonell yelled for other officers to pull him back and screamed from the "shooting pain" he felt in his left shoulder, which he rated as "one of the worst pain I felt in my life. From one to ten, probably ten," comparable to when he broke his foot. *Id.* at 54:21-55:24. Fitzsimons ignored Sgt. Gonell's screams and held on, continuing to wrench Sgt. Gonell's shoulder. Sgt. Gonell hit Fitzsimons with his baton in an attempt to dislodge Fitzsimons' grip, but Fitzsimons would not relent. *Id.* at 56:9-25. Sgt. Gonell, believing his life was in danger, contemplated shooting Fitzsimons with his gun to free himself but decided it was better to suffer excruciating pain than risk escalating the violence out of concern "not only for [himself], but for the other officers and also for the members of Congress and the Senate, including the Vice President, who was inside the Capitol at that time." *Id.* at 57:1-58:24. Finally, after approximately twenty seconds, another officer struck Fitzsimons, enabling Sgt. Gonell to escape from Fitzsimons' grasp. *Id.* at 59:8-16.

Fitzsimons was far from done. After Sgt. Gonell freed himself, Fitzsimons committed his fourth assault. He stood up, stepped toward the group of officers, and threw several indiscriminate punches at them, landing several. *See* GEX 205.



*Image 11: Fitzsimons (circled, white coat) trying to punch the officers standing in front of him. GEX 205.*

Fitzsimons then committed his fifth assault on the officers. He briefly backed up to the center of the front line of rioters attacking the phalanx of officer. GEX 204. He steadied himself, shook his head and body, as if to psych himself up, and clenched his fists. *Id.* And then he charged headlong into the group of officers, wildly swinging his fists and punching any officer he could reach, landing several punches that hit at least two officers. *Id.*



*Image 11: Fitzsimons preparing for his final charge and flurry of wild punches. GEX 204.*

After several retaliatory strikes by law enforcement officers and one blow to his head, which bloodied him and may have been due to another rioter swinging a crutch and not the action of police officers, *see* GEX 204, 205, Fitzsimons finally retreated, turning his back to the tunnel, staring proudly, ferally, and wild-eyed at the angry mob, GEX 230-006, 230-008.



*Image 12: Fitzsimons just after turning his back on the Tunnel following his fifth assault. GEX 230-006.*

20

Fitzsimons then casually and easily walked through the crowd and away from the U.S. Capitol. GEX 202. As he did so, he urged members of the mob to "Get in there!" meaning go to the Tunnel and fight the police like he had, *i.e.* to use violence to attempt to breach the Capitol and stop the certification. GEX 221. A member of the mob stopped him and told him, "You're an American hero, buddy." *Id.* Fitzsimons proudly responded, "My name is Kyle Fitzsimons." *Id.* He wanted recognition and notoriety for what he had done.

### E.    Injuries

Fitzsimons' assault on Sgt. Gonell permanently damaged Sgt. Gonell's shoulder, ending his 24-year law enforcement career. Specifically, Sgt. Gonell suffered a torn labrum; despite surgery, he has not regained full use of his shoulder. Gonell Tr. I at 71:12-74:17. He also continues to experience painful biceps tendinitis. The injuries inflicted by Fitzsimons forced Sgt. Gonell to medically retire from the USCP, losing a promotion in the process, because he can no longer perform the basic duties of a police officer. *Id.* His personal life has been permanently impaired by Fitzsimons' violence too: Sgt. Gonell can no longer play basketball or coach his son's team. *Id. see also* Victim Statement of Sgt. Gonell, Exhibit 1.

In addition, a preponderance of the evidence established that Fitzsimons at least contributed to the "incredibly painful experience" and "terrible injury," Verdict Tr. at 32:16-18, 34:25-35:1, suffered by Det. Nguyen when the chemical irritant sprayed by another rioter was trapped inside his gas mask, which in the moment caused Det. Nguyen to feel like he was suffocating and about to die, as well as experience "pain and burning [that] lasted for days and weeks thereafter," *id.* at 35:1-4. While the Court found that the government did not prove beyond a reasonable doubt that Fitzsimons contacted Det. Nguyen's gas mask, let alone that Fitzsimons broke its seal, *see id.* at

32:20-36:25, Fitzsimons' swipes at Det. Nguyen's face at least occupied his attention and made him vulnerable to attacks from other rioters, including the sprayer.

