1

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

3    United States of America,        ) Criminal Action
                                      ) No. 1:21-cr-00158-RC-1
4                     Plaintiff,      )
                                      )
5    vs.                              ) **Bench Trial**
                                      )
6    Kyle Fitzsimons,                 ) Washington, D.C.
                                      ) **August 16, 2022**
7                     Defendant.      ) Time:  10:00 a.m.
     _____

8

9

10

**Transcript of Bench Trial**
**Held Before**
**The Honorable Rudolph Contreras**
**United States District Judge**

11

12

A P P E A R A N C E S

13

14

For the Government:        **Douglas B. Brasher**
                           UNITED STATES ATTORNEY'S OFFICE
                           Northern District of Texas
                           1100 Commerce Street, Third Floor
                           Dallas, Texas 75242

15

16

17

                           **Michael M. Gordon**
                           UNITED STATES ATTORNEY'S OFFICE
                           400 North Tampa Street, Suite 3200
                           Tampa, Florida 33602

18

19

For the Defendant:         **Natasha Taylor-Smith**
                           FEDERAL COMMUNITY DEFENDER OFFICE
                           601 Walnut Street, Suite 545 West
                           Philadelphia, Pennsylvania 19106

20    _____

21    Stenographic Official Court Reporter:
                           Nancy J. Meyer

22                         Registered Diplomate Reporter
                           Certified Realtime Reporter

23                         333 Constitution Avenue, Northwest
                           Washington, D.C. 20001

24                         202-354-3118

25

1                               **I N D E X**

2                                                        PAGE:

3        **Opening Statements**:

4            Mr. Brasher..................................... 5
             Ms. Taylor-Smith............................... 12
5

6        **Witnesses**:

7        Phuson Nguyen

8            Direct Examination by Mr. Brasher.............. 16
             Cross-Examination by Ms. Taylor-Smith.......... 40
9            Redirect Examination by Mr. Brasher............ 63
             Recross-Examination by Ms. Taylor-Smith........ 66

10       Aisha Woodward

11
12           Direct Examination by Mr. Gordon............... 69
             Cross-Examination by Ms. Taylor-Smith.......... 91

13       Deborah Wilson

14           Direct Examination by Mr. Gordon............... 97
             Cross-Examination by Ms. Taylor-Smith.......... 127
15           Redirect Examination by Mr. Gordon............. 133
             Recross-Examination by Ms. Taylor-Smith........ 135
16

17       Bettie Harris-Howard

18           Direct Examination by Mr. Brasher.............. 137

19       Tia Summers

20           Direct Examination by Mr. Brasher.............. 146
             Cross-Examination by Ms. Taylor-Smith.......... 172
21           Redirect Examination by Mr. Brasher............ 180
             Recross-Examination by Ms. Taylor-Smith........ 181

22       Paul Wade

23           Direct Examination by Mr. Gordon............... 183
             Cross-Examination by Ms. Taylor-Smith.......... 210
24           Redirect Examination by Mr. Gordon............. 214

25

1              **I N D E X**, continued

2                                                              PAGE:

3      **Government Exhibits Admitted**:

4         Government Exhibit 200........................... 157
          Government Exhibit 204........................... 38
5         Government Exhibit 205........................... 31
          Government Exhibit 205A.......................... 31
6         Government Exhibit 205B.......................... 34
          Government Exhibit 211........................... 35
7         Government Exhibit 211A.......................... 35
          Government Exhibit 212........................... 37, 54
8         Government Exhibit 212A.......................... 37
          Government Exhibit 250........................... 140
9         Government Exhibit 306........................... 125
          Government Exhibit 400........................... 190
10        Government Exhibit 401........................... 205
          Government Exhibit 600........................... 150
11        Government Exhibit 601........................... 152
          Government Exhibit 602........................... 153
12        Government Exhibit 603........................... 154
          Government Exhibit 604........................... 154
13        Government Exhibit 606........................... 155
          Government Exhibit 607........................... 155
14        Government Exhibit 609........................... 74
          Government Exhibit 610........................... 84
15        Government Exhibit 611........................... 89
          Government Exhibit 612........................... 119
16        Government Exhibit 618........................... 21
          Government Exhibit 700........................... 143

17

18     **Defendant Exhibits Admitted**:

19        Defendant Exhibit 207........................... 61
          Defendant Exhibit 208........................... 61
20        Defendant Exhibit 209........................... 61
          Defendant Exhibit 210........................... 61

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  This is Criminal Action

 3     21-158, United States v. Kyle Fitzsimons.

 4            For the United States, I have Douglas Brasher and

 5     Michael Gordon.  For defendant, I have Natasha Taylor-Smith.

 6     Our court reporter today is Nancy Meyer.

 7            All parties are present.

 8            THE COURT:  All right.  Is there anything we need to

 9     deal with before we do openings?

10            MS. TAYLOR-SMITH:  No, Your Honor.  I do just want to

11     advise that present with me as well this morning is Jake

12     O'Donnell, a research and writing attorney from my office.

13            THE COURT:  Okay.

14            MR. O'DONNELL:  Good morning, Your Honor.

15            THE COURT:  Welcome.

16            MR. GORDON:  And, Your Honor, just one brief thing.

17     You had asked the parties -- or at least the government to

18     submit the vaccination status of all of our personnel and

19     witnesses under seal.  I provide a paper copy of that to your

20     courtroom deputy.  We'll file it under seal at the end of

21     today.

22            THE COURT:  I've seen it.

23            MR. GORDON:  Thank you.

24            THE COURT:  All right.  And the one thing I will note

25     for the parties is the -- the public line is open, which is
```

1    good for purposes of having a public criminal trial but is bad

2    for purposes of the rule against witnesses.  So if you could

3    advise all your witnesses not to listen to the proceedings so

4    that it ends up in a violation of the rule against witnesses.

5            Okay.  We're ready to do openings?

6            MR. BRASHER:  Yes, Your Honor.

7            THE COURT:  Okay.  Let's get started.

8            MR. BRASHER:  May it please the Court, Counsel.

9            You will hear from two officers during this trial who

10   thought they were going to die on January 6th, 2021 -- two

11   police officers who were defending the Capitol and the public

12   servants inside -- near eminent death on January 6th because of

13   that man, Kyle Fitzsimons.

14           The evidence in this case will show that over the span

15   of just a few minutes, Kyle Fitzsimons unleashed a reign of

16   terror on officers protecting the Capitol.  The officers will

17   show in just five minutes Kyle Fitzsimons committed four

18   separate assaults on law enforcement; one using a deadly and

19   dangerous weapon; two that caused bodily injury; and a fourth

20   that leaves no doubt about the defendant's intent to inflict

21   maximum carnage that day.

22           To fully understand the violence unleashed at the

23   defendant's hands, we will break it down and show the Court

24   exactly what happened minute by minute, second by second, and,

25   for those key moments, video frame by video frame.  We'll show

1    the Court video from multiple angles, from surveillance

2    footage, body-worn camera footage, and video taken by other

3    rioters in the crowd that day.  And you will hear from the

4    victims of these assaults.

5         Phuson Nguyen on January 6th, a detective -- now a

6    sergeant -- with the Metropolitan Police Department will

7    testify that he was at the Capitol on January 6th; that he

8    first reported to the west terrace area where he encountered

9    rioters who were throwing and swinging objects at him; and how

10   he did battle there and was injured on the west terrace.  But

11   despite being injured, he continued on with his duties

12   defending the Capitol until he and his fellow officers

13   eventually retreated into an area that has now become known as

14   the tunnel.

15        Now, on January 6th, 2021, construction of the temporary

16   inaugural stage was almost complete on the West Front of the

17   Capitol, and a stairway located here under this archway was

18   partially covered by part of that stage, which created a sort

19   of tunnel with an entrance to the Capitol at the end.

20        Now, on Inauguration Day, the President-elect passes

21   through these doors to take the oath of office; thus,

22   completing the peaceful transfer of power, which is the

23   hallmark of our democracy.  But on January 6th, 2021, this

24   tunnel was the locus of some of the fiercest battles between

25   rioters and law enforcement, including the defendant; these

1        folks who were intent on preventing this peaceful transfer of

2        power and obstructing the certification of the Electoral

3        College vote taking place inside.

4             Once Detective Nguyen had fallen back to the tunnel, he

5        worked his way to the frontline where he and his fellow

6        officers defended the Capitol from those rioters who were

7        trying to get in.  Detective Nguyen will testify that he would

8        work to [sic] the frontline for a period, then he would rotate

9        to the back and recover, and then work his way back up to the

10       frontline.

11            And during one of his trips to the frontline, Detective

12       Nguyen was assaulted by the defendant, pictured here in a white

13       jacket over another black jacket with the sleeves poking out at

14       the end.  Detective Nguyen, here in yellow jacket, was wearing

15       a riot helmet and a gas mask.  Detective Nguyen will testify

16       that Fitzsimons lunged toward him and dislodged his gas mask

17       and that this all happened just as another rioter sprayed him

18       in the face with pepper spray.

19            As you will hear, these gas masks have stretchy

20       rubberized straps on the back.  They're designed to make an

21       airtight seal on the officer's face.  And after Detective

22       Nguyen got this face full of pepper spray, the defendant let go

23       of the mask and it snapped back into place, trapping that

24       pepper spray right in his face.  Detective Nguyen will testify

25       that he couldn't breathe, that he thought he was going to

1    suffocate and die and get pulled out into the crowd.

2        You will hear from Sergeant Aquilino Gonell, a sergeant

3    with the United States Capitol Police, who testify about his

4    encounter with the defendant in the tunnel.  Armed with a

5    circular riot shield like this one here -- that makes it easier

6    to identify him in the videos and the photographs -- Sergeant

7    Gonell made his way to the frontline.

8        And once there, the defendant grabbed on to him and

9    started pulling his arm and his shield.  Here's an arrow

10   pointing to the circular shield of Sergeant Gonell, who's

11   pictured here in riot gear, and the defendant's arm with that

12   white jacket with the black sleeve coming out from underneath

13   it.

14       As the defendant grabbed on to Sergeant Gonell and was

15   pulling, something happened to his shoulder, and he will

16   testify about the effects he still feels today from the injury

17   that he received that day.

18       And fearing that he would get also pulled out into the

19   crowd and be killed, Sergeant Gonell reached back to his fellow

20   officers, who were ultimately able to pull him back to safety,

21   but only after the defendant lost his grip.  But for more than

22   ten agonizing seconds, Sergeant Gonell was being pulled by the

23   defendant towards the crowd.

24       You'll also hear from Metropolitan Police Department

25   Officer Sarah Beaver, and she will testify about her time in

1     the tunnel.  She will testify that she remembered being hit

2     with a pole-like object in the head, but she won't be able to

3     identify what it was, but we will show the Court exactly what

4     it was and that it was the defendant who threw it.

5          The others will show that the defendant made a stop

6     between former President Trump's rally at the Ellipse that

7     morning and his time at the Capitol.  He stopped to put on his

8     white butcher's coat embroidered with his first name, a fur

9     pelt, and to retrieve a weapon, an archery bow.

10         Now, after January 6th, the defendant will tell other

11    people that the bow was unstrung, and that he brought this

12    unstrung bow to the Capitol as a symbol of peace, but the

13    evidence will show that Fitzsimons took the supposed symbol of

14    peace and transformed it into a weapon and that he began his

15    string of assaults by deliberately and intentionally hurling

16    his bow like a spur right into Officer Beaver's head.  And,

17    luckily for Officer Beaver, she was wearing this riot helmet

18    with a face shield, and that bow would have hit her in the head

19    and face had she not been wearing this protective gear.  You

20    can see Officer Beaver pictured here with her badge number on

21    her helmet, and the bow coming in striking her head.

22         We'll show also body-cam footage that shows that bow

23    being passed back through the line of officers in the tunnel,

24    leaving no doubt that it is the same weapon that the defendant

25    was seen carrying earlier that day.

1       And, lastly, we will show you Fitzsimons' final assault;

2   how after he had assaulted Officer Beaver with his dangerous

3   weapon and after he had assaulted and injured Detective Nguyen

4   and Sergeant Gonell, how he took a moment to gather himself,

5   make ready, and then make a final charge into the line of

6   officers, swinging his fists madly, hitting multiple officers.

7   And only after that final assault, did he turn back, bloodied

8   and defeated, and retreated into the crowd.

9           (An audio-visual recording was played.)

10          MR. BRASHER:  The evidence will show that

11  Kyle Fitzsimons intended to commit each of those assaults.  He

12  wasn't pushed unwillingly into the line of officers.  No, he

13  was -- the evidence will show that moments before his barrage

14  of assaults, he was sprayed in the face with pepper spray.  And

15  when that happened, he turned around and walked down the steps

16  away from the tunnel.  But then he stopped, shook it off, and

17  turned back around and headed back to the line of officers,

18  pushing his way back up the stairs towards the tunnel.

19          And that's when his assaults began.  And when he had

20  finally had enough and when he couldn't take any more of the

21  officers' batons, he turned around and walked away, unimpeded

22  by the crowd.

23          Now, let's take a big step back.  How did we get here?

24  Why did this happen?  The evidence will show that

25  Kyle Fitzsimons was upset with the results of the 2020

1    presidential election.  He feared that if the Electoral College

2    vote was certified on January 6th, that it would be the last

3    day of the republic.  In a voice mail left for Representative

4    Jared Golden, from Maine's 2nd Congressional District,

5    Fitzsimons asked Representative Golden to have the courage to

6    object on January 6th and made it crystal clear that he too

7    would be in D.C. on the 6th, objecting to his own life going

8    forward if the results were certified and Joe Biden declared

9    the winner.

10                  (An audio recording was played.)

11             MR. BRASHER:  And in a post to the Facebook Group

12    Lebanon Maine Truth Seekers, Fitzsimons asked other people to

13    caravan with him to D.C. for the Electoral College vote on

14    January 6th.

15             MS. TAYLOR-SMITH:  Your Honor, I would note my

16    objection for the record.

17             THE COURT:  I remember.

18             MR. BRASHER:  And what's important about this post is

19    that he was not looking for fellow voices.  He wanted able

20    bodies.  And the evidence will show why Fitzsimons wanted able

21    bodies; because he knew that things would get physical on

22    January 6th.  The evidence will show that after his violent

23    assaults, he wanted others to do as he had done and, quote, get

24    in there; and that he was proud of his actions and wanted the

25    world to know his name.

```
 1              (An audio-visual recording was played.)
 2         MR. BRASHER:  And that is why at the conclusion of
 3    this trial we will ask the Court to find the defendant guilty
 4    of the assault on Officer Beaver; guilty of the assault on
 5    Detective Nguyen; guilty of the assault on Officer -- Sergeant
 6    Gonell; and guilty of assaulting officers with his final
 7    charge; guilty of obstruction of an official proceeding; and
 8    guilty of civil disorder.  Indeed, guilty of all 11 counts in
 9    the superseding indictment.
10         Thank you.
11         THE COURT:  Thank you.
12         Go ahead, Ms. Taylor-Smith.
13         MS. TAYLOR-SMITH:  Good morning, Your Honor.  Thank
14    you.  Good morning, Counsel.
15         The 2020 presidential election was unlike any in modern
16    times, and regardless of what side of the aisle you stood on,
17    there were entrenched thoughts and feelings about the way in
18    which each state handled the process.
19         For Mr. Fitzsimons, the election results in his
20    community came as no real shock to him.  No Republican
21    candidate had ever won the four Electoral College votes from
22    Maine since 1988.  What -- shortly after the election,
23    Mr. Fitzsimons started to hear about irregularities across the
24    country, and not just from your typical
25    aluminum-foil-wearing-hat conspiracy theorists.  He was hearing
```

1      these stories from mainstream media, from local elected

2      officials, from state elected officials, from federal elected

3      officials, and from the President of the United States himself.

4              And if the old adage where there's smoke there's fire

5      has any credence whatsoever, Mr. Fitzsimons felt as though he

6      was watching a towering inferno.  And so he watched intently as

7      challenges and rallies were held across the country.  And

8      although he saw the results of each challenge fade away, he was

9      still being told by these same mainstream individuals and by

10     the chief executive officer of this nation that there was a

11     plan.  That plan did not include the military.  It did not

12     include violence or guns or weapons of any kind.  All that

13     needed to happen was for the state's legislators to come

14     together on January 6th and to object to the certification.  To

15     come together on January 6th and object to the certification.

16             They had every right to do so, and each of them had

17     taken an oath to protect our Constitution, and that included

18     ensuring free and fair elections.  It was their responsibility,

19     and if the congressmen did that and they found irregularities,

20     they would act.  And if they didn't, it would be over and

21     Joseph R. Biden would be sworn in as the 46th President of the

22     United States.  That's what this country is all about.  That is

23     what our nation is built upon.

24             So when he heard there was going to be a rally in D.C.

25     to support this effort, he drove down.  He didn't drive down

1    with weapons.  Although, prior to January 6th, he did own a

2    legal firearm that he used in his employment.  He also owned

3    several serrated and long blades that he used in his employment

4    as a butcher.  He didn't link up with any fringe groups or

5    anti-establishment types.  He drove down.  He visited the

6    shrine of Pope John Paul II.

7         And on the morning of January 6th, he got up early and

8    walked over to the Ellipse.  He stood in line for almost an

9    hour to wait to get in.  He stood during the speeches, and he

10   remained the entire time the rally was going on.  He watched

11   every speech.  And, yes, there was some rhetoric, but the

12   overarching theme of that rally was that there was a legitimate

13   and legal path towards objecting to the certification and that

14   that was happening at the Capitol.

15        And so after the speeches, Mr. Fitzsimons found his way

16   down to the Capitol where he saw people gathering.  As he made

17   his way up to the Capitol, you will hear what Mr. Fitzsimons

18   heard, and you will see what Mr. Fitzsimons saw.

19        Eventually, he did find himself as part of the fray.

20   And when he left the Capitol on January 6th, he was taken to an

21   area hospital where he was bloodied, concussed, and received

22   eight staples to the top of his head.

23        In the days following January 6th, Mr. Fitzsimons never

24   bragged about his interactions with law enforcement.  He didn't

25   go around telling people how he tried to enter the Capitol, and

1     he never advocated for further action.  The election had been

2     certified at that point, Congress had done its job, and he had

3     traveled to D.C. to see just that, Congress to do their job.

4     That's it.

5          Mr. Fitzsimons never attempted to actually enter the

6     Capitol Building itself, and his sole purpose for traveling

7     from Maine to the District of Columbia was to witness and

8     support those legislators who had already committed to

9     objecting to the certification.  Mr. Fitzsimons could not get

10    what he wanted if he somehow stopped that process from

11    happening.  And while there were some interactions with law

12    enforcement, Mr. Fitzsimons never intended to injure anyone,

13    and the evidence in this case will bear that out.

14         As this Court would say to a jury if it was in a box,

15    what I would have to say and what counsel has to say isn't

16    evidence.  It's just argument.  And so at this point I'm going

17    to conclude my opening remarks so that this Court can get to

18    the evidence.  And at the end of this evidence, I'm going to

19    ask this Court to find Mr. Fitzsimons not guilty.

20         Thank you.

21              THE COURT:  Thank you.

22         All right.  The government can call its first witness.

23              MR. BRASHER:  Thank you.  The government calls Phuson

24    Nguyen.

25              THE COURTROOM DEPUTY:  Sir, can you please step

 1    into the jury box beside the plexiglass and raise your right

 2    hand.

 3              (Oath administered.)

 4              THE WITNESS:  I do.

 5              THE COURTROOM DEPUTY:  Thank you, sir.

 6              THE WITNESS:  Thank you.

 7              MR. BRASHER:  Your Honor, may the witness remove his

 8    mask?

 9              THE COURT:  He may.

10              MR. BRASHER:  You can take your mask off.

11                       DIRECT EXAMINATION

12    BY MR. BRASHER:

13    Q.  Good morning, De- -- you're no a longer detective; correct?

14    A.  Yes, sir.

15              THE WITNESS:  Good morning, Your Honor.  Good

16    morning, everyone.

17    BY MR. BRASHER:

18    Q.  Can you introduce yourself to the Court, please.

19    A.  Yes.  My name is Phuson Nguyen.

20    Q.  How are you employed?

21    A.  I am currently a sergeant with the Metropolitan Police

22    Department here in Washington, D.C.

23    Q.  And on January 6th, did you have a different title?

24    A.  Yes.  I was a detective with the major crash unit at

25    special investigation division of MPD.

1   Q.  And focusing your time on January 6th, in addition to your

2   duties as a detective, did you have other ancillary duties?

3   A.  Yes.  So a major crash, our duty is to investigate fatal

4   traffic crashes that occur in D.C., but because we fall under

5   special -- special -- special operation division, we are

6   activated along with SOD for any major demonstration.

7   Q.  Okay.  What is SOD?

8   A.  Special operation division.

9   Q.  Thank you.

10       So is it -- is that just another way to say that you're

11  involved in responding to demonstrations and -- and other large

12  public events?

13  A.  Yes.

14  Q.  How long have you been employed with the Metropolitan

15  Police Department?

16  A.  I will have 19 years on this month with MPD.

17  Q.  Why did you become a police officer?

18          MS. TAYLOR-SMITH:  Objection.

19          THE COURT:  You can answer.

20  A.  I guess police officers was not my -- my first calling.  I

21  was -- I was an immigrant from Vietnam.  So I came to the

22  United State at the age of 13 as a -- after high school, I

23  finished -- I finished high school, and I wanted to join the

24  Marine, but my dad, who have fought in the Vietnam War and --

25  his wish was, I guess, not for me to be in the armed force.

1    So he -- he wished that I attend the school so that we

2    could -- you know, I respect my parent.  So, basically, I put

3    aside my dream to serve in the armed force and continue school.

4    And from there -- after he pass in 2000, I started working

5    full-time.  And because I work in loss prevention, I get to

6    know a lot of police officer, and from there, they -- they

7    guide me and I joined the police department.

8    BY MR. BRASHER:

9    Q.  On January 6th did you respond to the United States Capitol

10   Building?

11   A.  Yes, I did.

12   Q.  Can you just give a brief overview of what happened when

13   you first arrived?

14   A.  Yes, sir.  On that day, you know, it start out as any other

15   day; a large demonstration that we have been handling since I

16   been on the police department, especially for the last

17   two years.  Starting in May 2020, we were seeing a lot of large

18   demonstration.  And right before January 6th, I believe about a

19   month or two earlier, there's another large demonstration that

20   we handle.

21   So that day, you know, it start out pretty normal, you

22   know.  The -- the whole department were activated.  We knew

23   that there's going to be a large demonstration.  So MPD was

24   ready to handle the demonstration.  And I came into work around

25   8:00 or 9:00 a.m. that morning.

1           At around 10:00 a.m., we -- my squad, which is

2     consisting of my sergeant and myself and another five

3     officer -- detective and officer.  So we -- we responded to

4     Ten and Constitution, and I remember parking on Tenth Street

5     facing south.  And, eventually, shortly later, we --

6     Q.  Let me stop you.  When you first arrived on scene, what did

7     you see?

8     A.  When I first start arrive on scene at Ten and Constitution,

9     we see a few people walking by, walking east on Constitution

10    towards the Capitol, and eventually we keep seeing more and

11    more people coming.

12    Q.  So what did you do at that point?

13    A.  We stay there, but at some point close to noon or around

14    noon is when our incident commander at the time went over the

15    radio and said that the Capitol Police --

16          MS. TAYLOR-SMITH:  Objection.

17          MR. BRASHER:  Your Honor, it's just to give the

18    background information about why the defendant responded to the

19    different areas.

20          THE COURT:  You can answer.

21    A.  Our incident commander went over the radio and stated that

22    the Capitol Police need our help.  And at that time, he will

23    call in MPD unit to respond to the Capitol.  And around noon

24    is -- my squad responded to the Capitol.

25    BY MR. BRASHER:

1   Q.  Okay.  What kind of -- what were you wearing that day, at

2   the beginning of the day?

3   A.  That day, I had my regular uniform on with the outer vest,

4   tactical vest, on the outside.  So I -- and then I will wear

5   a -- a winter jacket, and our jacket -- our winter jacket is --

6   is a combination of a winter jacket and a visibility jacket.

7   So on the outside you have these bright yellow section on the

8   jacket that -- so that you can be visible.

9   Q.  And did you have other gear with you that you were not

10  wearing?

11  A.  Yes.  So, of course, I had my -- my duty belt, but that

12  day, we also have our CDU bag, which is civil disturbance unit.

13  That what CDU stand for, and we had our CDU gear with us in --

14  in our car.

15  Q.  And what does the CDU gear consist of?

16  A.  So the CDU gear, the basic gear consist of the heavy-duty

17  helmet, a baton, the gas mask.  And depend on the level of CDU

18  training that you have, you might have some additional gear.

19            MR. BRASHER:  Your Honor, may I approach the witness?

20            THE COURT:  You may.

21  BY MR. BRASHER:

22  Q.  I've just handed you an object.  We'll mark a photo of it

23  with Exhibit 16.  But do you recognize that object?

24  A.  Yes, sir.  This is the gas mask that part of our CDU gear

25  that I have with me on that day.

1    Q.  And if you can put that down for a minute.

2         Did you have -- did you put your gas mask on right away?

3    A.  No, sir.

4    Q.  Why not?

5    A.  Because at that time, when we first responded, there was no

6    gas, you know, being thrown yet.  And so at that time, it was

7    not required for us -- or I didn't feel the need to put it on

8    at that point.  So at that point, I just had my gas mask at my

9    side.  I had my helmet with me and my baton with me.

10        MR. BRASHER:  Your Honor, we offer Government's

11   Exhibit 618.

12        THE COURT:  Any objection?

13        MS. TAYLOR-SMITH:  No, Your Honor.

14        THE COURT:  It's admitted.

15        (Government Exhibit 618 admitted into evidence.)

16        THE COURTROOM DEPUTY:  Are you publishing that?

17        MR. BRASHER:  Yes, Your Honor, we publish that to the

18   Court as well.  Your Honor, we'll have to substitute a photo of

19   that later today.

20        THE COURT:  Okay.

21        MR. BRASHER:  Thank you.

22   BY MR. BRASHER:

23   Q.  Okay.  Once you -- did you take your gear and go somewhere

24   on the Capitol Grounds?

25   A.  Yes.  We -- we -- we responded to the Capitol, and I

1    remember parking my car along with my squad on -- somewhere on

2    Louisiana Avenue.  So that is on the -- the northwest corner of

3    the Capitol.  And so we approaching the northwest corner, and

4    at that point, I remember the EMS were attending to a person

5    that was on the ground.  And at that point, we -- we approach

6    it.  There was a large crowd surrounded them, and so we trying

7    to push people back so that the EMS personnel can tend to this

8    person on the ground.

9         At that point, you know, we got some push back from some

10   people in the crowd, but also get help from some people in the

11   crowd to help push the crowd back.

12   Q.  Did you eventually make your way to the west plaza?

13   A.  Yes.  So at that point, the -- the west terrace -- outside

14   the west terrace of the Capitol was filled with people by the

15   time we got there; and that -- so we didn't have a path to go

16   to the west terrace from the front.  We have to walk on the

17   north side of the Capitol to the rear and then loop back to the

18   front.  And when we get to the front, we see -- see people in

19   the front of us, and we eventually made our way down to the

20   ground level.

21   Q.  Once you got to that ground level, what did you do, just

22   generally?

23   A.  When we get down to the ground level, there was bike rack

24   lined up to separate the police officers, MPD and Capitol, from

25   the -- the protester, demonstrators, and so we help keep that

1     line in place.

2     Q.  And were you injured at any point during that time on the

3     west terrace?

4     A.  Yes.  So if you -- if you stand on the west terrace facing

5     the White House and you see the demonstrator in front of us

6     and -- on both side there are -- there were inaugural stand

7     that were built, get ready for the inauguration.  And at that

8     point, I looked to my right, and I see the people that were

9     climbing on the -- get through the inaugural stand and climbing

10    up top.

11         And so to my right there would be a ledge -- so if I'm

12    standing here on the ground, there would be a ledge -- a

13    concrete that's part of the Capitol structure on my right.  And

14    so myself and another officer -- or detective, we climb up

15    there to -- I mean, based on my experience doing these

16    demonstration, you know, I wanted to protect that -- our right

17    flank.  And so we climb up there, and while we up there, I saw

18    this guy that have a knife.  And they were cutting -- so when

19    they build the inaugural stand, they have these fabric -- big

20    sheet of fabric that cover the bottom so that nobody can get

21    under.  But there's a guy with a knife, and he was cutting

22    the -- the sheet of fabric up to open up the hole.  And,

23    eventually, the demonstrator was going in under the inaugural

24    stand and then start to make their way up top.

25    Q.  Okay.  And did you -- let's talk about your shoulder.  Did

```
1   you injure your shoulder during some point that day?

2   A.  I believe while on the -- that's -- that's -- while on that

3   ledge is where I got my shoulder injure.  There was three guy,

4   and they got a long piece of 2-by-4, got to be 18 feet or so.

5           MS. TAYLOR-SMITH:  Your Honor, at this point I'm

6   going to object unless --

7           THE COURT REPORTER:  You're going to have to come to

8   the microphone.  "I'm going to object unless."

9           MS. TAYLOR-SMITH:  -- unless he's going to say my

10  client was one of these three guys who attacked him at this

11  point.  I don't know what the relevance is to my client's

12  charges.

13          MR. BRASHER:  Your Honor, we're not proffering the

14  defendant was one of those individuals, but this is background

15  to show the defendant -- or the witness's state once he did

16  encounter the defendant.