Moreover, Fitzsimons' attacks impacted *all* of the officers in the Tunnel. Fitzsimons' violence made it more difficult for all of those officers to hold the line, repel the rioters, and defend themselves from attacks by the other rioters fighting there. Additionally, Fitzsimons' assaults emboldened and inspired others to attack police, just as he hoped they would.

### F.    Fitzsimons' Statements in the Days After the Riot

Fitzsimons should have been ashamed of his conduct at the Capitol. Instead, he was proud. The day after the riot, Fitzsimons called in to the Lebanon, Maine town select board meeting and spoke for approximately 13 minutes describing his actions and observations at the Capitol on January 6. *See* GEX 250. In his self-serving account, he lauded the number of "combat-aged young men" among the mob but said he "could not imagine a more peaceful revolution." *Id.* Fitzsimons took no responsibility for his actions; instead, he completely omitted violence by rioters, including himself, from his retelling. *Id.* According to Fitzsimons, "a human movement" carried him toward the police line holding the Tunnel; he claimed he "was not able to move" and was involuntarily "pushed to the front," where he—without any provocation—"receive[d] a beating . . . or a baton." *Id.* Presenting himself as a blameless victim, Fitzsimons said he "cycled through that wave of humanity twice before [he] was bloodied enough to get off the steps and get out of there." *Id.*; *see also* GEX 616. He described the riot as a "set-up" perpetrated by "agent provocateurs," not the "Make America Great Again movement," and characterized himself as a "pawn" in a "great game being played." GEX 250.

22

The next day, Fitzsimons gave an interview to an independent journalist, writing for his self-published newspaper, *The Rochester Voice*. *See* GEX 616. In that interview, Fitzsimons recounted attending the "Stop the Steal" rally on the Ellipse, then changing clothes and walking to the Capitol. *Id.* He admitted that as he approached the Capitol building, he saw people climbing on top of it, clearly having breached the heavy security he had seen the day before. *Id.* He said he heard that someone had been shot and claimed to have "watched as the woman who was shot was hustled past him." *Id.* He admitted experiencing tear gas and the scene becoming "hot, violent." *Id.* He admitted seeing "an enormous number of young men," many of whom were "specifically agitated," including one carrying a sledgehammer. *Id.* Yet none of this deterred Fitzsimons. Moreover, Fitzsimons repeated the same untruthful narrative he had shared with the Lebanon town select board, describing himself as a peaceful protestor who was twice "pushed . . . unwillingly forward into a police line" where "[p]olice in riot gear clubbed" him with a baton without justification. *Id.*

G.     **Fitzsimons' Post-Arrest Statements**

Despite his arrest and conviction, Fitzsimons has shown absolutely no remorse for his conduct or for the injuries he caused and continues to cast himself as a victim and unjustly prosecuted political prisoner. He has given at least three brief interviews while incarcerated, including one just a few months ago, repeatedly invoking the Navy mantra "Don't give up the ship" to encourage his interviewers and listeners spread the false narrative that he and other January 6-related defendants are being politically persecuted for their beliefs not their conduct.[4]

---

[4]   *See* "Cowboy Logic–01/05/23: J6 Political Prisoners–2 Years Later (part 8)," https://rumble.com/v23n0xy-cowboy-logic-010523-j6-political-prisoners-2-years-later-part-8.html; "Interview with J6 Political Prisoner KYLE FITZSIMONS," https://rumble.com/vwgva9-

Additionally, Fitzsimons' mother maintains a fundraising website for his benefit that has raised $26,892 to pay for Fitzsimons' "financial need[s] for his family" based on an appeal to donors that falsely characterizes Fitzsimons as a mere rallygoer and "J6 Patriot" who has experienced "egregious violations of due process rights . . . [while] sitting in DC jails."[5]

## III.   THE CHARGES

Following a four-day bench trial, on September 27, 2022, the Court announced a verdict of guilty on all eleven counts against Kyle Fitzsimons:

- Count 1, Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count 2, Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2;

- Count 3, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous or Deadly Weapon, 18 U.S.C. §§ 111(a)(1) and (b);

- Count 4, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);[6]

- Count 5, Assaulting, Resisting, or Impeding Certain Officers and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b);

---

interview-with-j6-political-prisoner-kyle-fitzsimons.html; "Gulag inmates call from behind bars to the January 6 Truth and Light Freedom Festival," https://rumble.com/v1bcl39-gulag-inmates-call-from-behind-bars-to-the-january-6-truth-and-light-freedo.html

[5] These funds are the subject of a pending government motion, which remains before the Court and ripe for decision. *See* Motion to Compel Defendant to Reimburse the Court for Costs of His Defense, ECF No. 81. If the Court imposes the fine requested by the government as part of its sentence, the motion will be moot.