17          THE COURT:  Okay.  I'll allow it.

18  BY MR. BRASHER:

19  Q.  So just briefly describe what happened to your shoulder.

20  A.  Yes.  So these -- these guy, they trying to hit me with the

21  2-by-4.  And so in the process, I grabbed it, and during the

22  struggle, I somehow got the 2-by-4 from them and pass it down

23  to the officer behind -- below me.  And at that time -- I

24  didn't notice it at that point, but later that night is when

25  I -- I noticed that my right shoulder were injured.
```

1    Q.  And eventually -- let's jump forward -- did you and fellow

2    officers retreat?

3    A.  Yes.  So at -- at -- when we were outside on the bottom

4    ground on the west terrace, at some point we got overran by

5    the -- the demonstrator, and we were given the command to

6    retreat.  And at that point, we retreat back toward the -- the

7    west terrace, and my -- my squad -- or at least some of --

8    member of my squad, we got separated, but most of us -- and

9    along with some other officer -- retreat inside the west

10   terrace tunnel.

11   Q.  And once you were in the tunnel, what did you do?

12   A.  When we first got in there, we -- I did not do it

13   personally, but I notice at some point after we got in the door

14   was --

15            MS. TAYLOR-SMITH:  Objection, Your Honor.

16            THE COURT:  Hold on.  What is the nature of the

17   objection?

18            MS. TAYLOR-SMITH:  Your Honor, he's -- began his

19   comment with I don't know this personally, which means whatever

20   information was provided to him was provided to him at some

21   other time by some other person.

22            THE COURT:  Sustained.

23            MR. BRASHER:  Okay.

24   BY MR. BRASHER:

25   Q.  Did you observe things -- well, let's -- let's focus on

1    just you personally.

2    A.  Yeah.

3    Q.  Once you got to the -- to the tunnel, did you move up to

4    the frontline?

5    A.  Yes.  So after we got in, at some point I noticed that the

6    demonstrator were breaking their way in, pushing their way in.

7    So at that point, we all lined up in the hallway side by side

8    and in rows, and -- and we line up to push the demonstrator

9    back.

10          The hallway were approximately, I would say, around

11   10 feet wide.  So we -- officers shoulder to shoulder lined up

12   by rows, and the demonstrator were trying to push in, and we

13   were trying to push back.  Initially, we're just pushing and

14   they were yelling one, two, three, push.  And we were doing the

15   same thing.  We were pushing back.  But then it's -- it -- it

16   escalated into full fighting.

17   Q.  And did you stay at the front the whole time you were

18   there?

19   A.  No, sir.  So during that time that the fight for inside

20   that hallway -- during that day, we were in there approximately

21   two -- three to four hours.  And during that day, if an officer

22   get tired or get injured, we pull them back or the officer

23   would make their self -- make their way back to the back, and

24   then a fresh officer would move forward to the front.

25          And -- and so initially when I was in there, I made

1    myself up to the front.  And during the fighting, I got spray.

2    Q.  Let's -- let's focus on the time that you got sprayed.  Was

3    that the first time that you were at the front?

4    A.  Yes.

5    Q.  Okay.  When you were on that front, tell us, if you can, in

6    best detail, what happened when you got sprayed?

7    A.  Yeah.  So when we first got in there -- this is when, you

8    know, COVID restriction was still in place.  So I have a -- a

9    black cloth mask, a mask that I -- I wore.  And so when I got

10    up to the front and during that fighting, I got sprayed; what I

11    believe to be pepper spray.  And then I made my way back to --

12    after that to decon, decontamination.

13    Q.  And what did you do then?

14    A.  So there's -- there's a worker at the Capitol.  And, you

15    know, a lot of us was thanking him for -- for his quick

16    thinking; that he led us to a water fountain in one of the

17    mechanical room.  And that's where, you know, I used the water

18    to splash up my -- my face to -- to wash the -- the spray and

19    rest it for about 15 minutes or so.  And then I -- after I were

20    able to see again, I went back to the line.

21    Q.  Okay.  And at that point did you put on your gas mask?

22    A.  So yes.  So after I got sprayed the first time, I thinking,

23    you know, put on a gas mask will prevent -- you know, if I get

24    sprayed again, it's going to limit my exposure.  So I put on my

25    gas mask.

1   Q.   Okay.  And can you explain what the straps on the back of

2   the gas mask are for?

3   A.   Yes.  So this gas mask -- so normally it would be -- the

4   top would -- would turn backward like that, and then if I'm

5   going to put it on, I put my chin right here and then flip it

6   over.  And then the strap will help tighten the -- the gas mask

7   to my face to create a -- a seal on it.

8   Q.   Okay.  And why is that seal important?

9   A.   Excuse me?

10  Q.   Why is that seal important?

11  A.   The seal is important because if -- in case there were --

12  where there's gas, the filter will help filter the air so that

13  you can breathe, and without the seal, the gas mask won't work

14  properly.

15  Q.   Now, did you get sprayed a second time while you were

16  wearing that gas mask?

17  A.   Yes.

18  Q.   Okay.  Do you have an independent recollection of the

19  person -- or how did that happen?  If you had a gas mask on,

20  how did you get sprayed?

21  A.   So when I went back to the -- the line, the second time, I

22  have my -- the gas mask on and I have my helmet on.  And the

23  fighting, you know, continue.  And at some point, you know, one

24  of the demonstrator were trying to pull me outside.  And

25  luckily, you know, I -- I hold on to the metal rail by -- by

1    the entrance.  And with the assist of my colleague, they pull

2    me back.  And so I was successful to go -- go back in, but I

3    was still in the front.

4           And during the fighting, a person -- the demonstrator

5    from the -- on the other side grab my mask, pull it while

6    there's another guy be -- to -- to his right lean forward and

7    spray me a face full of what I believe to be -- later to be

8    bear spray.  When he spray me --

9    Q.  Let me stop you there, if I can.  What do you recall -- do

10   you have an independent recollection today of the -- what the

11   person looked like who pulled your gas mask?

12   A.  Yes.  It was a -- a white male wear -- he was wearing a

13   light jacket at the time of -- on January 6.

14   Q.  And since that time have you looked at body-worn camera

15   footage and other videos that have helped you identify when

16   this incident happened?

17   A.  Yes, I did.

18   Q.  Okay.  Tell us -- you were about to say what happened once

19   the -- you got sprayed with the bear spray.

20   A.  Right.  So after I got spray -- and at the same time the

21   person who pull my mask, let go of the mask, and then it

22   snapped back into place and --

23   Q.  What did that feel like?

24   A.  At that point I was choking under the mask, and I was --

25   also got knocked down at the same time.  And so at that point,

1    I was choking, and I was trying to get up.  I were panicking.

2    It was so severe that I had to -- I have to -- I was choking.

3    I were making that -- that sound (sound uttered by witness).

4    So I have to -- I have to gather myself.

5        At that point, I -- I have to break the seal to let

6    some air in so that I can breathe.  Because at that very

7    particular point when -- when -- when I was choking and got

8    knocked down, in my head, you know, I -- I thought that was --

9    I thought it was it for me, is that -- I thought that's, you

10   know, where I'm going to die.  And -- and in my head, you know,

11   I was thinking about my family at that point before anything

12   else.

13       And in my head, I was telling myself, if you want to

14   see your family again, you need to gather yourself.  And

15   luckily, you know, I gathered myself and to break that seal.

16   And with the help of my colleague behind me, they pull me up.

17   And eventually, you know, I made my way back to the back.

18   Q.  In addition to the trouble you had breathing, what did it

19   feel like on your skin and in your eyes?

20   A.  It was a burning.  It's burning pretty much the whole

21   day and weeks.  Afterward, I made a mistake of, you know,

22   taking a shower when I get home, and because -- to live with,

23   when you take a shower, it -- it go down your body and then it

24   absorb into your skin.  And, basically, you know, my -- my hand

25   was -- was tingling, burning for the next week or two

```
 1    afterward.

 2              MR. BRASHER:  Your Honor, at this time I offer

 3    Government's Exhibit 205 and 205A.

 4              THE COURT:  Can you briefly describe what they

 5    are.

 6              MR. BRASHER:  Yes.  Government's 205 is body-worn

 7    camera footage from MPD Mustafa Ak, and then 205A are still

 8    images from that video.

 9              MS. TAYLOR-SMITH:  No objection.

10              THE COURT:  They're admitted.

11              (Government Exhibit 205 and 205A admitted into

12    evidence.)

13    BY MR. BRASHER:

14    Q.  Looking at Government's Exhibit 205A, page 6 --

15              MR. BRASHER:  May I publish, Your Honor?

16              THE COURT:  You may.

17    BY MR. BRASHER:

18    Q.  Okay.  Is this an image that you've seen before?

19    A.  Yes.

20    Q.  Okay.  And can you identify yourself in this photo?

21    A.  Yes.  So you're looking at the screen, I would be a little

22    to the left in the middle wearing a helmet.  You can see I have

23    my arm extended, and I was wearing the winter jacket that have

24    some neon on it.

25    Q.  Is that here where I just circled, is that you?
```

1    A.  Yes.

2    Q.  And the individual that pulled on your gas mask, can you

3    identify that person in the image?

4    A.  Yes.  He is --

5            MS. TAYLOR-SMITH:  Objection, Your Honor.  He's

6    already testified that, to the best of his recollection, it was

7    a white male with a light jacket.  That is the information that

8    he knows as he sits here today.

9            THE COURT:  Okay.  You can answer.

10   A.  Yes.  That's the person directly in front of me.  There's a

11   white male wearing a light jacket, and you can see that his

12   left arm is extending towards my -- my arm.

13           THE COURT:  And how do you know that's the person --

14   the same person that pulled your mask?

15           THE WITNESS:  Because I -- I just remember the -- the

16   incident.  The two incident that -- that I remember most about

17   the 6th was the two incident that I got spray.

18   BY MR. BRASHER:

19   Q.  And have you seen the video where these still images come

20   from?

21   A.  Yes.

22   Q.  And have you viewed body-cam footage from other officers?

23   A.  Yes.

24   Q.  And in viewing those, has that confirmed your

25   recollection -- your independent recollection of what happened

1   that day?

2   A.  Yes, it did.

3   Q.  Going to page 7 of Government's Exhibit 205A, do you see

4   yourself in this image?

5   A.  Yes, sir.

6   Q.  And -- and the person in the white jacket -- or the light

7   jacket reaching towards you?

8   A.  Yes.  So I would be at the center of the screen at the

9   bottom, and you can see that person hand is reaching towards

10   me.

11   Q.  And page 8.  What do you see in this image?

12   A.  You can see that there's a -- behind the person in the

13   light jacket, there's an arm extended towards me, and you can

14   see that the spray were being administered, being spray toward

15   to my direction.

16          MR. BRASHER:  Permission to publish Government's

17   Exhibit 205?

18          THE COURT:  You may.

19          (An audio-visual recording was played.)

20   BY MR. BRASHER:

21   Q.  I'll stop that right there at time stamp 16:11:16.  Is that

22   the incident you've been describing?

23   A.  Yes.

24   Q.  Would you have received the injuries that you received if

25   your gas mask was still in place?

1          MS. TAYLOR-SMITH:  Objection.  Calls for speculation.

2          THE COURT:  What injuries are you referring to?

3    BY MR. BRASHER:

4    Q.  When -- when you were injured the second time with the

5    spray, would that have happened if your gas mask had still been

6    in place?

7          MS. TAYLOR-SMITH:  Objection.  Calls for speculation.

8          THE COURT:  You can answer.

9    A.  If -- if my gas mask has -- had -- was still have been in

10   place, the effect of the -- the spray would be way less, and I

11   would not have been having that much of a difficulty breathing

12   if the mask was still in place and if I still have that seal.

13         MR. BRASHER:  Your Honor, the government offers

14   Government's Exhibit 205B, which is a slow-motion clip from

15   Government's Exhibit 205.

16         MS. TAYLOR-SMITH:  No objection.

17         THE COURT:  It's admitted.

18         (Government Exhibit 205B admitted into evidence.)

19         MR. BRASHER:  Whoops.  I'm sorry.

20         (An audio-visual recording was played.)

21   BY MR. BRASHER:

22   Q.  Can you describe what -- is that, again, the same incident

23   we've been talking about?

24   A.  Yes, sir.

25   Q.  Where your gas mask was dislodged?

1    A.  Yes.

2           MR. BRASHER:  Your Honor, the government offers

3    Government's Exhibit 211 and 211A, which is body-cam footage

4    from MPD Officer Henry Foulds and still images from that video.

5           MS. TAYLOR-SMITH:  No objection.

6           THE COURT:  They're admitted.

7           (Government Exhibit 211 and 211A admitted into

8    evidence.)

9    BY MR. BRASHER:

10   Q.  Have you reviewed this body-cam footage before?

11   A.  Yes.

12   Q.  And can you identify yourself in this image, which is

13   page 1 of Government's Exhibit 211A?

14   A.  Yes.  It's the -- I'm the officer with the -- my hand

15   extended and the neon and black jacket; and you can see that an

16   individual got ahold of my jacket on my wrist, and that person

17   was trying to pull me outside.  And that you can see that my

18   left arm is bracing on the -- on the metal rail.

19   Q.  And on page 2 of government's -- of 211A, is that you in

20   the yellow jacket?

21   A.  Yes.

22   Q.  And page 3, can you see yourself in this image?

23   A.  Yes.  I'm, like, far left on the screen.

24   Q.  And do you see the individual in the light jacket as well?

25   A.  Yes.  He's directly in front of me with his hands extended

1    out.

2    Q.  And page 4?

3    A.  Yes.  I -- I am on the left side of the screen with that

4    same jacket on, and the individual in the light jacket is --

5    with left hand extends towards me.

6    Q.  Same thing on page 5?

7    A.  I haven't --

8    Q.  A split second later; is that correct?

9    A.  Yes.

10   Q.  Same with page 6?

11   A.  Yes.

12   Q.  And page 7?

13   A.  Yes.

14           MR. BRASHER:  Your Honor, permission to publish

15   Government's Exhibit 211?

16           THE COURT:  You may.

17           (An audio-visual recording was played.)

18   BY MR. BRASHER:

19   Q.  What does that clip show?

20   A.  It show the same incident that I describe earlier from a

21   different angle.

22           MR. BRASHER:  Your Honor, the government offers

23   Government's Exhibit 212 and 212A, which is body-cam footage

24   and still images from MPD Officer Alphonso -- last name is

25   G-b-a-t-u.  I'm not sure of the pronunciation.

1        MS. TAYLOR-SMITH:  No objection.

2        THE COURT:  They're admitted.

3        (Government Exhibit 212 and 212A admitted into

4   evidence.)

5   BY MR. BRASHER:

6   Q.  And on page 1, do you see -- Government's 212A, do you see

7   the individual in the light jacket?

8   A.  Yes.

9   Q.  And on page 2, can you see yourself in this image?

10  A.  Yes.  I'm -- I'm right there in -- on the screen in front.

11  Q.  And, finally, page 3?

12  A.  That's -- that's the same.  That's -- that's me up there in

13  the front.

14        MR. BRASHER:  Permission to publish Government's

15  Exhibit 212?

16        THE COURT:  You may.

17        (An audio-visual recording was played.)

18  BY MR. BRASHER:

19  Q.  I'm going to move forward to time stamp, approximately,

20  6:11 -- or 16:11.  In that -- that clip, were you able to hear

21  the spray?

22  A.  Excuse me?

23  Q.  Were you able to hear the spray, the sound of the spray?

24  Do you want me to go back?

25        (An audio-visual recording was played.)

1    A.  Yes, you -- you definitely can hear the -- well, at least

2    myself, I can identify that that is -- that the sound of pepper

3    spray or whatever is being spray at that point.

4    BY MR. BRASHER:

5    Q.  And just for the record, what other things do you hear in

6    these clips that we've been watching?

7    A.  Just noise.  There's a lot of yelling.  There's a fire

8    alarm going off, but it's -- it's a lot of noise and a lot of

9    yelling and screaming.

10           MR. BRASHER:  Your Honor, the government offers

11   Government's Exhibit 204, which is CCTV footage from inside the

12   tunnel.

13           MS. TAYLOR-SMITH:  No objection.

14           THE COURT:  It's admitted.

15           (Government Exhibit 204 admitted into evidence.)

16           MR. BRASHER:  Permission to publish?

17           THE COURT:  You may.

18   BY MR. BRASHER:

19   Q.  Prior to coming here today, have you had the opportunity to

20   review closed-circuit video of you and the other officers on

21   January 6th?

22   A.  Yes.

23   Q.  And is this one of the videos you've seen?

24   A.  Yes.

25   Q.  If I forward to the -- about four minutes into the clip,

1  does this show you on the left-hand side of that tunnel?

2  A.  Yes.

3          (A video recording was played.)

4  BY MR. BRASHER:

5  Q.  Does it show the person grabbing your mask?  Can you see

6  that in this video?

7  A.  Yes.  And then the spray following it.

8  Q.  You can see the person -- let me break that down.  You can

9  see the person who pulled your mask; correct?

10  A.  Yes.

11  Q.  But can you actually see your mask being pulled in this

12  video?

13  A.  No, sir.

14  Q.  And then you can see the spray coming in?

15  A.  Yes.

16  Q.  And from putting all those videos together, what were you

17  able to determine about that moment?

18          MS. TAYLOR-SMITH:  Objection, Your Honor.

19          THE COURT:  You can answer.

20  A.  That's the same incident that I remember.  That's the

21  second time that I got sprayed that day with the person pulling

22  my mask, and then I got spray.

23          MR. BRASHER:  I pass the witness, Your Honor.

24          THE COURT:  I'm sorry.  I didn't hear that.

25          MR. BRASHER:  I'm sorry.  I pass the witness.

1          THE COURT:  Okay.

2                    CROSS-EXAMINATION

3    BY MS. TAYLOR-SMITH:

4    Q.  Good morning, still.  Sergeant Nguyen; is that right?

5    A.  Yes, ma'am.  Good morning.

6    Q.  Sergeant Nguyen, you testified earlier today that the first

7    time that you got sprayed that you had a black face mask on; is

8    that correct?

9    A.  Yes.

10   Q.  Okay.  And when you say a black face mask, you meant like a

11   black cloth face mask?

12   A.  Yes.

13   Q.  Okay.  And is it also fair to say that you have given

14   several statements about what happened to you on January 6th;

15   is that right?

16   A.  To -- to who, ma'am?

17   Q.  To -- I'm sorry.  To law enforcement agents.

18   A.  Yes.

19   Q.  Okay.  And, in fact, you gave a statement on or about

20   March 10th of 2021; is that right?

21   A.  I can't remember the date, ma'am.

22   Q.  Can you please bring up --

23          MS. TAYLOR-SMITH:  Your Honor, I would mark now for

24   identification purposes Defense Exhibit 9.  And may it be shown

25   to the witness?

```
1            THE COURT:  You may.

2   BY MS. TAYLOR-SMITH:

3   Q.  Do you have a screen, Officer [sic] Nguyen?

4   A.  Yes, I do.

5   Q.  Do you see what's been marked as -- I'm sorry.  Is that 9?

6   Oh, I'll start back there.

7            You gave a statement on or about April the 12th of -- of

8   2021; is that correct?

9   A.  I'm sorry.  Let me see.  That's the date it say on this

10  report.

11  Q.  How -- how about we do this, Officer Nguyen:  Do you see

12  the second line -- do you see Defense Exhibit 9?

13  A.  Yes.

14  Q.  Do you see the second line next to your email address?

15  A.  Yes.

16  Q.  Okay.  Does it say -- does it say that you were interviewed

17  on April the 12th of 2021?

18  A.  Yes.  According to the document, yes.

19  Q.  Okay.  And you do remember speaking to agents; correct?

20  A.  I do.

21  Q.  Okay.  Can you --

22            MS. TAYLOR-SMITH:  Court's indulgence.

23       Can you direct him to page 2, full third paragraph, and

24  can you call out the last two lines for me.  First full

25  paragraph, last two lines.
```

```
 1    BY MS. TAYLOR-SMITH:

 2    Q.  Did you tell the detective -- or the agent back on

 3    April the 12th that the person who sprayed you in the face with

 4    OC, that you did not have a mask on and that you had to leave

 5    the area to contaminate -- to decontaminate?  Did you tell him

 6    that?

 7                THE COURTROOM DEPUTY:  Is this in?

 8                THE COURT:  I'm sorry?  No, it's not in.

 9                THE COURTROOM DEPUTY:  Okay.

10    A.  So when I talk about I did not have a mask on during the

11    first incident, meaning that I did not have that mask on.

12    BY MS. TAYLOR-SMITH:

13    Q.  You did not have a gas mask on?

14    A.  Right.  During the first incident.

15    Q.  But what you said was that you didn't have a mask on.

16    That's what you told the agent?

17    A.  Right.  So I don't know if he misunderstood, but the first

18    incident when I say I did not have a mask on, meaning I did not

19    have the gas mask on the first time.

20    Q.  And you first described the incidents of January 6th to

21    a member of law enforcement back on March 10th of 2021.  Do

22    you remember that, about a month before you gave this

23    statement?

24    A.  I don't, ma'am, because I have talking to several FBI

25    agent.  So if you ask me about date, I cannot give you a date.
```

1    Q.  All right.  Well, do you think it might refresh your

2    recollection if I let you take a look at a statement?

3    A.  Sure.  Yeah.

4         MS. TAYLOR-SMITH:  Can you please bring up Exhibit 8.

5         Your Honor, I'm marking now for identification purposes

6    only Defense Exhibit 8.

7         THE COURT:  Okay.

8    BY MS. TAYLOR-SMITH:

9    Q.  Officer [sic] Nguyen, take a look at what's been marked as

10   Defense Exhibit 8.  Do you see that?

11   A.  Yes.

12   Q.  Is this the statement that you gave on or about March 10th

13   of 2021?

14        MR. BRASHER:  Objection, Your Honor.  To the extent

15   the witness is -- or counsel is referring to this as a

16   statement given by the witness, I would object.  I think that's

17   a mischaracterization of the document.

18        MS. TAYLOR-SMITH:  Your Honor, he can answer yes or

19   no.

20        THE COURT:  Yeah, I agree.  Go ahead.

21   BY MS. TAYLOR-SMITH:

22   Q.  Is this the statement that you gave back on March 10th of

23   2021?

24   A.  Yes, according to the document.  Yes, ma'am.

25   Q.  Okay.  And at that point in time, you described the

1    individual who pulled your mask inside the tunnel as a person

2    wearing a light gray jacket.  Is that how you described the

3    person?

4              MS. TAYLOR-SMITH:  Directing his attention to

5    paragraph 3.  Can you call out that third paragraph.

6              THE COURTROOM DEPUTY:  Counsel, is it March 10th or

7    March 11th?

8              MS. TAYLOR-SMITH:  It's March 10th.

9              THE COURTROOM DEPUTY:  The document says March 11th.

10             MS. TAYLOR-SMITH:  The document is March 11th.  His

11   interview was on March the 10th.

12             THE COURTROOM DEPUTY:  Oh, okay.  I apologize.

13             MS. TAYLOR-SMITH:  It's okay.

14   A.  Yes.

15   BY MS. TAYLOR-SMITH:

16   Q.  A light gray jacket; is that correct?

17   A.  Yes.

18   Q.  And you've seen from the videos today -- what color was the

19   jacket that Mr. Fitzsimons was wearing on January 6th?

20   A.  It appeared to be white.

21   Q.  Okay.  Today you testified that you were wearing a gas mask

22   at the time your face mask was pulled from you.  That's what

23   you said today; correct?

24   A.  Say that again, ma'am.

25   Q.  Today you testified that at the time your mask was pulled

1    away from you, you were wearing that gas mask or a similar gas

2    mask.  I don't know if that's the same one or not.

3    A.  That is the one.

4    Q.  So that's what you said you were wearing, a gas mask;

5    correct?

6    A.  Yes.

7          MS. TAYLOR-SMITH:  Can you pull up Defense Exhibit 6.

8    BY MS. TAYLOR-SMITH:

9    Q.  Do you see what has been marked as Defense Exhibit 6?

10   A.  Yes.

11   Q.  Is this the statement that you gave on or about January

12   the 22nd of 2021?

13   A.  Yes.

14         MS. TAYLOR-SMITH:  Okay.  Can you direct him to

15   page 2, first paragraph, first three lines.  Actually, first

16   four lines.

17   BY MS. TAYLOR-SMITH:

18   Q.  When you spoke to the law enforcement officers on

19   January 22nd, you told them that an unknown male protester

20   grabbed your face mask to pull it off while another male

21   sprayed him [sic].  You were wearing a black cloth mask to

22   prevent COVID-19.

23   A.  Well, I don't know how the agent type it or write it down

24   what I was speaking, but when I say an unknown male, meaning

25   that I don't know that person identity.

1    Q.   Correct.

2    A.   Right.   And then the cloth mask -- I mean, I don't know why

3    he wrote that this way, but I knew that I got sprayed twice

4    that day.   And the first time were with a cloth mask on, and

5    the second time were with that mask on.

6    Q.   Officer [sic] Nguyen, when you're inside the tunnel, you're

7    wearing that gas mask; is that correct?   When you're inside the

8    mouth of the tunnel, you're wearing that gas mask?

9    A.   At what point, ma'am?

10   Q.   Well, let me do this --

11              MS. TAYLOR-SMITH:   Can --

12   A.   To answer your -- your question, no, I did not have it on

13   the whole time.

14   BY MS. TAYLOR-SMITH:

15   Q.   At some point in time, you go back to decontaminate.   And

16   when you come back, you're wearing the gas mask; is that

17   correct?

18   A.   Yes.

19   Q.   And your testimony today is that there was a seal around

20   that gas mask that prevented the gas mask from just moving on

21   its own; right?   It wouldn't just fall off?

22   A.   No.

23   Q.   Okay.   It would have to have been jostled in some way in

24   order for the seal to break; is that correct?

25   A.   Yes.

1    Q.  And there would be no need for you to readjust the face

2    mask while you were wearing it once you had secured it;

3    correct?

4    A.  That's incorrect, ma'am.  Depend on the situation,

5    sometimes you might have to adjust it.

6    Q.  Okay.  Well, let me ask you this:  While you were inside

7    the tunnel prior to your face mask being removed or lifted up

8    by this individual, did you have to adjust your face mask, the

9    gas mask?

10   A.  No, I don't remember doing so.

11   Q.  Because the only reason to adjust the face mask would be if

12   it wasn't on your face properly; correct?

13   A.  Correct.

14            MS. TAYLOR-SMITH:  Your Honor, this document has

15   already been marked and moved into evidence by the government,

16   but it is also a defense exhibit.  It's Defense Exhibit --

17   Court's indulgence -- 206.

18            THE COURT:  And what are you asking me to do?

19            MS. TAYLOR-SMITH:  I'm asking you to mark it for

20   identification purposes at this point --

21            THE COURT:  Okay.

22            MS. TAYLOR-SMITH:  -- as Defense Exhibit 206 as well.

23   It's already been admitted by the government.

24            THE COURT:  Okay.

25            MS. TAYLOR-SMITH:  Can you bring up Exhibit 206 and

1    take it to 16:10:37 and then pause it.  That's fine.

2    BY MS. TAYLOR-SMITH:

3    Q.  Sergeant Nguyen, do you see yourself --

4              MR. GORDON:  Excuse me, Your Honor.  Is it possible

5    when the defense publishes something like this to have it also

6    appear on counsel's screens?

7              MS. TAYLOR-SMITH:  Oh, I'm sorry.  It's here.  I

8    thought it would be there as well.  It's not?

9              THE COURTROOM DEPUTY:  You might have to turn that

10   monitor on on the bottom or on the back.  Is it --

11             MS. TAYLOR-SMITH:  The screen itself is on, but it's

12   not projecting.

13             THE COURTROOM DEPUTY:  Oh.

14             MR. GORDON:  It's cycling between analog and HDMI.

15             THE COURTROOM DEPUTY:  I'll have to call John about

16   that one.  I'm not sure.

17             MR. GORDON:  Okay.  We'll make do.  Thank you.

18             MS. TAYLOR-SMITH:  Counsel, I'm happy to back this

19   monitor up so that.

20             MR. GORDON:  We're good now.

21             MS. TAYLOR-SMITH:  Do you have it on yours?

22             THE COURT:  I just flew on one of those discount

23   airlines.  Perhaps we charge for each monitor separately.

24             (A video recording was played.)

25   BY MS. TAYLOR-SMITH:

1    Q.  Sergeant Nguyen, do you see yourself in this video?

2    A.  I do.

3    Q.  Where exactly are you at this point?

4    A.  So I'm to the left side of the screen.  So you see the two

5    helmet right there.  The one closer to the middle, I'm right

6    next to him to his left against that wall.

7            MS. TAYLOR-SMITH:  Can you now advance it step by

8    step.

9            (A video recording was played.)

10           MS. TAYLOR-SMITH:  Pause it.

11   BY MS. TAYLOR-SMITH:

12   Q.  Sergeant Nguyen, do you see an individual with a gray --

13   light gray, camouflage jacket standing right in front of you?

14   A.  I see a gentleman with the -- with the hat on.

15   Q.  Uh-huh.

16   A.  Yes.

17   Q.  Can you see his arm extended towards you?

18   A.  Can you -- can you replay.

19   Q.  (Nods head.)

20           (A video recording was played.)

21           MS. TAYLOR-SMITH:  Pause it.

22   BY MS. TAYLOR-SMITH:

23   Q.  Do you see his arm moving back away from you at this point?

24   A.  I can't tell, ma'am.

25           MS. TAYLOR-SMITH:  Can you call that out.  Keep

1    pressing forward.

2              (A video recording was played.)

3    BY MS. TAYLOR-SMITH:

4    Q.  Did you see his other arm come from the pillar towards

5    where you are?

6    A.  Yes.  The gentleman with the -- look like a camo --

7    actually, it's blue.  And then he had a camouflage hat on; and,

8    yes, I do see his right arm coming over up top.

9    Q.  Toward you?  That's you right against the wall?

10   A.  Right.  It could be me or could be officer next to me.

11   Q.  Okay.

12   A.  But it's -- it's in that direction, yes.

13   Q.  Okay.

14              MS. TAYLOR-SMITH:  Keep going.

15              (A video recording was played.)

16              MS. TAYLOR-SMITH:  Pause it.

17   BY MS. TAYLOR-SMITH:

18   Q.  Do you see now that it's you?  There's an officer in front

19   of you, and you were wearing the yellow reflective jacket, the

20   closest to the wall.  Do you see yourself?

21   A.  Yes.

22              MS. TAYLOR-SMITH:  Keep going.

23              (A video recording was played.)

24              MS. TAYLOR-SMITH:  Pause.

25   BY MS. TAYLOR-SMITH:

1    Q.  Did you see the individual's hand pull back at this point?

2    A.  One more time, ma'am.

3    Q.  Sure.

4           (A video recording was played.)

5           MS. TAYLOR-SMITH:  Stop.

6    BY MS. TAYLOR-SMITH:

7    Q.  Do you see the individual's hand pulling back from you?

8    A.  Yes.

9    Q.  Okay.  Keep going.

10          (A video recording was played.)

11          MS. TAYLOR-SMITH:  You want to go all the way to 42.

12   No, keep going to 42.

13          (A video recording was played.)

14   BY MS. TAYLOR-SMITH:

15   Q.  Do you see the individual reaching out to you again?

16   A.  Yes.

17   Q.  Okay.  And he's reaching out near where your gas mask is;

18   is that correct?

19   A.  Yeah.  Toward my face, yes.

20          MS. TAYLOR-SMITH:  Okay.  Keep going.

21          (A video recording was played.)

22          MS. TAYLOR-SMITH:  Pause it.

23   BY MS. TAYLOR-SMITH:

24   Q.  Officer Nguyen, when -- I'm sorry.  Sergeant.  I apologize.

25   Sergeant Nguyen, do you see your hand going up towards your gas

1   mask?

2   A.  Yes.

3   Q.  To adjust it?

4   A.  Could be, yeah.

5   Q.  And that's because that person made contact with your face

6   mask?

7   A.  I don't know, ma'am.

8          MS TAYLOR-SMITH:  Your Honor, at this point I would

9   move for the admission of Defense Exhibits 9, 8, and 206.

10         MR. BRASHER:  No objection to 206.  We object to

11   Defense Exhibit 8 and 9.  Foundation.  Hearsay.

12         THE COURT:  Which were 8 and 9?  The 302s?

13         MS. TAYLOR-SMITH:  They were the one -- 302s that

14   Officer [sic] Nguyen testified were his statements.

15         THE COURT:  Okay.  And your objection is hearsay?

16         MR. BRASHER:  Hearsay, yes.

17         THE COURT:  And your response is?

18         MS. TAYLOR-SMITH:  Your Honor, he adopted the

19   statements as his own, and they include prior inconsistent

20   statements, which is an exception to the hearsay rule.

21         MR. BRASHER:  I don't believe the witness adopted

22   these reports.

23         THE COURT:  Okay.  I agree with that.  He said he

24   didn't know why the agent had written it the way he did.

25         MS. TAYLOR-SMITH:  Well, Your Honor, first he said

 1    that they were, in fact, his statements, and then he said I

 2    don't know why it's written that way.  But initially he did

 3    adopt it as his own statement.

 4              THE COURT:  All right.  I'll go look back at the

 5    transcript.

 6              MS. TAYLOR-SMITH:  Can I have now marked for

 7    identification purposes only -- I'm sorry, Your Honor.  This is

 8    a little confusing for me.

 9              THE COURT:  No, that's fine.

10              MS. TAYLOR-SMITH:  I apologize.  -- for

11    identification purposes only Exhibit 212.

12              THE COURT:  212.  Okay.

13              MS. TAYLOR-SMITH:  You can play it.

14              (An audio-visual recording was played.)

15    BY MS. TAYLOR-SMITH:

16    Q.  Officer [sic] Nguyen, at what point during that clip did

17    you actually see Kyle Fitzsimons make contact with your mask?

18    A.  You can't see on the clip, ma'am.

19              MS. TAYLOR-SMITH:  Can you go to 16:11:09 on this

20    clip but don't play it.  I want you to go step by step.

21              I'm sorry, Your Honor, this is Exhibit 1612 [sic].  I

22    would offer Exhibit 1612, which is a portion of Exhibit 206,

23    just a portion of it.  I would offer it into evidence.

24              THE COURT:  And 206 is already in?

25              MS. TAYLOR-SMITH:  That's correct.