[6] Count Four of the Second Superseding Indictment charged Fitzsimons with Assaulting, Resisting, or Impeding Certain Officers and Inflicting Bodily Injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Specifically, this count dealt with Fitzsimons' assault of Det. Nguyen. While the Court convicted Fitzsimons under 18 U.S.C. § 111(a)(1) of assaulting, resisting, or impeding Det. Nguyen, the Court acquitted Fitzsimons under 18 U.S.C. § 111(b) of inflicting bodily injury on Det. Nguyen. *See* Verdict Tr. at 32:20-36:25.

- Count 6, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1);

- Count 7, Entering or Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1);

- Count 8, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2);

- Count 9, Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A);

- Count 10, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

- Count 11, Act of Physical Violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F).

## IV.   STATUTORY PENALTIES

Fitzsimons now faces sentencing on each of the counts listed above. The maximum terms of incarceration for each count are detailed in the chart below.

| Count | Statute | Maximum Term of Imprisonment |
|---|---|---|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years |
| 2 | 18 U.S.C. §§ 1512(c)(2) and 2 | 20 years |
| 3 | 18 U.S.C. §§ 111(a)(1) and (b) | 20 years |
| 4 | 18 U.S.C. § 111(a)(1) | 8 years |
| 5 | 18 U.S.C. §§ 111(a)(1) and (b) | 20 years |
| 6 | 18 U.S.C. § 111(a)(1) | 8 years |
| 7 | 18 U.S.C. § 1752(a)(1) | 1 year |
| 8 | 18 U.S.C. § 1752(a)(2) | 1 year |
| 9 | 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) | 10 years |
| 10 | 40 U.S.C. § 5104(e)(2)(D) | 6 months |
| 11 | 40 U.S.C. § 5104(e)(2)(F) | 6 months |

For each of the felony counts—*i.e.* Counts 1-6 and Count 9—the Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per count.

As for the misdemeanor counts, Fitzsimons faces up to one year of imprisonment, a maximum of one year of supervised release, a fine of up to $100,000, and a mandatory special assessment of $25 per count on each of the two § 1752 offenses (Counts 7 and 8). For each of the two § 5104 offenses (Counts 10 and 11), Fitzsimons faces up to six months of imprisonment, a fine of up to $5,000, and a mandatory special assessment of $10 per count.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Respectfully, the PSR contains three errors, the first of which has no impact on the ultimate Guidelines calculations, the second of which increases the final combined offense level from 32 to 34, and the third of which ignores the applicability of grounds for an upward departure, which the government seeks here. Those errors are further described below.

### A.      Required Guidelines Calculations for Each Count Prior to Grouping

The PSR does not include a Guidelines analysis for every count, which it must, even though doing so would not result in a change to the final combined offense level. U.S.S.G. §1B1.1(a)(4). Specifically, the PSR is missing separate Guidelines analyses for Counts 5, 7, 8, and 9.

Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. §1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines

26

analysis as set out in U.S.S.G. §1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. Although the omissions do not impact the final Guidelines calculation, the government has included the Guidelines calculations for each count in Exhibit 2 for completeness and the Court's convenience.

**B.     Victim Related Adjustment for Count 2**

> ***i.     The applicability of the six-level official victim enhancement, pursuant to §3A1.2(c)***

Probation has calculated Fitzsimons' total offense level as 32. PSR ¶ 100. The United States disputes this calculation, and specifically objects to paragraph 90 of the PSR, which applies no victim related adjustment for the defendant's conviction for obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count 2). As set forth in the Government's Amended Objection to the Presentence Investigation Report, ECF No. 115, the Court should apply the six-level victim related adjustment set forth in U.S.S.G. §3A1.2(c), which would change the grouping analysis and result in Fitzsimons' total offense level increasing from 32 to 34.