```
1                    THE COURT:  Okay.  Any objection?

2                    MR. BRASHER:  What is that number?

3                    MS. TAYLOR-SMITH:  It's -- the exhibit is 212, which

4       is a clip from 206.  I gave you a whole exhibit binder.

5                    MR. BRASHER:  No objection.

6                    THE COURT:  It's admitted.

7                    (Defendant Exhibit 212 admitted into evidence.)

8                    MS. TAYLOR-SMITH:  Thank you.  211 [sic].  Okay.  Can

9       you go step by step.

10                   (A video recording was played.)

11                   MS. TAYLOR-SMITH:  Okay.  Pause it.

12      BY MS. TAYLOR-SMITH:

13      Q.  Sergeant Nguyen, am I correct in -- in stating that this

14      video shows that Mr. Fitzsimons is reaching toward you at the

15      same time an individual behind him is spraying some sort of

16      spray?  Is that -- is that -- did I fairly and accurately

17      depict what's in this frame?

18      A.  Can you replay it.

19      Q.  Sure.

20                   MS. TAYLOR-SMITH:  Go back.  Start at 16 -- yeah.

21                   (A video recording was played.)

22                   MS. TAYLOR-SMITH:  Pause it.

23      BY MS. TAYLOR-SMITH:

24      Q.  Mr. Fitzsimons is reaching toward you when this individual

25      is spraying some sort of spray towards you; is that correct?
```

1    A.  Yes.

2    Q.  Okay.  But your mask is still on your face; correct?

3    A.  Yes.

4    Q.  And he has not made contact with that mask?

5    A.  Yes.

6              MS. TAYLOR-SMITH:  Keep going.

7              (A video recording was played.)

8              MS. TAYLOR-SMITH:  Pause it.

9    BY MS. TAYLOR-SMITH:

10   Q.  And at this point, you see an arm outstretched; is that

11   correct?

12   A.  Yes.

13   Q.  All right.  And would it surprise you if I told you that

14   that was Officer Mustafa Ak's arm outstretched from you?

15   A.  Yes, from the left of the screen.

16   Q.  It wouldn't surprise you?  You know that it is; right?

17   A.  Well, I -- I don't know who arm, but I'm assuming it's an

18   officer arm because it's from our side of --

19   Q.  Of the incident is what you're --

20   A.  Yes.

21   Q.  And you can see that that officer is spraying some sort of

22   chemical spray as well?

23   A.  Yes.

24   Q.  Okay.  But at this point in time, you still have not

25   seen Kyle Fitzsimons make contact with your mask; is that

1    correct?

2    A.  Well, yes.  After the previous clip that you -- you show

3    me, then everything was blocked.

4    Q.  Right.

5    A.  Yes.

6    Q.  So after Kyle was reaching towards you-- correct? -- and

7    while Kyle was reaching towards you, somebody was spraying

8    behind him; correct?

9    A.  Yes.

10   Q.  Okay.  And then the officer started spraying; correct?

11   A.  Yes.

12   Q.  All while Kyle was reaching towards you?

13   A.  Well, at this point you don't know -- you can't see

14   anything right there where I'm at, just the arm.

15   Q.  Okay.

16           MS. TAYLOR-SMITH:  Keep going.

17           (A video recording was played.)

18           MS. TAYLOR-SMITH:  All right.  Pause it.

19   BY MS. TAYLOR-SMITH:

20   Q.  Did you see that the arm that Mr. Fitzsimons had

21   outstretched towards you is now bent?

22   A.  It was bent, but then it stretch out again.

23           MS. TAYLOR-SMITH:  Okay.  Keep going.

24           (A video recording was played.)

25           MS. TAYLOR-SMITH:  Pause it.

1      BY MS. TAYLOR-SMITH:

2      Q.  You would agree with me that at this point in time you

3      still have not seen Mr. Fitzsimons make contact with your mask;

4      is that correct?

5      A.  Yeah, not from the video, ma'am.

6      Q.  Okay.  And you were sprayed; correct?

7      A.  I mean, the spray going on for a long time, so it --

8      Q.  You said it was going on for a long time?

9      A.  Yes.

10     Q.  Okay.  Well, we just moved from 16:11:10 to 16:11:10 -- I

11     mean, from 16:11:10 to 16:11:11.  That's one second.

12     A.  Well, I'm talking about the whole time that he was

13     spraying.

14             MS. TAYLOR-SMITH:  Keep going.

15             (A video recording was played.)

16             MS. TAYLOR-SMITH:  Pause it.

17     BY MS. TAYLOR-SMITH:

18     Q.  We just went from 16:11:10 to 16:11:12; correct?  Correct?

19     A.  Yes.

20     Q.  I'm sorry.  You have to say yes or no because --

21     A.  Yes.

22     Q.  And you've seen Mr. Fitzsimons' hand up against the wall

23     from 16:11:11 to 16:11:12; correct?

24     A.  Yes.

25     Q.  And, clearly, he's not grabbing your mask at that point?

```
 1    A.  Not -- not right now, yes.

 2            MS. TAYLOR-SMITH:  Okay.  Keep going.

 3            (A video recording was played.)

 4            MS. TAYLOR-SMITH:  Can you play at normal speed.

 5            (A video recording was played.)

 6            MS. TAYLOR-SMITH:  Can you show him exhibit --

 7         Your Honor, I would now mark for identification purposes

 8    only as Exhibit 214.  214.

 9            THE COURT:  Okay.

10            MS. TAYLOR-SMITH:  It's smaller.  Go ahead and play

11    it.

12            (A video recording was played.)

13    BY MS. TAYLOR-SMITH:

14    Q.  Can you see that Officer [sic] Nguyen?

15    A.  Yes.

16    Q.  Okay.

17            (A video recording was played.)

18    A.  It's small on my screen.

19    BY MS. TAYLOR-SMITH:

20    Q.  I know.  It's small on mine too.

21    A.  Okay.  All right.

22            MS. TAYLOR-SMITH:  Pause it.

23    BY MS. TAYLOR-SMITH:

24    Q.  So at 16:11:07, you can see Mr. Fitzsimons reach out toward

25    you; correct?
```

```
 1    A.  Yes.

 2    Q.  But not making contact with your face mask -- I mean

 3    your gas mask.  I know it's small, but you've seen this

 4    already.

 5    A.  I believe at that point -- it look like I have my left --

 6    left hand up.

 7    Q.  Right.  And so he's making -- almost making contact with

 8    your hand.

 9              MS. TAYLOR-SMITH:  Keep playing it.

10              (A video recording was played.)

11    BY MS. TAYLOR-SMITH:

12    Q.  Is that correct, Officer [sic] Nguyen?  He's almost --

13    A.  Yes.

14    Q.  -- making contact with your hand?

15    A.  Right.

16              MS. TAYLOR-SMITH:  Okay.  Can you pause it.

17    BY MS. TAYLOR-SMITH:

18    Q.  Officer Nguyen, I'm sorry.  I think I may have been

19    speaking over you.  And I know the stenographer --

20    A.  Yes, he did make contact with my hand.  Then he pull his

21    hand back, and now you can see that now his hand is making

22    contact with my face.

23    Q.  Are you sure?  Because you've already seen this video.

24    A.  Well, at least from this angle, it look like it's making

25    contact with my face, ma'am.
```

1    Q.  Okay.  You had a face shield on?

2    A.  I do have a face shield on my helmet.  I can't tell whether

3    it's on or it's up at that point.

4            MS. TAYLOR-SMITH:  Keep playing it.

5            (A video recording was played.)

6    BY MS. TAYLOR-SMITH:

7    Q.  Can you see now that he did not make contact with your gas

8    mask?

9    A.  So his -- his hand went away, and then now it's back to

10   where my face is.

11   Q.  Right.  But still not making contact with your gas mask;

12   correct?

13   A.  I -- I really can't tell, ma'am.

14   Q.  Okay.

15           MS. TAYLOR-SMITH:  Can we show Officer [sic] Nguyen

16   207.

17       Your Honor, I'll mark now for identification purposes

18   only at 207, 208, 209, and 210, which are still photographs of

19   the video 206.

20           THE COURT:  Okay.

21           MS. TAYLOR-SMITH:  Your Honor, I would offer them

22   into evidence.

23           MR. BRASHER:  No objection.

24           THE COURT:  They're admitted.  So that was 207.

25           MS. TAYLOR-SMITH:  I'm sorry, Your Honor.  It's 207,

1    208, 209, 210.

2            THE COURT:  Okay.  They're admitted.

3            (Defendant Exhibit 207, 208, 209, and 210 admitted

4    into evidence.)

5    BY MS. TAYLOR-SMITH:

6    Q.  You can see in this -- so, Officer -- I'm sorry.  I'm so

7    sorry.  Sergeant Nguyen, in photograph -- or Exhibit 207, you

8    can see at 16:11:12 someone is spraying you or spraying;

9    correct?

10   A.  Yes.

11   Q.  Okay.  And Mr. Fitzsimons has one hand around the column

12   and the other hand on the wall.  Is that what we see in this

13   photograph?

14   A.  Yes, ma'am.  You can't -- you can't see his right hand, but

15   his left hand is on the column, yes.

16   Q.  Okay.  Neither one of those hands are touching your mask;

17   is that right?

18   A.  No, ma'am.

19            MS. TAYLOR-SMITH:  Can you show him 208.

20   BY MS. TAYLOR-SMITH:

21   Q.  And this is just a closer view of the last photograph; is

22   that correct?

23   A.  Yes.

24            MS. TAYLOR-SMITH:  Can you show him 209.

25   BY MS. TAYLOR-SMITH:

1    Q.  And then this is 16:11:09.  You can see that

2    Mr. Fitzsimons' hand is outstretched; correct?

3    A.  Yes.

4    Q.  And you can see that your gas mask is on your face; is that

5    correct?

6    A.  Yes.

7    Q.  And Mr. Fitzsimons is not making contact with your gas

8    mask; is that correct?

9    A.  Not in this photo, yes.

10             MS. TAYLOR-SMITH:  Can you show him 210.

11   BY MS. TAYLOR-SMITH:

12   Q.  Again, you see Mr. Fitzsimons reaching out; correct?

13   A.  Yes.

14   Q.  Your gas mask is still on your face?

15   A.  Yes.

16   Q.  And Mr. Fitzsimons has not made contact with you?

17   A.  Not in this photo.

18             MS. TAYLOR-SMITH:  You can take that down.

19   BY MS. TAYLOR-SMITH:

20   Q.  Sergeant Nguyen, is it fair to say that your recollection

21   of the events of January 6th were fresher in your mind in, say,

22   March of 2021 than they might be today?

23   A.  It could be, yes.

24   Q.  And when you met with law enforcement officers in January

25   and in March of 2021, that was before you had started watching

1    videos; is that right?

2    A.  Yes.  I -- I believe the video don't -- wasn't available

3    until later on, yeah.

4    Q.  And before you started watching videos, you described the

5    individual who pulled your face mask as a white male with a

6    light gray jacket on; correct?

7    A.  Yes.

8    Q.  At that point in time, nobody had even mentioned the name

9    of Kyle Fitzsimons to you in January or March of 2021; right?

10   A.  No, ma'am.

11           MS. TAYLOR-SMITH:  Court's indulgence.  Your Honor, I

12   need to check on one thing.  I think I'm done.

13        Your Honor with that, my examination is concluded.

14           THE COURT:  Okay.  Thank you.  Mr. Brasher, how long

15   might you foresee your redirect being?

16           MR. BRASHER:  Three minutes max.

17           THE COURT:  Okay.  Go ahead.

18                     REDIRECT EXAMINATION

19   BY MR. BRASHER:

20   Q.  Sergeant Nguyen, was it -- is it difficult to identify

21   exactly what's happening in a video frame by frame?

22   A.  It does.

23   Q.  But you were there that day; is that correct?

24   A.  Correct.

25   Q.  And is it your testimony that you felt the seal break on

1    your gas mask?

2    A.  Yes.

3    Q.  And that it was the individual that you've identified in

4    that white jacket who did that?

5    A.  Yes.

6    Q.  On that gas mask, is that canister -- the filter canister,

7    does it -- is it centered?

8    A.  No, sir.  It's -- if I put it on, it's -- it's to my -- the

9    left side of my face a bit.

10   Q.  And these pictures we've been showing, they all show you

11   from the right side; is that correct?

12   A.  Correct.

13   Q.  If we just look at Government's Exhibit 211A, page 6.  I'm

14   going to zoom in on this.  Does that show the individual's hand

15   underneath your face shield?

16          MS. TAYLOR-SMITH:  Objection.

17          THE COURT:  You can answer.

18   A.  Yes.  It's up here, like it's underneath my face shield.

19   BY MR. BRASHER:

20   Q.  And from that view, is the canister on your gas mask to the

21   left of his hand?

22   A.  To -- from -- from my point --

23   Q.  From your perspective.

24   A.  From my perspective, to the left, yeah.

25   Q.  Was your gas mask jostled, or was it pulled away from your

1    face?

2    A.   It was -- it happened really quick, and you can -- you can

3    see from the video, the spray lasted about 3 to 4 second, but

4    it was a -- a quick grab and let go.  It's -- you know, when we

5    slow the -- when we slow down the video, it appear that it's

6    going on for a long time.  But the -- the reason why I say the

7    spray is long because for us, you know, when -- not in this --

8    on January 6th.  But when dealing with a suspect, we do a

9    burst -- a quick burst of OC spray.  So when I see that the --

10   that the person is pressing it down, just keep on going, to me

11   that's a long spray.

12        But when we slow down the video, it look like it

13   happened over a long period of time, but in reality, this

14   happened in second or millisecond.  And it just happened so

15   quick.

16   Q.   As a result of what happened, did that interfere with your

17   ability to continue doing your job?

18   A.   Yes.

19        MR. BRASHER:  And lastly, Your Honor, if it would

20   assist the Court, I'd ask the witness to actually put on the

21   gas mask so the Court can see what it looks like on the

22   witness.

23        THE COURT:  Sure.

24   BY MR. BRASHER:

25   Q.   Go ahead and put that on, please.

 1    A.   (Witness complies.)

 2    Q.   And if you were to move your head around, does it still

 3    stay secure?

 4         I can't hear you, can -- now you can take it off.

 5         Okay.  So when you moved your head around like that, did

 6    it stay secure on your face?

 7    A.   Yes.

 8    Q.   And about how far out does that filter canister protrude

 9    when you're wearing it, from your actual face?

10    A.   I mean, it protrude, I say, like, 4 to 5 inches, maybe.

11              MR. BRASHER:  Nothing else, Your Honor.

12              THE COURT:  All right.

13              MS. TAYLOR-SMITH:  Your Honor, just briefly --

14              THE COURT:  Sure.

15              THE COURT REPORTER:  I'm sorry.  I can't hear you.

16              MS. TAYLOR-SMITH:  I'm sorry.  Just very briefly, and

17    could you leave up Exhibit 211A, please.

18              THE COURT:  Okay.  Go ahead.

19              MS. TAYLOR-SMITH:  Where it is now.  That's fine.

20                        RECROSS-EXAMINATION

21    BY MS. TAYLOR-SMITH:

22    Q.   Sergeant Nguyen, you're still looking at 211A; is that

23    correct?  Are you still looking at the photograph?

24    A.   Yes.  Yes.

25    Q.   Okay.  And you can see Mr. Fitzsimons' arm outstretched; is

1     that correct?

2     A.  Yes.

3     Q.  You can see that his fingers are curved towards himself; is

4     that -- is that a fair and accurate depiction of what I'm

5     seeing?

6     A.  Towards himself?

7     Q.  Uh-huh.  Yep.  His fingers.  Not the hand.  But his

8     fingers.

9     A.  From the photo, it look like it extended to me, ma'am.

10    Q.  You said that it looks like it's extended?

11    A.  The finger extended, yes.

12    Q.  All right.  Let me ask you this:  In order to grab your

13    face mask, an individual -- the face mask is bigger than a hand

14    or as big as an adult male's hand; correct?

15    A.  Right.

16    Q.  So in order to grab that face mask, you basically have to

17    palm it; is that fair to say?

18    A.  Well, I mean, I never grab a face mask before.  So it's --

19    it's hard for me to -- to answer your question.

20    Q.  Okay.

21    A.  But if you ask for my opinion, that I can give you my

22    opinion, of how to grab it, but for me, I never have to do

23    that.  And so I don't know how to answer your question.

24    Q.  You testified that in this photograph you see

25    Mr. Fitzsimons' hands up under your face shield; is that

1    correct?

2    A.  Yes.

3    Q.  Can you see his fingers and where his fingers are laying?

4    Aren't they on top of your face shield?

5    A.  No, ma'am.  From -- from the -- from the -- this angle of

6    this photo, it look like it's under my face shield or maybe to

7    the side of it from this angle.  I mean, you can see the

8    outline of my face shield, and then you can see that his hand

9    is under it.  The fingers are under it --

10   Q.  Well --

11   A.  -- maybe to the side.  It look --

12   Q.  I'm sorry.  I apologize.

13        When I say "under," I mean closer to your face than the

14   face shield.  I don't mean actually under in terms of

15   proximity.  So, for example, in this video I can see your face

16   shield; is that correct?

17   A.  Yes.

18   Q.  Okay.  And then if I went down vertically, you can see his

19   fingers; is that right?

20   A.  Yes.

21   Q.  But his fingers are not up under your face shield?

22   A.  No, ma'am, it's not up and under, like inside my face

23   shield, no.

24   Q.  Oh, okay.  Okay.  And even in this photograph, you can't

25   see Mr. Fitzsimons making contact with your gas mask?

1    A.   No.  I mean, I can -- I can see that it touching my -- make

2    contact with my -- my -- my face area, but I can't see the face

3    mask in this picture.

4             MS. TAYLOR-SMITH:  I don't have anything further.

5             THE COURT:  All right.  Thank you, Sergeant.

6             MR. BRASHER:  I have nothing further.

7             THE COURT:  Thank you, Sergeant.  You're excused.

8             THE WITNESS:  All right.  Thank you, Your Honor.

9    Thank you, all.

10            THE COURT:  We're going to take a ten-minute break.

11            (Recess taken.)

12            THE COURT:  Do we have everybody?

13            MR. GORDON:  Yes, sir.

14            THE COURT:  All right.  Call your next witness.

15            MR. GORDON:  The United States calls Aisha Woodward.

16            THE COURTROOM DEPUTY:  Good afternoon, ma'am.  Can

17   you please step into the box behind the plexiglass and raise

18   your right hand.

19            (Oath administered.)

20            THE WITNESS:  Yes.

21            THE COURTROOM DEPUTY:  Thank you, ma'am.

22            THE COURT:  Go ahead.

23                           DIRECT EXAMINATION

24   BY MR. GORDON:

25   Q.  Good afternoon, Ms. Woodward.

1    A.   Hi.

2    Q.   Ma'am, are you employed?

3    A.   Yes.

4    Q.   And by whom are you employed?

5    A.   Congressman Jared Golden.

6    Q.   What do you do for Congressman Golden?

7    A.   I'm his chief of staff.

8    Q.   Can you describe, sort of briefly, your professional life,

9    how you came to have your current job.

10   A.   Yeah.  I started working in Maine politics around 2012 on

11   then-Governor Angus King's first run for Senate.  When he was

12   elected, I came to Washington to work for him as a legislative

13   assistant and then helped run his reelection in 2018 and then

14   took this job with the congressman when he was elected in 2018.

15   Q.   And how long have you been in your current job?

16   A.   Three and a half years.

17   Q.   As the chief of staff that entire time?

18   A.   Yep.

19   Q.   And just to be clear, Ms. Woodward, before we go any

20   further, are you appearing to testify today under a subpoena?

21   A.   I am, yes.

22   Q.   And so are you, thus, required to be here and provide this

23   testimony whether you want to or not?

24   A.   Correct.  Yes.

25   Q.   Now, Ms. Woodward, can you briefly describe what your job

1   duties are as Congressman Golden's chief of staff.

2   A.   Sure.   I manage his staff of about 17 permanent staffers

3   between Maine and D.C.   We have three offices in the

4   congressional district and one here at the Capitol.

5   Q.   And which congressional district is that?

6   A.   It's Maine's 2nd Congressional District.

7   Q.   And how many congressional districts are there in Maine?

8   A.   Two.

9   Q.   Who represents the 1st Congressional District in Maine?

10  A.   Chellie Pingree.

11  Q.   You said there are three offices for the congressman in

12  Maine and a fourth office in Washington?

13  A.   Correct.

14  Q.   Where are the three offices in Maine?

15  A.   Lewiston, Maine; Bangor, Maine; and Caribou, Maine.

16  Q.   Is the town of Lebanon, Maine, within Congressman Golden's

17  district?

18  A.   It is not.

19  Q.   Who represents the town of Lebanon, Maine?

20  A.   Chellie Pingree.

21  Q.   You said as the chief of staff, you manage approximately

22  17 permanent staff.   Are there nonpermanent staff for the

23  congressman?

24  A.   Yeah.   We'll often have interns, usually three or four, at

25  a given time.

1   Q.  And do those interns work in the Maine field offices or in

2   the D.C. office or both?

3   A.  Both.

4   Q.  Is it a total of three to four across all four offices or

5   in each office?

6   A.  Three to four total, usually, yeah.

7   Q.  Do you supervise the interns?

8   A.  By extension, but not directly, yeah.

9   Q.  I mean, you supervise people who supervise them?

10  A.  Exactly, yeah.

11  Q.  As part of your duties as the chief of staff, do you

12  directly interact with constituents?

13  A.  I do sometimes, yep.

14  Q.  Do other members of your staff do that as well?

15  A.  Yep.  All the time.

16  Q.  If members of -- well, if anybody wants to contact

17  Congressman Golden, can they do so?

18  A.  Yeah.

19  Q.  How do they do that?

20  A.  They can call us, any of our offices that we listed out.

21  They can email us through our web page.  They can send us snail

22  mail.  Yeah.

23  Q.  And how do people know what number to call or what email

24  address to use or what snail mail address to use to contact the

25  congressman?

1    A.  All of that's listed on our website publicly and also in a

2    congressional directory.

3    Q.  And those are publicly available to anyone who wants to

4    view them?

5    A.  Yep.  Correct.

6    Q.  What if somebody who isn't a constituent, like, for

7    example, a resident of Lebanon, Maine, who wants to contact

8    Congressman Golden, can they do that?

9    A.  Uh-huh, yep.

10   Q.  Do you treat contacts from nonconstituents differently than

11   you do contacts from constituents?

12   A.  We answer all the phone calls that we get, but our

13   obligation to respond to those outreach -- for example, if

14   people want a letter from the congressman, we -- we direct all

15   that work only to constituents.

16   Q.  Now, I'd like to show you on -- it's going to come up on

17   the screen in front of you -- a photograph that's been

18   electronically marked for identification as Government's

19   Exhibit 609.  Do you see it on your screen?

20   A.  I do, yeah.

21   Q.  Do you recognize the person depicted in Government's

22   Exhibit 609?

23   A.  Yeah.  That's Congressman Golden.

24   Q.  Your boss?

25   A.  Yes.

1    Q.  Thank you.

2            MR. GORDON:  Your Honor, at this time the government

3    submits 609 into evidence.

4            MS. TAYLOR-SMITH:  No objection.

5            THE COURT:  It's admitted.

6            (Government Exhibit 609 admitted into evidence.)

7    BY MR. GORDON:

8    Q.  Now, you mentioned that there are a variety of ways to

9    contact the congressman, including one of them by phone?

10   A.  Uh-huh.

11   Q.  Are those phone lines answered by human beings; or by a

12   computer or robot, essentially?

13   A.  Human beings, between normal working hours, 8:30 to 5:00.

14   Q.  What if somebody calls after hours or on a weekend?

15   A.  They'll receive a voice mail message, and they can leave us

16   a voice mail, which we'll then check the following day,

17   usually.

18   Q.  And how about on holidays or times when the office is

19   otherwise closed?

20   A.  Same deal.  If we're closed for an extended period of time,

21   like more than two days over a weekend, we'll -- we'll check

22   them periodically over that window.

23   Q.  So if someone calls after hours or on a holiday or when the

24   office is closed or any of those examples you just gave and

25   they get the voice mail system --

1    A.  Uh-huh.

2    Q.  -- do they have an unlimited period of time to talk on the

3    voice mail or does it cut them off at some point?

4    A.  I don't know, actually.  Yeah.

5    Q.  Okay.  If they leave a voice mail, what happens next from

6    your office's procedures?

7    A.  We -- the system that we use -- that I think all House

8    offices use -- connects our phone system to our email.  So

9    there's a specific email account for all the voice mails our

10   offices receive.  A copy of that voice mail will be sent to

11   that email account as an MP3 file, typically, and there's a

12   rough transcript that's automated that accompanies the audio

13   file.

14   Q.  Is there one email box that all four offices, the three in

15   Maine and the one in D.C., they all four dump into, or does

16   each office have its own email box?

17   A.  I believe it's one per office, yeah.

18   Q.  Do you or any staffers get some sort of alert when a

19   voice -- a new voice mail comes in, or is it only listened to

20   at the time when someone proactively checks the box at some

21   point?

22   A.  The latter.  You'll -- I don't think we get alerts.  You go

23   and, sort of, intentionally listen to all the voice mails.

24   Q.  Is that somebody's job every day to check the voice mailbox

25   and listen to the voice mails?

1    A.  Yep.  Yes.

2    Q.  Is it your job?

3    A.  No.

4    Q.  Why not?

5    A.  We have 17 people in the team, and they're -- I have a lot

6    of other things usually going on; so I'm typically not the

7    person to do this.

8    Q.  So fair to say you have bigger fish to fry?

9    A.  Usually, yes.  Yeah.

10   Q.  If a voice mail comes in and a staffer listens to that

11   voice mail, do they have -- what do they do when they listen to

12   it?

13   A.  As we do for anything, a voice mail or any sort of

14   outreach, if it's a constituent, we'll log the contact in a

15   software system that we used to manage constituent

16   correspondence.  And we'll indicate the name of the person,

17   where they're calling from, and what they were calling about,

18   and then indicate whether or not it requires follow-ups.

19        So sometimes we get calls where people just want to

20   register their opinion about legislation.  Other times people

21   want a response from the congressman on an issue or need help

22   with a federal agency.  So kind of what they're asking

23   determines what happens after that.

24   Q.  Is the same staff member who listens to the voice mail then

25   responsible for logging that voice mail in the database you

1    just described?

2    A.  Yes.  Typically, yes.  Yeah.

3    Q.  Is the same staff member responsible for doing whatever the

4    follow-up is?

5    A.  Not always.  It depends on what the follow-up is.

6    Q.  What if a nonconstituent leaves a voice mail and registers

7    an opinion about something?  Do you log that?

8    A.  Usually not, unless there's a reason to do so, like we need

9    to note that it's a person who's a frequent caller who's

10   harassing our office or something and we want to create a log

11   of it.  But, typically, if they're not a constituent, we won't

12   record it.

13   Q.  Are there any voice mails that get directed to you,

14   someone -- when the staff member listens to it, they then

15   forward it and say:  Ms. Woodward, you should listen to this

16   one?

17   A.  Uh-huh.  Yeah.  If it's someone of note that they want me

18   to be aware of or if it's a concerning message that they feel

19   like we should elevate in some way or they want to know what we

20   should do with, then it will get sent to me and a couple of my

21   other senior colleagues.

22   Q.  So I'd like you to focus for a bit on just those types of

23   messages, the ones deemed concerning.

24   A.  Sure.

25   Q.  So if a staff listened to a message, what might be the

1   type of concern that would cause the message to be elevated to

2   you?

3   A.  It's usually one of a couple of different scenarios.  One

4   might be a direct or implied threat to the congressman or his

5   family, or our staff or offices.  Another situation might be if

6   the person seems to be in any sort of distress and suggesting

7   they're going to harm someone else or themselves.

8   Q.  Now, focusing on the ones that deal with direct or implied

9   threats to the congressman or his family, or perhaps any of the

10  staff, do you or someone else in the office train staff on how

11  to recognize threats or implied threats?

12  A.  We do, although I think it's usually pretty

13  straightforward.  It's kind of you know it when you see it.

14  Q.  Are your staff trained to err on the side of caution and

15  elevate anything that might be construed as a threat?

16  A.  Yeah.  That's correct.

17  Q.  Why do they send those to you?

18  A.  Usually, it's either me or two of my colleagues who are in

19  more senior roles in the congressional district who have helped

20  make the determination, having heard thousands of voice mails

21  over time, about whether or not it's something that causes

22  concern for us.  And if -- if so, then we make a decision about

23  whether or not it needs to be shared with the Capitol Police.

24  Q.  Okay.  So is that -- is that the next step?  If you get

25  forwarded -- so a staff member hears a message.  It sends up a

1    red flag for the staff member.  They forward it to you and say:

2    Ms. Woodward, I think you should listen to this one.  You

3    listen to it and think, you're right, this is a direct or

4    implied threat.  What do you do?  Do you then investigate

5    yourself?

6    A.  No.  No.  There's a specific, I think, unit or line within

7    the Capitol Police that deals specifically with threats.  So

8    we'll then forward the message to them and ask them to look

9    into it, basically.

10   Q.  And from your perspective, what happens from there?  Once

11   you provide the message to the Capitol Police, what -- what do

12   you do?

13   A.  Really, nothing, unless there's additional, like, contact

14   and -- and we haven't heard back from the Capitol Police, but

15   they're usually very good about getting back to us within a

16   day.

17   Q.  Now, are you familiar with the name Kyle Fitzsimons?

18   A.  Yes.

19   Q.  And why are you familiar with that name?

20   A.  I'm familiar because he left voice mail for our office,

21   and I read the news and understand the circumstances of this

22   trial.

23        MS. TAYLOR-SMITH:  I'm sorry, Your Honor.  Can we

24   have the witness speak up a little louder.

25        I can't -- I can't hear you.

1           THE WITNESS:  Sure.

2           THE COURT:  Okay.  You did trail off a little bit at

3      the end there, so.

4           THE WITNESS:  Yeah.  Sorry.  I -- we received voice

5      mails from Mr. Fitzsimons, and also I follow the news, and I'm

6      aware of the charges against him.

7      BY MR. GORDON:

8      Q.  Ms. Woodward, I'm going to ask you, would you take that

9      microphone in front of you and just bend -- it's bendy.  So if

10     you'll bend it down closer to your mouth.

11     A.  Yeah.

12     Q.  Or whatever works.

13     A.  I can lean forward too.

14     Q.  Great.  Thanks.

15          In terms of -- you said Mr. Fitzsimons has left messages

16     for your office.  When did he leave messages for your office?

17     A.  Primarily in December of 2020.

18     Q.  And as -- in general, can you -- how many messages did he

19     leave for your office?

20     A.  I'm aware of three voice mails.

21     Q.  Were any of those voice mails ones that were elevated to

22     you from a staff member who listened to them because they

23     thought you needed to hear them?

24     A.  Yes.  Yeah.  The third of the three voice mails, which was

25     left on December 29th, around 4:00 or 5:00 p.m., was elevated

1   to me and our district director.  The person who listened to

2   the voice mail is one of the three who is, sort of, empowered

3   to already forward things to Capitol Police without clearing;

4   so she did that and copied us on the message.

5   Q.  And why did she forward it to the Capitol Police?

6           MS. TAYLOR-SMITH:  Objection as to why she did

7   something.  She is not here.

8           THE COURT:  To the extent you know.

9   A.  My understanding and --

10          THE COURT:  Your understanding based on what?

11          THE WITNESS:  Based on having spoken with the staffer

12  and --

13          MS. TAYLOR-SMITH:  Objection.  Hearsay.

14          THE COURT:  Okay.  Finish what you were going to say.

15          THE WITNESS:  Okay.  My understanding based on the

16  staffer's analysis and my own having listened to the voice mail

17  at the time was that the voice mail both had a bit of an

18  implied threat in it to the congressman and also indicated that

19  the person calling was in some sort of distress and might also

20  harm themselves.

21  BY MR. GORDON:

22  Q.  Did you listen to the voice mail yourself?

23  A.  I did.

24  Q.  Did you make that same assessment that the voice mail

25  contained an implied threat?

1    A.  Yes.

2    Q.  If you had been the original listener to that voice mail,

3    would you have forwarded it to the Capitol Police yourself?

4    A.  Yes.

5    Q.  In general, can you characterize the topic of the voice

6    mail.

7    A.  Yes.  It was around the planned convening of Congress on

8    January 6th to certify the results of the 2020 election,

9    requesting that the congressman object to that certification;

10   indicating that the caller, Mr. Fitzsimons, was distressed

11   about the certification and wanted the congressman to object

12   and would be coming to Washington on the 6th.

13   Q.  What's threatening about that?

14   A.  The language he used in the voice mail indicated that he

15   was willing to object with his life, which was concerning, and

16   just -- it's an unusual thing for us to get a message from

17   someone saying they're coming to Washington with this specific

18   purpose and to -- to potentially -- yeah, it was just unusual

19   and concerning.

20        And we had been, obviously, following the news at the

21   time and knew that there were pushes online for people to come

22   to the Capitol on January 6th, and it was already -- I think

23   had been suggested to staff to be cautious about whether or not

24   people came into work that day, et cetera.  So it, sort of, was

25   in the context of that that we thought that it was worth

1    sharing with the Capitol Police.

2    Q.  Why were staff advised not to work in the office on

3    January 6th?

4    A.  There had been news reports of potential protests, and it's

5    not totally unusual for the Capitol security to recommend,

6    given that -- the staff might want to consider telework if it's

7    going to be, potentially, physically difficult to access parts

8    of the Capitol complex.  So it was in that light, I think, that

9    the recommendation was suggested.

10   Q.  Besides some concerns about, sort of, convenience of

11   accessing the building, were there concerns about violence?

12            MS. TAYLOR-SMITH:  Objection.  Leading.

13            THE COURT:  You can answer.

14   A.  I don't recall if violence was something that was suggested

15   by the Capitol Police explicitly in giving that guidance.

16   BY MR. GORDON:

17   Q.  Were you concerned by violence?

18   A.  I wasn't necessarily concerned about violence, but I was

19   concerned that it could be just challenging and we'd like to

20   err on the side of caution, I guess, yeah.

21   Q.  Did Congressman Golden have any specific role with respect

22   to January 6th or -- or events in Congress on January 6th?

23   A.  As a member of Congress, yes, he's -- you know, would vote

24   to certify the election.  That's part of his official duties.

25   Q.  Can you explain that?

1    A.  Yeah.  It's, I think, laid out in federal law that Congress

2    convenes on the 6th to certify the election, convenes at

3    1:00 p.m.  There's a whole, sort of, ceremonial process around

4    that, at the end of which the members vote to certify.

5    Q.  Is that an official convening of Congress?

6    A.  Yeah.

7    Q.  Okay.  And is it one that the congressman casts an official

8    vote at?

9    A.  Yeah.

10   Q.  Is it recorded in the Congressional Record?

11   A.  Yeah.

12   Q.  Now, the voice mail that was forwarded to the

13   Capitol Police, have you listened to it in the time since then?

14   A.  I have, yes.

15   Q.  And is the recording that you listened to previously, is it

16   a fair and accurate recording of the voice mail that was left

17   in December of 2020?

18   A.  Yes.

19            MR. GORDON:  Your Honor, at this time the

20   United States submits Government's Exhibit 610 into evidence.

21            MS. TAYLOR-SMITH:  No objection.

22            THE COURT:  It's admitted.

23            (Government Exhibit 610 admitted into evidence.)

24            MR. GORDON:  Your Honor, permission to publish at

25   this time --