Although the United States Congress is the primary victim of the defendant's obstructive conduct, the defendant committed the obstruction offense "in a manner creating a substantial risk of serious bodily injury … knowing … that a person was a law enforcement officer [and] assaulted such officer during the course of the offense." *See* U.S.S.G. §3A1.2(c). Indeed, the defendant assaulted and caused serious bodily injury to Sgt. Gonell's shoulder during the commission of Count 2, which forced Sgt. Gonell to retire from the USCP. *See* PSR ¶ 31; *see also* Verdict Tr. at 40:5-8 ("Sergeant Gonell needed surgery on his shoulder and testified that he continues to have a limited range of mobility. This is more than sufficient to show that he suffered serious bodily

injury."); Victim Statement of Sgt. Gonell, Exhibit 1. Additionally, the Court appropriately found

that the defendant's assaultive conduct was part of his effort to obstruct the certification:

> It is clear beyond a reasonable doubt that Mr. Fitzsimons personally acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding. He was aware of the violent scene and understood that the Capitol was closed to the public. In that context, natural and probable cause of violently engaging with the officers was obvious to further besiege the building and prevent the certification from going forward. […] Finally, I find beyond a reasonable doubt that Mr. Fitzsimons acted corruptly. Corruptly means that the defendant used an unlawful means or had a wrongful or unlawful purpose or both. Physically attacking law enforcement officers engaged in their official duties in an attempt to gain entrance to an area that is off-limits to the public is certainly unlawful.

Verdict Tr. at 21:21-22:20. *See also United States v. McCaughey, et al.*, 1:21-cr-40 (TNM)

(sentencing court applied same +6 enhancement to defendants Sills and Judd, both convicted of

violating 18 U.S.C. § 1512(c)(2) for assaultive conduct against officers in the Tunnel).

Accordingly, the offense level for Count 2 should be increased by six levels, resulting in a

total offense level of 31.

### ii.     The impact of applying the enhancement on grouping

This six-level increase impacts the grouping analysis in paragraph 94 of the PSR as

follows:

| PSR Grouping Analysis | | | Government's Grouping Analysis | | |
|---|---|---|---|---|---|
| **Count** | **Adjusted Offense Level** | **Units** | **Count** | **Adjusted Offense Level** | **Units** |
| Group 1 | 26 | 1.0 | Group 1 | 26 | 0.5 |
| Group 2 | 20 | 0.0 | Group 2 | 20 | 0.0 |
| Group 3 | 29 | 1.0 | Group 3 | 29 | 1.0 |
| Group 4 | 20 | 0.0 | Group 4 | 20 | 0.0 |
| Group 5 | 25 | 1.0 | Group 5 | 31 | 1.0 |
| **Total Number of Units** | | 3.0 | **Total Number of Units** | | 2.5 |

As the chart above displays, adding the six-level victim related adjustment to Count 2 changes the group with the highest offense level from Group 3 (at 29) to Group 5 (at 31), which impacts the units analysis as well. Adding the new units total (2.5) to the new top offense level (31) produces a total offense level of 34.

Probation calculated Fitzsimons as having a criminal history score of zero, thus generating a criminal history category of I, which is not disputed. PSR ¶ 103.

Accordingly, Fitzsimons' Sentencing Guidelines range of imprisonment—before adding the upward departure discussed below—should be 151 to 188 months.

### C.    Upward Departure Under §3A1.4, Comment Note 4, and/or §§5K2.2, and/or 5K2.7

Respectfully, in this case an upward departure is applicable and warranted pursuant to one or more of three different Guidelines provisions: U.S.S.G. §3A1.4, Comment Note 4, U.S.S.G. §5K2.2, and/or U.S.S.G. §5K2.7.

### i.   *U.S.S.G. §3A1.4, Comment Note 4*

Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5).  U.S.S.G. §3A1.4, cmt. n.1. Where, as here, a defendant's conviction was not for, or was not "intended to promote," an *enumerated* "federal crime of terrorism," an upward departure is still warranted under U.S.S.G. §3A1.4, cmt. n.4(A) ("Note 4(A)") if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." An upward departure is appropriate here because the conduct that led to Fitzsimons' eleven convictions was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

The government bears the burden to prove that the Note 4(A) departure is applicable by a preponderance of the evidence, based on all relevant conduct. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018). In this case, the evidence clearly shows that Fitzsimons' conduct was calculated to influence, affect, or retaliate against government conduct.[7]