```
1              THE COURT:  You may.

2              THE COURTROOM DEPUTY:  The public line is off.

3              THE COURT:  Hold on one second, Counsel.

4          All set, Tanya?

5              THE COURTROOM DEPUTY:  (Nods head.)

6              THE COURT:  Go ahead.

7              MR. GORDON:  Thank you, Your Honor.

8          Now publishing Government's Exhibit 610.

9              (An audio recording was played.)

10     BY MR. GORDON:

11     Q.  Ms. Woodward, did the words themselves in this call concern

12     you or feel threatening to the congressman?

13     A.  Sorry.  Can you repeat the question.

14     Q.  Did the words used by Mr. Fitzsimons in this call concern

15     you or feel threatening to the congressman?

16              MS. TAYLOR-SMITH:  Objection.  Relevance.

17              THE COURT:  You can answer.

18     A.  They were concerning with regard to the indication of being

19     willing to object to, I think he says, the rest of his entire

20     life and the comment at the end about coming to Washington on

21     the 6th.

22     BY MR. GORDON:

23     Q.  How about the tone?  Was there anything about the tone that

24     you found concerning?

25     A.  Yeah.  The tone seemed kind of menacing and the pauses --
```

1          MS. TAYLOR-SMITH:  Objection, Your Honor.

2          THE COURT:  You can continue.

3    A.  The -- the pauses, I think, also just -- it sort of felt

4    intense in a way, I guess.

5    BY MR. GORDON:

6    Q.  You had mentioned earlier that voice mails are forwarded

7    sometimes if there's threat to the congressman but also

8    sometimes if you feel that a person themselves is a threat to

9    themselves or others, not the congressman specifically.  Was

10   that part of the threat assessment in this voice mail, or no?

11   A.  Yes.

12   Q.  Can you explain why?

13   A.  Because of the words he uses around the willingness to

14   object to the rest of his life.  It felt more than just a

15   threat about coming to Washington.  It felt like this person

16   might, you know, be in some sort of distress or is willing to

17   take significant steps in support of the cause.

18   Q.  Were any other voice mails from Kyle Fitzsimons forwarded

19   to the Capitol Police for concerns about threats to the

20   congressman or others?

21   A.  No.

22   Q.  In the time since January 6th, have you become aware of the

23   charges against Mr. Fitzsimons?

24   A.  Yes.

25   Q.  When did you first become aware of those charges?

1   A.  I think around April of 2021.

2   Q.  And at that time did you make a connection between

3   Mr. Fitzsimons and Maine or your job specifically?

4   A.  Yes.  It was reported around that time that the voice mail

5   in question was in possession of the government, and that was

6   when I first became aware of our -- our, sort of, loose

7   connection to it, yeah.

8   Q.  When you did become aware of it, did you do anything to,

9   kind of, further investigate Mr. Fitzsimons' relationship with

10  your office?

11  A.  Yeah.  I -- it prompted myself and another member of our

12  staff to go back and try to determine if we had had any

13  additional outreach.

14  Q.  And have you had additional outreach?

15  A.  And -- yeah.  That's when we discovered one voice mail that

16  had been left a couple minutes before this current voice mail

17  in question.  Same day.  Just a couple minutes before.

18  Q.  And just to be clear, what day was that?

19  A.  December 29th, 2020.

20  Q.  And you said the one we just listened to was approximately

21  4:05 in the afternoon?

22  A.  Yes.

23  Q.  So this other voice mail that you went back and found --

24  A.  Yeah.

25  Q.  -- when was that message left, approximately?

1    A.   4:03.

2    Q.   Was that message -- you said that message was not forwarded

3    to the Capitol Police?

4    A.   Correct.

5    Q.   Have you since listened to that message?

6    A.   I have.

7    Q.   If you had been the original staff member hearing that

8    message on the voice mailbox, would you have decided to forward

9    that first message to the Capitol Police as well?

10             MS. TAYLOR-SMITH:  Objection.

11             THE COURT:  Are you going to try to introduce that

12   other message?

13             MR. GORDON:  I am, Your Honor.

14             THE COURT:  All right.  Go ahead and answer.

15   A.   Yes.

16   BY MR. GORDON:

17   Q.   And why is that?

18   A.   It, similarly, indicates that Mr. Fitzsimons was coming to

19   Washington and says something about maybe he will see the

20   congressman while he's there, and so it -- it felt threatening.

21   It didn't have the element of also suggesting harm to himself,

22   which I think is why the second voice mail was the one that our

23   staff flagged, but.

24   Q.   So I understand you correctly, that you -- the first voice

25   mail, the one we haven't heard yet --

1    A.  Uh-huh.

2    Q.  -- is one that you thought contained a threat to the

3    congressman only?

4    A.  Correct.

5    Q.  But the second one contained a threat to the congressman

6    and/or Mr. Fitzsimons himself?

7    A.  Correct.

8           MR. GORDON:  Your Honor, the first voice mail is

9    premarked for identification as -- or electronically premarked

10   for identification as Government's Exhibit 611.  The

11   United States offers at this time.

12          THE COURT:  The one we've already listened to?

13          MR. GORDON:  No, Your Honor.  That was 610.  This is

14   the other one that was subsequently discovered.

15          THE COURT:  All right.  Any objection?

16          MS. TAYLOR-SMITH:  No, Your Honor.

17          THE COURT:  It's admitted.

18          (Government Exhibit 611 admitted into evidence.)

19          MR. GORDON:  Permission to publish at this time,

20   Your Honor.

21          THE COURT:  Yep.

22          (An audio recording was played.)

23   BY MR. GORDON:

24   Q.  Ms. Woodward, you testified that you considered this

25   message threatening as well.  Can you explain why.

1    A.   The section in the voice mail where he says, "I probably

2    won't see you, but maybe I will."  And then the second, "Maybe

3    I will."  Just out of an abundance of caution, I probably would

4    have reported it.

5    Q.   Can you explain what your thought process is there?

6    A.   Yeah.  The -- it's -- it's possible for members of the

7    public to enter the Capitol or the House office buildings.  I

8    don't remember the exact posture of the buildings due to COVID

9    precautions in 2020.  But, certainly, staff could escort

10   members of the public in, you know, without, you know, too much

11   trouble.  And so out of an abundance of just wanting to be

12   careful if we had staff in the office or others, wanted to make

13   sure that we shared it with the -- well, I would have wanted to

14   make sure we shared it with the Capitol Police, but we shared

15   the other one, so.

16   Q.   What was ominous about the second "maybe I will" that was

17   different from the first "maybe I will"?

18   A.   Just felt like a transition of thought from saying probably

19   not going to see you to then thinking a little bit more about

20   maybe it's possible I could see you or find you.

21              MR. GORDON:  One moment, please.

22              THE COURT:  I'm sorry?

23              MR. GORDON:  One moment to confer.

24              THE COURT:  Sure.

25              MR. GORDON:  Nothing further, Your Honor.  I'll pass