---

[7] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole motive or sole purpose.  For example, the D.C. Circuit has held (applying a prior version of Section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose."  *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular *motivation* . . . is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

First, Fitzsimons carried out coercive and intimidating acts targeting the U.S. government by attacking its agents, namely officers of both the USCP and MPD as they sought to defend the Capitol building and the members of Congress inside. Fitzsimons engaged in repeated, relentless hand-to-hand combat against the officers defending the Tunnel. Second, Fitzsimons' intent to influence, affect, or retaliate against the government is clear from his words before, during, and after January 6. Third, Fitzsimons' choice of target—the United States Capitol building— coupled with the level of violence he directed at the police protecting the building further evidences his intent to intimidate, affect, or retaliate against the government. As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*,[8] 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target." Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199. That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing cases).

Clearly, attacking the United States Capitol—the legislative seat of our government— while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or retaliate against the government.

Indeed, in announcing its verdict, the Court described its own reasons for concluding that

---

[8] In *Khatallah*, the full adjustment (12 levels, CHC 6) was applied because that defendant was convicted of offenses that are enumerated in 18 U.S.C. § 2332b(g)(5).

Fitzsimons wanted to influence government by means of force. Fitzsimons "understood the certification to be happening in Congress that day. That was the entire point of the trip to D.C." Verdict Tr. at 18:23-25. "He considered [preventing the certification] something of an existential crisis." *Id.* at 19:25-20:1. "[O]bstructing or impeding that proceeding was central to what he subjectively believed was the future of the republic." *Id.* at 21:1-3. To accomplish that goal, Fitzsimons relied on "intimidation or coercion" through threats and violence. Specifically, he called Congressman Golden and left ominously threatening voicemails, designed to intimidate Congressman Golden into objecting to the certification, and he committed five separate assaults against police officers blocking his ability to enter the Capitol. As the Court noted,

> He was aware of the violent scene and understood that the Capitol was closed to the public. In that context, natural and probable cause of violently engaging with the offices was obvious to further besiege the building and prevent the certification from going forward. [ . . . ] Mr. Fitzsimons could have retreated . . . . He, instead, paused and then doubled down. The video is unambiguous. Mr. Fitzsimons did not charge at the officers ignorantly or by mistake. He did it knowingly and, as described above, with the knowledge that his acts would obstruct or impede the certification and, in fact, the specific intent to do so.

*Id.* at 21:24-22:13.

By committing multiple aggravated assaults against law enforcement officers in the course of obstructing an official proceeding, Fitzsimons engaged in offense conduct "calculated to influence or affect the conduct of government by intimidation or coercion." There are thus grounds for an upward departure under Note 4(A). The government seeks this enhancement to ensure that cases that involve extreme, violent behavior, are appropriately highlighted before any Court, so long as the guideline appropriately applies.[9]

---

[9] In the January 6, 2021 context, the government has sought the Note 4(A) enhancement in five other cases against a total of thirteen other defendants, with each case presenting different factual and procedural circumstances. *See United States v. Reffitt*, 21-cr-32 (DLF); *United States v. Judd*,

While §3A1.4(a) mandates a twelve-level enhancement for offenses that involve or promote enumerated federal crimes of terrorism, Note 4(A) provides the sentencing court more latitude. For cases that trigger the alternative grounds described in Note 4(A), the sentencing court may depart upward by any amount (including as little as one day) up to a maximum of twelve levels. Here, the government recommends a two-level upward departure, which would raise Fitzsimons' total offense level to 36 and his Guidelines range of imprisonment to 188-235 months. A two-level upward departure accounts for the applicability of Note 4(A) and the relentless violence perpetrated by Fitzsimons to achieve his political goals.

### ii.    U.S.S.G. §5K2.2

Section 5K2.2 provides an additional (or alternative) ground for an upward departure. There, the Guidelines state the sentencing court may depart upwards "[i]f significant physical injury resulted." *Id.* The Guidelines elaborate that the sentencing court should consider "the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was

---

21-cr-40-3 (TNM); *United States v. Gardner, II*, 21-cr-622 (APM); *United States v. Rhodes, et al*, 22-cr-15 (APM); *United States v. Milstreed*, 22-cr-198 (JEB). Reffitt was convicted after a jury trial, Judd resolved his case via stipulated facts bench trial, and Gardner pleaded guilty via a plea agreement in which he accepted the government's reserved right to seek an upward departure under Note 4(A) but did not agree that it was applicable. Neither Judge Friedrich, Judge McFadden, nor Judge Mehta, respectively, applied the enhancement at sentencing in those cases (although in *Gardner*, Judge Mehta noted that the Note 4(A) enhancement likely applied as a matter of law, but as a matter of discretion he declined to depart upwards under Note 4(A)).