```
1    the witness.
2               THE COURT:  Okay.  All right.
3          How long do you foresee your cross being?
4               MS. TAYLOR-SMITH:  Not very, but don't hold me to it.
5               THE COURT:  No, no, I understand.  You know, because
6    of COVID, the cafeteria closes earlier than normal.  So I think
7    it's best if we break for lunch now so people have an adequate
8    period of time to eat.
9          So we'll -- it's around 12:58 now.  So we'll come back
10   at 2:00.  And you can do your cross then.
11         In the meantime, please don't discuss your testimony
12   with any of the lawyers or anyone else.
13              THE WITNESS:  Okay.
14              THE COURT:  Thank you.
15              (Recess taken.)
16              THE COURT:  All right.  Are we ready to resume with
17   that witness?
18              MS. TAYLOR-SMITH:  Your Honor, I am ready.
19              THE COURT:  Okay.  Ms. Woodward, I remind you you're
20   still under oath.
21              THE WITNESS:  (Nods head.)
22              THE COURT:  Go ahead.
23                        CROSS-EXAMINATION
24   BY MS. TAYLOR-SMITH:
25   Q.  Good afternoon, ma'am.
```

1    A.  Hi.

2    Q.  So I just want to ask you a few questions based on what

3    you'd testified to earlier today.  You testified earlier today

4    that, generally, the phone calls Congressman Golden receives at

5    his office are those of constituents; is that correct?

6    A.  Correct.

7    Q.  And by constituents, you meant individuals who live

8    specifically in his legislative district; is that fair to say?

9    A.  That's correct.

10   Q.  But it's not unusual at all for the congressman to receive

11   phone calls from any individual who might want to reach a

12   member of Congress on a matter of importance; correct?

13   A.  That's correct.

14   Q.  And on this particular day, you said that -- December 29th

15   of 2020?

16   A.  Yes.

17   Q.  Okay.  The first phone call that you received, you said you

18   received it on or about 4:03 in the afternoon; is that right?

19   A.  Correct.

20   Q.  And there's nothing unusual about that hour of the day, is

21   there?

22   A.  No.

23   Q.  Okay.  Do you have, for example, your office's hours on the

24   website?

25   A.  Yes.

1    Q.  And what are the hours for the office?

2    A.  8:30 to 5:00.

3    Q.  Okay.  And so when Mr. Gordon was asking you about this

4    voice mail system that picks up on weekends and overnight, it

5    will also pick up if, for example, you know, all of the phones

6    are being used; correct?

7    A.  That's correct.

8    Q.  Okay.  And it appears that that is what happened in this

9    instance?

10   A.  Actually, in this instance, our offices are closed between

11   Christmas and New Year's; so all of the calls that were coming

12   in were going to voice mail.

13   Q.  And how do you make your constituents aware of that?

14   A.  I think we post notices on our doors for people who maybe

15   come to them, and I think the voice mail that people receive

16   will often indicate over holiday periods that our office is

17   closed.  But we check the voice mail usually three times a day

18   to make sure we don't miss anything time sensitive.

19   Q.  Okay.  Well, you heard on the voice mail -- apparently the

20   outgoing message was that you were working with other

21   constituents.  That's -- that's what the voice mail that we

22   heard earlier said; correct?

23   A.  That's right.  So it must have not been specific to the

24   holidays.

25   Q.  Prior to -- well, strike that.

1        Prior to today, you had never seen Kyle Fitzsimons in

2    persons; is that fair to say?

3    A.   Correct.

4    Q.   And you've never had a conversation with him?

5    A.   Correct.  I have not, no.

6    Q.   And, in fact, other than the fact that the individual on

7    the other line said that their name was Kyle Fitzsimons, you

8    don't know whether or not it was the person who was sitting in

9    the courtroom who made those phone calls; is that also fair to

10   say?

11   A.   That's correct.

12   Q.   Your concern about the messages was that the request was

13   for Congressman Golden to object to the certification; is that

14   right?

15   A.   That was not my specific concern.  My concern was

16   Mr. Fitzsimons saying that he was willing to object to the rest

17   of his life, I think was the language, as well as his

18   indication that he was coming to Washington.

19   Q.   Okay.  Well, let me ask you this:  On direct examination

20   you said that the certification of the Electoral College vote

21   was part of Congressman Golden's responsibilities; is that

22   right?

23   A.   Yes.

24   Q.   Okay.  But objecting to the certification of the Electoral

25   College would not be outside the realm of his responsibilities,

1   would it?

2   A.  Not necessarily.

3   Q.  And so -- and -- so an individual called your office and

4   expressed they wanted Congressman Golden to object to the

5   certification; is that right?

6   A.  Can you repeat the question, please.

7   Q.  Yep.  So an individual called your office, leaving a voice

8   mail, asking Congressman Golden to object to the certification;

9   correct?

10  A.  Correct.

11  Q.  And when you initially told us what you thought the

12  individual said on the phone, you said you were concerned

13  because they said that they would object with their life;

14  meaning that they would, you know, lose their life in order to

15  object?  That's what you said; right?

16  A.  Yes.

17  Q.  But that's not actually what the voice mail said, is it?

18  It didn't say object with my life, did it?

19  A.  We would have to play it again.  He may have said to the

20  rest of my life.

21  Q.  Okay.  Nowhere in that voice mail was there a specific

22  threat of violence towards the congressman; correct?

23  A.  Correct.

24  Q.  Nowhere in the voice mail was there a specific threat of

25  self-harm; is that correct?

1    A.  I -- it was not direct -- I -- I heard it as implied.

2    Q.  Okay.  That was the interpretation that you gave to it?

3    A.  Yes.

4            MS. TAYLOR-SMITH:  Court's indulgence.  I think I'm

5    almost done.

6            THE COURT:  Sure.

7    BY MS. TAYLOR-SMITH:

8    Q.  I think I just have two more questions.  The first question

9    is, it's fair to say that the idea that you, a staffer, or your

10   staff members would not be going to D.C. on January 6th had

11   more to do with the logistics of getting into the building than

12   it had to do with specific security concerns; correct?

13   A.  I think it was a combination of security and logistics, but

14   I was asked earlier if we were specifically concerned about

15   violence, and that was not something that we were specifically

16   talking about.

17   Q.  Okay.  And then, finally, is it unusual for the congressman

18   to meet with or to see individuals from Maine while he's in --

19   at his office in -- in Washington, D.C.?

20   A.  It is not unusual, no.

21           MS. TAYLOR-SMITH:  Okay.  Nothing further.  Thank

22   you.

23           THE COURT:  Thank you.

24           MR. GORDON:  No redirect, Your Honor.

25           THE COURT:  All right.  Thank you.

 1          Thank you, Ms. Woodward.

 2               THE WITNESS:  Thanks.

 3               MR. GORDON:  Your Honor, the United States calls

 4     Deborah Wilson.

 5               THE COURTROOM DEPUTY:  Ma'am, could you please raise

 6     your right hand.

 7               (Oath administered.)

 8               THE WITNESS:  I do.

 9               THE COURTROOM DEPUTY:  Thank you.  Can you please

10     step over to the end behind the plexiglass.

11               THE WITNESS:  Sure.

12               THE COURTROOM DEPUTY:  Thank you.

13               THE COURT:  Go ahead.  You can sit down.

14               THE WITNESS:  Thank you.

15               THE COURT:  Go ahead.

16                         DIRECT EXAMINATION

17     BY MR. GORDON:

18     Q.  Ms. Wilson, can you remove your mask, please, if you're

19     comfortable doing so.

20     A.  Thank you.  I don't like them.

21     Q.  Good afternoon, Ms. Wilson.

22     A.  Hi.

23     Q.  Ms. Wilson, where do you live?

24     A.  Lebanon, Maine.

25     Q.  How long have you lived there?

1    A.  Since 2003.

2    Q.  So you -- can you describe Lebanon, Maine.

3    A.  The best description I can tell you is that the residents

4    like to call it Lawless Lebanon.

5    Q.  Lawless Lebanon?

6    A.  Lawless Lebanon.  It's -- it's very beautiful country there

7    and a lot of back roads, a lot of woods, lakes.  As a matter of

8    fact, our border is -- is Salmon Falls River, which creates

9    several millponds between ourself and New Hampshire.  It's very

10   pretty.

11   Q.  Can you explain why people call it Lawless Lebanon.

12   A.  So we don't have a police department, and we rely on the

13   state police, which are dispatched out of Augusta, which is

14   probably an hour and a half to our north, to do our law

15   enforcement.

16   Q.  Approximately how many people live in Lebanon, Maine?

17   A.  Our last census was just under 7,000 people.  It swells to

18   about 12 to 15 thousand in the summer with -- with camp

19   residents.

20   Q.  But in, you know, the winter months, is 7,000 approximately

21   an accurate --

22   A.  Yes.

23   Q.  -- guess?

24   A.  Yes.

25   Q.  Can you explain how the town of Lebanon is governed.

1      A.   I'm sorry?

2      Q.   Can you explain how the town of Lebanon is governed.

3      A.   So we have a select board, a five-member select board that

4      is voted by the people.  And then we have several different --

5      different committees and -- and groups that do certain things,

6      like an appeals board.  We have a code enforcement office.  We

7      have a budget committee, things like that.

8      Q.   Now, the five members of the select board, is any of those

9      people, you know, the mayor, so to speak?

10     A.   No.

11     Q.   And is there any sort of town office that's higher than the

12     select board?

13     A.   No.

14     Q.   Do you serve on the select board?

15     A.   I do not.

16     Q.   How do you --

17     A.   I serve on many other committees, but not the select board.

18     And I haven't missed a select board meeting in nine years.

19     Q.   They're open to the public?

20     A.   They are.

21     Q.   Okay.  How often does the select board meet?

22     A.   They meet every week on Thursday evenings.

23     Q.   And you've been to every one of those meetings for

24     nine years?

25     A.   Yeah.

1    Q.  Do other people from the town typically attend?

2    A.  Sometimes.  And during COVID, it was also acceptable for

3    call-ins, telephone calls, or -- or via Zoom.

4    Q.  And you said there are committees as well that are -- are

5    they staffed only by the elected members of the select board or

6    other people as well?

7    A.  The committees are either elected, such as our budget

8    committee -- is an elected position -- or appointed by the

9    selectmen.  For example, our appeals board is appointed by

10   selectmen.  And that all depends on the ordinance that governs

11   them and really who wrote the ordinance, because it's --

12   whatever the ordinance says, that's how it's --

13   Q.  Have you served on any of those committees?

14   A.  I serve on almost all of them.  I serve on the budget

15   committee.  I'm an elected member of the budget committee.  I'm

16   the appeals board chairman.  I -- I serve on the comprehensive

17   plan committee.  I serve on many, and I do a lot of volunteer

18   work.

19   Q.  Do you have a nickname in the town?

20   A.  I do.

21   Q.  What's that nickname?

22   A.  The Queen.

23   Q.  The Queen?

24   A.  Yes.

25   Q.  Why do people call you Queen?

1    A.  Because I take care of people.  I -- I -- I do a lot of

2    food drives.  I do a lot of fundraising.  I am friends with

3    most of our state legislators.  So if there are food programs

4    or grant programs that are eligible for my town, I go to work

5    with my state legislative people to bring that to my town,

6    because being so far away from Augusta, they -- they forget

7    that we exist.  We're the very southernmost tip of Maine.

8    Q.  Are you familiar with a social media website Facebook?

9    A.  Yes.

10   Q.  Do you use Facebook?

11   A.  I do.

12   Q.  Are you familiar with a web page called Lebanon -- or a

13   Facebook page called the Lebanon Truth Seekers?

14   A.  It's the Lebanon Maine Truth Seekers.  And, yes, that's my

15   page.

16   Q.  It's your page?

17   A.  It is.

18   Q.  And you run the page?

19   A.  I do.

20   Q.  Does anybody else run the page with you?

21   A.  No.  When I first started, I did have a partner, but she

22   passed away, and so now it's only myself.

23   Q.  Does anybody else have the ability to post to the page?

24   A.  They do not.  They can create a post and send it, but I

25   have to approve it before it goes on to the Facebook page.

1   Q.   Do you share the password to that page with anyone?

2   A.   No one.

3   Q.   So is it fair to say all of the content posted on that page

4   was either written by you or approved by you?

5   A.   Yes.

6   Q.   Can people comment on posts written on that page?

7   A.   They can.

8   Q.   Okay.  When did you create Lebanon Maine Truth Seekers?

9   A.   April 1st, 2015.

10   Q.   Can you briefly describe why you created that Facebook

11   page.

12   A.   Our -- our town government was kind of in a mess, and it

13   was specifically to involve the fire department.  My husband

14   was a Marine and a firefighter.  I saw things happening on

15   other Facebook pages by former members of the town government,

16   and they were claiming our fire department was bad.  Our

17   residents were scared.  They were, like, driving themself to

18   another town to call EMS because they were afraid that they

19   wouldn't get the care that they deserved.

20        And I went and talked to the fire chief, and he asked me

21   to create a page to combat the lies and the things that were

22   scaring people in my town.  So I did.  And that -- that's why

23   it's called the Truth Seekers was because there were so many

24   lies being told and people were so suspicious of our

25   government, of our fire department, and of our boards and

1     committees.  At that time I served on none of them.

2           And so that's kind of how everything evolved, is that

3     through getting to know these people, working with them,

4     volunteering with them.  And now I just keep going because I

5     think people need to know the facts of things.

6     Q.  Do you -- so you still maintain and post to the Lebanon

7     Maine Truth Seekers group to this day?

8     A.  I do.

9     Q.  Is it still primarily concerned with the fire department

10    and issues around care?

11    A.  No.  But the fire department is a big part of -- of our --

12    our stuff on the Truth Seekers page.  It's -- they're just my

13    people.  And -- but I also post things about upcoming food

14    drives.  I run a food -- I run a fire victims' locker, and so

15    if I need things for -- for victims of fire or traumatic

16    injury, I post on there.

17          Also, people post things about other towns, ideas, what

18    they're doing.  They'll send me posts about missing dogs or

19    cats, and we post them on there and try to help find them.  To

20    date there's only been one dog we haven't found in all this

21    time.  So it's just a community page, really, now more than

22    only focused on the fire department.

23    Q.  Approximately how many followers or subscribers do you have

24    to the Lebanon Maine Truth Seekers page?

25    A.  I just looked this morning, and I just went up over 6800.

1   Q.  Over 6,800?

2   A.  Yes.  And they're all local people.

3   Q.  Okay.  So approximately the same as the population of

4   Lebanon; is that accurate?

5   A.  Yes, but that -- some of them come from neighboring towns

6   too.

7   Q.  Are you aware of any other community Facebook page or

8   similar online place that has a similar number or more

9   followers?

10  A.  Not from my town.  There is one for Acton that seems to be

11  doing really good, and that's operated by a friend of mine

12  who's also the animal control in Acton.  But for a small town,

13  no.  I -- I -- and from my town, certainly no.  There's --

14  there's not one that big.

15  Q.  Do you know the defendant, Kyle Fitzsimons?

16  A.  I do.

17  Q.  Can you explain -- first of all, when did you meet him?

18  A.  I met Kyle a couple years back when I was -- when I was

19  serving on the comprehensive plan committee, and Kyle came into

20  a few meetings.

21  Q.  What is the comprehensive plan committee?

22  A.  So it -- in Maine, in the state of Maine, in order to apply

23  for a federal grant, which I had just gone to grant writing

24  class, you have to have a comprehensive plan.  And a

25  comprehensive plan outlines -- Part 1 will outline the past

1    history, the demographics of your community.

2         Part 2 will outline what you currently have for an

3    infrastructure, what you currently have for -- for activities,

4    what you currently have to call people to your town.

5         And then Part 3 will try to identify a three- to

6    five-year goal for -- for projects or improvements in your

7    town.

8    Q.  Are there regular community meetings about the

9    comprehensive plan?

10   A.  There were.  There was a comprehensive plan committee that

11   started out with about 12 people until they found out that they

12   had to write and then they all disappeared and wound up being

13   three of us.  So yeah.

14   Q.  Do you remember the day that you met Kyle Fitzsimons?

15   A.  I do.

16   Q.  Can you describe that or recount that day for us.

17   A.  So Kyle had come into the comprehensive plan committee, and

18   he was -- he was against the comprehensive plan.  He did not --

19   he didn't know me.  I didn't know him.  And he was a little

20   angry that we were putting together a comprehensive plan

21   because he thought it created a bigger government, and -- and

22   he was pretty angry about that.

23   Q.  Approximately how many years ago was this?

24   A.  A guess would be four.  It may have been five.

25   Q.  So you described him as pretty angry.  How did you know he

1   was pretty angry?

2   A.  Because he yelled at me.

3   Q.  Can you describe that interaction when he yelled at you.

4   A.  You -- Kyle came in, and he didn't -- he didn't want the

5   comprehensive plan.  Like I said, he -- he felt that it was

6   creating a bigger and more controlling government.  He stated

7   that he had moved to Lebanon to get away from that in -- in his

8   former residence.  And when I -- when I argued with him, he --

9   he called me a communist, a Bolshevist, a fascist, a lot of

10  "ists," all of which I am none.

11  Q.  And you said he yelled at you.  How long did that

12  interaction last?

13  A.  I don't -- I don't know.  I didn't time it, and I

14  wouldn't -- I don't know.

15  Q.  Okay.  And was that during the public meeting that he

16  yelled at you?

17  A.  It was.

18  Q.  Okay.  Did you have a further interaction with him that day

19  or that night?

20  A.  When he went outside, I went outside because I'm one that

21  tries to find common ground.  And I didn't know Kyle, and I

22  felt really bad that somebody in my community would think of me

23  that way.  My husband was a Marine and a firefighter, and I do

24  my best to serve every person -- I'm getting a little

25  emotional -- but every person in my community.

1        And Kyle was one that I hadn't known, and I felt bad he

2    thought that way of me.  So I went outside and I -- I did have

3    some discussion with him.  And I told him he was wrong about

4    me, you know.  And -- and I wasn't real happy about the names

5    that he had called me, and I think I got in his face a little

6    bit, because it's kind of who I am, so.

7    Q.  How did he respond to that?

8    A.  I think he took it all in pretty good.  I mean, he was

9    pretty angry, and -- and he believed that what I was doing was

10   wrong.  So he did go and get in his car, and he just left.

11   There was no, like, big altercation.  But, you know, I was kind

12   of yelling at him at that point, and -- and he wasn't real

13   happy with me.

14   Q.  Over the last four years, have you had other interactions

15   with him?

16   A.  I have.

17   Q.  Approximately how often?

18   A.  Spotty, you know.  Just kind of when I see him.  I was

19   there the day that his dog passed, and nobody wanted to go tell

20   him.  So I said, "I'll go tell him," you know.

21   Q.  You told him his dog died?

22   A.  I did.  And -- and -- and then he came and brought me

23   dog food that had been left over so that I could give it to

24   other people.

25        I mean, I just want to make sure that I'm not painting

1    him as the guy that, like, attacks me or -- you know, he --

2    Kyle has a human side.  We just disagree politically.

3    Q.  Had you seen him be angry about government or political

4    issues on other occasions?

5            MS. TAYLOR-SMITH:  Objection.

6    A.  I have.

7            MS. TAYLOR-SMITH:  I'm going to object.  I feel like

8    we're getting a little far left.

9            THE COURT:  Counsel, where are we heading with this?

10           MR. GORDON:  A few places, Your Honor.  First, I'm

11   establishing this witness's familiarity with Mr. Fitzsimons,

12   especially his voice.  One of the questions asked on

13   cross-examination of a prior witness was a suggestion that

14   maybe she didn't know for sure who that person was.  So I'd

15   like to establish this witness's ability to then authenticate

16   that voice.

17           And then, also, we're leading to a particular exhibit

18   that I'm trying to lay the foundation for, what happened there.

19           THE COURT:  Okay.  Go ahead.

20   BY MR. GORDON:

21   Q.  So, Ms. Wilson, do you need me to repeat the question?

22   A.  Yes.  Please.

23   Q.  Have you had other interactions with Mr. Fitzsimons over

24   the last four years where he has been angry about government or

25   political issues?

1    A.  Yes.  He -- at one point he came into the public hearing,

2    also regarding the comprehensive plan, and he was really angry

3    about it; you know, again, calling it a communist document,

4    fascist document.  But, you know, we all tried to -- to show it

5    to him and to assure him that we had done everything -- the

6    three of us had done everything we could to remove any mandates

7    on the local people, to remove any government restrictions.  We

8    did everything that we could to remove that.  And it was

9    basically what the state was calling for us to do in order to

10   be able to apply for state grants.

11   Q.  Okay.  And on that occasion, did Mr. Fitzsimons respond to

12   your, sort of, reasoned response calmly or not?

13   A.  I think that by that time he knew me, and he wasn't -- he

14   wasn't real negative to me.  I mean, he had some words for me

15   and -- and for the document.  He -- he didn't like it, and it

16   was very clear, and -- and everybody kind of knew it was very

17   clear.

18   Q.  So just ballpark, how many times do you think you've

19   conversed with this defendant over the last four years?

20           MS. TAYLOR-SMITH:  Objection.

21   BY MR. GORDON:

22   Q.  More than 50?

23           MS. TAYLOR-SMITH:  Your Honor, if this is going down

24   the fact that she doesn't know Mr. Fitzsimons' voice, I will

25   stipulate that she can probably recognize his voice, that she

1    knows him, and that they've known each other for the last four

2    or five years.

3              THE COURT:  All right.  Go ahead.  Ask your

4    questions.

5    BY MR. GORDON:

6    Q.  Ballpark.

7    A.  I'm sorry.  Could you --

8    Q.  Can you give me a ballpark estimate of how many times

9    you've talked to him.

10    A.  If I had to say ten, it -- that may be ballpark.

11    Q.  Now, I want to direct your attention, specifically, to

12    December of 2020.  At that time did the defendant reach out to

13    you and ask you to post something for him on Lebanon [sic]

14    Truth Seekers?

15    A.  He did.

16    Q.  Can you describe what he -- first of all, how did he

17    contact you?

18    A.  He had contacted me by email.

19    Q.  And what was the content of the email that he sent you?

20              MS. TAYLOR-SMITH:  Objection, Your Honor.

21              THE COURT:  You can answer.

22              MS. TAYLOR-SMITH:  Your Honor, for the record, I'm

23    objecting to this witness testifying to the contents of an

24    email that is, one, not present in the courtroom today and,

25    two, not properly authenticated as an email address that

1    belonged to Mr. Fitzsimons.

2              THE COURT:  Well, that's -- I think that's where

3    we're heading.  So go ahead.

4    A.  So the email was word for word what then was posted on the

5    Facebook page on behalf of Mr. Fitzsimons.

6    BY MR. GORDON:

7    Q.  So he sent -- is it fair to say that he wrote out text and

8    said can you please post this text on your Lebanon Maine Truth

9    Seekers Facebook page?

10   A.  Yes, sir.

11   Q.  Approximately when in December of 2020 was this, if you

12   remember?

13   A.  If I had to guess, it was just before Christmas.

14   Q.  And when you read what Mr. Fitzsimons asked you to post on

15   the page, did you have any concerns about it?

16   A.  I did.

17   Q.  Did you agree to post it on the page?

18   A.  Not immediately.

19   Q.  What does that mean?  Did you say yes or no when he asked

20   you to do it?

21   A.  I made it very clear to Mr. Fitzsimons that I didn't want

22   to, that I thought it was going to bring trouble, and that --

23   and that -- I just really didn't want to.  I also told him that

24   I would not post it without his name and clearly directing

25   people that it was his post and not my post.

1    Q.  Did you say that to him orally?  Did you respond via email?

2    How did you convey what you just said?

3    A.  I wish I could tell you that.  I don't -- I -- I would have

4    to say that -- that I contacted him via email because it would

5    have been an answer to his email.  My best guess is -- is that

6    I contacted him via email.

7    Q.  Now, when you told him no, did he take no for an answer?

8    Did he drop it?

9    A.  No.  No, he didn't.  He wanted it posted.  He stated that

10   it was fine to use his name on it, and he was looking to -- to

11   get other people in the community to understand what he wanted

12   to do and what he was offering.

13   Q.  So when -- was that response by email, what you just

14   described?

15   A.  I don't know.

16   Q.  So did you ever have an in-person conversation with the

17   defendant about this post that he wanted, that you --

18   A.  Not about that post, no.  I had -- I had conversations with

19   him about -- a conversation with him at the town office with

20   regard to everybody going.  I had a concern.

21   Q.  Did he come to your house to talk about this?

22   A.  He did.  He did, just one time, but --

23   Q.  Describe that.

24   A.  So he was -- he had come to my house.  I didn't even know

25   he knew where I lived, but -- but, basically, everybody in town

1    knows.

2    Q.  So you didn't invite him to come to your house?

3    A.  No.

4    Q.  And you hadn't given him your address?

5    A.  No.

6    Q.  But he showed up at your house?

7    A.  Yes.  But that's not uncommon.

8    Q.  Well, approximately what time of day was this?

9    A.  Oh, I would say it was 5 o'clock.  Maybe 5 o'clock.

10   4, 5 o'clock.  It would have been after work time.

11   Q.  So in -- 5 o'clock p.m.?

12   A.  Yeah.

13   Q.  All right.  So he showed up at your house.  Were you home?

14   A.  I was.

15   Q.  Then what happened?

16   A.  So I was caring for my cousin, who was on hospice, and I

17   had a boyfriend that lived with me that was very, very sick.

18   And I didn't allow a lot of people into the house because of --

19   I was afraid somebody would get them sick.

20          So I went outside and just had words with -- with Kyle.

21   And, you know, I was really nervous about the people -- my

22   people -- in my town that might go to the Trump rally with

23   Mr. Fitzsimons.

24   Q.  Was that -- we haven't talked about the content of the

25   email yet.  Was that part of the post he wanted you to send

1   out?

2   A.  Yes.  Yes.  He was looking for people to come to

3   Washington, D.C., on January 6th for the big Trump rally that

4   was being held here.  He offered -- whether people wanted to

5   caravan with him or he offered to drive, if people didn't want

6   to make the drive.

7   Q.  Now, you had refused to put this on Lebanon Maine Truth

8   Seekers, and he came to your home.  Was he calm during that

9   interaction?

10   A.  Calm for Kyle is -- he was angry with me for not putting it

11   on right away.  But we had to have that discussion about I

12   couldn't put it on there as my post because I -- I really

13   didn't approve of it.  But he said put it on with his name,

14   which I did.

15   Q.  You said he was angry at you personally?

16   A.  Yeah, he was.  And, again, you know, I didn't take offense

17   to him.  A lot of people come to my house, and a lot of people

18   are angry with things that are going on in town government, or

19   a lot of people -- you know, they come angry and they kind of

20   leave as my friend, but I really didn't want to put that post

21   to -- can we just -- can we just leave it at that?  I didn't

22   want to put that post.

23   Q.  But that's what only you can explain.

24   A.  Right.

25   Q.  What was it about the post that you found so concerning

1     that you were so reluctant or unwilling to put it up for people

2     to read?

3     A.  My town, Lebanon, Maine, is hugely Republican.  There are

4     Trump banners on every house to this day.  There are a handful

5     of -- of Democrats or a handful of people who don't support

6     Trump, but it's hugely supportive of former President Donald

7     Trump.

8          Obviously, you've seen my Facebook page.  And the

9     arguments regarding political things in a little tiny town in

10    Maine are so huge and negative and people calling each other

11    names and threatening each other all -- I mean, it's -- it gets

12    out of control.  And we have a lot of constitutionalists in our

13    town who will tell you that they -- they're constitutionalists.

14    And -- and many of them are Vietnam veterans or older veterans.

15         And I -- just reading it, I kind of knew who was going

16    to go.  And they're my people, you know, and I -- I worried

17    about them; that it's a long drive for them.  I worried

18    about -- it's a very antagonistic subject matter.  It was at

19    the time when people were angry over the switch of power.  And

20    I knew in my heart who was going to go.  And they are the same

21    people that went.

22         So, I mean, things worked out okay for them, and they

23    didn't work out so okay for Kyle.  But -- but I knew.  I mean,

24    my town is that way.  So, I mean, I just didn't want to put it

25    out there because I didn't want -- some of the people that I

1    knew were going to go I didn't want to go and get in any

2    trouble.

3    Q.  Did you think they'd get in trouble if they went with the

4    defendant?

5    A.  I thought they'd get in trouble if they came here to

6    Washington, D.C.

7    Q.  Now, did you ultimately agree to post the message drafted

8    by the defendant on your page?

9    A.  I did.

10   Q.  Did you edit it in any way?

11   A.  I did not.  No.  No.  I think I talked to him about a

12   spelling error, and he told me to leave it alone, and I did so.

13           MR. GORDON:  Now at this time I'd like to show what's

14   electronically premarked for identification as Government's

15   Exhibit 612.

16       Your Honor, a moment.  I need to get the computer back

17   up.

18   BY MR. GORDON:

19   Q.  Ms. Wilson, can you see on the screen in front of you --

20   A.  I do.

21   Q.  -- what's electronically marked as Government's 612.

22       All right.  Do you recognize Government's 612?

23   A.  I do.

24   Q.  And what do you recognize that to be?

25   A.  That is the post that I made on behalf of Kyle Fitzsimons.

1    Q.  All right.  Is this a fair and accurate copy of the post?

2    A.  It is.

3    Q.  Does this post look in any way different than the way you

4    posted it?

5    A.  I don't usually see the -- the website information on the

6    bottom.  You see where it says, you know, like, the website,

7    Facebook?

8    Q.  But other than that, the rest of the text is the way it

9    appeared?

10   A.  I can't really see the text.  It's very light.  Oh, much

11   better.  Much better.  Whoops.

12   Q.  How about now?  Is that the same text that you posted?

13   A.  Yes.

14   Q.  Is that the same text that Kyle Fitzsimons provided to you

15   and asked you to post?

16   A.  It is.

17   Q.  Is that the same text that he came to your house and argued

18   that you should post?

19   A.  It is.

20             MR. GORDON:  Your Honor, at this time -- I'm sorry.

21   One more.

22   BY MR. GORDON:

23   Q.  And the photograph that appears below the text --

24   A.  Uh-huh.

25   Q.  -- where did that photograph come from?

1    A.  That was just an internet photograph.

2    Q.  Did you add that, or did the defendant add that?

3    A.  No.  I put a picture on every single post because I think

4    it creates interest.  There were no -- there aren't posts on my

5    page that appear without photos.  Most of the photos are my

6    own.  I'd say 99 percent of them.

7    Q.  Did the defendant provide any guidance on what photograph

8    you were going to attach?

9    A.  He did not.

10   Q.  Did he ask any -- for a photograph to be attached?

11   A.  He did not.

12   Q.  Did you alert him that you were going to attach a

13   photograph to it?

14   A.  I did.

15   Q.  Okay.  And did he express any opinion about it?

16   A.  He did not.  I don't even think he saw it until it was

17   posted.

18   Q.  But did you offer him an opportunity to pick a photograph

19   for it?

20   A.  No.

21           MR. GORDON:  Your Honor, at this time the

22   United States submits Government's 612 into evidence.

23           MS. TAYLOR-SMITH:  My objection remains the same.

24           THE COURT:  Why don't you think she has authenticated

25   it?

1          MS. TAYLOR-SMITH:  Your Honor, the -- to the best of

2     my knowledge, her testimony is that she received an email from

3     an email address, that she responded to that email address,

4     that she would not, you know, post it.  She did say there was a

5     conversation.  I don't know if that conversation took place

6     before or after this post.  And I don't know if the

7     conversation was directly related to this post versus being

8     related to attendance in Washington, D.C., on January 6th.  And

9     so, yes, I maintain that the document has not been properly

10    authenticated, and my objection remains.

11         THE COURT:  Okay.  It's admitted.

12         (Government Exhibit 612 admitted into evidence.)

13    BY MR. GORDON:

14    Q.  How long after the defendant came to your house asking

15    for -- reiterating his demand that this be posted, did you then

16    follow through and post it?

17    A.  That evening.

18    Q.  So at the top you see under Lebanon Maine Truth Seekers, it

19    says "December 24, 2020."

20    A.  Uh-huh.

21    Q.  So that's the same date that he came to --

22    A.  That would be the same day that he came, yeah.

23    Q.  Okay.  Is the email address listed underneath the names --

24    so it says, "Please contact Kyle Fitzsimons,

25    kylefitzsimons.kf@gmail.com.  Where does that address come

1    from?

2    A.  From Mr. Fitzsimons.

3    Q.  That's the email address you've used to correspond with

4    him?

5    A.  Yes.  And he had also indicated -- I -- I had told him I

6    wasn't -- like I said, that I was going to be clear that this

7    was from him, and so he told me to use this address.

8    Q.  Now, at this time I'm going to read the text of

9    Government's 612.

10          "Discussion and offer by Lebanon resident

11   Kyle Fitzsimons....

12          "What has the local reaction been to the pretty obvious

13   fraud being perpetrated since Trump lost the election?

14          "Not since the rigged election of 1960 has a State sent

15   dueling electors to DC and now we have 7 doing that this year.

16          "I've seen the flags."

17          MS. TAYLOR-SMITH:  Your Honor, at this time I object

18   to the reading of the email unless counsel is going to ask a

19   question.  I mean, she's already said that this is the email.

20   So unless there's a question involved, I object.

21          THE COURT:  Okay.  You can go ahead and read it.

22   BY MR. GORDON:

23   Q.  "I've seen the flags.  I know there are supporters of

24   Mr. Trump in town.

25          "I'm also seeing flags that this election was stolen and

1    we are being slow walked towards Chinese ownership by an

2    establishment that is treasonous and all too willing to

3    gaslight the public into believing the theft was somehow the

4    will of the people.

5           "Would there be interest locally in organizing a caravan

6    to Washington DC for the Electoral College vote count on

7    Jan 6th, 2021?

8           "I am arranging the time off and will be a driver if

9    anyone wishes to hitch a ride, or a lead for a caravan of

10   vehicles.

11          "If a call went out for able bodies, would there be an

12   answer?

13          "Merry Christmas.

14          "Please contact.

15          "Kyle Fitzsimons.

16          "kylefitzsimons.kf@gmail.com."

17          Now, Ms. Wilson, you've expressed that you had concern

18   for your people, as you called them; that you thought that --

19   you said you knew who would probably respond to this and you

20   knew who would go and you were worried about it.

21          Was there something about this post, the wording of this

22   post, that made you particularly concerned versus some other

23   offer to go to D.C. on January 6th?

24   A.  Well, I didn't see any other offers anywhere from anybody,

25   and I didn't see any other offers locally.  Only this one.

1    So -- so versus another, no, but what concerned me about this

2    particular post is that -- is that I just know he -- Kyle is

3    passionate about the government.

4         And I knew that this was potentially a -- an explosive

5    situation down here, and the -- the last sentence that says,

6    "If a call went out for able bodies, would there be an answer?"

7    Because the people that I knew would go -- the people I knew

8    would answer this Facebook post are not able.  They're -- they

9    think they are, but they're not.

10   Q.  You said your husband was --

11   A.  Do you have some water by any chance?  I'm going to choke

12   myself.

13              MR. GORDON:  May I approach, Your Honor?

14              THE COURT:  Of course.

15              THE WITNESS:  Thank you very much.

16   BY MR. GORDON:

17   Q.  You said your deceased husband was a marine.  Did -- does

18   the word "able bodies" mean something specifically in that

19   context?

20              MS. TAYLOR-SMITH:  Objection.

21   A.  Well, it does to me.

22              MS. TAYLOR-SMITH:  Objection, Your Honor.

23              THE COURT:  What is the basis?

24              MS. TAYLOR-SMITH:  As to the relevance of what able

25   bodies means to marines, unless she's about to testify

 1    Kyle Fitzsimons is somehow a marine.

 2              THE COURT:  What's your response, Counsel?

 3              MR. GORDON:  She is explaining why it was -- the text

 4    of this was particularly concerning for her and her knowledge

 5    about the terminology or her -- the context for her is relevant

 6    to explaining why certain words may have been alarm- --

 7    particularly alarming to her.

 8              THE COURT:  All right.  Sustained.

 9              MS. TAYLOR-SMITH:  Your Honor --

10              THE COURT:  Sustained.

11    BY MR. GORDON:

12    Q.  Now, Ms. Wilson, I'm going to play a recording for you, and

13    I'd like you to tell us if you recognize the voice on the

14    recording.

15              MR. GORDON:  Your Honor, permission to publish what's

16    already in evidence as Government's 610.

17              THE COURT:  You may.

18              (An audio recording was played.)

19    BY MR. GORDON:

20    Q.  Do you recognize the speaker in Government's Exhibit 610?

21    A.  I do.

22    Q.  Who is it?

23    A.  That's Kyle Fitzsimons.

24    Q.  This defendant?

25    A.  Yeah.

1          MR. GORDON:  Your Honor, permission to publish what's

2   already in evidence as Government's Exhibit 611.

3          THE COURT:  Go ahead.

4          (An audio recording was played.)

5   BY MR. GORDON:

6   Q.  Do you recognize the voice in Government's Exhibit 611?

7   A.  I do.

8   Q.  Whose voice is that?

9   A.  That's Kyle Fitzsimons.

10  Q.  This defendant?

11  A.  Yes.

12  Q.  And to make the determinations you just did to recognize

13  the voice, were you relying on the speaker stating that their

14  name was Kyle Fitzsimons, or did you recognize the actual voice

15  itself?

16  A.  I not only recognize his voice, I recognize his speech

17  patterns and other manners.  His speaking words tend to be very

18  passive-aggressive, with Kyle, in the way he's spoken to me in

19  the past as well.

20         MR. GORDON:  Your Honor, permission to publish what's

21  already in evidence as Government's 204A-014.

22         THE COURT:  You may.

23         MR. GORDON:  I'm sorry.  It's 012.

24  BY MR. GORDON:

25  Q.  Ms. Wilson, looking at the person in the center of the

1    screen wearing the white jacket, do you recognize that person?

2    A.  I do.

3    Q.  And who is that?

4    A.  Kyle Fitzsimons.

5    Q.  This defendant?

6    A.  Yes.

7          MR. GORDON:  If I can show the witness what's not yet

8    in evidence but premarked electronically for identification as

9    Government's Exhibit 306.

10   BY MR. GORDON:

11   Q.  Ms. Wilson, do you recognize the person that's depicted in

12   Government's Exhibit 306?

13   A.  I do.

14   Q.  And who is that?

15   A.  Kyle Fitzsimons.

16   Q.  Is that a fair and accurate depiction of what

17   Kyle Fitzsimons looked like in approximately January of 2021?

18   A.  Yes.

19          MR. GORDON:  Your Honor, at this time I move

20   Government's Exhibit 306 into evidence.

21          MS. TAYLOR-SMITH:  No objection.

22          THE COURT:  It's admitted.

23          (Government Exhibit 306 admitted into evidence.)

24   BY MR. GORDON:

25   Q.  Ms. Wilson, after January 6th -- January 7th, 2021, were

1    you in attendance at that week's select board meeting?

2    A.  I was.

3    Q.  Did you attend the entirety of the select board meeting?

4    A.  I did.

5    Q.  Are those -- do those meetings get recorded -- video

6    recorded in some way?

7    A.  They do.  Every meeting is -- since 2018 is recorded,

8    unless there's equipment failure, which does happen once in a

9    while.

10   Q.  And are those recordings made available to the public to

11   watch in any way?

12   A.  They are.  They're on YouTube.

13   Q.  And are they protected in any way, or can anyone go to

14   YouTube and watch them?

15   A.  They're not protected against viewing, but they are

16   protected against comment.  They don't allow for public

17   comment.

18   Q.  But anyone can view them?

19   A.  Yes.

20   Q.  And was -- that meeting on January 7th, was that one

21   recorded as well?

22   A.  It was.

23   Q.  Now, during that meeting, did Kyle Fitzsimons call in?

24   A.  He did.

25   Q.  Okay.  And did you hear what he said when he called in?

1    A.  I did.

2    Q.  Have you subsequently viewed the recording of his call-in?

3    A.  I have not.

4    Q.  Okay.  But you listened to it live?

5    A.  I was there live, yes.

6    Q.  And did you recognize the voice of the person who called in

7    and identified himself as Kyle Fitzsimons?

8    A.  Yes.

9    Q.  And was it Kyle Fitzsimons?

10   A.  It was.

11   Q.  Okay.

12              MR. GORDON:  One moment, Your Honor, to consult.

13          Nothing further, Your Honor.  I'll pass the witness.

14              THE COURT:  All right.  Thank you.

15                        CROSS-EXAMINATION

16   BY MS. TAYLOR-SMITH:

17   Q.  Ms. Wilson, you said on a number of occasions you and

18   Mr. Fitzsimons got into what you described as an argument over

19   political things; is that correct?

20   A.  Yes, ma'am.

21   Q.  And during those arguments on at least one occasion, you

22   got in his face a little bit?

23   A.  I did.

24   Q.  Okay.  And as a consequence of you getting in his face a

25   little bit, his response was to turn, get in his car, and go

1    home?

2    A.   There was probably more words than that, but toward the

3    end, yes, he got in his car and I got in my car.

4    Q.   And just so that I'm clear, during these times when you

5    would have these heated discussions with Mr. Fitzsimons, he

6    never pushed you?

7    A.   No.

8    Q.   He never punched you?

9    A.   No.

10   Q.   He never slapped you?

11   A.   No.

12   Q.   He never dragged you?

13   A.   No.

14   Q.   Your testimony was that you did not want to post the email

15   on your page; is that correct?

16   A.   That is correct.

17   Q.   And you said that was because these were your people and

18   you didn't want any of them to get in trouble; is that correct?

19   A.   Yes, ma'am.

20   Q.   And you didn't want them to get in trouble because they

21   went to D.C.; is that right?

22   A.   Correct.

23   Q.   That was irrespective of whether or not they were with Kyle

24   or not?

25   A.   Yes.   That's -- that's true.   I felt that the -- the

1   situation was incendiary.

2   Q.  And this email that you received, how many emails had you

3   received from that email address prior to December of 2020?

4   A.  I -- I think there may have been only one, and I'm not sure

5   it was from the same address.

6   Q.  Okay.

7   A.  It was from Mr. Fitzsimons.

8   Q.  So someone sent you an email and said that they were

9   Kyle Fitzsimons; is that right?

10  A.  Uh-huh.

11  Q.  I'm sorry.  You have to say yes or no because --

12  A.  Oh, I'm sorry.  Yes.  I'm sorry, ma'am.

13  Q.  But as you sit here today, you don't even know whether or

14  not it was the same email address that you got this email from?

15  A.  Correct.  But there were other conversations beside the

16  email that would confirm that to me, that it was him.

17  Q.  Your testimony was that on one evening Mr. Fitzsimons came

18  to your home; is that correct?

19  A.  Correct.

20  Q.  And when he came to your home, did you reach out to the

21  state police?

22  A.  No.

23  Q.  Did you complain to anybody in law enforcement that you

24  were being harassed?

25  A.  I didn't feel harassed.

1    Q.  But you had a conversation with him that day, according to

2    you, about posting this email on the Facebook page; correct?

3    A.  Correct.

4    Q.  And even though you didn't want to post it, you included a

5    photograph; is that right?

6    A.  I did.

7    Q.  And you included that photograph because you wanted to make

8    sure you generated more traffic to the post?

9    A.  Every single post on my page has a photograph.

10   Q.  Great.

11        Because you wanted to make sure it generated more

12   traffic?

13   A.  No.

14   Q.  Well, I thought --

15   A.  I don't do clickbait.

16   Q.  I thought you said that you put the -- the photo on the

17   post to generate interest.  Did you not say that?

18   A.  To generate interest; correct.

19   Q.  Interest in an event that, according to you, you didn't

20   want to post about?

21   A.  So the photo has nothing to do with an event.  It simply

22   says "Electoral College," which was the subject matter of the

23   post.

24   Q.  Well, the subject matter of the post was a rally in D.C.?

25   A.  I didn't promote that with the photograph.

1   Q.  I understand that.  But that was the subject of the post --

2   right? -- a rally in D.C.?

3   A.  If you read that, which you can pull it up again, the post

4   talks about the Electoral College.

5   Q.  I thought -- I'm sorry.  Maybe I'm mistaken.  I thought you

6   had said that your concern was that individuals who were

7   overwhelmingly in support of Mr. Trump would attend the rally

8   in D.C.  Did you not testify to that?

9   A.  Could you introduce yourself to me.  You haven't done that,

10  and I'd like you to do that because you don't know me, and

11  you're assuming some pretty big things right there.

12  Q.  Well, unfortunately, ma'am, I'm the one who gets to ask the

13  questions and not you.

14       So, again, your testimony was that you were concerned

15  that individuals in your community --

16  A.  Correct.

17  Q.  -- that overwhelmingly supported Trump -- Mr. Trump --

18  A.  Yes.

19  Q.  -- would attend the rally?

20  A.  Correct.

21  Q.  So that was the subject of the email -- correct? -- the

22  rally?

23  A.  The subject of the email was about attending a Trump rally,

24  an Electoral College vote here in Washington, D.C., and driving

25  down as a caravan or offering to drive other people.

1          So the photograph was Electoral College, and if you know

2     how Facebook works, what you see is about two sentences, and

3     then you decide to click on the "see more" and drop it down.

4          Sometimes I put subject matter on there, like the

5     photograph that says Electoral College, and half the people

6     aren't going to look at it because it says Electoral College

7     and not come to the rally.  Do you understand?

8     Q.  Aside from yourself, who else saw Mr. Fitzsimons at your

9     home on this day?

10    A.  I don't know that answer.

11    Q.  Did you bring the actual email that you received

12    from -- from this email address?

13    A.  I did not.

14    Q.  Your testimony was that in your interactions with

15    Mr. Fitzsimons, he is typically a passionate man.  Those were

16    your words; correct?

17    A.  He is.

18    Q.  But you've never seen him break anything or throw anything;

19    is that fair?

20    A.  I have never seen him break or throw anything.

21    Q.  Okay.  Just get loud?  That's it?

22    A.  That's right.

23    Q.  All right.

24               MS. TAYLOR-SMITH:  Nothing further.  Thank you.

25               THE WITNESS:  Thank you.

1      THE COURT:  Thank you.

2                 REDIRECT EXAMINATION

3    BY MR. GORDON:

4    Q.  Ms. Taylor-Smith asked you many questions about whether

5    Mr. Fitzsimons, you know, shoved you, punched you, et cetera,

6    in response to your, you know, objection to posting what he

7    wanted.  How about when he came to your house?  Did he put his

8    finger in your chest?

9    A.  He -- he -- I mean, I don't think he ever physically

10   touched me.  But, yes, he did.

11   Q.  Do you view that as aggressive?

12   A.  I do.  I view that as Kyle.

13   Q.  Because it's par for the course for him?

14   A.  It is.

15   Q.  When he talks to you and he is being passionate, does he

16   maintain normal physical space or does he act differently than

17   other people?

18   A.  Kyle tends to stare in your eyes, straight into your eyes,

19   and get closer and closer and closer as he gets louder.  That's

20   his way.

21   Q.  Do you view that as an attempt to be intimidating?

22   A.  I do.

23   Q.  Ms. Taylor-Smith just asked you about whether you brought

24   the email that Mr. Fitzsimons sent to you in which he asked you

25   to post this.

1    A.  Uh-huh.

2    Q.  Why didn't you do that?

3    A.  As Lebanon Maine Truth Seekers, I receive -- it could be

4    three to five hundred messages a day.  It could be two to three

5    hundred emails a day.  I don't keep them all.

6         And at one point I had an email that was Lebanon Maine

7    Truth Seekers, but someone hacked it, and they were sending

8    out, like, emails asking people for support and money.  And I

9    just deleted it, that email.  So I don't know even whether I

10   kept Mr. Fitzsimons' email or whether I deleted it, but I do

11   know that that email is no longer in existence because somebody

12   hacked it and was sending out these emails asking for people to

13   give them money.

14   Q.  You subsequently deleted the entire account and all of its

15   contents?

16   A.  I did.

17   Q.  Ms. Wilson, why not -- if Mr. Fitzsimons wanted to post

18   this on Facebook, why not just do it himself?  Why does he have

19   to go through you?  What's the advantage to having gone to you

20   to get you to try to post this on Lebanon [sic] Truth Seekers?

21   A.  I would have to say that the advantage is that my page

22   reaches more people.  If Kyle had posted it on his own page, he

23   would reach his friends and family or people that regularly

24   view his Facebook page.  And I don't know how many that is.

25   But people regularly reach out and post on my page because of

1    the reach.

2         So, again, I don't know if you know how Facebook works,

3    but I have 7,000, about, people that view my page, but if they

4    comment, their friends will also see that, and then their

5    friends will also see that.  So a typical post on my page has

6    the capacity to -- to reach about 12,000 people, especially if

7    it's a post of interest, where people are either clicking the

8    like button or commenting on it.

9         MR. GORDON:  Nothing further, Your Honor.

10        THE COURT:  Thank you.

11        MS. TAYLOR-SMITH:  Just very briefly.

12                          RECROSS-EXAMINATION

13   BY MS. TAYLOR-SMITH:

14   Q.  Ma'am, if somebody submits a post to the Lebanon Truth

15   Seekers -- or Lebanon Maine Truth Seekers, that's the same as

16   though you posted it yourself; correct?

17   A.  No.

18   Q.  Well, if they submit a post and you accept it, it shows up

19   on the page, doesn't it?

20   A.  Yes, it does.

21   Q.  And that's the same reach as if you had posted it yourself?

22   A.  The same reach, yes.  But it's not the same as if I had

23   written the post.

24   Q.  Okay.  And just so we're clear, did you know that

25   Kyle Fitzsimons didn't have a Facebook page?

1    A.   I didn't know.

2    Q.   Okay.

3              MS. TAYLOR-SMITH:  I don't have anything further.

4              THE WITNESS:  Thank you.

5              THE COURT:  All right.  Thank you, ma'am.  You're

6    excused.

7              THE WITNESS:  Thank you, sir.

8              MR. BRASHER:  Your Honor, before we call the next

9    witness, can we have a brief sidebar.

10             THE COURT:  Sidebar?  It's a little difficult with

11   all this plexiglass.

12             MR. BRASHER:  So the Court is aware, we were made

13   aware that there are some folks who are potentially harassing

14   our witnesses as they're leaving the building.  Our case agent

15   is going to go escort this witness out, but I just want the

16   Court to be aware of that, in case we need to get the marshals

17   involved, I wanted to bring that to the Court's attention.

18             THE COURT:  All right.  So -- okay.  So who's your

19   next witness?

20             MR. BRASHER:  The government calls Bettie

21   Harris-Howard.

22             THE COURTROOM DEPUTY:  You can step right into the

23   jury box and raise your right hand.

24             THE COURT:  All the way back to where the microphone

25   is.