In contrast, in *Rhodes, et al.*, Judge Mehta applied the Note 4(A) upward departure against Elmer Stewart Rhodes, Kelly Meggs, Jessica Watkins, and Kenneth Harrelson for conspiring to use force against the United States. In doing so, he applied +6, +3, +3, and +1 level upward departures, respectively. The government has also sought the Note 4(A) upward departure against the remaining five *Rhodes, et al.* defendants, but they have not yet been sentenced.

Finally, Milstreed pleaded guilty via a plea agreement in which he agreed that a two-level upward departure under Note 4(A) is appropriate. Sentencing has not yet occurred, however, so Chief Judge Boasberg has not yet addressed the issue.

intended or knowingly risked." *Id.* While the text suggests that the court should apply a sliding scale based on those factors, the Guidelines underscore that "[w]hen the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a <u>substantial</u> departure may be appropriate." *Id.* (emphasis added).

Here, Fitzsimons intentionally wrenched Sgt. Gonell's shoulder for an extended period of time, ignoring Sgt. Gonell's screams of pain, baton strikes, pleas for help, and attempts to free himself. The injury Fitzsimons inflicted on Sgt. Gonell is permanent. Despite surgery, he has not regained full use of his shoulder and he never will. Because he can no longer adequately protect himself or others, he was forced to medically retire from the USCP after a distinguished 24-year career in law enforcement. Beyond ending Sgt. Gonell's career, Fitzsimons also permanently impaired his personal life; Sgt. Gonell can no longer do simple things like shoot a basketball, which prevents him from not only playing himself but also demonstrating skills to his son. Pursuant to §5K2.2, the permanent disability that Fitzsimons intentionally inflicted on Sgt. Gonell more than warrants the two-level upward departure that the government seeks.

Addressing the errors to the PSR as discussed above and applying the requested upward departure results in a total offense level of 36 and a Guidelines range of imprisonment of 188-235 months, the low end of that range.

### iii.    U.S.S.G. §5K2.7

Section 5K2.7 provides a third ground for an upward departure. There, the Guidelines state that "[i]f the defendant's conduct resulted in a significant disruption of a government function" the sentencing court may depart upwards "to reflect the nature and extent of the disruption and the importance of the governmental function affected." *Id.* While the Guidelines state that an upward

departure under §5K2.7 "ordinarily would not be justified" for an obstruction of justice conviction because "in such cases interference with a governmental function is inherent in the offense," the Guidelines also explicitly recognize that unusual circumstances could still justify an upward departure under §5K2.7 in such cases.

For the reasons discussed above, this case presents such unusual circumstances, and it is the rare case involving an obstruction of justice conviction that warrants a two-level upward departure under §5K2.7. First, this provision of the Guidelines does not appear to contemplate a case in which obstruction of justice is only one facet of a defendant's criminal conduct. Here, the Court convicted Fitzsimons of ten other crimes—including five violent felonies—besides Count 2, the obstruction of justice charge. While on first blush it might appear redundant to depart upwards on Count 2 on the basis of Fitzsimons causing "a significant disruption of a government function," it is not duplicative to apply this ground for an upward departure to any of Fitzsimons' *other* convictions, such as his four assaults on police officers (Counts 3-6). Second, Fitzsimons' relentless violence not only disrupted Congress's certification of the Electoral College vote on January 6, 2021, which is charged in Count 2, but by permanently injuring Sgt. Gonell, Fitzsimons also caused "a significant disruption" to the USCP. Fitzsimons' commission of five separate assaults on police, coupled with the career-ending injury he inflicted on Sgt. Gonell, all in the service of stopping the certification, makes this the rare case involving an obstruction conviction that also merits an upward departure under §5K2.7.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.      Nature and Circumstances of the Offense