```
1              THE COURTROOM DEPUTY:  All the way at the end.
2         Can you please raise your right hand.
3              (Oath administered.)
4              THE WITNESS:  Yes.
5              THE COURTROOM DEPUTY:  Thank you, ma'am.
6              THE COURT:  You can have a seat, ma'am.
7                        DIRECT EXAMINATION
8    BY MR. BRASHER:
9    Q.  Good afternoon.
10        You can remove your mask, if you'd like.
11   A.  Thank you.
12   Q.  Ms. Harris-Howard, where are you from?
13   A.  I'm -- actually, I live in Winthrop, Maine, now, but I was
14   living in Lebanon a year ago.
15   Q.  And, Ms. Harris-Howard, how long had you lived in Lebanon?
16   A.  Ten years.
17   Q.  Do you know an individual named Kyle Fitzsimons?
18   A.  Yes, I do.
19   Q.  And do you see him in the courtroom today?
20   A.  Yes, I do.
21   Q.  Okay.  And is he sitting over here at the defense table?
22   A.  Yes, he is.
23   Q.  And can you describe just the color of clothing that he's
24   wearing?
25   A.  Orange.
```

1          MR. BRASHER:  Just so the record is clear, the

2    witness has identified Kyle Fitzsimons.

3          THE COURT:  So noted.

4    BY MR. BRASHER:

5    Q.  Are you familiar with the town government in Lebanon,

6    Maine?

7    A.  The what?

8    Q.  I'm sorry.  The town government.

9    A.  Yes, I am.

10   Q.  And what is the form of that government?

11   A.  They have a board of selectmen.

12   Q.  And does that select -- does that board meet regularly?

13   A.  Yes.  I believe weekly.

14   Q.  And how do you know that?

15   A.  Because I've been to many meetings and I've watched them

16   on, you know, on the phone.

17   Q.  Are those broadcasts live on YouTube?

18   A.  They are.

19   Q.  And do you recall watching one of those meetings on

20   January 7th, 2021?

21   A.  I do.

22   Q.  And was there something significant involving

23   Mr. Fitzsimons that happened during that meeting?

24   A.  Yes.  Kyle called in and talked about being in Washington,

25   D.C., at the Capitol building in --

1          MS. TAYLOR-SMITH:  I'm sorry to interrupt,

2     Your Honor.  But the same thing as Ms. Woodward.  If we

3     could just have her --

4          THE COURT:  Ma'am, if you could get closer to the

5     microphone.

6          THE WITNESS:  Sorry.

7          THE COURT:  Sure.

8          THE WITNESS:  Is that better?

9     BY MR. BRASHER:

10    Q.  I think so.  Just speak up and you'll be fine.

11    A.  Okay.

12    Q.  When he called in, were you watching that live on YouTube?

13    A.  Yes, I was.

14    Q.  And did you recognize the voice from the person who was

15    calling in?

16    A.  I did.

17    Q.  And whose voice was it?

18    A.  Kyle Fitzsimons.

19    Q.  And did you recognize that voice from him introducing

20    himself as Kyle Fitzsimons or from actually hearing the -- the

21    voice?

22    A.  I know his voice because I had been in meetings with him

23    before.

24    Q.  Okay.  What meetings had you been in with him before?

25    A.  It was called the marijuana committee.

1   Q.  Okay.  What was the work of the marijuana committee?

2   A.  To determine what, I guess, rules we should lay down for

3   the legalization of marijuana in Maine -- or in our town.

4   Q.  Ma'am, I'm going to, if I can, show you what's been marked

5   as Government's Exhibit 250 for identification.  Do you

6   recognize that still image?

7   A.  I do.

8   Q.  And what does that depict?

9   A.  That's the meeting where Kyle called in.

10   Q.  Is this a video that you've reviewed since January 7th,

11   2021?

12   A.  I have.

13   Q.  Okay.  And is this a fair and accurate representation of

14   the video that you saw on January 7th, 2021?

15   A.  Yes.

16   Q.  I'm sorry.  I think I overspoke you.  Did you say yes?

17   A.  Yes, I did.

18        MR. BRASHER:  At this time, Your Honor, the

19   government offers Government 250 into evidence.

20        MS. TAYLOR-SMITH:  No objection.

21        THE COURT:  It's admitted.

22        (Government Exhibit 250 admitted into evidence.)

23   BY MR. BRASHER:

24   Q.  Now, I'm going to play this now, and at the end I'm going

25   to ask you, again, if you recognize the voice as

1   Kyle Fitzsimons and if this is the meeting we've been talking

2   about.

3   A.  Okay.

4           (An audio-visual recording was played.)

5   BY MR. BRASHER:

6   Q.  I'm going to pause it right there.  Do you recognize the

7   woman who just spoke?

8   A.  Yes, Deborah Wilson.

9   Q.  And do you see her sitting in -- kind of over on the side

10  behind you, next to the --

11  A.  I do, next to the file cabinet.

12  Q.  Okay.  And she's someone you know from the town of Lebanon?

13  A.  Yes.

14          (An audio-visual recording was played.)

15          MR. BRASHER:  Does anybody know what that beeping is?

16          THE COURT:  There's a possible evacuation of the

17  building, but until they tell us, we'll continue.

18          (An audio-visual recording was played.)

19  BY MR. BRASHER:

20  Q.  Going back to my question, that voice we heard describing a

21  trip to Washington, D.C., whose voice was that?

22  A.  It was Kyle Fitzsimons.

23  Q.  And at the time that you saw this video live, since that

24  time, have you seen other video or pictures of Kyle in the

25  news?

```
 1    A.  I have.

 2    Q.  Okay.  And had you seen those at this point when you were

 3    hearing his story?

 4    A.  No.

 5    Q.  So did you know whether anything he had said was truthful?

 6    A.  No.

 7    Q.  After you heard this -- or saw this video and heard this

 8    encounter, what did you do?

 9    A.  Excuse me?

10    Q.  What did -- did you do anything after you saw this?

11    A.  I did.  I -- actually, in a couple of days, I called the

12    FBI and reported him.

13    Q.  Why did you do that?

14    A.  Because I think it was on TV that they wanted to know if

15    anyone knew of anyone that was there.  So I felt it was my duty

16    to call up and tell them.

17              MR. BRASHER:  I'll pass the witness.

18              THE COURT:  All right.  Thank you.

19              MS. TAYLOR-SMITH:  I don't have any questions, ma'am.

20              THE COURT:  All right.  Thank you.

21          Thank you.  You're excused.

22              THE WITNESS:  Thank you.

23              MR. GORDON:  Your Honor, at this time before the

24    United States calls its next witness, which AUSA Brasher will

25    be questioning, I'd like to enter into evidence the
```

1      stipulations of the parties, which are premarked for

2      identification as Government's Exhibit 700.  Given they're

3      stipulations, I don't know if there's any objection from

4      defense.

5              THE COURT:  Okay.  I gather that they're stipulated.

6              MS. TAYLOR-SMITH:  I was going to say, how am I going

7      to object to my own stipulation, but yeah.

8              THE COURT:  All right.  They're admitted.

9              (Government Exhibit 700 admitted into evidence.)

10             MR. GORDON:  So I'd like to read into the record two

11     stipulations prior to this witness.  That is, Stipulations

12     No. 1 and 3.

13             Stipulation No. 1.  The Capital Building and Grounds.

14     By law, the U.S. Capitol, which is located at First Street,

15     Southeast, in Washington, D.C., is secured 24 hours a day by

16     U.S. Capitol Police or USCP.  Restrictions around the Capitol

17     include permanent and temporary security barriers and posts

18     manned by USCP.  Only authorized people with appropriate

19     identification are allowed access inside the Capitol.

20             At the U.S. Capitol, the building itself has 540 rooms

21     covering 175,100 square feet of ground, roughly 4 acres.  The

22     building is 751 feet long, roughly 228 meters, from north to

23     south and 350 feet wide, roughly 106 meters, at its widest

24     point.

25             The U.S. Capitol Visitor Center is 508,000 square feet

1    and is located underground on the east side of the Capitol.

2          On the west side of the Capitol Building is the West

3    Front, which includes a variety of open concrete spaces, a

4    fountain surrounded by a walkway, two broad staircases, and

5    multiple terraces on each floor.  On January 6th, 2021, the

6    inaugural stage scaffolding was on the West Front of the

7    Capitol Building.

8          On the East Front are three staircases, porticos, on

9    both the House and Senate side, and two large skylights into

10   the visitors center, surrounded by a concrete parkway.

11         On January 6th, 2021, the exterior plaza of the

12   United States Capitol was closed to members of the public.

13   There's a reference here to Government Exhibit 601, which will

14   be entered into evidence shortly.

15         Government employees placed security barriers, including

16   bike racks, that were positioned to the north of the

17   U.S. Capitol along Constitution Avenue, to the south of the

18   U.S. Capitol along Independence Avenue, to the west of the

19   U.S. Capitol along First Street, on the eastern side of the

20   street, and on the east side of the U.S. Capitol between the

21   Capitol plaza, otherwise known as the East Front, and the

22   grassy areas located between the plaza and First Street.

23         Government employees had placed additional temporary

24   barriers within the West Front of the restricted area due to

25   preparations and ongoing construction for the inauguration,

1    which was scheduled for January 20th, 2021, including green

2    snow fencing and signs stating "Area Closed By order of the

3    United States Capitol Police Board."

4         On January 6th, 2021, the restricted area described

5    above and outlined in red in Government Exhibit 601 was a

6    posted, cordoned off, or otherwise restricted area where the

7    Vice President and members of his immediate family were and

8    would be temporarily visiting and, therefore, constituted a,

9    quote, restricted building or grounds, end quote, as that term

10   is used in Title 18, United States Code § 1752(c).

11        Stipulation No. 3.  The activities on January 6th, 2021.

12   Beginning at approximately 12:53 p.m. on January 6th, 2021, and

13   continuing until approximately 6:30 p.m. on January 6th, 2021,

14   there were activities involving acts of violence by assemblages

15   of three or more persons which caused an immediate danger of or

16   resulted in damage or injury to the property or person of

17   any -- of individuals on the grounds of the U.S. Capitol and in

18   the U.S. Capitol Building.

19        Thank you, Your Honor.

20        THE COURT:  Thank you.

21        MR. BRASHER:  The government calls Tia Summers.

22        Your Honor, the last witness, Ms. Harris-Howard, would

23   like to stay and watch the rest.  Ms. Taylor-Smith still wants

24   her subject to the rule.  We don't see any need for her to be

25   recalled and ask her to be released so she can stay and watch.

```
1              THE COURT:  Do you -- do you object if they waive
2     their right to recall her?
3              MS. TAYLOR-SMITH:  If they waive the right to recall
4     her?  Court's indulgence.
5              MR. BRASHER:  We'll waive the right to recall her.
6     We ask that she be released.
7              THE COURT:  Okay.
8              MS. TAYLOR-SMITH:  Court's indulgence.
9              THE COURT:  Sure.
10             MS. TAYLOR-SMITH:  Your Honor, she may be excused.
11             THE COURT:  Okay.  She can -- she can stay, and
12    she'll be prohibited from being recalled.
13             THE COURTROOM DEPUTY:  Good afternoon, ma'am.  Please
14    raise your right hand.
15             (Oath administered.)
16             THE WITNESS:  I do.
17             THE COURTROOM DEPUTY:  Thank you, ma'am.
18                       DIRECT EXAMINATION
19    BY MR. BRASHER:
20    Q.  You can remove your mask now, if you'd like, and make sure
21    you speak right into the microphone so we can hear you.
22    A.  Okay.
23    Q.  Good afternoon.  Captain Summers; is that correct?
24    A.  Yes, sir.
25    Q.  How are you employed?
```

1   A.  United States Capitol Police.

2   Q.  How long have you been with the United States

3   Capitol Police?

4   A.  Twenty-three years.

5   Q.  And how long have you been a captain?

6   A.  A year and a couple months.

7   Q.  What are your responsibilities as a captain?

8   A.  Right now I'm assigned to the Capitol Police's command

9   center.  I'm the commander over command center reports

10  processing and our court liaison unit.  Yeah, that covers it.

11  Q.  Is that the same role that you were in on January 6th,

12  2021?

13  A.  No, not at that time.

14  Q.  What were -- what was your position at that time?

15  A.  At that time I was a lieutenant.  I was the commander of

16  the second shift for our communication section.

17  Q.  What is the communications section?

18  A.  The communications section houses our dispatchers, as well

19  as our alarms -- our alarm system for the Hill.

20  Q.  Okay.  And where does that happen?  Where is your office?

21  A.  Oh, that office, it's located in the Verizon building.  I

22  believe the address is, like, 30 E Street, in the southwest.

23  Q.  So not in the physical United States Capitol?

24  A.  No.  It's about three blocks or so away.

25  Q.  Being a couple blocks away, are you able to see what's

1    going on at the United States Capitol Building?

2    A.  Yes.

3    Q.  How -- how do you do that?

4    A.  In the communications room, the room is surrounded with

5    televisions that are monitoring the closed-circuit television

6    system that we have on the Hill.

7    Q.  Okay.  And turning your attention to January 6th, 2021,

8    were you working that day?

9    A.  Yes.

10   Q.  What time did you report to work?

11   A.  0600 hours, 6:00 a.m.

12   Q.  And was that your normal scheduled time?

13   A.  Yes.  I normally worked 6:00 to 2:00.

14   Q.  What was significant about January 6th, 2021?  Before --

15   before that day, what did you know it to be?

16   A.  Before?  We know that they were certifying the electoral

17   votes for the -- for the day, for the election.

18   Q.  And were you prepared for demonstrations that day?

19   A.  I would say yes.  But our standard demonstrations, I guess.

20   For Capitol Police demonstrations, it's kind of what we do.  So

21   it's nothing to have a couple of people in one of our permitted

22   areas, maybe expressing their First Amendment rights.

23   Q.  Talk to me about the -- the First Amendment permitted

24   areas.  What do you mean by that?

25   A.  We have designated areas on the grounds where groups can

1    apply for permits with our special event section so that they

2    can express their First Amendment rights on the grounds.

3    Q.  And did people on January 6th stay within those restricted

4    areas?

5    A.  I know that we were still in the COVID restrictions; so we

6    really weren't giving out a lot of permits during that time,

7    and I am unaware if we had any permitted demonstrations for

8    that day.

9    Q.  Are any of those areas permit -- permitted demonstrations

10   inside the Capitol Building?

11   A.  No.

12   Q.  What about the west terrace of the Capitol Building?

13   A.  On that day, because the inaugural stage was being built,

14   the West Front is closed during that construction.

15   Q.  So were there also restrictions in place because of the

16   COVID-19 pandemic?

17   A.  Yes.

18   Q.  Was the building open to the public?

19   A.  No.

20   Q.  And then on the West Front, in particular because of the

21   construction of the stage, that area was also closed?

22   A.  Yes.

23   Q.  And then because of the certification vote happening on

24   January 6th, was there yet additional restrictions in place?

25   A.  Yes.  We had a bike fence, snow fence perimeter around the

1    square.

2    Q.  And was that bike fence, bike rack, and snow fencing

3    successful in keeping demonstrators out of the Capitol

4    Building?

5    A.  Not that day.

6    Q.  If I could show the witness Government's Exhibit 600.  I'd

7    offer --

8            MR. BRASHER:  Do you have any objection,

9    Ms. Taylor-Smith?

10           Your Honor, we offer Government's Exhibit 600.

11           MS. TAYLOR-SMITH:  There's no objection, Your Honor.

12           THE COURT:  It's admitted.

13           (Government Exhibit 600 admitted into evidence.)

14   BY MR. BRASHER:

15   Q.  Do you recognize this photo?

16   A.  Yes.

17   Q.  And what is it?

18   A.  That's an overview of the Capitol -- I would call the

19   Capitol Square.

20   Q.  And is it aligned north to south and east to west as if you

21   were looking at a map?

22   A.  Yes.

23   Q.  So the top of this picture is north?

24   A.  Yes.

25   Q.  And so when you're talking about the West Front, you're

1    talking about the left-hand side of the picture?

2    A.   Correct.

3    Q.   And do you see the inaugural stage in this picture?

4    A.   Yes.

5    Q.   And where -- where is that?  Let's see if I can -- is it

6    this -- what I've circled here in green?

7    A.   Yes, sir.

8    Q.   And is there -- just, again, for some real basic

9    background, is there a name for this room that's under the dome

10   in the middle?

11   A.   That's the Rotunda.

12   Q.   Okay.  And what about the rectangular top or the end of the

13   building?

14   A.   That is the Senate side of the Capitol, which houses the

15   Senate Chamber.

16   Q.   And what about the -- the bottom of the picture or the

17   south side?

18   A.   The House side, and that houses the House Chamber.

19   Q.   And then what are these structures over here on the east

20   side of the Capitol?

21   A.   So what you were first circling, the square -- it looks

22   like the square with another square within it, those are

23   skylights into the CVC or Capitol visitors center.

24   Q.   Was the Capitol visitors center open on January 6th?

25   A.   No.

1          MR. BRASHER:  We offer Government's Exhibit 601.

2          MS. TAYLOR-SMITH:  There's no objection, Your Honor.

3          THE COURT:  It's admitted -- it's admitted once I see

4     it.

5          MR. BRASHER:  I'm sorry?  Is 601 admitted?

6          THE COURT:  Let me see it.

7          It's admitted.

8          (Government Exhibit 601 admitted into evidence.)

9     BY MR. BRASHER:

10    Q.  Do you recognize this picture?

11    A.  Yes.

12    Q.  And this is just a more zoomed-out area of an aerial view

13    of the Capitol; is that correct?

14    A.  Correct.

15    Q.  And do you see a red line that has been drawn on here?

16    A.  Yes, sir.

17    Q.  And what is the significance of that red line?

18    A.  That was our perimeter that we had set up for that day.

19    Q.  That day being January 6th?

20    A.  Yes, sir.

21    Q.  And so along that perimeter, how would someone know that

22    that's what the perimeter -- where the perimeter was?

23    A.  Bike racks, snow fencing, signs.

24          MR. BRASHER:  Your Honor, we offer Government's

25    Exhibit 602.

1          MS. TAYLOR-SMITH:  No objection.

2          THE COURT:  It's admitted.

3          (Government Exhibit 602 admitted into evidence.)

4    BY MR. BRASHER:

5    Q.  Is this a photograph of the Capitol Building?

6    A.  Yes, sir.

7    Q.  And which direction is this?

8    A.  We are looking at the West Front.

9    Q.  And at the very bottom of the photo, what is it that you

10   see?

11   A.  That's some snow fencing.

12   Q.  Okay.  And so just -- so the Court is aware, the snow

13   fencing is this -- the green plastic fencing; is that correct?

14   A.  Yes.  It's like mesh.  It comes in a roll.  And whenever we

15   utilize it, they just roll it out, and they put posts every so

16   many feet to hold it in place.

17   Q.  And behind that, do you see another set of fencing?

18   A.  Yes.

19   Q.  What is that fencing?

20   A.  That looks like bike rack fencing.

21   Q.  And do you see the white squares or rectangles on that?

22   A.  Yes.

23   Q.  And do you know what those are?

24   A.  Those are the restricted-area signs or the signs that

25   we post when we don't want people to go beyond a certain

1      point.

2                    MR. BRASHER:  Your Honor, we offer Government's

3      Exhibit 603.

4                    MS. TAYLOR-SMITH:  No objection.

5                    THE COURT:  It's admitted.

6                    (Government Exhibit 603 admitted into evidence.)

7      BY MR. BRASHER:

8      Q.  And what is this picture?

9      A.  That is a picture of the demonstrators pushing through the

10     bike fence and snow fencing that we had in place on

11     January 6th, and pushing them on to the officers that were

12     standing there.

13     Q.  And do you see an area-closed sign as well?

14     A.  Yes, sir.

15                   MR. BRASHER:  We offer Government's Exhibit 604,

16     which is a close-up of the area-closed sign.

17                   MS. TAYLOR-SMITH:  No objection.  I'm sorry,

18     Your Honor.

19                   THE COURT:  It's admitted.

20                   (Government Exhibit 604 admitted into evidence.)

21     BY MR. BRASHER:

22     Q.  Do you recognize this photo?

23     A.  Yes, sir.

24     Q.  And what is it?

25     A.  It's the standard sign that we put up around our perimeter

1    when an area is closed off to the public.

2    Q.  And just for the record, can you read what the sign says.

3    A.  Sir, it says, "Area Closed By order of the United States

4    Capitol Police Board."

5              MR. BRASHER:  And we offer Government's Exhibit 606,

6    which is a 3-D model of the Capitol.

7              MS. TAYLOR-SMITH:  No objection.

8              THE COURT:  It's admitted.

9              (Government Exhibit 606 admitted into evidence.)

10   BY MR. BRASHER:

11   Q.  Is this a fair and accurate representation of what the

12   Capitol looked like on January 6th, 2021?

13   A.  Yes.

14   Q.  And it shows the inaugural stage?

15   A.  Yes.

16             MR. BRASHER:  And Government's 607 we offer as well.

17             MS. TAYLOR-SMITH:  No objection.

18             THE COURT:  It's admitted.

19             (Government Exhibit 607 admitted into evidence.)

20   BY MR. BRASHER:

21   Q.  Is that the same model but just from a different angle?

22   A.  Yes, sir.

23   Q.  Now, directing your attention to when you got on duty on

24   January 6th, when was your first -- did it -- did your day go

25   as planned?

1    A.  No, not at all.

2    Q.  When was your first inkling that something was not going to

3    go as planned?

4    A.  The news, because we do monitor most of the news networks

5    throughout the day, and the news was showing the crowds.  It

6    showed the speech by the President, and that's when we started

7    to notice things were maybe going left, I would say.

8    Q.  Okay.  And let me ask you what you mean by that.

9    A.  Meaning it's not our standard run-of-the-mill -- this is

10   not the first time I've worked on a day when we had to certify

11   electoral votes.  You know, I came to work thinking I was going

12   to come in, it was going to go on.  Once the event was over, I

13   would go home.  That would be it.

14   Q.  As that day progressed, what happened?  What did you

15   observe?

16   A.  We started observing the crowds on the news.  We had some

17   of the cameras in place to look down the avenues and down the

18   mall.  We were also getting reports over the radio of a large

19   crowd on its way to the Capitol.

20   Q.  Now, prior to coming to court today, did you have the

21   opportunity to view a video that I showed you over a web

22   conference?

23   A.  Yes.

24   Q.  And did that video contain clips from CCTV cameras from the

25   United States Capitol Police?

1    A.  Yes.

2    Q.  And did it include other pictures and images of the

3    Capitol Building?

4    A.  Yes.

5    Q.  And based on what you saw on January 6th, was that

6    video a fair and accurate representation of the events of

7    that day?

8    A.  Yes.

9         MR. BRASHER:  Your Honor, at this time we offer

10   Government's Exhibit 250 -- I'm sorry, 200.

11        MS. TAYLOR-SMITH:  Your Honor, Court's indulgence.

12   Your Honor, Court's indulgence.  I'm sorry.

13        THE COURT:  Sure.

14        MS. TAYLOR-SMITH:  Your Honor, no objection.

15        THE COURT:  It's admitted.

16        (Government Exhibit 200 admitted into evidence.)

17   BY MR. BRASHER:

18   Q.  As I play this video for you, I'm going to ask if you would

19   narrate what you're seeing.  If you want me to stop at any

20   time, just let me know; and I'll stop it, if I want to ask you

21   a question, if that's all right.

22   A.  Okay.

23   Q.  So --

24        (A video recording was played.)

25   A.  So we have a view here of Peace Circle.  We have the crowds

1    gathering right in between the Pennsylvania Avenue walkway and

2    the circle.  The crowds are starting to get larger.

3    BY MR. BRASHER:

4    Q.  At this point, at 12:57 -- or 12:54 p.m., had crowds

5    breached that red perimeter that we saw on Government's

6    Exhibit 602 -- or I'm sorry, 601?

7    A.  Yes.

8         We were starting to see more and more photos of -- of

9    the crowd coming up onto the West Front.  They're coming up the

10   Pennsylvania Avenue walkway and the center panel, the center

11   grassy panel area, toward the stage.

12        You see officers along the bike fencing on the lower

13   west terrace, and crowds have made it up to the west terrace

14   and over the wall that's there.

15   BY MR. BRASHER:

16   Q.  And at the top where I paused it at 12:58 p.m., do you see

17   the bike rack fencing at the top of the screen?

18   A.  Yes.

19   Q.  And do you see it's still intact on the left-hand side?

20   A.  It looks like it's not.  I can't really see, but it looks

21   like it may be down.

22   Q.  On this side, you think it's down?

23   A.  On that side, it looks intact.

24   Q.  But on the right-hand side, it looks like it's down?

25   A.  It looks like a portion of it is down.  It's kind of hard

1    to see.

2    Q.  And just a word on the CCTV footage and -- that we're

3    seeing, can you describe how that system works generally.

4    A.  How the closed-circuit television works?  The command

5    center has primary control of those cameras.  We're able to

6    manipulate them, move them, if we need to, to get better views

7    of things.

8    Q.  Do all the cameras have the ability to zoom and pan or

9    tilt?

10    A.  No, not all of them.

11    Q.  Some of them are fixed?

12    A.  We do have stationary ones, yes.  Most of those are at our

13    vehicle checkpoints.

14    Q.  Do you know approximately how many cameras there are?

15    A.  I would say approximately 1500 or so around the campus.

16          (A video recording was played.)

17    A.  The -- the line that they had on the lower west terrace has

18    been broken, and they're coming up on the terrace.  They've

19    pushed through the line of officers that was there trying to

20    hold that line.

21         So we're looking at the East Front there, and there are

22    a lot of bike racks that we keep there to keep the plaza or the

23    East Front plaza closed.

24    BY MR. BRASHER:

25    Q.  Is this at 1:59 p.m.; is that correct?

1    A.  Yes.

2    Q.  At this point had demonstrators broken through that line of

3    bike racks?

4    A.  I'm looking right there, kind of to the center rightish

5    there, and it looks like, yes, they -- they've pushed through

6    there.

7    Q.  And do you see other individuals coming around from the

8    right-hand side?

9    A.  Yes.

10   Q.  That would be the north?

11   A.  I'm sorry?

12   Q.  Would that be the north side?

13   A.  Yes.  Or more -- I would say center north.  I see them all

14   the way over to the right.  That's more north where you're

15   looking.

16        We're looking now at the center -- center stairs.  This

17   is when the crowd made it up to the center stairs.  Those doors

18   up at the top lead to the Rotunda, and we have a police line of

19   officers trying to keep the crowds back.

20   Q.  Now, did you see some of the officers running up those

21   steps?

22   A.  I do.

23   Q.  Do you know why they did that?

24   A.  To get better -- to get a better vantage point and also try

25   to block that Rotunda door.

1          So we're looking at the west side again and part of the

2     terrace next to the inaugural stage, and they're coming up the

3     steps.  I believe that's on the north side.  It looks like the

4     north side.

5          Okay.  This camera is showing demonstrators on the upper

6     west terrace on the north side, which is a closed area.

7     Q.  Do you know -- are you familiar with these doors here at

8     the bottom of the frame?

9     A.  So those doors right there would lead onto one of the

10    Senate corridors on the second floor.

11    Q.  This was at 2:11 p.m.; is that correct?

12    A.  Yes, sir.

13          And you can see banging on the windows and doors.

14    Q.  And is -- the image we're looking at now at 2:12 p.m., is

15    that the interior of what you've identified as the Senate --

16    doors to the Senate corridor?

17    A.  Yes.  That's the Senate corridor.  If you walk further

18    down, looking at the left, that leads to the Crypt, I believe.

19    It's kind of hard to tell.

20          (A video recording was played.)

21    BY MR. BRASHER:

22    Q.  I'm pausing now at 2:12 p.m. and 25 seconds.  What do you

23    see on the right-hand side of the video?

24    A.  One of the windows has been broken.  And you see the crowd

25    moving about on the outside, banging on the windows, breaking

1    the windows.

2              (A video recording was played.)

3    A.  Now we see the glass has broken, a piece of plywood has

4    come through, and it's completely broken at this point.  And

5    officers are responding.

6    BY MR. BRASHER:

7    Q.  I'm pausing it there at 2:13 p.m.  There's an individual.

8    Do you see that individual in the frame?

9    A.  Yes.

10   Q.  Do you know who that is?

11   A.  I do not.

12   Q.  Is it a member of the Capitol Police?

13   A.  That just jumped through the window?

14   Q.  Correct.

15   A.  No.

16   Q.  Was that person authorized to be in the Capitol Building?

17   A.  No.

18   Q.  When visitors come to the Capitol Building, is there a

19   procedure that they do go -- when tours are allowed, that

20   visitors go through?

21   A.  Yes.  Yes.

22   Q.  What is that?

23   A.  When you want to take a tour of the Capitol Building, you

24   come in through our Capitol visitors center, which is on the

25   east side.

1    Q.  And are there any security place -- measures in place?

2    A.  Yes.  We have magnetometers, X-ray machines, hand wand --

3    hand wands and officers stationed -- are stationed there to

4    screen individuals that want to come in.

5           THE COURT:  Counsel, how much more time on this video

6    do we have?

7           MR. BRASHER:  Another 17 minutes, Your Honor.

8           THE COURT:  All right.  Is this a good enough time as

9    any to take a break?

10          MR. BRASHER:  That's fine.

11          THE COURT:  Okay.  We'll take a ten-minute break.

12     If you can please not discuss your testimony with anyone

13    during the break.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Thank you.

16          (Recess taken.)

17          THE COURT:  You may continue.

18    BY MR. BRASHER:

19    Q.  I'm going to continue playing Government's Exhibit 200.

20          (A video recording was played.)

21    A.  We have demonstrators coming in the window.  The gentleman

22    with the helmet was trying to -- they're trying to get that

23    center door open.  They got the door open, and they're letting

24    people in, and demonstrators are coming in the windows and

25    doors.

1          We have officers down there on the West Front pushing

2     against the bike rack, trying to keep the crowd from getting

3     through the bike rack and getting up the terrace.

4     BY MR. BRASHER:

5     Q.  This is at 2:15 p.m.?

6     A.  Yes, sir.

7     Q.  This is one of the cameras that can zoom and move around?

8     A.  Yes, sir.

9          We have a police line of MPD and Capitol Police at that

10    point.

11    Q.  Do you recognize the officer who's in the image at 2:15?

12    A.  Yes.

13    Q.  Who is that?

14    A.  His name is escaping me at the moment, but I definitely

15    recognize him.

16    Q.  Is it Eugene Goodman?

17    A.  Yes.  Thank you.

18         Standing next to him there, I do recognize

19    Inspector Lloyd as well, and they're talking to demonstrators.

20         Looking at the hallway outside of the Senate Chamber.

21    BY MR. BRASHER:

22    Q.  What's significant about where this location is?

23    A.  This location is always closed to the public because it's

24    right outside of the Senate Floor.

25         And we have a crowd of demonstrators who have gained

1    access, and the officers have confronted them.

2         More and more demonstrators.  We have press gathering.

3         That's the Senate door.  It's on the first floor.

4    There's crowds of demonstrators attempting to gain entry, and

5    the officers are trying to keep demonstrators out.

6         This is the Crypt area.  This is directly under the

7    Rotunda, and there's a line of Capitol Police officers trying

8    their best to keep the crowds back, but we just didn't have

9    enough that day.

10        That is -- what we're looking at is, like, the foyer

11   into the Rotunda.  Those are Rotunda -- those doors where there

12   are, looks like, demonstrators standing lead right outside onto

13   the West Front.

14   Q.  We're now at 2:26 p.m.  Is it fair to say that one or more

15   officers there are completely outnumbered?

16   A.  Yes.

17        This area is right off of the Crypt.

18   Q.  We're at 2:26 p.m.?

19   A.  Yes, sir.  And officers, again, trying to control the

20   crowds and keep them back, but we were unsuccessful.  Just too

21   many people.

22        The area is continuing to fill with demonstrators.

23   People still filing in the doors and still continuing to

24   traverse the first floor of the building.

25        Looking at the House wing, again, officers trying

1    unsuccessfully to hold back the crowds.  Again, another

2    corridor with too little officers and way too many

3    demonstrators to stop.

4    Q.  Now we're at 2:29.  Is that the visitors center?

5    A.  Yes, that's the visitors center.

6         And you see demonstrators on the other side.  The

7    officers are attempting to roll down the fire doors to cut

8    access, but we were unsuccessful because the doors are set up

9    with a safety measure so that no one gets crushed.  So as long

10   as there's something underneath or -- I believe there's like a

11   sensor toward the bottom -- it's going to go back up.  So they

12   were unsuccessful in getting those doors down.

13        And then the crowds start to enter into the CVC.

14        Again, we're on the House wing, and there are crowds.

15   There's an officer there at the end.  I can't tell who that

16   person is.  And the crowds are just too large for the officers,

17   the amount of officers that we had.

18        Looking at the West Front again.  At this point, we're

19   up on the inaugural stage -- or a portion of the inaugural

20   stage, and the crowds keep coming, and the officers are

21   trying -- excuse me -- to keep the crowd back, but are

22   unsuccessful.

23   Q.  Does this make you emotional?

24   A.  Yes, it does.

25   Q.  Why?

1    A.  I worked at the Capitol a really long time.  I take pride

2    in what I do.  And a lot of people that I work next to for many

3    years were hurt.  A lot of people are still dealing with it

4    emotionally.  And it was just hard to see people that I work

5    alongside on a regular basis have to fight for their life,

6    essentially.

7             THE WITNESS:  Thank you.

8    A.  And it was hard to watch.  My husband is a Capitol Police

9    officer.  He's on the Capitol division.  He's in the Capitol.

10   He was in the Capitol that day.  So that kind of doubled my

11   fears of what was going on for the day because I was worried

12   about his well-being, as well as for my coworkers, in what was

13   going on.

14   BY MR. BRASHER:

15   Q.  When the Capitol is open to the public for tours, do they

16   go everywhere in the building?

17   A.  No.

18   Q.  Are they allowed in this area?

19   A.  No.  That's the Speaker's corridor.

20   Q.  Looking at --

21   A.  That is not open to the public.

22   Q.  That's at 2:34 p.m.?

23   A.  Yes.

24        This is on the House side.  The officers are trying to

25   keep the crowds back.  This is the second floor.  And, again,

1   these corridors are right outside of the House floor.

2          This area, you come through these doors, would lead you

3   into the Rotunda.  There's steps off -- if you look off to the

4   right, there are steps that go down.  That'll take you down

5   into the visitors center.

6   Q.  Does this show demonstrators both on the outside trying to

7   get in and from the inside trying to let people in?

8   A.  Yes.  We have a crowd on the inside pushing the doors open.

9   Those doors are very heavy.  So they're pushing the doors open

10  to try to allow -- or to allow the crowd that's on the outside

11  to gain entry.

12         That door is at the top of the steps on the

13  West Front -- on the House steps on the West Front.  Again,

14  that's right outside of the House floor.

15  Q.  Now, at 2:42 p.m.

16  A.  This hallway is outside of the Senate galleries.  Looks

17  like a doorkeeper is attempting to lock the gallery doors.

18         This is right above the Senate Chamber.  If you were

19  visiting during normal visiting hours, you would gain entry

20  into this area to watch the Senate in session.

21         They're breaking the glass on another emergency door

22  that should not have regular entry.  Again, we have officers

23  there trying to keep the demonstrators outside, but, again, not

24  enough of us that day for the amount of people.

25         Here you have Capitol Police trying to stop the flow of

1   demonstrators from coming in that wing door, and they're trying

2   to hold the line as best they can.

3   Q.  Is that 2:48 at the Senate wing area?

4   A.  Yes, sir.

5   Q.  Does it appear the line had been resecured and then being

6   rebreached?

7   A.  Yes.  Looks like they're attempting, but now they've made

8   their way and were able to push their way in.

9        This is --

10  Q.  I'll pause it here at 3:00 p.m.  Are you familiar with this

11  area?

12  A.  Yes.  That is the lower west terrace door.  That door leads

13  into the basement of the Capitol, and it also leads right onto

14  the platform, the inaugural platform.

15  Q.  On inauguration day, what is this door used for?

16  A.  This is the door where all the dignitaries, to include our

17  President, will enter onto the inaugural stage.

18             (A video recording was played.)

19  A.  Those doors there on the right lead to the Senate lobby,

20  which is right outside of the Senate floor.

21  BY MR. BRASHER:

22  Q.  Was that at 3:01 p.m.?

23  A.  Yes.

24        And that desk they're sitting at there, that belongs to

25  the Senate doorkeepers.

1    Again, we're looking at the lower west terrace door.

2    You have demonstrators on the landing.

3    Q.  Is that 3:13 p.m.?

4    A.  Yes.

5    Q.  To your knowledge, were officers successful in keeping

6    demonstrators from entering that door?

7    A.  They held for a really long time.  I do not recall if we

8    were successful at keeping the crowd out.  I do know that they,

9    the officers, did an exceptional job trying to keep that door

10   secure.

11   Q.  And before we get to the next view of the east Rotunda

12   door, would it be fair to say that there were multiple

13   different areas of the Capitol that were being breached on

14   January 6th?

15   A.  Yes.

16   Q.  Some of them simultaneously?

17   A.  Yes.

18   Q.  And for those officers who were in that tunnel by the

19   west terrace doors, if no one had been there that day trying to

20   get in those doors, would officers have been able to go help in

21   other places?

22   A.  Oh, absolutely.

23        (A video recording was played.)

24   A.  We're still -- we're at the second floor outside of the

25   Rotunda.  The doors that are at the top of the stairs, there

1    are a lot of officers who have gone to the area, but the crowd

2    still persists to try and push in.

3    BY MR. BRASHER:

4    Q.  We're back again to the Senate wing door at about 3:39 p.m.

5    Does it look like officers have somewhat secured that area

6    again?

7    A.  Yeah.  It looks like they're talking the demonstrators into

8    leaving through that door.  A lot more officers were

9    concentrated in that area.

10   Q.  Now we're at 4:30 p.m.  You testified earlier that your

11   shift was supposed to end at 2:00 p.m.

12   A.  Yes, sir.

13   Q.  Did it end at 2:00 p.m.?

14   A.  No, sir.

15   Q.  Do you recall approximately what time you went home that

16   day?

17   A.  I would say probably about 7:00 p.m.

18   Q.  And do you recall that it was finally around 4:30 when

19   things finally started to clear out?

20   A.  At that time, based on what we could see on the cameras, it

21   looked like we were starting to gain a little bit more control

22   of the crowds.  Things were thinning out a little bit.  We had

23   gotten some more reinforcements by then because we called for

24   any of the local jurisdictions in the area that had civil

25   disturbance units that were available, to please send them

1    because we were in dire need.

2    Q.  And were those communications that you were a part of in

3    the communications center?

4    A.  Yes.

5    Q.  Can you describe what the situation was like in the

6    communications center as this was going on?

7    A.  Chaos, I would say.  Dispatchers trying to get control of

8    the air because we had so many officers calling out breaches,

9    calling out hurt officers, calling out demonstrator locations.

10        I had duress buttons from offices going off.  Our 911

11   lines were maxed out because we were getting calls from the

12   public as well as calls from staff all at once.

13        I had to recall my entire communications section, all

14   three shifts, to come in to help with the workload.

15        MR. BRASHER:  I have nothing further for this

16   witness, Your Honor.  Thank you.

17        THE COURT:  All right.  Thank you.

18                    CROSS-EXAMINATION

19   BY MS. TAYLOR-SMITH:

20   Q.  Good afternoon, Captain Summers.

21   A.  Hello, ma'am.

22   Q.  Captain Summers, Mr. Brasher showed you a lot of videos --

23   A.  Yes, ma'am.

24   Q.  -- during his direct examination.

25        In any of those videos, could you tell whether or not

1    Kyle Fitzsimons was present at all?

2    A.  No, ma'am.

3    Q.  If you are on the west -- strike that.

4         The tunnel for the lower west terrace that day looked

5    out on to the stage; is that correct?

6    A.  Yes, ma'am.

7    Q.  And how -- how would one get from the level below the stage

8    up onto the stage?

9    A.  Stairs, climb scaffolding.

10   Q.  The stairs on -- were on either side of the stage?

11   A.  Yes, ma'am.

12   Q.  And the stairs are permanent stairs?  Marble?

13   A.  There are some, yes.

14   Q.  Okay.  Were there other stairs?

15   A.  I believe we do construct additional stairs when they put

16   the stage together.

17   Q.  Okay.  And so if you are on, say, the level right

18   underneath the stage, can you see inside the tunnel area?

19   A.  Underneath the stage?

20   Q.  Yeah.  So you said there are stairs that lead up to the

21   stage; correct?

22   A.  Yes.  Yes.

23   Q.  So if you're at the bottom of those stairs that lead up to

24   the stage, can you see inside the tunnel?

25   A.  Not well, no.

1   Q.  Okay.  And is there a landing at the bottom of those stairs

2   where the stage is?

3   A.  For the lower west terrace door and the stage itself or --

4   Q.  So --

5   A.  I'm sorry.  I'm trying to understand.

6   Q.  We're going to call the top of the -- of the stage the

7   tunnel.

8   A.  Okay.

9   Q.  Okay.  And you've already told us that if you walk out of

10  the tunnel, you're basically on the stage.

11  A.  Yes.

12  Q.  Okay.  And if you come down the stairs that are on either

13  side of the stage --

14  A.  Yes.

15  Q.  -- is there a landing?

16  A.  Yes.

17  Q.  Okay.  Is that what is typically called the lower west

18  terrace?

19  A.  Yes.

20  Q.  Okay.  And below the lower west terrace, is there another

21  landing?

22  A.  We still consider that to be the lower west terrace.

23  Q.  Okay.  But it is a separate -- you have to walk up steps?

24  A.  Yes.

25  Q.  And if you are in that area, is that where the grass is?