Of all the violent rioters at the Capitol on January 6, 2021, Fitzsimons was among the worst. He assaulted police five different times. He experienced no provocation; he indiscriminately attempted to harm any police officers in front of him simply because they were doing their jobs—trying to stop him and other rioters from entering the Capitol and stopping the certification. He brought and used a weapon. He caused one officer to suffer a career-ending, life-altering permanent injury. He only quit fighting once he himself had been bloodied, either by police officers defending themselves or another rioter's violently swung crutch. And even then, he urged other rioters to "Get in there!" and continue the violence in his stead. In the time since January 6, 2021, he has demonstrated no remorse, no self-reflection. To the contrary, he has spread lies about the events of the day, further fomenting division by portraying himself as a victim in spite of the video evidence clearly revealing him to be an instigator. He should be sentenced accordingly. Fitzsimons' actions—during January 6 and after—fully support the government's recommended sentence of 188 months' incarceration, the bottom of his Sentencing Guidelines range.

### B.      Fitzsimons' History and Characteristics

Fitzsimons has two prior convictions. The first was for Driving While Intoxicated in 2009. PSR ¶ 102. The New York state court judge sentenced Fitzsimons to 3 years of probation (with a condition that he complete a six-month outpatient substance abuse program) and 40 hours of community service, imposed a $500 fine, and revoked his driver's license. PSR ¶¶ 102, 118. In 2016, Fitzsimons received a second driving-related conviction, this time for Operating an Unregistered Motor Vehicle, but Probation was unable to determine the sentence he received. PSR ¶ 104.

Fitzsimons participated in a pre-sentence interview with Probation but failed to provide Probation with signed releases, *id.* ¶ 107, preventing Probation from verifying any of his claims about his personal and family data, *id.* ¶¶ 107-112b, physical condition, *id.* ¶¶ 112-114, mental and emotional health, *id.* ¶ 115, substance abuse history, *id.* ¶¶ 116-119a, education, vocational, and special skills, *id.* ¶¶ 119-120, employment record, *id.* ¶¶ 121-129, social media usage, *id.* ¶ 130, or financial condition, *id.* ¶¶ 131-134. This represents yet another example of Fitzsimons' contempt for the legal process and refusal to comply with authority. Nevertheless, even by his own unverified telling, Fitzsimons did not experience any childhood abuse, had all of his basic needs met, does not have a drug problem, does not suffer from any mental health issues, and is not destitute. *See id.* ¶¶ 107-134. He cannot blame his violent conduct on January 6 on anyone or anything other than his own choices.

## C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Fitzsimons' criminal conduct, in which he committed five separate unprovoked assaults against a group of police officers, was the epitome of disrespect for the law. The country cannot function if people are free to assault—and seriously injure—police officers when they are unhappy that the law is being enforced.

## D.   The Need for the Sentence to Afford Adequate Deterrence

### General Deterrence

A lengthy sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic

terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Fitzsimons' lack of remorse is evident from his interviews and fundraising appeal. It is abundantly clear that he sees nothing wrong with his actions at the Capitol on January 6 and in fact sees himself as a victim. Taken together, Fitzsimons' recruitment efforts prior to January 6, his conduct at the Capitol, and his statements afterward suggest that Fitzsimons believes his violence was justified and that he would resort to it again. Accordingly, the Court needs to impose a sentence that will achieve the specific deterrence that its verdict has not.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most analogous case is *United States v. Peter Schwartz*, 21-cr-178, in which Judge Mehta sentenced the defendant after a jury trial to 170 months of imprisonment. Armed with a wooden tire knocker, Schwartz threw a chair at a line of police officers on the Lower West Terrace, creating an opening in the line that enabled hundreds of rioters to flood the area as overwhelmed officers were forced to retreat. He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they tried to escape the mob. Schwartz later made his way to the Tunnel, where he sprayed the group of officers with pepper spray. Schwartz did all this while on felony probation for a case involving both assaultive conduct and illegal firearms possession. After the riot, Schwartz—like Fitzsimons—showed no remorse and instead demonstrated nothing but pride for his conduct. He bragged about it on multiple occasions and—like Fitzsimons—brazenly gave interviews from jail, even after being convicted at trial. Although Schwartz had a prolific criminal history, resulting in a criminal history category of VI, Fitzsimons' conduct was worse. Schwartz committed three assaultive acts, whereas Fitzsimons committed five. Schwartz did not injure anyone, whereas Fitzsimons permanently damaged Sgt. Gonell's shoulder. Moreover, Fitzsimons, unlike Schwartz, sought to inspire others to inflict similar violence.