```
 1    A.  No.
 2    Q.  So you have to go down another level to get to where the
 3    grass is?
 4    A.  Yes.  There's a wall, and then the grass is on the other
 5    side of the wall.  So if you come over the wall, you're on a
 6    cemented area.  Then there's a step up, and there's some more
 7    cemented area.  Then there's a fountain, but you can't see the
 8    fountain because the stage is over top of it, and then there's
 9    stairs on either side.
10    Q.  Okay.  Okay.  So if you are in the grassy area in front of
11    the lower west terrace, can you see into where the tunnel is?
12    A.  You can see the opening, but you wouldn't be able to see
13    very clearly what is beyond that opening.
14    Q.  Okay.  Individuals who are on -- let's start with that
15    first level, right after the grass.
16    A.  Okay.
17    Q.  Individuals who are on that level, what view, if any, do
18    they have of the Senate Chamber?
19    A.  None.
20    Q.  The Crypt?
21    A.  None.
22    Q.  The Rotunda?
23    A.  None.
24    Q.  What about the Senate doors on the west side?
25    A.  No.
```

1   Q.  What about if you go up to the next level?  Can you see any

2   of those things?

3   A.  Are you talking about actually on the stage itself?

4   Q.  No, no, no.  I'm still -- I'm --

5   A.  Still at the bottom of the stone stairs?

6   Q.  Yes.

7   A.  No.  It's hard to see.

8   Q.  So -- and just so I'm clear, on the map that the government

9   showed you, you can't see BLM Plaza?

10  A.  No.

11  Q.  That's because BLM Plaza is where in relation to the

12  west side of the terrace, for example?

13  A.  Closer to the White House.

14  Q.  Okay.  And the BLM terrace -- I mean, plaza, it -- the

15  street -- it -- it ends up where?  Where does it lead out?  How

16  close does it get you to the Capitol?

17  A.  It doesn't.

18  Q.  It doesn't?

19  A.  No.  It's pretty -- it's far.  It's far enough.

20          THE COURT:  By "BLM," do you mean Black Lives Matter?

21          MS. TAYLOR-SMITH:  Yeah.  I'm sorry.

22          THE COURT:  Okay.  No, no.  I mean, I know, but it's

23  not near.

24  BY MS. TAYLOR-SMITH:

25  Q.  When you were going through the videos and describing what

1    you were seeing, for example, outside the Senate door, near the

2    offices of the Speaker of the House, you can't see any of those

3    areas from outside on the west side of the Capitol; correct?

4    A.  No.  No, ma'am.

5    Q.  Do you have an independent recollection right now as you

6    sit here as to what area of the Capitol was breached first?

7    A.  No.

8    Q.  And you don't remember whether or not the officers in the

9    tunnel, for example, were able to prevent individuals from

10   going inside?

11   A.  I do not remember at that time.  Again, I was in

12   communications, and I was doing a lot of other things as well.

13   Q.  Okay.  You spoke earlier on in your testimony about the

14   perimeter that had been set up around the Capitol.

15   A.  Yes, ma'am.

16   Q.  Were -- after the -- 7:00 p.m., I guess, on January 6th,

17   when was the next time you were at the Capitol?

18   A.  The next morning, 6:00 a.m.

19   Q.  Okay.  And do you know whether or not -- strike that.

20        Who placed the perimeter around the Capitol?

21   A.  Our Security Services Bureau sets our perimeter.

22   Q.  Is that part of Capitol Police?

23   A.  Yes, ma'am.

24   Q.  Do you know whether or not they worked overnight to

25   reestablish that perimeter?

1   A.  I do not know.

2   Q.  When you arrived the next morning at 7:00 -- I'm sorry,

3   6:00 a.m., was the perimeter set back up?

4   A.  I do not remember.

5   Q.  You testified that your offices are about three blocks away

6   in the Verizon building; correct?

7   A.  Yes, ma'am.

8   Q.  Did you actually ever leave the Verizon building and come

9   over to the Capitol on January 6th?

10  A.  No, ma'am.

11  Q.  We saw areas of the video where certain portions of the

12  barriers had been breached; correct?

13  A.  Yes.

14  Q.  And you know that those areas were breached prior to --

15  well, prior to 2:30 p.m.; right?  Because it was after -- it

16  was -- it was before 2:30 p.m. when we started seeing the

17  breaches occur on the videos; correct?

18  A.  Yes.

19  Q.  And you right now don't know what happened to the barriers

20  themselves; right?

21  A.  Some of them, yes.

22  Q.  Let's talk about the barriers that would have cordoned off

23  the lower west terrace.

24          I'm sorry.  You have to say yes.

25  A.  I'm sorry.  Yes.

1   Q.  Okay.  Were those barriers still present when the

2   individuals converged on that portion of the Capitol?

3   A.  Portions, yes.

4   Q.  When you say "portions," are we talking about the bike

5   racks, or are we talking about the snow fencing, or do you

6   know?

7   A.  I don't know.  I do remember from video that I saw portions

8   of bike rack were pulled apart and thrown --

9   Q.  Okay.

10  A.  -- at officers.

11  Q.  Okay.  And it's -- would it be fair to say that you could

12  see on the CCTV that an individual who approached the Capitol

13  at, say, 4:00 p.m. might not have seen those bike racks or snow

14  fencing up?

15  A.  Yes, ma'am.

16  Q.  Okay.  I'm sorry.  I forgot for a second what it was

17  called.

18  A.  Yes, ma'am.

19  Q.  Prior to January 6th, did the Capitol Police -- strike

20  that.

21       The Capitol Police did, in fact, have a plan for how the

22  officers were going to be disseminated and where they were

23  going to be stationed to protect certain things as a result of

24  anticipated demonstrations; right?

25  A.  Yes.

1   Q.  And that plan was pretty detailed; correct?

2   A.  Yes.

3   Q.  Various units had been assigned to set up in various areas?

4   A.  Yes.

5   Q.  The prosecutor asked you at one point when he showed you

6   the video inside the tunnel, the -- where the lower west

7   terrace is.

8   A.  Yes.

9   Q.  That video was at 3:38 p.m.  He asked you the question:  If

10  those officers had not been in the tunnel at 3:38 p.m., could

11  they have helped elsewhere?

12  A.  Yes.

13  Q.  Okay.  Do you know whether or not the lower west -- whether

14  or not that tunnel was breached prior to or after any of the

15  other areas that we saw?

16  A.  I do not recall.

17  Q.  I don't have anything further.  Thank you, Captain.

18            THE COURT:  Thank you.

19                    REDIRECT EXAMINATION

20  BY MR. BRASHER:

21  Q.  You were asked if it was possible that someone approaching

22  the Capitol at -- later in the day might not have seen the bike

23  racks.  And you said that's possible; correct?

24  A.  Correct.

25  Q.  It's also possible they could have seen them?

1    A.  Yes.

2    Q.  When you were hearing the radio traffic, did you hear

3    sirens?

4    A.  Yes.

5    Q.  Alarms?

6    A.  Yes.

7    Q.  And in watching the CCTV footage, did you see officers in

8    riot gear?

9    A.  Yes.

10   Q.  Did you see pepper spray and other nonlethal munitions

11   being deployed?

12   A.  Yes.

13   Q.  Are all those warning signs to people to stay away?

14          MS. TAYLOR-SMITH:  Objection.

15   A.  Yes.

16          THE COURT:  Yeah, you can answer.

17   A.  Yes.

18          MR. BRASHER:  Nothing further.  Thank you.

19                    RECROSS-EXAMINATION

20   BY MS. TAYLOR-SMITH:

21   Q.  Prior to -- well, prior to anybody going inside the

22   Capitol, there were Capitol officers who were in riot gear; is

23   that correct?

24   A.  I'm sorry.  Can you say that one more time.

25   Q.  Yep.  I'm sorry.  I'll ask the question a little bit more

1    succinctly so it makes more sense to you.

2    A.  Okay.  Thank you.

3    Q.  Prior to the first demonstrator -- strike that.

4         That morning when Capitol officers were given their

5    various assignments, there were some Capitol officers who would

6    have been in riot gear; is that correct?

7    A.  Not quite.

8    Q.  Not quite?

9    A.  Not quite.  Normally what we do, the hard-squad officers

10   will have their riot gear available, if needed, but we do have

11   what we call our civil disturbance unit officers there and

12   ready with riot gear, ready to deploy, if needed.

13   Q.  Okay.  So the civil -- do you remember whether or not the

14   civil disturbance -- disturbance unit had been deployed that

15   morning at 6:00 a.m.?

16   A.  I do not remember what their start time was for the day.

17   Q.  But if they had been deployed at 6:00 a.m., they would have

18   had on riot gear at 6:00 a.m.?

19   A.  Not necessarily.

20   Q.  But they could have?

21   A.  They could have.

22   Q.  Okay.  Nothing further.

23             THE COURT:  Thank you.

24             MR. BRASHER:  Nothing further, Your Honor.

25             THE COURT:  All right.  Thank you, Captain.  You're