The Court should also consider *United States v. Thomas Webster*, 21-cr-208, in which Judge Mehta sentenced the defendant after a jury trial to 120 months' incarceration. That case involved a physical assault against a single officer whom the defendant had picked out from the

police line on the West Front. Webster was convicted of violating 18 U.S.C. §111(b), among other

crimes, for using a flagpole in his assault on the officer. Unlike Fitzsimons, Webster's guidelines

range was elevated by enhancements for destroying evidence and using body armor; Judge Mehta

also found that Webster lied under oath during his trial testimony. In contrast to Webster, however,

Fitzsimons engaged in a greater quantity of violence (five separate assaults on officers instead of

just one) and higher degree of violence (causing permanent injury). Further, Webster was a former

police officer with no criminal history. Fitzsimons' sentence should reflect his far greater level of

violence, the injury he inflicted, his attempts to goad others to attack like he had, and his lack of

prior public service.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18

U.S.C. 3663), "provides federal courts with discretionary authority to order restitution to victims

of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution

Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),

"requires restitution in certain federal cases involving a subset of the crimes covered" in the

VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to only certain offenses "in which an

identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. §

3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Fitzsimons was convicted of violating 18 U.S.C. § 111(b), a crime of violence, the MVRA applies here.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at

512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Fitzsimons to pay $2,000 in restitution for his convictions on Counts 1-4, 6-8, and 10. This amount fairly reflects Fitzsimons' role in those offenses and the damages to the Capitol resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

In addition, for Counts 5, 9, and 11 (the charges centered on Fitzsimons' assault of Sgt. Gonell), the Court should require Fitzsimons to pay restitution to Sgt. Gonell to cover any economic losses suffered by Sgt. Gonell—including out-of-pocket medical expenses and loss of

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

income—as a result of the career-ending and life-alerting shoulder injury Fitzsimons inflicted upon him.[14]

## VIII.   FINE

Fitzsimons' convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

After evaluating Fitzsimons' description of his financial situation, but without the benefit of consulting a credit report because Fitzsimons refused to provide one, PSR ¶ 131, Probation determined that he has the resources to pay a fine, *id.* ¶ 134. Indeed, a fine is appropriate in this case given that Fitzsimons has used his crimes and notoriety to fundraise. As of May 17, 2023, Fitzsimons has raised $26,892 in an online campaign styled as a "J6 Family Relief Fund" with an image of Fitzsimons and his daughter as the header.[15] The website indicates the campaign was created by his mother, Jenean Fitzsimons, describes Fitzsimons as a mere rallygoer who is being unconstitutionally prosecuted, and promises that the money will be used to "assist his family

---

[14] At the time of filing, the exact amount of these losses is unknown, but the government has requested information from Sgt. Gonell and anticipates providing the Court and defense counsel with a precise figure prior to sentencing. If necessary, the Court can and should hold a separate restitution hearing to determine the exact loss. *See* 18 U.S.C. § 3664(d)(5).

[15] https://www.givesendgo.com/J6Familyrelief (last visited on May 17, 2023).

financially." *Id.* Fitzsimons should not be able to capitalize on the violence and chaos that he unleashed, the injuries he inflicted, or the damage he caused during the Capitol riot in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 188 months of incarceration, three years of supervised release, restitution in the amount of $2,000, a fine of $26,892, and a mandatory special assessment of $770. This sentence is at the bottom of Fitzsimons' Sentencing Guidelines range after a two-level upward departure under U.S.S.G. §3A1.4 n.4, and/or U.S.S.G. §§5K2.2, and/or 5K2.7, and takes account of his repeated violence against police officers on January 6th, the permanent, career-ending and life-altering injury he inflicted on Sgt. Gonell, Fitzsimons' utter lack of remorse, his efforts to profit from his crime, and the urgent need to deter others from engaging in political violence.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Michael M. Gordon*
MICHAEL M. GORDON
Assistant United States Attorney
Florida State Bar No. 1026025
400 N. Tampa St., Suite 3200
Tampa, Florida 33602
michael.gordon3@usdoj.gov
Telephone: 813-274-6370

*/s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
douglas.brasher@usdoj.gov
Telephone: 214-659-8604