```
 1    excused.
 2              MR. GORDON:  Your Honor, at this time the
 3    United States calls Paul Wade.
 4              MS. TAYLOR-SMITH:  Court's indulgence.
 5              THE COURT:  Sure.
 6              THE COURTROOM DEPUTY:  Good afternoon, sir.
 7              THE COURT:  Hold on.  Wait until counsel --
 8              (Oath administered.)
 9              THE WITNESS:  I do.
10              THE COURTROOM DEPUTY:  Thank you, sir.
11              THE COURT:  Okay.  If you can sit by the
12    microphone -- in the jury box by the microphone.
13              THE COURTROOM DEPUTY:  Behind the plexiglass.
14              THE COURT:  Go ahead.
15                         DIRECT EXAMINATION
16    BY MR. GORDON:
17    Q.  Good afternoon, Mr. Wade.
18    A.  Good afternoon.
19    Q.  Are you employed, sir?
20    A.  Yes.
21    Q.  By whom are you employed?
22    A.  The United States Secret Service.
23    Q.  And what do you do for the Secret Service?
24    A.  I'm a supervisory special agent for the Liaison Division.
25    Q.  So let's unpack that.  So, first of all, what's your title?
```

1    A.  It's an ASAC, assistant to the special agent in charge.

2    Q.  And so is it proper to call you Special Agent Wade?  Agent

3    Wade?  ASAC Wade?  What's the proper title to address you?

4    A.  Agent Wade is fine.

5    Q.  And what does the liaison office do?

6    A.  We coordinate protective visits for Secret Service

7    protectees at the U.S. Capitol and other venues.

8    Q.  Who are Secret Service protectees?

9    A.  That would be the administration and those that we're

10   ordered to -- to protect per the Department of Homeland

11   Security:  the President; the Vice President; under statute,

12   their families; and foreign heads of state that visit the U.S.

13   Q.  So back on January 6th of 2021, was the Vice President of

14   the United States Michael Pence?

15   A.  Yes.

16   Q.  Was he a Secret Service protectee at the time?

17   A.  Yes, sir.

18   Q.  And what does Secret Service protection involve for a

19   Vice President?

20   A.  What -- I'm sorry.  Can you --

21   Q.  What does it involve?  When you say he's a "protectee,"

22   what does that mean?  What does the Secret Service do to

23   protect him?

24   A.  Well, he gets full-time protective detail, for starters,

25   and with that comes Secret Service advance teams and -- and

1    protection at whatever sites he's visiting.

2    Q.  So, for example, if the Vice President was going to be

3    coming to the United States Capitol, what would the

4    Secret Service do in advance of that visit to prepare for the

5    Vice President to be protected?

6    A.  The Secret Service liaison team would coordinate with the

7    U.S. Capitol Police and the Senate and House Sergeant at Arms

8    offices to -- to plan for any such visit.

9    Q.  And that's part of your job is to make that plan; is that

10   accurate?

11   A.  Yes.

12   Q.  Okay.  And in doing so, you're coordinating with that

13   counterpart at the Capitol Police and other agencies?

14   A.  Correct.

15   Q.  So I want to -- I'm sorry.  You also mentioned the

16   Vice President or any protectee's immediate family is protected

17   as well; is that right?

18   A.  Yes.

19   Q.  So for the Vice President who did -- who else was a

20   protectee?

21   A.  During that time, 2021, would have been Mrs. Pence, his

22   spouse; and Charlotte Pence, the daughter.

23   Q.  And Mrs. Pence is Ms. Karen Pence?

24   A.  Karen Pence; correct.

25   Q.  Now, I want to draw your attention specifically to

1    January 6th of 2021.  Why was it that the Vice President was

2    going to be coming to the Capitol that day?

3    A.  As the President of the Senate, he was to preside over the

4    vote for the -- the certification of the electorate vote for

5    President.

6    Q.  Was that an impromptu plan, or did the Secret Service have

7    a lot of advance notice that that visit was going to be

8    happening?

9    A.  Yeah, we had advance notice.  Of course, it was scheduled

10   for the complex, yes.

11   Q.  It's in the Constitution, in fact, is it not?

12   A.  Of course.  Yeah.  It's an obligation, yes.

13   Q.  We know -- in fact, now we know that a hundred years from

14   now -- or I guess at this point 99 -- that the Vice President

15   will need to visit the Capitol on that date; is that correct?

16   A.  Yes, per -- per the statute or whatever.  They have to

17   preside over the Senate, of course.

18   Q.  So walk us through, then, how -- what the steps were to

19   prepare for the Vice President's visit.

20   A.  They were -- well, we had meetings, phone calls,

21   walk-throughs as far as preparation for -- for the planning.

22   Q.  Are the -- is the physical building -- well, let's start

23   small.  Is the room where the Vice President is going to be in

24   the Capitol, is that given special protection because he's

25   going to be there?

1    A.  Well, the --

2    Q.  Is it a secure area?

3    A.  Yes.  Correct.

4    Q.  Is it a restricted area?

5    A.  Yes.

6    Q.  How about moving up?  How about the building itself, the

7    whole Capitol Building?  Would that have been a secured or

8    restricted area for the time that the Vice President was

9    visiting?

10   A.  Well, yes.  The U.S. Capitol Building has its own 24-hour

11   police force that's secure.  So it's a secure complex.  Then we

12   bring additional agents, detail agents, in with the

13   Vice President when he's there.

14   Q.  And in advance of that, did you coordinate with the

15   Capitol Police to review what the security precautions at the

16   Capitol Building would be to make sure that they were

17   satisfactory to the Secret Service?

18   A.  Yeah.  This was done by my team; correct.

19   Q.  And how about beyond the building itself or the four walls

20   of the building?  How about the grounds of the Capitol, the

21   surrounding, you know, grass and plazas and areas?  Were those

22   also secured and restricted for the time period the

23   Vice President would be visiting?

24   A.  Yes.

25   Q.  And how?  How -- what was the plan for how to do that?

1  A.  They were secured with bike -- my observations were bike

2  rack and snow fence, police signs on the perimeter, and posted

3  with Capitol -- U.S. Capitol Police officers.

4  Q.  And was that something that the Secret Service coordinated

5  with or approved; the Capitol Police's plan for how to do that

6  security or that restricted area?

7  A.  Well, there's several different types of events at the

8  Capitol.  For January 6th, this was not an NSSE.  So when it's

9  an NSSE, the Secret Service has the overall say in -- over

10  committees and subcommittees for the security process.

11      This was a -- a standard U.S. Capitol visit, which was

12  under the -- the approval process of the U.S. Capitol

13  Police Board, which is the Senate and House Sergeant at Arms,

14  the Architect of the Capitol, and the Capitol Police Chief.  So

15  they have the overall say of the perimeter that day.

16      However, Secret Service accepts -- accepted their

17  perimeter that day as acceptable to bring our protectee in,

18  which we do at other sites around the country when we visit.

19  We have agreements with other state, local, and federal

20  agencies to post our outer perimeter.

21  Q.  So -- so the parties that you just described, they work

22  together.  They put their heads together, and they come up with

23  what they believe is the appropriate perimeter, the appropriate

24  bounds to draw that will be a restricted area.  And then the

25  Secret Service views that and approves it, that it meets your

1   requirements; is that accurate?

2   A.  Well, the U.S. Capitol, again, is handled slightly

3   differently.  So we do not have the overall written approval

4   for their perimeter.  However, we observed that perimeter --

5   and through our discussions and planning for the event, we were

6   made aware of the perimeter that the Capitol Police was going

7   to have in place.

8        This perimeter was consistent with other historical

9   events where they've had protests in the city.  That perimeter

10  that we observed was consistent with that same setup that

11  they've used in the past.  So that was acceptable to us.

12  However, we did not sign off saying that that perimeter was

13  going to be in place ahead of time, but we knew they would have

14  an expanded perimeter as part of that day's events.

15  Q.  Agent Wade, I'm now showing you what's already in evidence

16  as Government's Exhibit 601, an overhead view of the Capitol

17  with an area outlined in red.  Is the area outlined in red the

18  restricted area that you were just describing?

19  A.  Yes.  Set up on that day; correct.

20  Q.  So who was allowed to be within that restricted area?

21  A.  That would have been posted by U.S. Capitol Police.  So it

22  would have been Capitol Police, any congressional staff, and

23  Sergeant at Arms staff as well.  So people who have access to

24  that restricted space with proper credentials.

25  Q.  And if you were just a regular member of the public, are

1    you allowed in that restricted area?

2    A.  No.

3    Q.  If you were in that restricted area during the time it was

4    restricted, are you, essentially, committing a crime?

5    A.  Yeah, I'll let the attorneys determine that.  But, yes,

6    that would be a restricted posted perimeter, and breaching that

7    perimeter would be in violation.

8    Q.  Now, I want to direct your attention to an item premarked

9    for electronic identification as Government's Exhibit 400,

10   which I don't anticipate there being any objection to.

11           MR. GORDON:  So I want to move it into evidence at

12   this time.  This is the Head of State Worksheet.

13           MS. TAYLOR-SMITH:  No objection, Your Honor.

14           THE COURT:  It's admitted.

15           (Government Exhibit 400 admitted into evidence.)

16   BY MR. GORDON:

17   Q.  Agent Wade, take a look at this document that's now in

18   evidence as Government's Exhibit 400.  Can you describe -- it's

19   titled at the top Head of State Worksheet.  Can you describe

20   what this is?

21   A.  Yeah.  The Head of State Worksheet is a Secret Service

22   document and used by the Liaison Division to -- to make a

23   formal notification to the Capitol complex, so all the staff

24   and Capitol Police entities up there, of the latest logistics

25   and information known to -- to make a formal notification for

1    our partners and -- of a -- of a Secret Service protectee visit

2    to the Capitol.

3    Q.  So is it fair to say this is a -- a document where you're

4    working out the times and places and personnel involved in a

5    visit of Vice President Pence, his wife, and his daughter to

6    the Capitol on January 6th?

7    A.  Yes.

8    Q.  I want to direct your attention to the bottom section where

9    it's marked Itinerary.  Can you explain the notations there and

10   explain what it tells us about what the Vice President's

11   movements were expected to be on January 6th.

12   A.  Yes.  At -- per this timeline, at 12:30, the Vice President

13   would arrive via -- MC is motorcade.

14   Q.  Let me stop right there.  What is a motorcade?

15   A.  It is a Secret Service-controlled motorcade of a group of

16   vehicles that -- that we secure.

17   Q.  And for transporting the Vice President, is there a

18   standard or average number of vehicles that are involved in a

19   motorcade?

20   A.  It depends on the type of event, whether it's official, off

21   the record.  There's different scenarios.  But, yes, there's

22   typically standard package numbers, depending on the -- the

23   event.

24   Q.  And why does the Vice President travel by motorcade?

25   A.  For -- for his safety.  We secure that motorcade.

1   Q.  Is there more security in greater -- sometimes having more

2   cars than just one for the Vice President to travel in?

3   A.  Yes.

4   Q.  All right.  So you said 12:30 via MC, or motorcade, to

5   Senate carriage.  What is the Senate carriage?

6   A.  It's the -- the northernmost main steps for the

7   U.S. Capitol on -- on the U.S. Senate side of the U.S. Capitol

8   Building.  And the carriageway is -- is the path underneath and

9   behind the steps where -- where vehicles arrive and drop off

10  senators and, in this case, the Vice President.  That's where

11  his arrival was.

12  Q.  Okay.  When it says "Greeter," what does the greeter column

13  mean?

14  A.  Yeah.  The greeter, SSA [sic], is Senate Sergeant at Arms.

15  So it's a ceremonial greet provided by the -- where the -- at

16  the -- currently, it's the general or their designee.

17  Q.  What does destination mean?

18  A.  That is the -- the initial destination, which S-214, is --

19  is currently the Vice President's ceremonial office in -- at

20  the U.S. Senate.

21  Q.  What does functional hold mean?

22  A.  Function is -- hold, meaning they were going to stage in

23  that room, S-214, prior to their next movement or next event.

24  Q.  What does it mean to stage?

25  A.  To stand by.  To -- to -- because the -- everything is on a

1    certain timeline.  Because he would stage in his -- or hold in

2    his ceremonial office until he's brought out onto the floor to

3    preside over the Senate.

4    Q.  Was there a time when the Vice President was expected to

5    begin presiding over the Senate?

6    A.  Yes.  Approximately 1 o'clock.

7    Q.  Okay.  So in layman's terms, is it fair to say that what

8    this document shows so far is the Vice President was going to

9    be picked up at his home at the Naval Observatory, driven to

10   the Senate, met there by the Sergeant at Arms and brought to

11   his office to wait a few minutes, prepare for his 1 o'clock,

12   you know, constitutionally mandated duties to preside over the

13   Senate; is that accurate?

14   A.  Yes.

15   Q.  All right.  So then looking at the next column, departure,

16   via foot en route to the House Chamber, depart time 12:45, what

17   does that mean?

18   A.  That's when the Vice President -- again, they would

19   convene, bring the Senate to order, and then they would proceed

20   as a procession -- he would lead the senators over to the

21   House Chamber.

22   Q.  And I'm looking at the next row.  Arrival time 12:55.

23   Location, House Chamber.  Destination, House Floor.  Can you

24   explain how -- what those three columns mean when read

25   together?

1    A.  Yeah.  Again, departing from the Senate Chamber via the

2    second floor, which is the -- the House and Senate Floor level.

3    They would proceed through the Rotunda and then over to the

4    House Chamber.  And that's where he would stage, and then the

5    House Chamber would come to order.

6    Q.  So why was the Vice President going to be leading a

7    procession of all the senators from the Senate to the House?

8    A.  Well, he's the -- the Vice President is the President of

9    the Senate.  So that is one of their duties.

10   Q.  Particularly on January 6th?

11   A.  Yes.

12   Q.  For the certification proceeding; is that right?

13   A.  Correct.

14   Q.  So is that why the next column says, "Function, Electoral

15   College Certification"?

16   A.  Yes.

17   Q.  Now, the depart time says, "TBD."  Can you explain why that

18   is?

19   A.  Because at this point, we knew by the program that we would

20   have to arrive in the carriage, go to -- go to his hold, to his

21   office, to the Senate Floor, then over to the House.  And at

22   that point, our -- we were briefed that they could finish the

23   entire certification and depart from there or there could be

24   objections, at which point we'd have to break out and go back

25   to the Senate Chamber and then return to the House Chamber.  So

1   at that point we used TBD for to be determined.

2   Q.  From a big-picture overview, is it fair to say the plan,

3   from Vice President Pence and the Secret Service, was that the

4   Vice President would stay at the Capitol until the

5   certification of the Electoral College vote was completed?

6   A.  Yes.

7   Q.  And jumping ahead in time, is that what happened?  Did the

8   Vice President stay on the grounds of the U.S. Capitol until

9   the certification of the Electoral College vote was completed?

10  A.  He stayed on the grounds -- correct -- with -- with a break

11  in the -- the certification due to the incident.

12  Q.  Okay.  Things didn't go as planned; correct?

13  A.  No.

14  Q.  Okay.  But he -- is it true that he never left the

15  Capitol Grounds --

16  A.  Correct.

17  Q.  -- until the certification was complete?

18  A.  Yeah.  We had to relocate for emergency purposes.  However,

19  we stayed on the grounds within the Capitol Police-restricted

20  zone.

21  Q.  In other words, you weren't able to follow this itinerary

22  as planned, but you didn't -- you never left the grounds; is

23  that right?

24  A.  Yes.

25  Q.  Until what time?  When did the Vice President eventually

1    leave the Capitol Grounds?

2    A.  I wasn't present for that, but that happened, I was told

3    around, after 4:00 a.m., 4:30.

4    Q.  The next day?

5    A.  The next day, when it was completed.

6    Q.  I should have asked.  Did he -- did the first part of this

7    itinerary happen as planned?  Was he picked up from his

8    residence at 12:30?

9    A.  He arrived at 12:30, yeah.

10   Q.  I'm sorry.  Did he arrive at the Senate carriage at

11   approximately 12:30?

12   A.  I believe it was 12:37, yeah.  Just after 12:30.

13   Q.  And was the first part of this followed?  Did he then move

14   to his ceremonial office as planned?

15   A.  Yes.

16   Q.  Okay.  So you said, sir, things were interrupted; right?

17   The -- things -- somehow things went off the rails and didn't

18   go as planned.  Can you describe what happened.

19   A.  Yeah.  So we took him to the -- the House Chamber.  There

20   was the objection on the floor.  We came back to the

21   Senate Chamber, at which point I briefed up my vice

22   presidential counterpart from the detail and the Capitol Police

23   officer on our emergency action drills because we knew

24   protesters were growing in large numbers around the perimeter.

25   Q.  Can I stop you there for a second.

1    Before there was the emergency, you -- you had said that

2  there was an expectation there might be objections, and if

3  there were objections, the Vice President would have to be

4  removed from the House Chamber.

5  A.  He would have to lead the Senate back to the Senate Chamber

6  so they could do a breakout session of the senators to -- to

7  debate the --

8  Q.  And did that happen?

9  A.  -- objection.

10  Q.  Were there objections in the House Chamber when the

11  Vice President and all the senators were there?

12  A.  The -- the very first vote was an objection; so we didn't

13  stay in the House Chamber very long.  So we returned back to

14  the Senate Chamber --

15  Q.  Okay.

16  A.  -- just before the incident, yeah.

17  Q.  So you were in the Senate Chamber.  You'd moved from the

18  ceremonial office to the Senate, led the senators to the House,

19  and then had left the House and returned to the Senate Chamber

20  at the time, sort of, the emergency began; is that accurate?

21  A.  Just before the emergency; correct.  We were in the

22  Senate Chamber.

23  Q.  Okay.  So then describe -- when you say an emergency

24  happened, tell it to us from your perspective.  What was your

25  role at this point in the day?  Were you physically with the

1    Vice President, or were you somewhere else?

2    A.  So at this point I was on the -- what's considered the

3    third floor of the U.S. Capitol, the gallery level or balcony

4    level, and the floor level is the second floor.  So I was on

5    the balcony level and -- with Mrs. Pence and Charlotte Pence,

6    because that's where their seats were to observe the -- the

7    certification.

8         So when we made it back to the Senate Chamber, I -- I'm

9    also -- I was also the lead planner for the inauguration.  So I

10   wanted to respond down to the basement to our office to get

11   some paperwork.  So just prior, I made sure I briefed up

12   everybody on the emergency action plan in the event that

13   something happened; that they were to respond to the second

14   floor and pair up with the Vice President and his detail down

15   there.

16        So I was only gone a couple of minutes.  I responded to

17   the basement, to our office, retrieved some paperwork.  Shortly

18   after I heard scuffling in the hallway.  I poked my head out,

19   and I observed Capitol Police like running in the hallway, and

20   I heard something about a breach.  So I --

21   Q.  Let me stop you there.  So when you left Mrs. Pence --

22   Ms. Karen Pence and Charlotte Pence in the gallery and went

23   down to meet with other personnel in the basement, that was the

24   time when you understood rioters were amassed, but they were

25   still outside the Capitol Building; is that correct?

1    A.  Yeah.  My understanding at that point was there were large

2    numbers, but I had -- at that point, I had not heard of any

3    breaching.

4    Q.  But -- and then when you were downstairs, that's when you

5    learned there had actually been a breach.  Now there were

6    rioters inside the Capitol; is that correct?

7    A.  No.  At that point, my understanding from what information

8    I received, that they were -- they had breached the plaza --

9    the bike racks and they were on the grounds.  So I had -- at

10   that point in time, I did not know of anyone in the building

11   just yet.

12   Q.  Okay.  But they were past -- they're already past the first

13   barriers of restricted area, and now they're sort of, you know,

14   on the plaza you said.  They're outside the doors.  They're

15   near -- they're much closer to the building; is that right?

16   A.  Yes.

17   Q.  Is that when you and the other Secret Service agents start,

18   sort of, enacting an evacuation plan, or -- or is the

19   protection approach different at that point?  Are you still

20   trying to shelter in place or make some other movements?

21   A.  Well, at this point I -- hearing and seeing officers

22   running, I immediately ran to the second floor because that's

23   what I had briefed the -- the Vice President -- the

24   Vice President's agents that were on Mrs. Pence and

25   Charlotte Pence, I briefed them to go to the second floor, so

 1   them and their Capitol Police counterpart.

 2          So I -- when I proceeded to the second floor, I ran into

 3   Lanelle Hawa, who prepared, again, this HOS document.  And my

 4   immediate thoughts to her when she was saying, yes, she was

 5   getting information corroborating what I was hearing about

 6   rioters now being at the building.  So at this point, we had a

 7   brief discussion about the vehicles, knowing that the -- the

 8   east plaza where we had pulled up to the Senate carriage,

 9   knowing that there were protesters and now rioters that had

10   breached the bike racks and were at the building, we knew at

11   that point it wasn't safe to -- to put the Vice President in

12   the vehicles, if we were to relocate him that way.  So she

13   explained to me how the vehicles were being relocated for an

14   alternate relocation point.

15   Q.  So am I understanding you correctly, then, that the

16   Vice President's motorcade was parked on the east plaza and

17   that the normal response in this kind of situation would have

18   been to evacuate the Vice President somewhere out of the east

19   side and load him into the motorcade there, but because of

20   where the rioters were amassing, that was deemed no longer

21   safe?

22   A.  Correct.

23   Q.  And so the Vice President's motorcade had moved somewhere

24   else from its usual position on the east plaza to a different

25   extraction point?

1    A.  Yes.

2    Q.  Okay.  So you had this planning conversation with

3    Agent Hawa.  What happened next?

4    A.  So at that point, she proceeded to the stairs and was

5    coordinating with the Vice President's detail and other

6    Capitol Police uniform officers the egress of the

7    Vice President because we knew we would have to take him

8    downstairs.

9    Q.  Can you explain why.  You'd have to take him downstairs

10   why?

11   A.  Because we were up on the second floor.  So at that point,

12   shortly after we heard they were at the building and starting

13   to penetrate the building, so to -- to move the Vice President,

14   it wouldn't be safe to keep him on the second or third floor.

15   We would have to move downstairs because the -- the first floor

16   would be the carriageways or take him down into the basement

17   area.

18   Q.  So you're still at this point thinking we need to move him

19   somewhere where we can get him out of the Capitol and drive him

20   away by car; is that right?

21   A.  Yes.

22   Q.  So you're -- so what happened next, then, with -- from the

23   second floor?

24   A.  So at that point, Lanelle went to the detail agents and the

25   officers.  She was -- she was coordinating the egress part.  I

1   went into the -- just -- the hallway just outside the

2   Vice President's ceremonial office to then have conversations

3   with the Vice President's supervisor -- protection detail

4   supervisors.

5          So I had a few conversations and a short time span where

6   I first was talking with the uniform Capitol Police officer.

7   She was explaining some of the exact breach points that she was

8   hearing on their radio.  I then made a phone call to the head

9   in -- Capitol Police inspector and just to -- to see -- I knew

10  he would be wherever the major incident was -- to just get a

11  report from him.

12         Surprisingly, he answered the phone and at that point

13  told me:  If you have the Vice President, you need to move him

14  now because they've -- they're in the building now.

15         So at that point, it was an imminent situation, and I

16  then turned and I relayed this to the -- the Vice President's

17  supervisors.  And, in turn, based on other information and the

18  different -- from Capitol Police and what we're hearing from

19  the people outside, we ended up then presenting this to the

20  Vice President.  Everybody stood up and then we moved.

21  Q.  Meaning out of the Senate Chamber?

22  A.  Yes, out of the ceremonial office, which is located just

23  north -- it's a hallway outside the Senate Floor, the

24  Senate Chamber itself, where -- where the senators convene.

25         There's a back hallway or lobby area, and then

1    there's the Vice President's office.  So we were in that little

2    lobby area, and he was inside his office.  So we then relocated

3    him from there down the staircase.

4    Q.  And was that, you know, easy and clear to -- to move the

5    Vice President from the ceremonial office down the staircase to

6    the first floor, or were there obstacles or concerns the

7    Secret Service had to deal with to make that move?

8    A.  There were major concerns because at this point some of the

9    agents downstairs were observing people that had broken into

10   the building.  I was closer to the Pences and the supervisors;

11   so I did not see the rioters at that point.  But other folks

12   were interacting with them and -- or observing them, I should

13   say.  So we knew they were getting close.

14        So we were trying to post officers and agents in a

15   position to secure our egress.  So it was a major concern at

16   that point to get him off that floor before protesters,

17   rioters, and so forth took over that first floor in our area.

18   Because at that point, now you have a really severe situation

19   for his safety.

20   Q.  One where the Vice President would, essentially, be trapped

21   on the second floor; is that accurate?

22   A.  Basically, yes.  Yeah.

23   Q.  Were you ultimately able to extract the Vice President down

24   that stairwell outside of his ceremonial office?

25   A.  Yes.

1    Q.  And as he was extracted in that manner, how close did he

2    come to rioters who were inside the building, approximately?

3    A.  From where we came down the staircase, when I hit the

4    threshold, I could hear yelling and screaming from around the

5    corner.  I would say it was 20, 30 yards.  Twenty, 30 yards or

6    so when you add up the distances around the hallway, couple

7    bends in the hallways, to -- to where they were breaching at

8    the Senate wing door from the west side.

9    Q.  Now, I -- for the next question, I don't want you to give

10   away any information that would prevent -- present a security

11   risk now or in the future for anyone.  But after the

12   Vice President proceeded down that hallway and to the first

13   floor, was he taken somewhere else on the Capitol Grounds?

14   A.  Yeah.  We stayed within the U.S. Capitol Building.

15   Q.  And how long -- and the next location -- wherever you

16   brought him after you brought him down those stairs, in the

17   next location, how long did you spend in that next location?

18   A.  We stayed there until that evening when the

19   Capitol Building was declared swept, secure, and safe.

20   Q.  Is it fair to say that you were in that -- that next

21   location after his ceremonial office for hours?

22   A.  Yes.

23   Q.  And why were you there for hours?  What -- what took so

24   long?

25   A.  Well, when we relocated down there, there was a lot of

1   unknowns.  Of course, outside with the tens of thousands of,

2   again, rioters, protesters, demonstrators that were all around

3   the complex.  It wouldn't have been safe to -- to initially

4   drive out there without additional information.  We did call

5   additional agents in, and we did eventually have eyes outside.

6   But until then, we had to maintain, you know, what we consider

7   hardening up for safety.

8   Q.  And just to explain, what does the term "hardening up"

9   mean?

10  A.  It's basically securing, fortifying, kind of digging into

11  your position in case the situation becomes, you know, more

12  severe, and -- and -- so at that point, you know, you just want

13  to kind of put yourself in a position to kind of give yourself

14  the safest location, advantage point, that you can in the event

15  that the rioters would have gotten to our position.

16          MR. GORDON:  Your Honor, at this time I would like to

17  submit into evidence Government's Exhibit 401, a video of the

18  Vice President being evacuated.  I don't believe there's any

19  objection from the defense.

20          MS. TAYLOR-SMITH:  No objection.

21          THE COURT:  It's admitted.

22          (Government Exhibit 401 admitted into evidence.)

23          MR. GORDON:  Doug, do you have 401?

24      I'm sorry, Your Honor.  Brief indulgence.  Scratch that

25  at the moment, Your Honor, as we do not have 401.

1          I am, instead, going to publish what's already in

2     evidence as Government's Exhibit 200.  And I'm going to move

3     the video to approximately 1 minute and 55 seconds into the

4     video.  It will just take a second to load.

5                (A video recording was played.)

6     BY MR. GORDON:

7     Q.  Let's stop there for a moment.  I pause the video at the

8     1-minute-33-second mark, which has a time stamp of 1:59:14 p.m.

9     Agent Wade, what -- can you tell us what we're looking at with

10    respect to the black-and-white vehicles in the center of this

11    paused video?

12    A.  Yeah, you're looking at the -- the east side of the

13    U.S. Capitol and the vehicles here that are departing to the

14    left.  The black Suburbans are the Vice President's motorcade.

15    Q.  And is this when the motorcade was moved to accommodate the

16    change in plans as the rioters were amassing?

17    A.  Yes.

18    Q.  Now I'm going to move Exhibit 200 to the time stamp,

19    approximately, 3:01 p.m.  I have paused the video at the 18:22

20    mark of the video.  And I'm now going to play, and I want,

21    Agent Wade, for you to tell us what we're watching and narrate

22    that for us.

23                (A video recording was played.)

24    BY MR. GORDON:

25    Q.  So, first of all, what is this highlighted area that's

1    shown at 18:26 in red?

2    A.  So that's what they call the -- the members' staircase on

3    the U.S. Senate.  So you're looking -- to the right, where it

4    says Senate, that is the Senate Chamber, and that staircase in

5    red was where we -- where we relocated the Vice President, down

6    those stairs.

7                (A video recording was played.)

8    BY MR. GORDON:

9    Q.  Playing the video here.  I paused the video at 18:30.  What

10   am I looking at here?

11   A.  So that's the staircase that was in the last video that was

12   highlighted, but this is the -- the relocation staircase.  To

13   your right is the -- the doors to the lobby behind the

14   Senate Chamber and just -- if you go through those wooden

15   double doors, to your right is the Vice President's ceremonial

16   office.

17   Q.  And, approximately, what time was the Vice President

18   evacuated through the staircase, if you know?

19   A.  Based on times, it was approximately -- approximately -- I

20   thought it was approximately 2:30.

21   Q.  About a half hour before this?

22   A.  It was just after -- yes, because it was about 20 minutes

23   or so after -- 25 minutes after the motorcade physically moved

24   on the plaza.

25                (A video recording was played.)

1    BY MR. GORDON:

2    Q.  Okay.  So as I'm playing the video here, are these rioters

3    that we see here, are they coming up the same staircase, just

4    in the opposite direction that you evacuated the

5    Vice President?

6    A.  Yes.

7    Q.  Did you believe the Vice President's life to be in danger

8    during the events of this afternoon?

9    A.  Well, I'll let folks interpret that as they will, but

10   hundreds, if not, you know, thousands of people breaching the

11   U.S. Capitol Building that haven't been screened and swept for

12   weapons, yes, that would be an imminent threat to -- to the

13   Vice President's safety.

14   Q.  And did that -- did those hundreds or thousands of people,

15   did they interfere with the ability of the Vice President to

16   provide -- to preside over the Electoral College count

17   certification?

18   A.  Yes.  I mean, the fact that we had to move the

19   Vice President for his safety and that the senators and

20   representatives were relocated to -- to safe locations was a

21   disruption to the -- to the vote.

22   Q.  And is that only -- was that only caused by the rioters

23   inside the Capitol or the rioters outside the Capitol were to

24   blame for that as well?

25   A.  Well, as soon as they began breaching the perimeter,

1   obviously that raised concerns.  And then when they were at the

2   building at some point, they made a call to -- to recess the

3   proceedings for safety.

4   Q.  And at approximately -- so you said that Vice President

5   Pence was evacuated down these stairs sometimes between two --

6   A.  2:30.

7   Q.  2:30, 2:40, somewhere at that range?

8   A.  Yeah.

9   Q.  So at approximately 4:15 was the Vice President still in

10  that secondary safety area that you had described earlier?

11  A.  Yes.

12  Q.  And had rioters cleared the Capitol but still been fighting

13  police outside -- so if the building itself was empty of

14  rioters but there was still violence outside, still rioters

15  trying to get in, would you have moved the Vice President back

16  to the Senate and gone back about your business?

17  A.  No.

18  Q.  Why not?

19  A.  Well, for safety.  We -- we had to, again, harden our

20  position, assess all the intel that was coming in, and it was

21  better to not move him than to move him out into an unknown.

22  Q.  Is it fair to say that you could not bring the

23  Vice President back to the Senate Chamber so that the

24  electoral count certification could resume until the violent

25  rioters were removed from the Capitol Grounds?

1    A.  Correct.

2              MR. BRASHER:  Nothing further, Your Honor.

3              THE COURT:  Go ahead.

4                         CROSS-EXAMINATION

5    BY MS. TAYLOR-SMITH:

6    Q.  Good afternoon, Agent Wade.

7    A.  Good afternoon.

8    Q.  I just have a few questions for you.

9    A.  Sure.

10   Q.  You testified on direct examination that the perimeter that

11   had been constructed by the Capitol Police was really in regard

12   to both the inauguration setup and anticipated protests;

13   correct?

14   A.  That, yes, it was signed off by the Capitol Police Board,

15   is a standard posture for that perimeter on days when there's

16   numerous protests in the city.

17   Q.  Okay.

18   A.  Correct.

19   Q.  And can I ask you:  The itinerary that we saw earlier, the

20   government exhibit, who has access to that?  Well, strike that.

21   Don't answer that question.

22   A.  Okay.

23   Q.  I'll ask this question.  Would a member of the public

24   typically have access to that itinerary?

25   A.  No.

1    Q.  And it's also --

2    A.  Now -- I'm sorry.  Correction.  No, they wouldn't have our

3    paperwork that was disseminated.  I don't know what the

4    Sergeant at Arms puts out to the general public, as far as how

5    they do new releases and press releases through the House and

6    Senate galleries of the Electoral College vote.

7    Q.  But even in a press release, it would not have the specific

8    movements of a governmental protectee, like the Vice President

9    and his family?  That's fair to say?

10   A.  Not in detail as our document; correct.

11   Q.  And in looking at the itinerary itself, there were a lot of

12   blocks that had TBD written in it; correct?

13   A.  Yes.

14   Q.  That -- that means to be determined; is that correct?

15   A.  Yes.

16   Q.  And it's -- because it's fair to say that once the process

17   begins, the electoral votes process begins, there's no way of

18   telling how long it might last?

19   A.  Correct.  We were told it would be anywhere from 30 minutes

20   to 3 hours to more than that.  Just depending on objections and

21   so forth.

22   Q.  And what does the Vice President do during objections?

23   A.  Well, as far as -- you would have to talk to Senate or

24   House rules on specific procedural -- which I'm sure you had on

25   your list, but as far as our movements that -- and my

1    understanding of the process, he would preside over the vote in

2    the House.  And then if there were objections, he would

3    leave -- lead all the senators back to the Senate Chamber to

4    then convene to discuss objections with the senators before

5    reconvening.

6    Q.  Well, you testified today that when -- he did, in fact,

7    lead the senators back to the Senate; right?

8    A.  Yes.

9    Q.  Okay.  And when he led the senators back to the Senate, he

10   did not stay in the chamber with them.  He went to his office;

11   is that what you said?

12   A.  No.  I didn't -- I said he led them back, but at some point

13   when they -- when the breaches were occurring, they gaveled out

14   and he then went to his office to hold.

15   Q.  Okay.  And that would have been taking place while you were

16   downstairs on the first floor in your separate office?

17   A.  That was somewhere around that time period, yeah.

18   Q.  Do you remember what time the Vice President left this

19   separate area and came back up to the Senate Chamber?

20   A.  I'm sorry.  I don't understand.  Separate area?

21   Q.  Well, it's secret; so I don't know where he was.

22   A.  Oh.  You're talking about the relocation area?

23   Q.  Yes.  Yes.

24   A.  And it -- it's fair to say in -- in the basement level, we

25   were on -- in the Capitol Building, yeah, and we never left the

1    Capitol Grounds.

2    Q.  Yes.  What time did he come back to the Senate Chamber?

3    A.  Later that evening.  I believe it was just before

4    7 o'clock p.m.  So we went down around 2:30 p.m., and we stayed

5    down there until -- we got the all-clear somewhere around 6:00,

6    6:30.  We did additional -- we brought additional agents

7    upstairs to -- to secure it.  And at that point it was

8    somewhere just before 7 or -- 7 o'clock, I believe,

9    approximately, that he went back upstairs.

10   Q.  And he was moved from the Senate Chamber first to his

11   office because demonstrators or protesters had approached the

12   building; is that correct?

13   A.  I couldn't tell you exactly why they recessed, but that is

14   the natural point -- the initial point of dismissing on the

15   floor would be to move him to his office.

16   Q.  Okay.

17   A.  To assess, yeah.

18   Q.  So you don't know whether or not the senators continued to

19   debate the objections when there were demonstrators just inside

20   the perimeter but not at the building?  Do you understand my

21   question?

22   A.  Yeah, I could only speculate at that point, because when I

23   got to the Senate lobby area behind the chamber, the

24   Vice President and his family were in that office.  I wasn't at

25   that point really paying attention to the Senate Floor on who

1    was still present.  But my understanding was that they were in

2    recess for him to come off the floor, but I couldn't tell you

3    what was going on on the Senate Floor at that point.

4    Q.  Okay.  Do you know whether or not Vice President Pence left

5    the Senate prior to the recess?

6    A.  I mean, again, I wasn't there to witness exactly when he

7    walked out versus gaveling, yeah.

8    Q.  Okay.

9    A.  I couldn't explain that.

10           MS. TAYLOR-SMITH:  All right.  I have nothing

11   further.  Thanks.

12           THE WITNESS:  Sure.

13           MR. GORDON:  Your Honor, I now would like to publish

14   what we've admitted as Government's 401 but I wasn't able to

15   earlier.

16           (A video recording was played.)

17                    REDIRECT EXAMINATION

18   BY MR. GORDON:

19   Q.  Agent Wade, what's being displayed in the exhibit on

20   Exhibit 401, is that what you were describing earlier as the

21   evacuation of the Vice President?

22   A.  Yes.

23   Q.  And are you in that video?

24   A.  Yes.  I was right at the beginning.

25           MR. GORDON:  Nothing further, Your Honor.

1          MS. TAYLOR-SMITH:  Your Honor, I don't have any

2     recross.

3          THE COURT:  Okay.  All right.  Thank you,

4     Special Agent Wade.  You're excused.

5          THE WITNESS:  Thank you, Your Honor.

6          MR. GORDON:  Your Honor, we do have another witness

7     here.  Would you prefer to call that witness or break for the

8     day?

9          THE COURT:  I think I would prefer.  My staff would

10    kill me if I did, though.  It's -- so we'll break for the day.

11         So tell me what tomorrow is going to look like.

12         MR. GORDON:  Yes, Your Honor.  So I anticipate we'll

13    finish with the government's case tomorrow.  The first witness

14    will be Metropolitan Police Department Officer Sarah Beaver.

15    She was the person who was hit with the spear-like throw; that

16    assault.

17         The next witness after her will be a journalist from

18    Maine who interviewed Mr. Fitzsimons and wrote an article about

19    it immediately after January 6th in which --

20         THE COURT:  What's the name of that person?

21         MR. GORDON:  Harrison Thorp.

22         THE COURT:  Okay.

23         MR. GORDON:  United States Capitol Police Sergeant

24    Aquilino Gonell will testify.  He was the victim of the assault

25    where Mr. Fitzsimons was attempting to steal his shield.

1          And the case agent will testify, FBI Special Agent Tom

2     Ryan.

3          So we have those -- those witnesses tomorrow.

4          THE COURT:  And of those, you -- I assume Gonell is

5     the longest?

6          MR. GORDON:  Yes, Your Honor.  Well, I anticipate

7     that the cross-examination of Gonell will be considerably

8     lengthy.

9          THE COURT:  Given how many exhibits are attached to

10    him, yes.

11         MR. GORDON:  Yes, Your Honor.  I do not think that

12    our examination of Special Agent Ryan will be lengthy, only

13    because we're admitting many video exhibits through him that

14    we'll have to publish.

15         THE COURT:  Okay.

16         MR. GORDON:  But I don't anticipate the questioning

17    of him will necessarily be lengthy.

18         THE COURT:  All right.  Anything else from the

19    government?

20         MR. GORDON:  Yes, Your Honor, I do have one other

21    matter.

22         So AUSA Brasher brought it up earlier, but throughout

23    the day the government's witnesses have been harassed by a

24    variety of people as they've left the courtroom, and some have

25    let the agent or us know they're very uncomfortable, feel

1    threatened by that.

2         So if there's any way that we can have those witnesses

3    either exit the courtroom in a different way than out that door

4    after they finish testifying or if that's the only way they can

5    go, if we can arrange for some sort of marshals' escort or

6    other protection for them.  I think tomorrow's witnesses would

7    greatly appreciate that.

8         THE COURT:  All right.  Do you have a position on any

9    of that?

10        MS. TAYLOR-SMITH:  Your Honor, I have no idea.  All I

11   know is what I heard from the prosecutors after Mr. Brasher had

12   initially addressed it with the Court.  So I don't even know

13   who we're talking about.  I mean, I would have conversations if

14   it was somebody connected to me.  I don't think it's somebody.

15        THE COURT:  Sure.  No, no, no.  I'm focusing more on

16   do you have -- I assume the government is talking about the

17   nonlaw enforcement witnesses; is that right?

18        MR. GORDON:  Both, Your Honor.  The first witness,

19   Sergeant Phuson Nguyen, was accosted as he left this morning.

20        But the primary concern -- primary concerns have been

21   from Representative Golden's chief of staff, Aisha Golden --

22   not Golden -- Aisha Woodward, as well as the civilians from

23   Maine when they left.

24        THE COURT:  Okay.  So, Ms. Taylor-Smith, do you have

25   an opposition to any of those witnesses exiting through a

1    different door, like the door into the hallway, instead of

2    going out the front door?

3              MS. TAYLOR-SMITH:  Your Honor, I -- it makes me no

4    difference.

5              THE COURT:  Okay.  So we can arrange something else,

6    if they don't want to go out that door, and I will have someone

7    from my staff escort them out this back door and to a hallway

8    and then to a different elevator.

9              MR. GORDON:  Thank you, Your Honor.

10             THE COURT:  All right.  Does the defense have

11   anything else to raise today?

12             MS. TAYLOR-SMITH:  I don't.

13             THE COURT:  Okay.  Thank you.

14         Thank you, Mr. Fitzsimons.

15             THE DEFENDANT:  Thank you, Your Honor.

16             THE COURT:  I'll see you in the morning, 10 o'clock

17   sharp, assuming the jail cooperates.

18             (Proceedings were concluded at 5:39 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3             I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                         Dated this 29th day of December, 2022.

10

11                         /s/ Nancy J. Meyer
                           Nancy J. Meyer
12                         Official Court Reporter
                           Registered Diplomate Reporter
13                         Certified Realtime Reporter
                           333 Constitution Avenue Northwest
14                         Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25